ROBBINS GELLER RUDMAN
 & DOWD LLP
JERRY E. MARTIN (20193)
CHRISTOPHER M. WOOD (254908)
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
jmartin@rgrdlaw.com
cwood@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

SOUTHERN DIVISION

| | |
|---|---|
| CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br> vs.<br><br>ASTEC INDUSTRIES, INC., BENJAMIN G. BROCK and DAVID C. SILVIOUS,<br><br>      Defendants. | Civil Action No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff City of Taylor General Employees Retirement System ("plaintiff"), by and through plaintiff's undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls, announcements, and U.S. Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Astec Industries, Inc. ("Astec" or the "Company"); analysts' reports and advisories about the Company; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Astec stock between July 26, 2016 and October 22, 2018, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Based in Chattanooga, Tennessee, Astec designs, engineers, manufactures, markets, and finances equipment and components, including aggregate crushers, pavers, asphalt plants, wood pellet plants, and related components. The Company comprises three segments: the Infrastructure Group; the Aggregate and Mining Group; and the Energy Group.

3. The Company's Infrastructure Group has been involved in the wood pellet plant business since approximately 2013, when Astec began commercial production and marketing of wood pellet plants to potential customers that supply wood pellets to the utility and home-use industries.

4.      The Company's pellet plants are made up of separate lines, with each line designed to produce 20 metric tons per hour ("TPH") of dense, dried wood pellets created from timber to be used as fuel for the creation of energy. During the Class Period, Astec's wood pellet plants were marketed and sold to customers seeking to serve the needs of European Union ("EU") utilities, whose goal was to use biomass fuels for a minimum of 20% of their overall energy production.

5.      Leading up to the start of the Class Period, the Company held itself out as the world's only single-source complete wood pellet plant manufacturer and touted the sale of two wood pellet plants, one in partnership with Highland Pellets, LLC, located in Arkansas, and one to Hazlehurst Pellets, located in Georgia.

6.      For the Hazlehurst plant, Astec financed its customer's purchase of the three-line facility for $60 million. The Hazlehurst plant was designed to produce 400,000 metric tons of pellets per year. Because it financed the purchase of the Hazlehurst plant, Astec could not recognize revenue from the plant until its customer paid off the financing. In July 2014, Astec told investors that the Hazlehurst plant was being financed for a period of 24 months.

7.      Astec described the Highland pellet plant as a four-line, 20 metric TPH per line plant capable of producing 600,000 metric tons of wood pellets annually. Astec was hired to design, install, test and get the Highland pellet plant running at full capacity. Astec stated the plant would become fully operational in the first quarter of 2018 and that it had "achieved recognition for being able to produce saleable pellets months ahead of what any competitive plant was able to accomplish to date." Astec received an initial down payment of $30 million on the plant in August 2015 and a final $122.5 million payment in March 2016.

8.      What the Company did not disclose during the Class Period was that its pellet plants suffered from significant and costly problems that prevented them from running at their promised

production capacity, posing a threat to the Company's pellet plant business, its overall financial performance, and its financial outlook.

9. News regarding problems with Astec's pellet plant projects reached the market through several partial disclosures. On July 25, 2017, defendants revealed "lower than expected" margins for Astec's wood pellet plant due to underestimated installation costs, but Astec refused to disclose the amount of the underestimated cost. This partial disclosure caused the price of Astec stock to decline by approximately 8% on July 25, 2017.

10. On July 24, 2018, defendants surprised the market when they reported disappointing financial results for Astec's second quarter of 2018 ("2Q2018"), abruptly announcing that the Company would substantially limit its wood pellet business, that it was giving up on its plans to engineer and develop the Highland wood pellet plant in Arkansas, and that it was limiting its participation in the development of other new pellet plants. Among other things, the Company reported a 143% decrease in earnings per share ("EPS") and stated that it would pay $68 million and forgive an additional $7 million in receivables to exit its contract for the Highland pellet plant after failing to resolve problems with the plant and meet a key deadline in the Company's sales contract with Highland. The Company also announced it had retained an outside consultant to conduct a strategic sourcing review to reduce costs and that the Board of Directors (the "Board") was reviewing the Company's overall capital allocation strategy.

11. In response to these disclosures, the price of Astec stock fell significantly, dropping 20%, or $12.59 per share, to close at $48.21 per share on July 24, 2018, on elevated trading volume.

12. Then, before the market opened on October 23, 2018, the Company surprised investors again by reporting third quarter 2018 ("3Q2018") results that fell well short of the low end

of the Company's guidance and the market's expectations. Among other things, the Company reported that:

- "Net sales for the third quarter of 2018 were $256.6 million compared to $265.5 million for the third quarter of 2017, a 3.4% decrease. Domestic sales decreased 7.5% to $194.2 million for the third quarter of 2018 from $209.9 million for the third quarter of 2017."

- "Net income for the third quarter of 2018 was $7.0 million or $0.30 per diluted share, compared to net income of $12.1 million or $0.52 per diluted share for the third quarter of 2017, a decrease in earnings per share of 42.3%."

13. The October 23, 2018 earnings release also stated that the Company's domestic backlog, a key indicator of the Company's future financial performance, decreased 28.1% to $223.2 million at September 30, 2018, down from $310.4 million at September 30, 2017.

14. The Company's poor results prompted a downgrade from William Blair & Company, L.L.C. ("William Blair"), who stated that Astec "continues to disappoint" and "has squandered the entire upside in its end-markets" and "destroyed value through poor execution and other factors such as the performance of its pellet plants." William Blair added that "[w]e can no longer give management any benefit of the doubt on its optimism" and labeled the Company's 3Q2018 results "[a]nother [d]isaster."

15. The market reacted swiftly and negatively to the Company's poor 3Q2018 financial results. After closing at $47.27 per share on October 22, 2018, Astec stock opened at $43.11 per share and continued falling to a close of $35.51 per share on October 23, 2018, a decline of nearly 25%, on heavy trading volume of nearly 1.6 million shares traded.

16. On January 22, 2019, Astec unexpectedly announced that Benjamin Brock ("Brock"), had resigned as President and Chief Executive Officer ("CEO") and as a member of the Board, effective as of the close of business on January 21, 2019.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

18.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District.  The Company's headquarters are located in this District at 1725 Shepherd Road, Chattanooga, Tennessee 37421.

20.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21.     Plaintiff City of Taylor General Employees Retirement System purchased Astec stock as described in the attached certification, which is incorporated herein by reference, and suffered damages as a result of the conduct alleged herein.

22.     Defendant Astec is incorporated in Tennessee and has its headquarters in this District.  Shares of Astec stock trade on the NASDAQ under the ticker symbol "ASTE."

23.     Defendant Benjamin G. Brock was the Company's CEO and President, a member of the Company's Board, and a member of the Board's executive committee.  Brock resigned from these positions on January 21, 2019.

24. Defendant David C. Silvious ("Silvious") is the Company's Chief Financial Officer ("CFO"), Treasurer and Vice President.

25. Defendants Brock and Silvious are collectively referred to as the "Individual Defendants." Each of the Individual Defendants acted and/or made the statements detailed herein in his capacity as an officer and/or director of Astec. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Astec's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

26. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Astec. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Astec stock was a success, as it: (i) deceived the investing public regarding Astec's prospects and business; (ii) artificially inflated the price of Astec stock; and (iii) caused plaintiff and other members of the Class (defined below) to purchase Astec stock at artificially inflated prices and suffer damages when that artificial inflation was removed from the price of Astec stock.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Astec stock during the Class Period (the "Class"). Excluded from the Class are defendants and their immediate families, the officers, directors and affiliates of defendants, at all relevant times, and their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Astec trades on the NASDAQ and has millions of shares outstanding, owned by hundreds, if not thousands, of persons.

29.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

        (a)     whether defendants violated the Exchange Act;

        (b)     whether statements made by defendants to the investing public omitted and/or misrepresented material facts about Astec;

        (c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

        (d)     whether defendants knew or recklessly disregarded that their statements were false and misleading;

        (e)     whether the price of Astec stock was artificially inflated; and

        (f)     the extent of damages sustained by Class members and the appropriate measure of damages.

30.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

31.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

32.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

33.     In the late 2000s, the EU began subsidizing burning wood for electricity under the presumption that doing so would be more environmentally friendly than coal or other traditional power generation methods.  To feed the wood-burning boilers of EU power plants, many EU-based companies started importing wood pellets from the United States.  As a result, the southern United States became the world's largest wood pellet supplier, with EU-based power companies importing more than 4.7 million metric tons of U.S. wood pellets each year, up from just 500,000 tons in 2009.

34.     A wood pellet manufacturing plant has two main tasks:  to dry the wood to a point where it is efficient to burn in power plants and to turn the whole trees into pellets for easy transport.  To begin the process, felled trees typically arrive by truck.  Once at the facility, trees are debarked and then chipped in shredding machines called hammermills.  The wood is then conveyed to a dryer, usually a large rotary dryer heated by burning wood and bark, where the moisture in the wood is reduced from about 50% by weight to around 10%.  After the dryer, the wood is again processed by hammermills to reduce its size to a point where it can be formed into pellets.

35.     The next unit is the pellet press, which presses the wood through holes in a die to create pellets, a process that requires large amounts of pressure and heat.  The pellets are then

deposited into a pellet cooler to reduce their temperature back to safe levels. The pellets are then ready for transport to a port, where they are usually stored for some time before being shipped to Europe. A typical facility produces between 50 and 70 tons of wood pellets per hour, or between 450,000 and 650,000 tons per year.

36.     Astec's wood pellet plants have been in commercial production since 2013. The Company's pellet plants use a modular design that includes replicated parallel production lines (for example, a 60 TPH plant consists of three 20 TPH lines), which the Company has touted as resulting in very few points in the process where any individual equipment failure can shut the entire plant down. For example, in the Company's 2017 annual report filed with the SEC on Form 10-K, Astec discussed the superior design of its pellet plants, as well as the turnkey nature of its pellet plant business, stating:

> In most other pellet plant designs, one small equipment failure, such as a dryer outage, would result in a total plant shutdown. If a dryer outage were to occur in a 60 TPH Astec plant, the plant could continue to operate at 40 TPH. In fact, there are very few reasons why the plant would ever be completely shut down. Even major maintenance cycles may be performed line-by-line while the plant continues to operate on the other lines.

*     *     *

> The Company believes that it is the only company offering a single source for a complete pellet plant, as known competitors only sell individual plant components thereby requiring the customer to purchase the remaining plant components from other sources.

37.     The Company's first pellet plant order was for a three-line facility located in Hazlehurst, Georgia. Rather than sell that plant, the Company financed it with the buyers for $60 million, meaning Astec could not recognize revenue from the plant until the loan was repaid. Astec did, however, include the plant in its reported inventory.

38.     On August 20, 2015, the Company announced it had entered into an agreement and received a related down payment to build, deliver and install the first production line of a new

turnkey wood pellet production facility in Arkansas. The Company's $30 million agreement with Highland Pellets, LLC included the option to add additional production lines, related equipment and installation services. The Company disclosed that the potential add-ons "could bring the total order amount to $143 million." Astec stated it expected to deliver the first production line and related equipment no later than early 2016. The Company disclosed that it was not financing the order, and that it would "generally recognize revenue on the first production line and any subsequent production lines when they are delivered to Highland Pellets."

39.     Announcement of the Highland pellet plant was seen as a way for Astec to offset slower revenue growth in its Infrastructure Group, which at the time accounted for approximately 40% of the Company's sales. It was also seen as an additional growth area for the Company, with Astec poised to take advantage of the growing demand for wood pellets in the EU.

40.     On March 30, 2016, the Company announced that it had been asked to build an additional $122.5 million of equipment to round out the initial $30 million order for the first production line of the multi-line Highland pellet plant, bringing the total project order to $152.5 million.

41.     On May 3, 2016, *Bloomberg Intelligence* reported that increased demand for Astec's wood pellet plants "may help mitigate weakness in the Energy and Aggregate and Mining businesses amid a global mining slowdown and lower oil prices. . . . While pellet demand has slowed in recent years because of warm winters in Europe, Astec could book another $100 million order by the end of 2016, with a goal of one to one-and-a-half plants a year."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

42.    The Class Period begins on July 26, 2016, when the Company reported its second quarter 2016 ("2Q2016") financial results.  Discussing the pellet business, the Company's release quoted defendant Brock as stating:

> "Our backlog is up 58.8% versus last year.  The majority of the increase is in the Infrastructure Group, again mainly as a result of the Federal highway bill and the $122.5 million pellet plant order announced during the first quarter."

43.    Also on July 26, 2016, the Company hosted a conference call to discuss its financial results.  Defendant Brock stated that the Company was "able to recognize $18 million in pellet plant revenue during the [second] quarter" and added:

> Changing subjects to the Hazlehurst, Georgia pellet plant, that's the original pellet plant that we shift [sic] that we have discussed on several calls.  As a continual reminder, it's a new product that we chose to finance at the time.  As a result, we will recognize the revenue for this plant as we are paid.  This will have an effect on our cash and inventory until it's paid in full.  ***The order for all three lines was for $60 million and we expect the final payment in 2017***.  As a reminder, the interest rate on the note is 6%.
>
> We were pleased to report the $122.5 million pellet plant during the first quarter.  And as a reminder, it's an add-on to the $30 million order that we recognized during the first quarter with Highland Pellets bringing in a total project order amount to $152.5 million.  ***As we mentioned on our last call, our plan is to recognize the $122.5 million order as follows.  During the second quarter we recognized $18 million, during the third quarter we would anticipate recognizing about $20 million, during the fourth quarter of about $35 million.  The balance of the order, which is around the $45 to $50 million, will be recognized in 2017 as site work, installation and start-up are completed***.
>
> ***Updating our current pellet plant quote activity, we do have ongoing quote activity for new projects and we believe that we will have a new larger order late this year.  We believe that that order will be in the range of $80 million***.  As a reminder, these deals are long and complicated to get across the line.  While we are optimistic that a new project will happen by the end of this year, it could always be longer than we anticipate.

44.    When asked about the Company's anticipated $80 million pellet plant order, defendant Brock touted the expansion of Astec's pellet plant business, stating:

I think that one is pretty square, but ***I would say we're talking to probably as many as ten people with five of them being pretty serious. So, it's not the only one that we think can happen in the next 12 months or so***. And we can deliver the whole 80 of that next one next year if it came soon enough, but it would have to be pretty close to the end of the year for us to do that.

45. During the call, defendants were also asked about expectations for pellet plant demand. Defendant Brock responded:

> ***This is Ben, with whom we are talking with, 1 to 1.5 of these plants in 2017 is our goal and what we're working for. We would love to have it sooner than later, so we can balance demand and keep openings for our asphalt plants. But our goal would be in the $100 million to $125 million range of revenue in 2017 with pellet plants***.

46. When asked about the "original [pellet] plant that [Astec] financed, [and] what remains for you to get paid on the $60 million," defendant Brock stated:

> [S]o there is almost all the $60 that's due, I mean, that we still have financed with Hazlehurst. ***And more color on that, all three lines have run pellets at production. What we needed to do is be able to burn wood exclusively on each line and we hit a wall on that on our burners, so we're replacing the burners. So the testing, proving that the lines will do what we said on tons per hour is fine. The other two have the new burners on, they are running. We have to put the third burner in, but they could get financing on that plant without it and that's the rest of the story.***
>
> ***I want to make sure everybody understands, we're not in a jam and at risk or anything, because there is no risk. We have met that and we are in good shape. But as far as how much money do we still have to collect, we have collected a little interest, but we were just thinking about it internally, it is about $60 million plus the interest***.

47. On August 5, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for 2Q2016, which reaffirmed the financial results announced in the July 26, 2016 press release. The 2Q2016 Form 10-Q was signed by defendants Brock and Silvious and included signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the 2Q2016 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading.

48.     On October 25, 2016, the Company reported its third quarter 2016 ("3Q2016") financial results, reporting a 17% increase in net sales to $247.8 million and EPS of $0.30, a 200% increase over the EPS of $0.10 in the prior year's third quarter. The Company reported that its domestic backlog increased 69% to $325.6 million and that total backlog increased 55% to $389.3 million at the end of 3Q2016. The release quoted defendant Brock as stating:

> "We were pleased to improve our earnings by 200% in the third quarter versus the third quarter of last year. **We were able to secure and ship orders at a more profitable rate during the quarter mainly due to favorable infrastructure and wood pellet equipment activity**."

> . . . "Despite our strong overall performance, we still face several challenges. Low oil and natural gas prices have hurt our Energy Group sales. The mining slowdown has hurt our Aggregate and Mining Group sales. The strong U.S. Dollar continues to affect our ability to export from our U.S. based operations. Nonetheless, our year-to-date revenues are up 7% and our year-to-date earnings are up 47% versus last year. **These positive results are mainly due to good domestic markets for our equipment targeted at the infrastructure and wood pellet industries** and execution of our margin improvement plans at our operating subsidiaries. Finally, we are also pleased to report that our backlog is up 55% versus last year indicating continued strong demand for our products."

49.     On October 25, 2016, the Company hosted a conference call to discuss its 3Q2016 financial results. Discussing the pellet plant business, defendant Brock stated:

> *Updating our current pellet plant quote activity, we do have ongoing quote activity for new projects, and we believe that we will add a new large order late this year or early next year for delivery in 2017. We believe the order will be in the range of $50 million rather than the $80 million we mentioned on our last call. We're also working on new projects that are in the $100 million range each. Based on what we know today we project that our pellet plant revenues will be in the range of $100 million to $125 million in 2017. This includes the remaining $45 million to $50 million that we anticipate from the Highland Pellets project.*

> *This projection does not include the $60 million Hazlehurst Wood pellet plant. Assuming we are paid on Hazlehurst in 2017, it would be in addition to our projection*, however, as mentioned on prior calls we would only breakeven on the revenue. As a reminder, these deals are long and complicated to get across the line.

> While we are optimistic that a new project will happen in the timeframe mentioned, it could always be longer than we anticipate.

50. On November 7, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for 3Q2016, which reaffirmed the financial results announced in the October 25, 2016 press release. The 3Q2016 Form 10-Q was signed by defendants Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 3Q2016 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading.

51. On November 8, 2016, Astec participated in the Robert W. Baird Global Industrial Conference, where defendant Brock talked about the Company's pellet plant business, stating, in part:

> *We see the opportunity in this business in the next five years in the range of 35 to 50 plants being sold in the US. They would be in the size range of $100 million each. Our goal would be to get our fair share of them. We will not sell that many. So please don't put that down and say, boy, they are going to sell that many wood pellet plants. We're not going to sell that many wood pellet plants, but we would do our best to get a good fair share of those; maybe half over that five-year period*.

52. On February 21, 2017, the Company issued a press release to report its fourth quarter 2016 ("4Q2016") and full-year 2016 financial results. The release reported significant improvement in several financial metrics when compared to prior periods, stating:

> Net sales for the fourth quarter of 2016 were $326.6 million compared to $215.0 million for the fourth quarter of 2015, a 52% increase. Earnings for the fourth quarter of 2016 were $12.4 million or $0.53 per diluted share compared to $3.6 million or $0.16 per diluted share in the fourth quarter of 2015, an increase in earnings per share of 231%.

> Domestic sales increased 65% to $265.0 million for the fourth quarter of 2016 from $160.3 million for the fourth quarter of 2015. International sales increased 13% to $61.6 million for the fourth quarter of 2016 from $54.7 million for the fourth quarter of 2015.

> Net sales for 2016 were $1.147 billion compared to $983.2 million for 2015, a 17% increase. Earnings for 2016 were $55.2 million or $2.38 per diluted share

compared to $32.8 million or $1.42 per diluted share for 2015, a 68% increase in earnings per share.

Domestic sales increased 30% to $941.3 million for 2016 from $722.3 million for 2015. International sales were $206.2 million for 2016 compared to $260.9 million for 2015, a 21% decrease.

The Company's domestic backlog increased 13% to $294.8 million at December 31, 2016 from $261.8 million at December 31, 2015. The international backlog at December 31, 2016 was $62.6 million compared to $54.1 million at December 31, 2015, an increase of 16%. Total backlog increased 13% to a year-end record of $357.4 million at December 31, 2016 from $315.9 million at December 31, 2015.

53. The release quoted defendant Brock as stating, in relevant part:

"We were pleased with our results for the fourth quarter and for the year. We were able to grow revenues and net income both quarter over quarter and year over year. At the same time, we were able to grow our backlog at December 31, 2016 to $357.4 million, a December record."

. . . "***The domestic market was strong for our Infrastructure Group's products*** targeted at the road construction industry and ***the group also recognized better than expected wood pellet plant revenues***."

54. On February 21, 2017, the Company hosted a conference call to discuss its 4Q2016 and full-year 2016 financial results. At the start of the call, defendant Silvious stated:

***Our fourth quarter revenues were boosted by the recognition of higher than expected pellet plant revenues based on where we are in the delivery and in the construction schedule on that project***.

55. In his prepared remarks during the call, defendant Brock stated:

As David covered during his comments, ***we recognized a much larger than anticipated $70.6 million in pellet plant revenue during the quarter. Frankly we're just ahead of where we thought we were. It's a big project but I guess if you're going to be ahead it's better than being behind, but $70.6 million in pellet plant revenue during the quarter***.

56. Discussing the pellet plant business, defendant Brock revealed that Astec had significantly extended the payment deadline on the Hazlehurst plant, stating:

***In December we agreed with the partners at Hazlehurst to extend the loan term to final payment due in December 2018 in lieu of July 2017. Given the fact***

*that Hazlehurst has been a good partner, they helped us get into the business, and have allowed several potential customers including, Highland Pellets, our second pellet plant we sold, to visit the site for sales purposes we agreed to the extension. The main reason for the extension is a temporary low in wood pellet demand that is widely expected to recover late this year. We now expect the final payment in December 2018 and as a reminder the interest rate on the note is 6%. With regards to Hazlehurst please keep in mind that we are carrying it on our books at breakeven. So its effect to us is really only our inventory and cash*.

57.     Continuing to discuss the status of Astec's pellet plant business, defendant Brock added:

> *As most of you on the call know today we were pleased to be on schedule all year long during 2016 in our revenue recognition of our $122.5 million with pellet plant order with Highland Pellets. This was the $122.5 million portion of a total order of $152.5 million.*
>
> *As a reminder our plan was to recognize the $122.5 million order as follows: in the second quarter about $20 million, and ended up about $18 million; in the third quarter about $20 million and ended up at $19 million; in the fourth quarter we expect to recognize about $35 million for a total of about $105 million in 2016. And as mentioned earlier again during David's comments and in mine we ended up recognizing $70.6 million in the fourth quarter.*
>
> *This leaves us with approximately $15 million to $20 million that we expect to recognize on the Highland Pellets project during 2017. Margin on the amount left to recognize is slightly below normal major equipment margins, as it is site work, installation, start-up type work*.
>
> \*          \*          \*
>
> *Based on what we know today and because we are now ahead on the Highland Pellets revenue recognition we project that our pellet plant revenues will be in the range of $40 million to $50 million in 2017. This includes the remaining $15 million to $20 million that we anticipate from the Highland Pellets project*. As we have said many times wood pellet plant deals are long and complicated to get across the line. While we are optimistic that a new project will happen in the timeframe mentioned it always could be longer than we anticipate.

58.     On March 1, 2017, the Company filed with the SEC its annual report on Form 10-K for 2016, which reaffirmed the financial results announced in the February 21, 2017 press release. The 2016 Form 10-K was signed by defendants Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2016 Form 10-K was accurate

and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 2016 Form 10-K touted the superior design of Astec's wood pellet plants, stating:

> Astec's wood pellet plants have been in commercial production since 2013. Astec's modular design for its wood pellet plants includes replicated parallel production lines (for instance, a 60 ton-per-hour ("TPH") plant consists of three 20 TPH lines) resulting in very few points in the process where any individual equipment failure can shut the entire plant down. In most other pellet plant designs, one small equipment failure, such as a dryer outage, would result in a total plant shutdown. If a dryer outage were to occur in a 60 TPH Astec plant, the plant could continue to operate at 40 TPH. In fact, there are very few reasons why the plant would ever be completely shut down. Even major maintenance cycles may be performed line-by-line while the plant continues to operate on the other lines.

59.   On April 25, 2017, the Company issued a press release announcing its first quarter 2017 ("1Q2017") financial results, which revealed that the Company's domestic backlog had decreased by 25% to $290.4 million, down from $387.9 million at the end of the prior year's quarter, and that the total Company backlog had decreased 18%. If Astec's pellet plants were excluded from the backlog, however, the Company reported that its total backlog had increased by 14%.

60.   Also on April 25, 2017, the Company hosted a conference call to discuss its 1Q2017 financial results. In his prepared remarks during the call, defendant Brock stated:

> *Our Infrastructure Group backlog was down 32% mainly due to not having a large pellet plant on order*. This group continued good order intake on non-pellet plant projects during the quarter, mainly a result of the Federal Highway Bill in United States and improved international shipments.

> \*      \*      \*

> Domestic backlog was down 25% year-over-year, and international backlog was up 40%. *Our lower backlog in domestic was primarily due to not having a large pellet plant on order*. Domestic backlog, excluding pellet plants, was up 7%.

> \*      \*      \*

Changing subjects to the Hazlehurst, Georgia pellet plant that we have discussed on several calls, as a reminder, it was a new product that we chose to finance. As a result, we'll recognize the revenue for this plant as we're paid. This will have an effect on our cash and inventory until it's paid in full. The order for all three lines of this plant was for $60 million. **_We expect the final payment in December of 2018_**. As a reminder, the interest rate on the note is 6%. With regards to Hazlehurst, please keep in mind that we are carrying it on books at breakeven, so its effect to us is in our inventory and cash.

_**Regarding the Highland Pellet plant in Arkansas, we are down to approximately $8 million in revenue that we expect to recognize on the Highland Pellets project during the rest of 2017. Margin on the amount left to recognize is slightly below normal major equipment margins, as it is site work, installation, and start-up type work**_.

*     *     *

_**Based on what we know today and because we are now ahead on the Highland Pellets revenue recognition, we continue to project that our pellet plant revenues will be in the range of $40 million to $50 million in 2017**_. As we have said many times, wood pellet plant deals are long and complicated to get across the line. While we are optimistic that a new project will happen in the timeframe mentioned, it always could be longer than we anticipate.

61.     On May 8, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for 1Q2017, which reaffirmed the financial results announced in the April 25, 2017 press release. The 1Q2017 Form 10-Q was signed by defendants Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 1Q2017 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading.

62.     On July 25, 2017, the Company issued a release announcing its second quarter 2017 ("2Q2017") financial results for the quarter ended June 30, 2017. Among other things, the release stated that while the Company's 2Q2017 Infrastructure Group revenues had declined by 6.1%, falling from $152.5 million in 2Q2016 to $143.1 million in 2Q2017, the group's 2Q2017 profit had declined by 49.7% from its 2Q2016 levels. The release stated:

Net sales for the second quarter of 2017 were $301.9 million compared to $294.4 million for the second quarter of 2016, a 3% increase. Earnings for the second quarter of 2017 were $14.4 million or $0.62 per diluted share compared to $18.2 million or $0.79 per diluted share for the second quarter of 2016, a decrease of 22% per diluted share.

*     *     *

The Company's backlog at June 30, 2017 was $352.4 million compared to $371.3 million at June 30, 2016, a decrease of $18.9 million or 5%. Domestic backlog decreased 13% to $276.2 million at June 30, 2017 from $316.4 million at June 30, 2016. The international backlog at June 30, 2017 was $76.2 million compared to $54.9 million at June 30, 2016, an increase of 39%. All prior year backlog amounts have been recast to include the backlog of Power Flame Incorporated which was acquired on August 1, 2016.

Excluding pellet plant backlogs of $65.1 million and $144.4 million at June 30, 2017 and 2016 respectively, the Company's June 30, 2017 backlog increased $60.4 million or 27% compared to June 30, 2016.

63.     The July 25, 2017 release also quoted defendant Brock as stating, in part:

"Although we were not pleased with our net income for the quarter, we were pleased that we were able to grow sales while also shipping several new products during the quarter. While the costs associated with building new products and getting them going in the field negatively affected our results as we expected, *significantly lower than expected margins on pellet plant installation were our primary disappointment for the quarter*."

64.     On July 25, 2017, the Company hosted a conference call to discuss its 2Q2017 financial results. During his prepared remarks, defendant Brock stated:

Changing subjects to the Hazlehurst, Georgia pellet plant that we've discussed on several calls, as a reminder, is a new product we chose to finance. As a result, we'll recognize the revenue for this plant as we're paid. *This will have an effect on our cash and our inventory until we are paid in full. The order for all 3 lines is for $60 million. We expect that final payment in December of 2018*. And as a reminder, the interest rate on the note is 6%. With regards to the Hazlehurst plant, please keep in mind that we are carrying on our books at breakeven, so its effect to us is in our inventory and cash.

Regarding the Highland pellets plant in Arkansas, we are down to approximately $4.8 million in revenue that we expect to recognize on the Highland pellets project during 2017. *We have projected gross margin on the amount left to recognize. It's slightly below normal major equipment margins for the site work, installation, start-up, etc. The actual margin during the quarter was significantly*

*less than we anticipated and represents the main difference between our estimate at the end of last quarter and our actual result not only in Infrastructure Group but for the company as a whole.*

*We're not going to sugarcoat this underestimated cost. It was a big miss on our part and it was a major issue with our net income result for the quarter. We've identified the root cause of our miss on this estimated cost and it won't happen again. As a result, we do not anticipate a significant margin effect moving ahead on this project.*

*With regards to the pellet plant revenues for this year, we had felt we had a good opportunity to add a large pellet plant order during the third quarter, which would have given us a chan[c]e to deliver a portion of the plant during the fourth quarter this year. That opportunity has passed as we have earned enough infrastructure-related business to make delivery on any new pellet plant order not possible in 2017. As a result, we now project that our pellet plant revenues will be in the range of $20 million to $25 million in 2017.*

65.     When asked to provide "a little more color" as to what the pellet plant cost issues were that impacted margins, defendant Brock responded:

*At the end of the day, when we were putting the plant up, we had a late add-on in the process, a change order with the construction firm that was our sub. We had a cost miss estimate really mainly by our guys and what we thought it would cost. It's embarrassing. It's a big mistake but it's a mistake made and it's one that's behind us. And we know how we would handle that going forward. But it is behind us. It's not something that shows back up again.*

66.     In response to these partial disclosures, the price of Astec stock dropped approximately 8% on July 25, 2017.

67.     On August 7, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for 2Q2017, which reaffirmed the financial results announced in the July 25, 2017 press release. The 2Q2017 Form 10-Q was signed by defendants Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2Q2017 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 2Q2017 Form 10-Q stated, in relevant part:

Consolidated gross profit decreased $7,928 or 10.8% to $65,524 for the second quarter of 2017 compared to $73,452 for the second quarter of 2016. Gross profit as a percentage of sales decreased 330 basis points to 21.7% for the second quarter of 2017 compared to 25.0% for the second quarter of 2016 due to changes in product mix, increased costs associated with new products and **pellet plant installation cost overruns**.

Consolidated gross profit decreased $4,112 or 2.8% to $141,296 for the six months ending June 30, 2017 compared to $145,408 for the six months ending June 30, 2016. Gross profit as a percentage of sales decreased 260 basis points to 22.8% for six months ended June 30, 2017 compared to 25.4% for the six months ended June 30, 2016 due to changes in product mix, increased costs associated with new products and **pellet plant installation cost overruns**.

\*       \*       \*

Infrastructure Group: Segment profit for this group was $9,893 for the second quarter of 2017 compared to $19,673 for the same period in 2016, a decrease of $9,780 or 49.7%. Segment profits for the Infrastructure Group were negatively impacted by a $9,763 decline in gross profits between periods resulting from a $9,370 decline in sales between periods and a 530 basis point decrease in gross margins. **The decline in gross margins was primarily due to unexpected cost overruns associated with pellet plant site preparation and installation costs** and increased production costs related to new products sold.

68.     On October 2, 2017, Astec issued two press releases. One announced the Company's acquisition of RexCon, LLC, a concrete batch plant manufacturer. The second release announced "**substantial design upgrades**" to correct "**design flaws**" at its pellet plants so they could "**achieve full production**." The "**significant design upgrades**" to the Georgia and Arkansas plants were labeled an "**additional investment**" that would "**negatively impact Astec's third quarter earnings by $0.54 to $0.58 per share**." The release quoted defendant Brock as stating:

> "**In the last 45 days, we identified significant design issues at our customers' Georgia and Arkansas wood pellet plants driven by the need for both facilities to achieve full production rates. Upon learning of these design flaws, which were different at each plant, we identified a clear path to success. In addition, this past Friday [September 29], we completed an updated analysis of the necessary all-inclusive investment needed to deliver on our commitments to our customers with regard to production rates** . . . . While we are very disappointed to be announcing this added investment to achieve full production in Georgia and Arkansas, one of our core values is delivering superior service to our customers."

. . . *"We remain very confident in the near-term and long-term outlook for the wood pellet business and believe it has been a good investment for our company. In total, we will have invested approximately $31 million over seven years to open up an opportunity for a $100 million per year business*."

69.     Purporting to describe the problems at each plant, the October 2, 2017 release added:

**Georgia Plant**

In December 2010, Astec, Inc., a subsidiary of Astec Industries, opened a work order to design, build, erect and operationally run a 5 ton per hour prototype pellet plant. The prototype plant, which ran at Astec, Inc. from September 2011 through May 2012, supported the company's entry into the market and ushered in its largest order at the time, with Hazlehurst Wood Pellets in Georgia. *While the last segment of that order was received on January 30, 2014, due to market conditions the plant had been run with natural gas as the fuel source and was not run at full capacity. Market conditions have since improved, and as a result, the plant needs to run at full capacity utilizing wood as its fuel source. This led to the identification of the aforementioned design flaws that will need to be corrected*.

**Arkansas Plant**

*Significant design issues at the company's Highland Pellets plant in Arkansas were also recently identified as production has increased. As communicated during Astec Industries' second quarter 2017 earnings conference call, the construction-related cost issue is no longer impacting the company's performance and is unrelated to the recently identified design issues*.

70.     Also on October 2, 2017, the Company hosted a conference call to discuss its RexCon acquisition and the "design upgrades" to its pellet plants. In his prepared remarks, defendant Brock stated:

*As we look to ramp up production rates [at Hazlehurst,] a series of the design flaws were uncovered, and we are working diligently to correct them. We have been working with being fired on wood for some time, but we only recently identified the ultimate fix as we attempted to ramp up production*. Our experience at the Georgia site gave us the confidence to pursue the largest single order in our history with Highland Pellets in Arkansas. The last segment of this order was received in March of 2016. *This plant has also been running at low production rates, and as we ramped up production we found design flaws as well that are different than those we experienced in Georgia*.

*I want to reiterate the design flaws we uncovered in Georgia and Arkansas were identified in the last 45 days*. In addition, to avoid any confusion, in Arkansas these upgrades are unrelated to the construction related cost issues we experienced

last quarter, which we believe are behind us. While the design issues are not identical at both sites, they each require our full attention and effort to get them to full production. ***We are confident in our ability to do so for our customers, and the investment we have announced is the amount that we believe will cover the entire cost associated with completing our commitments to our customers with regards to production rates***.

> ***Despite today's announcement, we are very confident in the near term and long term outlook for pellet plants and our success at these sites will put us in a strong leadership position for orders as we move ahead. Including today's announced charge we will have invested approximately $31 million over seven years to get into what we believe is a $100 million per year business***. We believe that the investment is a good one for our company.

71.    During the question-and-answer portion of the October 2, 2017 call, defendants were asked when they became aware of the need to make upgrades to the plants, why the need for the changes was not known when the plants were built, and why the Company was paying for an upgrade to a customer plant. In response, defendant Brock stated:

> Originally, when the plant was bought, Hazlehurst did not go for the long-term supply contract, was really going more on the open market when the private supply of pellets, they got more per ton. It got warm in Europe and that market fell apart, so market conditions really went down and the need for large scale production there wasn't necessarily there. If you'll recall, we agreed, we went longer on the loan to December of 2018. When we did that, they were facing that but also they helped us get in the business. They did a great job with us and gave us something to show, and that actually led to us being able to get the Hazlehurst order.

> ***We knew we needed to fire on wood. We started working on that, did a lot of work on that, and really didn't find that we had the issues that we needed to fix until the last 45 days when we tried to ramp up to full production on wood. We run well on natural gas, have really pretty good success on that, pleased with that. They are running pellets. They are selling pellets. But we need to run full production on wood if they are going to get a long term supply contract that they have an opportunity for***.

> ***I hope that answers the question. But until we stared [sic] to ramp up and go full bore on wood, we knew we had to do it, couldn't identify the issues that, I hate to say reared their ugly head, but that's kind of what they are. And we're working on it now as we speak***.

*      *      *

*Each line at Hazlehurst is 15 tons per hour, and so until we really had to ramp up and run on wood at full production rate we didn't identify that on the lines. And that is our design flaw, that's not the customer's to fix.*

72.     When asked whether the design flaw would impact the Company's ability to secure more pellet plant business and whether the Company needed to evaluate its current bids and project negotiations, defendant Brock stated:

*We are definitely reevaluating those as we find out what we found out. We are not going to accept a new order until we're across the line at these two sites. We don't think that would be a good idea, although we do have several inquiries.*

We feel like at Georgia, timing-wise, we actually thought we'd be early November. The hurricane that came through Florida dumped a lot of rain and wreaked havoc on things down there, so that delayed us. We're probably into November, the first week of December on finishing there. *Then April 15th is our furthest out date that we believe we'd be finished and proving out at Arkansas. We actually have a timeline that shows earlier than that internally, but that's our drop dead date is April 15th.*

*Based on that, we would anticipate another order sometime in Q2, with some of that volume having a good chance of being in Q4. We'd have to be probably pretty lucky to have it in Q3, so we're looking at in the range of maybe $15 million in pellet plant revenue in 2018, and then that would be a piece of a larger plant. We have very good confidence in this business and seeing it as a $100 million business going forward, and that would be in 2019. We see it as being a profitable business in goods and gross margin.*

73.     As he continued, defendant Brock revealed a change in the Company's pellet plant strategy:

Then, the other thing I would add to it is we are not going to be a construction company going ahead. If somebody else wants to be the full EPC contractor, that's great. We're going to be equipment suppliers. We're not construction guys, we found that out, so we are happy to be a part of a bigger group that's doing that, but our expertise is in supplying equipment. So, we aren't going to be taking on the general contract going forward.

74.     As the call continued, a Robert W. Baird analyst asked:

I was going back through the last several conference call transcripts, and back in July of 2016 you talked, and my question's also on Hazlehurst, you talked about needing to burn wood exclusively on each line and so you were replacing the burners and you were testing them, improving the new burners. In October of 2016, you said line two

is now running and has met the production targets in early start up. So, is this the same issue that you were talking about last summer that they needed to burn wood exclusively and you were swapping the burners? It seemed like that had been done, and again, at least in October line two had met its production target and really nothing was mentioned on this issue the last several calls. Is this the same issue about switching to burning wood?

75. In response, defendant Brock provided more detail on the Company's pellet plant

problems; stating:

> Kind of, Joe. **The only thing is that as we ramped up and needed to get all three going, another thing we've run into is a baghouse issue related to the dust that's created from burning the wood. We could get up to the 15 tons per hour, and we would run for some time, and then we would hit a wall on dust collection, and so we were trying different methods to get there.** But the absolute need to get to 45 tons really hadn't surfaced at that point. It's there now, so **there's baghouse related issues**.

> **Also, we're burning wood that has bark in it, that has sand in it, and at the temperatures that we use in the combustion chamber, when it gets hot it creates glass build up that needs to be cleaned out. That won't necessarily go away 100% but we're trying to make it to where the time between cleanouts is long enough that it makes sense. So, we're working on the combustion zone a little bit there.**

> **Then, the ash that's created with that wood and the bark wood will build up in the coils that have pins on them in the heater and we're fitting an apparatus to be able to just blow that off the pipes because that hurts your heat transfer. So, it's not just the burner this time, there's things behind the burner that have surfaced as we've gone to higher production rates.**

76. As the call continued, defendant Brock stated that there would be zero profit from

Hazlehurst and only the potential for "about a 5% gross margin still in at Highland." Later,

defendants were asked "how short you were in percentage terms, or maybe even tons per hour terms

on what you were supposed to guarantee and what you actually were running?" In response,

defendant Brock stated:

> **I think probably four lines at 20 tons per hour is the guarantee. We've had one of the lines up to that, and over it actually, but not for a long period of time. Where we're undersized is in the front end at the Hammermill site. It's mainly related to the particle size that they need at the press, and along with that there are some things in the main plant that we need to fix too. By the time you upsize the**

*green Hammermill capacity, the electrical, the site work, the controls of that, and the related things within the main plant, it's a big number.*

> *Thankfully, we've identified we have very high confidence in getting there. So, they're different issues, there are different burners at each site, and so the creation of the dust, we don't anticipate that being an issue at Highland in Arkansas because they're different type burners. But it's more of a front end issue that gets related through the whole plant to the press for the particle size at Arkansas.*

77. When asked whether pellet plants are sustainable if they burn wood as their fuel source, defendant Brock stated that to take advantage of the renewable fuel market in Europe, the pellet plants needed to run off of burning wood, stating:

> It comes down to where it's going, so for the sustainability piece of the utilities in the UK they need to burn wood for renewable fuel. If you want the ten-year supply contract, you're going to burn wood. If you're going to other markets, industrial private market, home heating, or other type markets, natural gas is an option. But they're also limited on natural gas, too, at the Hazlehurst site, so ultimately they need to run wood.

78. As the call continued, defendants were asked how the "setback on the Hazlehurst plant impact[s] the receivable that's outstanding?" In response, defendant Brock stated:

> *Right now, it does not. We don't plan on that being an effect. They are running it, selling pellets out of the plant. It's just at a low level, and this will help them secure a ten-year supply contract, and so we don't anticipate that changing.*

79. On October 24, 2017, the Company issued a press release announcing its third quarter 2017 ("3Q2017") financial results for the period ended September 30, 2017. The release stated that Infrastructure Group revenues dropped by 9.7%, falling from $109 million to $98 million, and that profit in the group swung to a loss, dropping 227% from a 3Q2016 profit of $9.8 million to a 3Q2017 loss of $12.5 million. The release added:

> Net sales for the third quarter of 2017 were $252.1 million compared to $247.8 million for the third quarter of 2016, a 1.7% increase. Domestic sales decreased 1.7% to $196.5 million for the third quarter of 2017 from $199.9 million for the third quarter of 2016. International sales were $55.6 million for the third quarter of 2017 compared to $47.9 million for the third quarter of 2016, an increase of 16.0%.

*The net loss for the third quarter of 2017 was $2.7 million, or $0.12 per share, compared to earnings of $6.8 million, or $0.30 per diluted share, for the third quarter of 2016, a decrease of 140.0% per diluted share. As previously announced, the company initiated significant design upgrades to its customers' Georgia and Arkansas wood pellet plants to meet full production rates, which negatively impacted earnings per share by approximately $0.59 during the third quarter of 2017.*

80.     The October 24, 2017 release quoted defendant Brock as stating, in part:

"While we exited the third quarter with a strong backlog, product mix and contracted delivery schedules have tempered our expectations for the fourth quarter. We believe that we still have a good opportunity to drive slight year-over-year sales growth for 2017; however, *our originally anticipated uptick in sales and earnings growth during the fourth quarter will be pushed into 2018. Sequentially, we expect earnings in the fourth quarter of 2017 will be slightly below this quarter's earnings, adjusting for the wood pellet investment*. As we look to 2018, we are very optimistic on our outlook given our backlog, quote activity and conversations with our customers."

81.     On October 24, 2017, the Company hosted a conference call to discuss its 3Q2017 financial results. During his prepared remarks, defendant Brock discussed the Company's pellet plant business, stating:

*On October 2nd, we did announce that we had initiated the significant design upgrades to our customers' plants in Georgia and Arkansas to meet full product[ion] for wood pellets. We identified significant design issues that are at the Georgia and Arkansas pellet plant sites driven by the need for both facilities to achieve full product rates. Upon learning on those design flaws which were different in each plant, we identified a clear path at both sites to achieve the necessary results for our customers in the near-term*. As many of you know, one of our core values is delivering superior service to our customers, and *we have a high level of confidence that we have identified the issues and are underway in making the necessary upgrades to achieve full production in Georgia and Arkansas*.

*Also on October 2nd, we announced that we had completed the analysis of the necessary all-inclusive investment needed to deliver on our commitments to our customers, which we expected to negatively impact our third quarter earnings by $0.54 to $0.58 per share. As David explained, the impact ended up at $0.59 per share.*

\*          \*          \*

*While the design issues are not identical at both sites, they each require full attention and effort to get them into full production. We are confident in our*

*ability to do so for our customers, and the investment we have announced is the amount that we believe will cover the entire cost associated with completing our commitments to our customers with regards to production rates. I am pleased to report that we are on schedule with regards to completing our commitments at this time.*

*Despite the announcement on October 2nd, we are very confident in the near-term and long-term outlook for pellet plants, and our success at these sites will put us in a strong leadership position for orders as we move ahead.* Including the announced charge on October 2nd, we will have invested approximately $31 million over seven years to get into a $100 million per year business. We believe that the investment is a good one for our company.

\*  \*  \*

*Updating our current pellet plant quote activity, we will not take an order for another pellet plant until we have passed the production test at the plants in Georgia and Arkansas. We expect to complete these tests no later than April 15, 2018.*

82. As the call continued, defendants were asked for specific metrics on the pellet plant business. Defendant Brock responded:

There are two different plants, two different tons per hour and even the modular lines that we supply the plant in Georgia is three 15-ton-per-hour lines, so 45 tons an hour there. The plant in Arkansas is 20-ton-an-hour lines. There are four of those line[s], so 80 tons an hour there. We're running one line and they are selling pellets out of Hazlehurst. We're doing the corrections on all lines kind of as we are going to be able to run on wood.

And we are expecting to test that mid-November there and then *at Highland in Arkansas*, it's a little more involved frontend work with green hammer mills, cement plant work. *They are running. They are running at low production rates; they're selling pellets out of that plant. But to ramp up and go to 20 tons an hour on all four lines at the same time and do the test there, it's a lot more involved, and that's the April drop dead date that we've mentioned in our comments.*

So, we have been at full production on individual lines at both places, but we've done it on gas mainly at Hazlehurst. Wood is a requirement for a long-term contract, so we're working on the wood part of that as we talked about on our last call. We had run on wood until you run all three of them and start trying to push it up. *That's where we hit our limits and found out issues as we went through time on bag houses down there. But different issues at Arkansas, but we have run one of the lines at 20 tons an hour. But consistently doing that on all lines, is our ultimate target.* And so that kind of, and maybe more than you ever wanted, but that's kind of where we are. We know what to do, we just have to execute it.

83. When asked if Astec would be responsible for additional costs if the pellet plant problems ended up not being solved in terms of guaranteed throughput, defendant Brock stated: "*In the unlikely event that we don't, we would be*."

84. On November 6, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for 3Q2017, which reaffirmed the financial results announced in the October 24, 2017 press release. The 3Q2017 Form 10-Q was signed by defendants Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 3Q2017 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. Discussing the Company's pellet plants, the 3Q2017 Form 10-Q stated:

> During the third quarter of 2017, the Company identified significant design issues at its customers' Georgia and Arkansas wood pellet plants. As the Company is financing the Georgia plant, no revenues have been recorded to date related to this order; however, the Company has been recording revenue on the Arkansas plant order under the percent of completion method. *Due to the identification of the design issues in the third quarter of 2017, the Company increased its estimate of the remaining costs to complete the Arkansas pellet plant order which resulted in negative $13,405 pellet plant revenue for the third quarter of 2017. Pellet plant revenue for the third quarter of 2016 was $19,139*.

> \*    \*    \*

> Consolidated gross profit decreased $16,305 or 29.4% to $39,084 for the third quarter of 2017 compared to $55,389 for the third quarter of 2016. Gross profit as a percentage of sales decreased 690 basis points to 15.5% for the third quarter of 2017 compared to 22.4% for the third quarter of 2016. During the third quarter of 2017, the Company identified significant design issues at its customers' Georgia and Arkansas wood pellet plants. *Due to the identification of the design issues in the third quarter of 2017, the Company increased its estimate of the remaining costs to complete both plants which resulted in negative $22,738 gross margin on the two orders for the third quarter of 2017*. Gross margin recorded in the third quarter of 2016 on pellet plant sales was $7,152. Non-pellet plant related gross margins improved in each segment due to increased sales, changes in product mix and improved overhead absorption driven by increased manufacturing hours being absorbed.

85.     On February 20, 2018, the Company issued a release announcing its fourth quarter

2017 ("4Q2017") and full-year 2017 financial results, which revealed decreases in sales and EPS.

The release stated, in part:

> Net sales for the fourth quarter of 2017 were $312.4 million compared to $326.6 million for the fourth quarter of 2016, a 4.3% decrease. Domestic sales decreased 7.4% to $245.4 million for the fourth quarter of 2017 from $265.0 million for the fourth quarter of 2016. International sales were $67.0 million for the fourth quarter of 2017 compared to $61.6 million for the fourth quarter of 2016, an increase of 8.7%.

> Earnings for the fourth quarter of 2017 were $10.9 million, or $0.47 per share, including an income tax benefit from U.S. Tax Reform legislation of $1.1 million, compared to $12.4 million, or $0.53 per diluted share, for the fourth quarter of 2016, a decrease of 11.3% per diluted share.

> Net sales for 2017 were $1.185 billion compared to $1.147 billion for 2016, a 3.3% increase. Domestic sales decreased 1.0% to $932.3 million for 2017 from $941.3 million for 2016. International sales were $252.4 million for 2017 compared to $206.2 million for 2016, an increase of 22.5%.

> Earnings for 2017 were $37.8 million, or $1.63 per diluted share, compared to $55.2 million, or $2.38 per diluted share, for 2016, a decrease of 31.5% per diluted share. ***As previously announced, the Company initiated significant design upgrades to its customers' Georgia and Arkansas wood pellet plants to meet full production rates, which negatively impacted earnings per share by approximately $0.59 during the third quarter of 2017***.

86.     On February 20, 2018, the Company hosted a conference call to discuss its 4Q2017

financial results. In his prepared remarks, defendant Brock discussed the Company's pellet plant

business, stating:

> Changing subjects to wood pellet plants, 2017 was an extremely challenging year to us with regards to these plants as we took significant charges related to getting the two plants we have delivered installed and up to speed on production for our customers. ***As an update on our progress on the wood pellet plants, we are making good progress and believe that our announced charges during 2017 are adequate to cover our commitments to our customers***.

> Updating our current pellet plant quote activity, we do have ongoing quote activity for new projects; however, as previously announced, ***we are not going to sign a new pellet plant order until we have finished it, both at the sites that the charges were announced for during last year. Given our progress at the two pellet***

*plant sites, we still believe we'll be in position to add an order in time to deliver a complete wood pellet plant in 2019*.  As a reminder, if we do get an order for another wood pellet plant, we'll only do so as a supplier of equipment in accordance with our traditional equipment parts and service offerings.

*      *      *

Looking ahead to the first quarter of 2018, we believe our first quarter 2018 revenue will be slightly higher than Q4 2017 and with regards to earnings in the first quarter of 2018, we expect our earnings per share to be slightly better than our first quarter 2016 earnings per share.  Our current outlook for the full year of 2018 is core revenues up 7% to 12% versus last year, with a much improved net income for the year.  *We expect to be paid on the pellet plant in Georgia in December, which would add $60 million to the sales number, but as a reminder, the sale will be at breakeven margin*.

87.    On March 1, 2018, the Company filed with the SEC its annual report on Form 10-K for 2017, which reaffirmed the financial results announced in the February 20, 2018 press release. The 2017 Form 10-K was signed by defendants Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2017 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading.  The 2017 Form 10-K stated, in relevant part:

The Company has a sales contract with the purchaser of a large wood pellet plant, on which revenues of $7,987 and $135,187 were recorded in 2017 and 2016, respectively.  *As the plant has not yet met the production output and the operational specifications set forth in the original contract, as amended through December 31, 2017, the Company entered into a contract amendment in February 2018, whereby the Company agreed to compensate the customer for production shortfalls caused by the Company and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018.  The Company incurred production shortfalls in January and February 2018.  The Company expects to meet the contract's operational specifications prior to June 15, 2018*.

88.    On April 24, 2018, the Company issued a press release announcing its first quarter 2018 ("1Q2018") financial results for the period ended March 31, 2018.  The release stated that Infrastructure Group 1Q2018 revenues had decreased by 11%, from $165 million to $147 million,

and that 2018 profit declined by 18% from 2017 levels, falling from $18 million to $14.8 million.

Regarding the Company's backlog, the release stated:

> The Company's backlog at March 31, 2018 was $444.9 million, an increase of $67.3 million or 17.8% compared to the March 31, 2017 backlog of $377.6 million. Domestic backlog increased 11.6% to $341.1 million at March 31, 2018 from $305.8 million at March 31, 2017. The international backlog at March 31, 2018 was $103.8 million compared to $71.8 million at March 31, 2017, an increase of 44.5%. Excluding all pellet plant backlogs, the Company's March 31, 2018 backlog increased $69.3 million or 22.4% compared to March 31, 2017.

89. Also on April 24, 2018, the Company hosted an earnings call to discuss its 1Q2018 financial results. During his prepared remarks, defendant Brock discussed the Company's pellet plants and the Company's outlook, stating:

> Changing the subject to wood pellet plants, 2017 was an extremely challenging year to us with regards to these plants as we took significant charges last year related to getting the two plants to be delivered, installed it and getting them up to speed on production for our customers. ***As an update on our progress on the wood pellet plants, we've made good progress and believe our announced charges during 2017 are adequate to fulfill our commitments to our customers***.

> ***Updating our current pellet plant quote activity, we do have ongoing quote activity for new projects. However, as previously announced we are not going to sign a new pellet plant order until we have finished at both of the current plant sites. We believe we will be in position to add an order in time to deliver a complete plant, a complete wood pellet plant in 2019***. As a reminder, if we do get an order for another big pellet plant, we will only do so as a supplier of the equipment in accordance with our traditional equipment, parts and service offerings.

> \*　　　\*　　　\*

> ***Looking ahead to the second quarter of 2018, we believe our second quarter of 2018 revenue will be slightly higher than our first quarter 2018 revenue, and with regards to earnings in the second quarter of 2018, we expect our earnings per share to be slightly better than our first quarter of 2018 earnings per share which was $0.87***.

> ***Our current outlook for the full year of 2018 is core revenue is up 7% to 12% versus last year . . . with a much improved net income for the year versus 2017***.

90.     During the question-and-answer part of the call, defendants were asked to be more specific regarding the potential for Astec to secure a pellet plant order for 2019 delivery. Defendant Brock responded:

> *Well, we want to be completely finished at both places before we take an order and we feel like in Georgia that we passed the test, we're meeting with them next week to talk through that. In Arkansas, we actually have until June 19 now, we've had weather issues, we've had some mechanical issues and we've modified some equipment. It is tight at Arkansas. We have a pathway to finish, but it is tight and so we're all hands on deck on that, but I feel like with what we committed to we have the, the charge we took last year is adequate but we have to finish, so we're all hands on deck in Arkansas and that's where we stand. We're just not going to take an order unless we do and if we don't get one in time to deliver in 2019, we don't. We want to finish first.*

91.     As the call continued, defendants were asked whether the charges, weather and mechanical issues were "related to the same sorts of issues" involving the "hammer mill press that you guys had last time?" Defendant Brock responded:

> Well, Stanley this is Ben and I think whenever we get into these, there's always something that'll pop up, but ***thankfully what has popped up and mechanical issues that we corrected has not been extremely major***. And so the hammer mills that piece and all that we fixed, the extra bag houses we fixed, but as you start up, sometimes things happen like shafts on a drag will break and you figure out how to correct that and fix that and have a long term fix, so it's things like that. We're in a position where we need to be cranking up and running full production and going through testing and we have a lot of people on site to do that.
>
> ***Fortunately for the charge that we took for the commitments we made we feel like we have adequate coverage. It's a little bit like an asphalt plant, every now and then and something pops up and you have to fix it fairly quickly and that's what we're doing as we get ramped up.***

92.     When asked about the Company's expectations and outlook for future pellet plant sales and the size of that opportunity, defendant Brock stated:

> Well, for us, ***just speaking for Astec, once we're through what we do and we offer the plants as they run, we see it as a potential of being about $100 million year business for us***. There could be more plants sold than that and there should be based on the projections of pellets needed for – the production needed for pellets in the UK and Japan particularly, ***but for us we see it as a potentially $100 million a year business***.

93.     On May 10, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for 1Q2018, which reaffirmed the financial results announced in the April 24, 2018 press release. The 1Q2018 Form 10-Q was signed by defendants Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 1Q2018 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 1Q2018 Form 10-Q stated, in part:

> The backlog of orders as of March 31, 2018 was $444,927 compared to $377,569 as of March 31, 2017, an increase of $67,358 or 17.8%. Domestic backlogs increased $35,394 or 11.6% while international backlogs increased $31,964 or 44.5%. The March 31, 2018 backlog was comprised of 76.7% domestic orders and 23.3% international orders, as compared to 81.0% domestic orders and 19.0% international orders as of March 31, 2017. Included in the March 31, 2018 and 2017 backlogs is approximately $60,000 for a three line pellet plant from one customer under a Company-financed arrangement whereby the Company will record the related revenues when payment is assured, which is expected in December 2018. **The customer for the pellet plant has indicated that if they are unable to obtain financing for the plant, they will explore other alternatives for payment to the Company, including possible sale of the plant to a third-party buyer prior to the December 2018 deadline**. The Company is unable to determine whether the changes in backlogs were experienced by the industry as a whole; however, the Company believes the changes in backlogs reflect the current economic conditions the industry is experiencing.
>
> *          *          *
>
> The Company has a sales contract with the purchaser of a large wood pellet plant, on which inception to date revenues of $142,487 have been recorded through March 31, 2018. Revenues for the three months ended March 31, 2018 were not significant. **As the plant had not yet met the production output and operational specifications set forth in the original contract, the Company entered into a contract amendment in February 2018, whereby the Company agreed to compensate the customer for production shortfalls caused by the Company and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018. The Company incurred penalties related to production shortfalls in the three-month period ended March 31, 2018 (penalties are recorded as reductions in revenues) and expects to incur additional penalties during the three-month period ended June 30, 2018. The customer's ultimate acceptance of the plant, and forfeiture of their right to any potential refund of the purchase price, is contingent upon the plant operating at the aforementioned**

*production output and operational specifications during a 30-day test period. Under the terms of the contract, as currently amended, the original test period deadline of June 19, 2018 could potentially be extended by 120 to 180 days, during which time the customer may be entitled to additional damages. The Company expects to meet the contract's production outputs and operational specifications prior to the contractual deadline or an extension thereof.*

94. On July 24, 2018, the Company issued a news release reporting the Company's 2Q2018 financial results for the period ended June 30, 2018, and providing an update regarding its pellet plant business. The Company reported unexpectedly poor financial results, including a 9.7% decrease in net sales, a 14.1% decrease in domestic sales, and a net loss of ($40.7) million, or ($1.76) per share, compared to earnings of $14.4 million, or $0.62 per share, for 2Q2017, representing a decrease in EPS of 143.5%. The release shocked investors by disclosing that the Company would **pay $68 million and forgive an additional $7 million** in receivables to exit its contract for the Highland pellet plant in Arkansas after failing to resolve issues related to pellet plant upgrades. The release's "Wood Pellet Plant Business Update" made clear that Astec would only supply equipment on pellet plant projects going forward, and would no longer construct, procure or engineer future projects. Specifically, the release stated:

> During the second quarter, after careful consideration in partnership with Highland, its wood pellet plant customer in Arkansas, ***the Company and Highland decided it was in both parties' best interest to restructure the Company's obligations related to Highland's wood pellet plant and exit the Company's obligations regarding the plant. The decision was driven by unresolved issues, which inhibited the plant's ability to meet contractual provisions by the date required by the Company's sales contract with Highland. Under the terms of the agreement to exit the contract, which was effective on July 20, 2018, the Company agreed to pay $68 million in cash in the aggregate over the course of the next 120 days and forgive approximately $7 million in receivables. In exchange, Highland agreed to release the Company from all contractual obligations related to the Arkansas wood pellet plant. The Company will remain available for onsite and telephonic technical advice.***

> In connection with the agreement to exit the contract with Highland, and in consideration of the historical impact of the wood pellet business on the Company's overall results, ***the Company has redefined its wood pellet plant strategy to limit its participation in the wood pellet plant market to offering proven technology for sale***

***as an equipment supplier, not as an Engineer, Procure, Construct (EPC)
organization or a participating lender on wood pellet plant projects***. The Company
will continue to offer for sale after-market parts and service support for wood pellet
plants.

95.     The July 24, 2018 earnings release also stated that the Company was commencing a

strategic sourcing review to reduce costs and that the Board was reviewing the Company's capital

allocation strategy, stating:

> The Company recently retained Maine Pointe, a globally recognized
> operations consulting firm, to assist management in conducting a comprehensive
> strategic sourcing review. Maine Pointe will coordinate with the Company's
> Director of Procurement and recently hired VP of Operational Excellence to
> streamline procurement operations to improve the quality of the Company's products
> and services while reducing costs. Also, as a function of a comprehensive strategic
> plan review, the Company's management team and Board of Directors are evaluating
> the Company's capital allocation strategy to ensure capital is directed to the areas
> that will drive the greatest value for shareholders.

96.     Commenting on the wood pellet plant business and other strategic initiatives, the July

24, 2018 earnings release quoted defendant Brock as stating:

> "The Board and management team are taking a number of steps that we believe will
> support our long-term goals of increasing operational efficiency, reducing costs and
> improving profitability. We are pleased that our core businesses continue to perform
> well, as demonstrated by our historically strong backlog and we are focused on
> achieving our core business profitability targets for 2018. In order to further
> capitalize on the strengths of our core businesses, ***we have exited our contractual
> obligations with regard to the Highland wood pellet plant and have redefined our
> wood pellet plant business***. At the same time, we are engaging in a strategic
> sourcing review to streamline our procurement process. As we optimize our cost
> structure, our Board is also considering capital allocation options. All of these
> actions are designed to position the Company well for 2019 and beyond."

97.     On July 24, 2018, the Company also hosted a conference call to discuss its 2Q2018

financial results, with defendant Silvious disclosing that the Company's pellet plant business had had

a significantly negative impact on the Company's financial performance, stating:

> During the quarter, we did record a charge to exit our obligation under the contract
> with Highland Pellets in Arkansas, which really obscured an otherwise historically
> strong performance by our core businesses. Excluding pellets, this would have been

our third best reported quarterly EPS on record. Our core business is strong. We have initiatives underway to make it even better.

98. As the call continued, defendant Brock used his prepared remarks to discuss the Company's "decision to exit the Arkansas wood pellet plant agreements" and reveal that Astec was removing the Hazlehurst, Georgia pellet plant from its backlog, stating:

Our backlog at June 30, 2018 was $302.9 million, which is up 3% and remains, historically, very good. Our Infrastructure Group backlog was down 51.2%. After consultation with our external auditor, we remove[d] the Georgia wood pellet plant from our backlog for clarity.

\*       \*       \*

Turning to our decision to exit the Arkansas wood pellet plant agreements and define our wood pellet strategy. As we mentioned in our last earnings call, we were on track, but tight, with regards to running the test required to fulfill our obligations to our customer. *In mid-June, we ran into new technical issues that would not allow us to meet our obligations with regards to the timing of the reliability test for our customer*.

*Given our original agreements with the customer and our position with regards to the reliability test, we worked in great partnership with our customer to come to an agreement that satisfies all of our obligations, with regards to all agreements with the customer. While the charge to finalize our obligations on this project is significant, we believe it is in the best interest of the Company and our shareholders*.

Today's announced charge will help us focus in a better way in our core business while we continue to offer aftermarket and onsite service and parts for wood pellet plants, as well as *continue to offer proven wood pellet plant equipment for sale as equipment suppliers only*. We remain confident in the wood pellet industry's potential over the long-term.

Referencing our first pellet plant delivered to our customer in Georgia, the plant is running in our agreements and $60 million loan remain in place. As a reminder, the loan is due in December. *We are working collaboratively with the customer in Georgia, as a potential sale of this plant is being contemplated*. NDAs are in place with multiple prospects for this plant, and we believe the plant could be sold, at least, by December, if not before.

99. During the question-and-answer portion of the July 24, 2018 conference call, defendants were asked why Astec did not take a charge for the Hazlehurst pellet plant in light of the

fact that it took a charge for the Highland plant and removed the Hazlehurst plant from the Company's backlog. In response, defendant Brock stated: "We have agreements in place on Hazlehurst, and so we really – we don't need to do that." When questioned about why Astec's auditors instructed the Company to remove Hazlehurst from the backlog, Brock added: "It adds clarity to the backlog for all of us." Next defendants were asked whether, "with a reasonable degree of confidence," the Company could "still state that [it] expect[s] to recognize revenue in the fourth quarter of 2018 from Hazlehurst," defendant Brock responded:

> At this time, yes, we do. If it sells before then, I mean, who knows if it does or not? We do have multiple prospects looking at the plant. It could pull forward – as we've said before, it is breakeven.

100. The market's reaction to the Company's 2Q2018 earnings release was swift and severe. After closing at $60.80 per share on July 23, 2018, the price of Astec stock dropped 20%, or $12.59 per share, to close at $48.21 per share on July 24, 2018, on elevated trading volume of more than 1.3 million shares. Market analysts reacted negatively as well, with William Blair calling the write-off of the Arkansas pellet plant a "surprise," while noting that "[o]perating performance at Astec has deteriorated considerably over the past few years" and that the Company was "activist bait."

101. On August 9, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for 2Q2018, which reaffirmed the financial results announced in the July 24, 2018 press release. The 2Q2018 Form 10-Q was signed by defendants Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2Q2018 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 2Q2018 Form 10-Q stated, in part:

*The Company's sales contract with the purchaser of a large wood pellet plant, on which $143,300 of revenue (prior to the $75,315 charge discussed below) has been recorded through June 30, 2018 based on the over-time method, contained certain production output and operational provisions, which if not timely met, could have resulted in the Company having to refund the purchase price to the customer. Additional contract provisions required the Company to compensate the customer for production shortfalls caused by the Company and other potential costs (depending on the market price of wood pellets). As the plant did not meet the production output and operational specifications by the deadline set forth in the contract (June 29, 2018), the Company entered into an agreement with the customer on July 20, 2018 whereby the Company agreed to pay its customer $68,000 over 120 days following execution of the agreement and to forgive $7,315 in accounts receivables to obtain a full release of all the Company's contractual obligations under the sales contract. The terms of the pellet plant agreement resulted in the Company recording charges against sales of $75,315 and gross margins of $71,029 in the second quarter of 2018.*

\*     \*     \*

The backlog of orders as of June 30, 2018 was $302,892 compared to $360,543 as of June 30, 2017, a decrease of $57,651 or 16.0%. Domestic backlogs decreased $66,267 or 23.3% while international backlogs increased $8,616 or 11.3%. The June 30, 2018 backlog was comprised of 71.9% domestic orders and 28.1% international orders, as compared to 78.8% domestic orders and 21.2% international orders as of June 30, 2017. *Included in the June 30, 2017 backlog is approximately $60,000 for a three-line pellet plant from one customer under a Company-financed arrangement whereby the Company expected to record the related revenues when payment became assured. While the plant is currently operational and meeting its production goals, the customer has expressed its desire to further modify its obligations under the arrangement. As a result, the Company has removed the order from its June 30, 2018 backlog and the parties have agreed to jointly market the plant to a new buyer.*

102. On October 23, 2018, the Company announced its financial results for 3Q2018, the period ended September 30, 2018. The Company reported a 1.2% decrease in domestic sales and a 20.2% decrease in the Company's backlog, with the domestic backlog contracting by 28.1%, which was being dragged down by the Company's pellet business. For 2018, the Company cut its core revenue growth forecast to 1% to 3%, down substantially from 7% to 12%. The Company also reported EPS of $0.30 for the quarter, widely missing the consensus estimate of $0.59. Revenue

came in light as well, with Astec reporting $256.6 million for 3Q2018, below analysts' expectations of $276.8 million.

103. On October 23, 2018, the Company also hosted a conference call to discuss its 3Q2018 earnings. In his prepared remarks, defendant Brock discussed the Company's pellet plant business, stating:

> As we mentioned on our last call, we are working collaboratively with our pellet plant customer in Georgia on the potential sale of the plant. As a reminder, it's our first pellet plant delivered, and the plant has been running for private side pellet customer orders. Our agreements and a $60 million loan, which is due in December, remain in place.
>
> Non-disclosure agreements are in place with multiple prospects for this plant. Based on our discussions with prospective buyers, we believe the plant could be sold this year. We remain confident in the wood pellet industry's potential over the long-term and would sell proven equipment to customers as traditional equipment suppliers only.

104. As the call continued, one analyst stated he was confused and asked for an "update on the loan repayment." Defendant Brock stated the Company could end up owning the Hazlehurst plant, which would contradict the Company's recently announced strategy to only be an equipment supplier to the pellet plant industry. Specifically, defendant Brock stated:

> Larry, it's Ben. Coming back to the previous question, it's due in December, and if it doesn't sell, the question is, what's the worst case scenario? And it goes back to not our first choice but we could be in the pellet business. And if we are, we are. We feel like it could make money. It would be less than, again, less than 5% of our business, probably more like 4% range. It would be an additional company that we might sell later, but if it's making money, we would hold on to. But we have the people that could run it if we wanted to do that or it ended up that way. That's not our first choice.

105. The market reacted negatively to the Company's poor financial results. After closing at $47.27 per share on October 22, 2018, the stock dropped 25% to close at $35.51 per share on October 23, 2018, on abnormally high trading volume of 1.6 million shares. The stock continued to fall the following day, dropping another 7.5% to close at $32.79 per share on October 24, 2018.

106. The statements referenced in ¶¶42-65, 67-99 and 101-104 above were materially false and misleading because:

(a) during the Class Period, defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems;

(b) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity;

(c) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and

(d) as a result of the foregoing, defendants' statements regarding the Company's outlook and expected financial performance were false and misleading at all relevant times.

## ADDITIONAL SCIENTER ALLEGATIONS

107. As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and omitted material facts, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Astec, their control over and/or receipt and/or modification of allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Astec, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

108.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Astec stock and operated as a fraud or deceit on Class Period purchasers of Astec stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Astec stock fell precipitously as the prior artificial inflation came out of the stock's price.  As a result of their purchases of Astec stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about Astec was revealed through the disclosures specified herein, which removed the artificial inflation from the price of Astec common stock.

109.    By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of Astec's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Astec stock to trade at artificially inflated levels throughout the Class Period.

110.    As a direct result of the disclosures identified herein, the price of Astec stock fell precipitously.  This removed the artificial inflation from the price of Astec stock, causing real economic loss to investors who had purchased Astec stock at artificially inflated prices during the Class Period.

111.    The price declines were a direct result of the nature and extent of defendants' fraud being revealed to investors and the market through several partial disclosures.  The timing and magnitude of the price declines in Astec stock negate any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The

economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Astec stock and the subsequent significant declines in the value of Astec stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

112.    At all relevant times, the market for Astec stock was an efficient market for the following reasons, among others:

(a)    Astec stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Astec filed periodic public reports with the SEC;

(c)    Astec regularly communicated with public investors via established market communication mechanisms, including the regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Astec was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

113.    As a result of the foregoing, the market for Astec stock promptly digested current information regarding Astec from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Astec stock during the Class Period suffered similar injury through their purchase of Astec stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

114.    The "Safe Harbor" warnings accompanying Astec's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with generally accepted accounting principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

115.    Defendants are also liable for any false and misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Astec who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

116.    Plaintiff incorporates ¶¶1-115 by reference.

117.    During the Class Period, Astec and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

118. Astec and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Astec stock during the Class Period.

119. In addition to the duties of full disclosure imposed on Astec and the Individual Defendants as a result of their affirmative false and misleading statements to the public, they had a duty to promptly disseminate truthful information with respect to Astec's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to Astec's pellet plant business, so that the market price of the Company's stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.1-01 *et seq*.) and S-K (17 C.F.R. §229.10 *et seq*.).

120. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Astec stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Astec stock and experienced loses when the artificial inflation was released from Astec stock as a result of the partial revelations and stock price declines detailed herein. Plaintiff and the Class would not have purchased Astec stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

121. By virtue of the foregoing, Astec and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against All Defendants

122. Plaintiff incorporates ¶¶1-115 by reference.

123. Defendants Brock and Silvious acted as controlling persons of Astec within the meaning of §20(a) of the Exchange Act. By reason of their controlling positions with the Company, and their ownership of Astec common stock, defendants Brock and Silvious had the power and authority to cause Astec to engage in the wrongful conduct complained of herein. Astec controlled defendants Brock and Silvious and all of its employees. By reason of such conduct, Astec, Brock and Silvious are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable, injunctive, or other relief as deemed appropriate by the

Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 1, 2019                    ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                                       JERRY E. MARTIN
                                                       CHRISTOPHER M. WOOD


                                                       */s/ Christopher M. Wood*
                                                       CHRISTOPHER M. WOOD

                                                       414 Union Street, Suite 900
                                                       Nashville, TN  37219
                                                       Telephone:  615/244-2203
                                                       615/252-3798 (fax)

                                                       ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                                       ROBERT J. ROBBINS
                                                       120 East Palmetto Park Road, Suite 500
                                                       Boca Raton, FL  33432
                                                       Telephone:  561/750-3000
                                                       561/750-3364 (fax)

                                                       ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                                       BRIAN E. COCHRAN
                                                       655 West Broadway, Suite 1900
                                                       San Diego, CA  92101-8498
                                                       Telephone:  619/231-1058
                                                       619/231-7423 (fax)

                                                       VANOVERBEKE, MICHAUD &
                                                          TIMMONY, P.C.
                                                       THOMAS C. MICHAUD
                                                       79 Alfred Street
                                                       Detroit, MI  48201
                                                       Telephone:  313/578-1200
                                                       313/578-1201 (fax)

                                                       Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

City of Taylor General Employees Retirement System ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of January, 2019.

City of Taylor General Employees Retirement System

By: _____

Its: _____

ASTEC INDUSTRIES

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 09/20/2017 | 41 | $52.40 |
| 09/21/2017 | 10 | $52.80 |
| 09/22/2017 | 40 | $53.50 |
| 09/25/2017 | 100 | $54.53 |
| 09/26/2017 | 300 | $55.60 |
| 11/03/2017 | 37 | $51.48 |
| 11/07/2017 | 145 | $52.26 |