# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CHARLES M. ATANASIO,

                                        Plaintiff,

                  -against-

TENARIS S.A.,
PAOLO ROCCA,
EDGARDO CARLOS,

                                        Defendants.
------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
18-CV-7059-RJD-SJB

**BULSARA, United States Magistrate Judge:**

This case, *Atanasio v. Tenaris* ("*Tenaris I*"), is a putative class action brought on December 12, 2018 by Charles M. Atanasio ("Atanasio") on behalf of investors who purchased publicly-traded securities of Tenaris S.A. ("Tenaris") from May 1, 2014 through November 27, 2018 ("the class period").  (Compl. dated Dec. 12, 2018, Dkt. No. 1 ("*Tenaris I* Compl.")).  *Tenaris I* alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by Tenaris, its Chairman and Chief Executive Officer Paolo Rocca ("Rocca"), and its Chief Financial Officer Edgardo Carlos ("Carlos").  (*Id.* ¶¶ 2, 8-9).  In a separate action commenced on January 9, 2019, *Gross v. Tenaris* ("*Tenaris II*"), Plaintiff Melvin Gross ("Gross") brought the same Exchange Act and Rule 10b-5 claims against Tenaris, Rocca, and Carlos, also on behalf of investors who purchased Tenaris stock from May 1, 2014 to November 27, 2018.  (Compl. dated Jan. 9, 2019, No. 19-CV-174, Dkt. No. 1 ("*Tenaris II* Compl.") ¶¶ 1, 23-24).

Pending before the Court are two competing motions by City of Warren Police and Fire Retirement System ("City of Warren") and Jeffrey Lynn Sanders and Starr

Sanders (collectively, "Sanders") for consolidation of the two cases, appointment as Lead Plaintiff, and appointment of Class Counsel.  (*See* Mot. to Consolidate by City of Warren dated Feb. 11, 2019, Dkt. No. 15 ("City of Warren Mot."); Mot. to Consolidate by Sanders dated Feb. 11, 2019, Dkt. No. 8 ("Sanders Mot.")).  Two other motions for consolidation, appointment as Lead Plaintiff, and appointment of Class Counsel were filed by Atanasio and the Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Local 103"); the one from Atanasio was withdrawn and the one from Local 103 was supplemented with a Notice of Non-Opposition.  (*See* Mot. to Consolidate by Atanasio dated Feb. 11, 2019, Dkt. No. 6 ("Atanasio Mot.") (withdrawn by Notice dated Feb. 22, 2019, Dkt. No. 18 ("Atanasio Withdrawal")); Mot. to Consolidate by Local 103 dated Feb. 11, 2019, Dkt. No. 11 ("Local 103 Mot.") (supplemented by Notice dated Feb. 25, 2019, Dkt. No. 19 ("Local 103 Non-Opposition"))).[1]

For the reasons stated below, Sanders's motion to consolidate, for appointment as Lead Plaintiff, and for appointment of Glancy Prongay & Murray LLP ("Glancy") as Class Counsel is granted.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Tenaris is a Luxembourg corporation that "produces and sells seamless and welded steel tubular products and related services for the oil and gas industry." (*Tenaris I* Compl. ¶ 7; *Tenaris II* Compl. ¶¶ 2, 22).  It is traded on the New York Stock Exchange under the ticker symbol "TS."  (*Tenaris I* Compl. ¶ 7; *Tenaris II* Compl. ¶ 22). As of December 31, 2017, Tenaris held 11.46% of the share capital of another

---

[1] Local 103's Notice of Non-Opposition states that "Local 103 does not appear to have the greatest financial interest in the Related Actions . . . and does not oppose the competing motions."  (Local 103 Non-Opposition at 1).

Luxembourg steel company, Ternium S.A. ("Ternium") that was created through the consolidation in 2005 of three other companies: Siderar of Argentina, Sidor of Venezuela ("Sidor"), and Hysla of Mexico. (*Tenaris I* Compl. ¶¶ 15-16; *Tenaris II* Compl. ¶¶ 29-30). In 2008, Sidor was nationalized by the Venezuelan government, and in 2009, Ternium sold its interest in Sidor for $1.97 billion. (*Tenaris I* Compl. ¶¶ 17-18; *Tenaris II* Compl. ¶¶ 31-33). Ternium did not receive final payment from this sale until 2012. (*Tenaris I* Compl. ¶ 18; *Tenaris II* Compl. ¶ 33).

Rocca served as Tenaris's Chairman and CEO and Carlos served as Tenaris's CFO throughout the class period. (*Tenaris I* Compl. ¶¶ 8-9; *Tenaris II* Compl. ¶¶ 23-24). Rocca is also the Chairman of Ternium. (*Tenaris I* Compl. ¶ 8). According to both Complaints, Rocca and Carlos made false representations to the public through several documents submitted to the Securities and Exchange Commission ("SEC"), as described below. (*Id.* ¶ 11; *Tenaris II* Compl. ¶ 26).

Tenaris filed five 20-F Forms with the SEC providing its financial results for the fiscal years 2013 to 2017, each certified by both Rocca and Carlos and "attesting to the accuracy of financial reporting . . . and the disclosure of all fraud." (*Tenaris I* Compl. ¶¶ 20, 23, 26, 29, 32; *see Tenaris II* Compl. ¶¶ 36, 39-40, 43-44, 47-48, 51-52, 55). Each of the five 20-F forms allegedly contained affirmations that Tenaris was "committed to conducting business in a legal and ethical manner" and referenced the company's code of conduct, which strictly prohibited bribery, and the company's code of ethics, which applied the code of conduct to financial officers. (*Tenaris I* Compl. ¶¶ 19, 21-22, 24-25; 27-28; 30-31; 33-34; *Tenaris II* Compl. ¶¶ 37-38, 41-42, 45-46, 49-50, 53-54). These forms were allegedly false and misleading "because they misrepresented and failed to disclose . . . adverse facts pertaining to the Company's business, . . . which were known

3

to Defendants or recklessly disregarded by them." (*Tenaris I* Compl. ¶ 35; *Tenaris II* Compl. ¶ 56).  Particularly, these statements failed to disclose that Rocca knew that one of Tenaris's executives paid cash to Venezuelan government officials in order to accelerate payment for the sale of Sidor, which led to the prosecution of Rocca in Argentina for a graft scheme and to heightened regulatory scrutiny.  (*Tenaris I* Compl. ¶ 35; *Tenaris II* Compl. ¶ 56).

According to plaintiffs, these misrepresentations led to an artificially inflated market price for Tenaris's securities.  (*Tenaris I* Compl. ¶ 54; *Tenaris II* Compl. ¶ 21).  The misconduct became public on November 27, 2018 when *Bloomberg* "reported that Rocca was indicted for his role in [the] graft scheme," causing Tenaris's stock to fall almost 10% the same day and resulting in significant loss to those who bought Tenaris stock during the class period.  (*Tenaris I* Compl. ¶¶ 36-38; *Tenaris II* Compl. ¶¶ 57, 60).

The Complaints in *Tenaris I* and *Tenaris II* assert the same two causes of action: violations of (1) Section 10(b) of the Exchange Act and Rule 10b-5 by all Defendants, (*Tenaris I* Compl. ¶¶ 48-57; *Tenaris II* Compl. ¶¶ 70-79); and (2) Section 20(a) of the Exchange Act by Rocca and Carlos, (*Tenaris I* Compl. ¶¶ 58-63; *Tenaris II* Compl. ¶¶ 80-85).  Both Complaints seek damages sustained by class members, pre-judgment and post-judgement interest, and costs and fees.  (Prayer for Relief, attached to *Tenaris I* Compl. ("*Tenaris I* Prayer for Relief"), at 16-17; Prayer for Relief, attached to *Tenaris II* Compl. ("*Tenaris II* Prayer for Relief"), at 20).

On February 11, 2019, four class members filed motions asking the Court to consolidate *Tenaris I* and *Tenaris II*, appoint them as Lead Plaintiff, and approve their choice of Class Counsel.  (*See* City of Warren Mot.; Sanders Mot.; Atanasio Mot.; Local 103 Mot.).  As noted, one of these motions was withdrawn and the other was

supplemented by a Notice of Non-Opposition.  (*See* Atanasio Withdrawal; Local 103 Notice of Non-Opposition).  There are, therefore, two competing motions before the Court, one by Sanders and one by City of Warren.[2]

DISUSSION

I.      Consolidation

"Consolidation is 'a valuable and important tool of judicial administration' that should be 'invoked to expedite trial and eliminate unnecessary repetition and confusion.'"  *Reitan v. China Mobile Games & Entm't Grp., Ltd.*, 68 F. Supp. 3d 390, 394 (S.D.N.Y. 2014) (quoting *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999)).  Under Federal Rule of Civil Procedure 42, a court may consolidate multiple actions that "involve a common question of law or fact."  Fed. R. Civ. P. 42(a)(2).  Absent prejudice to the defendants, "[c]onsolidation of multiple actions alleging securities fraud is appropriate where those actions relate to the same public statements and reports," *Constance Sczesny Tr. v. KPMG LLP*, 223 F.R.D. 319, 322 (S.D.N.Y. 2004) (quotations omitted), and the "actions need not be identical to allow for consolidation," *Reitan*, 68 F. Supp. 3d at 394; *accord Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 474-75 (S.D.N.Y. 2016).

---

[2] Jeffrey Lynn and Starr Sanders are married.  (Joint Decl. of Jeffrey Lynn Sanders and Starr Sanders dated Mar. 4, 2019, attached as Ex. A to Reply Mem. ("Sanders Reply"), Dkt. No. 23 ("Sanders Decl.") ¶ 4).  Although City of Warren does not argue these Plaintiffs should not be considered together for the purposes of appointment as lead plaintiff, the Court notes that such aggregation is appropriate.  *See, e.g.*, *Micholle v. Ophthotech Corp.*, No. 17-CV-1758, 2018 WL 1307285, at *8 (S.D.N.Y. Mar. 13, 2018) ("As the Wang Group made clear in its reply brief, Wang and Zhao are a married couple.  Thus, I find that Wang and Zhao will be able to act collectively and separately from their lawyers, and are properly considered a plaintiff group.") (quotations and citations omitted); *In re Sequans Commc'ns S.A. Sec. Litig.*, 289 F. Supp. 3d 416, 424-25 (E.D.N.Y. 2018) (finding the aggregation of two class members as lead plaintiffs was appropriate).

5

*Tenaris I* and *Tenaris II* "involve substantially identical questions of law and fact." *Kux-Kardos*, 151 F. Supp. 3d at 475. Both were brought on behalf of those who purchased stock in Tenaris between May 1, 2014 and November 27, 2018. (*See Tenaris I* Compl. ¶ 1; *Tenaris II* Compl. ¶ 1). Both allege violations of Section 10(b) of the Exchange Act by Tenaris, Rocca, and Carlos and violations of Section 20(a) by Rocca and Carlos based on the same five 20-F Forms for the years 2013 to 2017, (*see Tenaris I* Compl. ¶¶ 48-63; *Tenaris II* Compl. ¶¶ 70-85), and seek damages, pre-judgment and post-judgement interest, and costs and fees, (*see Tenaris I* Prayer for Relief; *Tenaris II* Prayer for Relief). In fact, the allegations in both Complaints are nearly identical. (*Compare Tenaris I* Compl. ¶¶ 20-38, *with Tenaris II* Compl. ¶¶ 36-60). There is no basis to believe that any Defendant would be prejudiced by consolidation, and despite disagreeing about who should be Lead Plaintiff, no plaintiff has opposed consolidation.

It is therefore appropriate to consolidate *Tenaris I* and *Tenaris II* into a single case. *See, e.g.*, *Dolan v. Axis Capital Holdings Ltd.*, No. 04-CV-8564, 2005 WL 883008, at *2 (S.D.N.Y. Apr. 13, 2005) ("Each of the Actions implicates similar or overlapping claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 . . . , along with Rule 10b-5. In particular, both complaints rest on the same fundamental allegations that defendants made material misrepresentations . . . . Accordingly, the Actions involve common issues of law and fact, and are hereby consolidated pursuant to Rule 42(a).") (quotations omitted); *Constance Sczesny Tr.*, 223 F.R.D. at 322 ("Here, the gravamen of the complaints in each of the related actions is the same allegedly fraudulent accounting treatment of certain tax credits and expenses in Polaroid's public securities filings issued in the spring of 2001. Therefore, crucial factual and legal questions are common to all the related actions. . . . Moreover,

6

it is clear that consolidation would not prejudice the defendants, who have not opposed the motions for consolidation.  Accordingly, this Court finds that it is appropriate to consolidate the nine pending related securities actions.").

II.     Lead Plaintiff

"In consolidated securities litigations, the [Private Securities Litigation Reform Act ('PSLRA')] recommends courts to make the decision regarding the appointment of the 'most adequate' plaintiff as the lead plaintiff for the consolidated actions '[a]s soon as practicable after [the consolidation] decision is rendered.'" *Constance Sczesny Tr.*, 223 F.R.D. at 322 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(ii)).

A.     Notice to Class

The PSLRA requires a plaintiff who files a complaint to publish, in a widely circulated business-oriented publication or wire service, a notice advising members of the purported class of "the pendency of the action, the claims asserted therein, and the purported class period" and permits that, "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff[.]"  15 U.S.C. § 78u-4(a)(3)(A)(i).

On December 12, 2018, the Rosen Law Firm, counsel for Atanasio, caused a notice about the pendency of the action to be published in *Business Wire*, informing potential class members of their right to move for appointment of lead plaintiff within 60 days.  (*See* Proposed Order, attached as Ex. 1 to Atanasio Mot., Dkt. No. 6 ("Atanasio Proposed Order") at 2; PSLRA Early Notice, attached as Ex. 1 to Mem. in Support of Atanasio Mot. ("Atanasio Mem."), Dkt. No. 7 ("PSLRA Notice")).  "*Business Wire* is a suitable vehicle for meeting the statutory requirement that notice be published." *Pirelli*

7

*Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co.*, 229 F.R.D. 395, 403 (S.D.N.Y. 2004).  No party has objected to the adequacy of the notice.

The 60-day period in which any member of the proposed class may apply for lead plaintiff status technically elapsed on February 10, 2019; however, because February 10 was a Sunday, the period expired on February 11.  *See* Fed. R. Civ. P. 6(a)(1)(C) ("[I]f the last day [of the period] is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").[3] Each of the two competing Lead Plaintiff motions, filed February 11, 2019, were thus timely.  *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

B.     Appointment of Lead Plaintiff

The PSLRA requires the court to appoint as "lead plaintiff" the member of the class that it determines to be the "most adequate plaintiff," *i.e.* the member that is "most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i).  The court must "adopt a presumption that the most adequate plaintiff . . . is the person or group of persons that": (1) "has either filed the complaint or made a [timely] motion" to be appointed as lead plaintiff(s); (2) "in the determination of the court, has the largest financial interest in the relief sought by the class"; and (3) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  This presumption may be rebutted "only" by proof that the presumptively adequate plaintiff either "will not fairly and adequately protect

---

[3] Rule 6(a) applies to computation of time "in any statute that does not specify a method of computing time."  Fed. R. Civ. P 6(a).  The PSLRA contains no provision for computing time.

8

the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

As stated above, each of the two competing movants—Sanders and City of Warren—made a timely motion to be appointed as lead plaintiff.  The Court therefore turns to the two remaining elements of the presumption.

### i.  Largest Financial Interest

In assessing the financial interests of parties competing for lead plaintiff status, the Court will generally consider the following:

> (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered.

*In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 112 (E.D.N.Y. 2012) (referring to these factors as the "*Olsten* factors" and citing *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)).  The fourth factor, the approximate losses suffered, is considered to be the most important.  *See Baughman v. Pall Corp.*, 250 F.R.D. 121, 125 (E.D.N.Y. 2008); *see also City of Warren Police v. Foot Locker, Inc.* 325 F. Supp. 3d 310, 315 (E.D.N.Y. June 25, 2018); *In re Sequans Commc'ns S.A. Sec. Litig.*, 289 F. Supp. 3d 416, 421 (E.D.N.Y. 2018).

During the class period, Sanders purchased 6,505 shares of Tenaris stock costing $260,850.50.  (Loss Chart, attached as Ex. C to Decl. of Lesley F. Portnoy ("Portnoy Decl."), Dkt. No. 10 ("Sanders Loss Chart")).  Sanders retained all of these shares during the class period, making the number of net shares purchased (the difference between shares purchased and shares sold) 6,505 and the net funds expended (difference

between amount spent and amount received from sales) $260,850.50.  (*See id.*).

Sanders suffered $108,918.92 in losses, calculated by subtracting $151,931.58 (6,505

shares times $23.3561, the 90-day average price per share from November 28, 2018 to

February 8, 2019)[4] from their original purchase cost of $260,850.50.  (*See id.*).

In contrast, City of Warren purchased 19,175 shares of Tenaris stock costing

$571,212.64.  (Movant's Purchases and Losses, attached as Ex. C to Decl. of David A.

Rosenfeld ("Rosenfeld Decl."), Dkt. No. 17 ("City of Warren Loss Chart")).  City of

Warren sold 3,935 shares during the class period for a total of $133,343.19, making their

net shares purchased 15,240 and net funds expended $437,869.45.  (*See id.*).  It suffered

$81,922.14 in losses, calculated by subtracting $355,947.31 (15,240 times $23.36, an

estimate of the 90-day average price per share from November 28, 2018 to February 8,

2019) and $133,343.19 (the amount received from sales) from their original purchase

cost of $571,212.64.  (*See id.*).[5]  These *Olsten* factors are summarized in the chart below.

---

[4] The price per share, $23.3561, appears to be rounded, as $23.3561 times 6,505 is actually $151,931.43.  Both parties make certain rounding assumptions that are not explained in their loss charts.  For example, City of Warren's Loss Chart states that on May 21, 2015, it purchased 5,916 shares of Tenaris stock at $30.06, totaling $177,830.23.  (Movant's Purchases and Losses, attached as Ex. C to Decl. of David A. Rosenfeld ("Rosenfeld Decl."), Dkt. No. 17 ("City of Warren Loss Chart")).  Using the numbers provided, this purchase would actually total $177,834.96.  The Court finds it likely the parties rounded the price per share of stock, and thus has no reason to believe the total loss calculations are inaccurate.  Neither Sanders nor City of Warren disputes the calculations of the other.

[5] The calculations submitted by the parties use the "last-in, first out" ("LIFO") method, as opposed to the "first-in, first out" ("FIFO") method.  (*See* Mem. of Law in Opp'n, Dkt. No. 20 ("Sanders Resp.") at 3-4; Sanders Loss Chart; City of Warren Loss Chart).  "LIFO calculates losses by assuming that the first stocks to be sold are the stocks purchased most recently prior to that sale.  The alternative, 'first in, first out' ('FIFO'), assumes that the first stocks to be sold are the stocks that were acquired first." *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 129 (S.D.N.Y. 2011).  "[R]ecently, courts have preferred LIFO and have generally rejected FIFO as an appropriate means of calculating

|  | Total Shares Purchased | Net Shares Purchased | Net Funds Expended | Approximate Loss |
|---|---|---|---|---|
| **Sanders** | 6,505 | 6,505 | $260,850.50 | $108,918.92 |
| **City of Warren** | 19,175 | 15,240 | $437,869.45 | $81,922.14 |

Under the *Olsten* criteria, Sanders has the largest financial interest. Although City of Warren purchased a greater number of total and net shares during the class period and expended a greater amount of net funds, Sanders has a greater loss by approximately $27,000. The approximate loss is the most important factor. The first three factors have almost no independent significance since, for example, the number of shares purchased alone gives no sense of financial impact without knowing the share price, the time of the purchase, or the net expenditures of the party on those shares. Each of the first three *Olsten* factors help determine the financial loss each movant experienced, which is the benchmark for determining, as the PSLRA demands, "the largest financial interest." *See, e.g.*, *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 478-79 (S.D.N.Y. 2011) ("The Court rejects the Institutional Investors Group's argument that the loss factor can be ignored and that it should be selected based on their larger net shares purchased and net expenditures. Certainly, these factors have to be considered, but they are not dispositive in themselves. Most courts agree that the largest loss is the critical ingredient in determining the largest financial interest and outweighs net shares purchased and net expenditures."); *Varghese v. China Shenghuo Pharm. Holdings, Inc.,* 589 F. Supp. 2d 388, 396 (S.D.N.Y. 2008) ("While the first two

---

losses in securities fraud cases. . . . The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price[,] [whereas] FIFO . . . ignores sales occurring during the class period and hence may exaggerate losses." *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005).

factors favor Maa and the third factor favors Bennett, the fourth factor in this case—the most important factor—strongly favors Bennett.  Because Bennett has suffered greater approximate losses, he has the largest financial interest in the relief sought by the Class as determined by the *Lax/Olsten* test."); *see also Elstein v. Net1 UEPS Techs., Inc.,* No. 13-CV-9100, 2014 WL 3687277, at *6 & n.6 (S.D.N.Y. July 23, 2014) (collecting cases in which courts have relied on the fourth *Olsten* factor over the first three).

City of Warren argues the difference in losses is so small that they should be treated as equal, especially given the fact that it is "a sophisticated institutional investor—precisely the type of investor Congress sought to encourage to serve as lead plaintiff when it passed the PSLRA." (Mem. in Opp'n to Competing Mots., Dkt. No. 21 ("City of Warren Resp.") at 2).  City of Warren cites to cases in which "courts have treated loss differences larger than the $27,000 difference here as roughly equal . . . because such a slight difference simply cannot dictate such an important result." (*Id.* at 6 (quotations omitted) (collecting cases)).

Sanders argues that these cases, particularly *Police & Fire Retirement System of City of Detroit v. SafeNet, Inc.*, No. 06-CV-5797, 2007 WL 7952453 (S.D.N.Y. Feb. 21, 2007), only found the loss differences to be slight because they looked at the percentage difference rather than the dollar difference.  (Reply Mem. in Supp., Dkt. No. 23 ("Sanders Reply") at 4).  In *SafeNet*, the percentage difference in losses between the competing plaintiffs was 2%.  2007 WL 7952453, at *2; (Sanders Reply at 4).  Further, Sanders argues that "better-reasoned authority holds even small differences in financial interest to be determinative because the PSLRA does not distinguish small advantages in financial interest from large ones." (*Id.* at 5).

The Court agrees with Sanders.  Looking at the dollar differential, at the exclusion of the percentage difference, can be misleading; "a difference of $5000 in losses may be significant where two competing movants suffered losses of say, $500 and $5500.  It is less significant where there two movants have suffered losses of say, $350,000 and $355,000."  *In re Sequans Commc'ns*, 289 F. Supp. 3d at 421.  In this case, the percentage difference in losses is 33%.[6]

None of the cases cited by City of Warren involve a court ignoring the result compelled by the PSLRA in the face of losses that are 33% lower than those of competing movants; in fact, the closest was a 14.6% differential.  *See Juliar v. SunOpta Inc.*, No. 08-CV-1070, 2009 WL 1955237, at *1-2 (S.D.N.Y. Jan. 30, 2009) (finding the approximately $30,000 difference between losses of $241,708 and $210,993 to be minimal) (cited in City of Warren Resp. at 6-7).  The Court, therefore, finds it more appropriate to analyze the approximate loss differential based on percentage and determines that a differential of 33% is significant, cannot be ignored, and leads to Sanders having the largest financial interest in the case.

This is true even though City of Warren may be an institutional investor.  While courts have found that the PSLRA's legislative history recites a preference for institutional investors to serve as lead plaintiffs, that preference—which is not embodied in the statutory text in any respect—has been determinative when an "institutional investor has a slightly lower loss than another potential lead plaintiff."  *In re Gentiva*,

---

[6] The percentage difference can be calculated by subtracting Sanders's approximate loss, $108,918.92, by City of Warren's approximate loss, $81,922.14 and dividing the result by Sanders's approximate loss.  In other words: ($108,918.92 – $81,922.14) ÷ $81,922.14 = .329.  This is approximately 33%.  City of Warren does not dispute that the percentage difference is 33%.

281 F.R.D. at 113 (collecting cases); *see also In re Sequans Commc'ns*, 289 F. Supp. 3d at 422 (rejecting movant's contention that, as an institutional investor, it should be appointed lead plaintiff when its approximate losses were not comparable to that of the competing movant).  As discussed above, the 33% difference in this case is not minor but significant, and thus City of Warren's status as an institutional investor does not affect the Court's determination that Sanders has the largest financial interest in relief sought by the class.

####    ii.   Rule 23

The next step in identifying which plaintiff is entitled to the presumption of adequacy is to "ensure that the person (or persons) with the largest financial interest 'otherwise satisfies the requirements of Rule 23.'"  *Maliarov v. Eros Int'l PLC*, No. 15-CV-8956, 2016 WL 1367246, at *5 (S.D.N.Y. Apr. 5, 2016) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc)).  In a PSLRA motion to appoint lead plaintiff, the Court considers only whether the proposed plaintiff has made a "preliminary showing" that two of Rule 23's requirements—typicality and adequacy—are satisfied.  *See Ford v. Voxx Int'l Corp.*, No. 14-CV-4183, 2015 WL 4393798, at *3 (E.D.N.Y. July 16, 2015) (adopting report and recommendation) (collecting cases); *see also Martingano v. Am. Int'l Grp., Inc.*, No. 06-CV-1625, 2006 WL 1912724, at *4 (E.D.N.Y. July 11, 2006) ("[A]t this stage in the litigation, one need only make a preliminary showing that the Rule's typicality and adequacy requirements have been satisfied.") (quotations omitted).

"Typicality is satisfied where the claims arise from the same course of events and each class member makes similar legal arguments to prove defendant's liability."  *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923, 2006 WL 1120619, at *3 (E.D.N.Y. Apr. 26, 2006) (citing *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d

Cir. 2001)).  There is no dispute among the movants that each of their claims arise out of the same course of events—the five Form 20-F filings and the allegedly false and misleading statements contained therein—and that each will make similar legal arguments (under the various provisions of the Exchange Act and Rule 10b-5 thereunder).  Consequently, the Court concludes that Sanders, the class member with the largest financial interest, has satisfied the burden to make a preliminary showing of typicality.  *See, e.g., Dolan*, 2005 WL 883008, at *4 ("Dolan and Schimpf easily meet the typicality requirement here because their claims arise from the same course of events and each class member makes similar legal arguments to prove the defendants' liability even if there are minor variations in the factual allegations.  In particular, both Dolan and Schimpf, like the other purported class members in this action, have asserted that they purchased Axis stock during the class period and were injured by false and misleading representations made by defendants in violation of the [Exchange] Act.") (quotations and citations omitted) (alterations omitted).

"Adequacy of a proposed lead plaintiff turns on whether that plaintiff 'will fairly and adequately protect the interests of the class.'"  *Constance Sczesny Tr.*, 223 F.R.D. at 324 (quoting Fed. R. Civ. P. 23(a)).  In analyzing the adequacy requirement in the context of appointing lead plaintiff, courts consider: "(1) whether the proposed class counsel is qualified, experienced, and generally able to conduct the litigation; (2) whether the proposed lead plaintiff has interests that are antagonistic to other class members; and (3) whether the proposed lead plaintiff and the class possess sufficient interest to pursue vigorous prosecution of their claims."  *Id.* (quotations and citations omitted); *see also In re Symbol Techs.*, 2006 WL 1120619, at *3 (citing *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 102 (S.D.N.Y. 2005)).

Sanders is represented by Glancy, who has submitted a firm resume detailing its experience as lead counsel in securities actions across the United States. (*See* Glancy Prongay & Murray Firm Resume, attached as Ex. D to Portnoy Decl., Dkt. No. 10 ("Glancy Resume") at 1-4). The Court concludes Glancy would generally be able to conduct this litigation. *See, e.g.*, *In re Symbol Techs.*, 2006 WL 1120619, at *3 ("The Pension Fund's counsel . . . has extensive experience litigating securities class actions and, therefore, has the ability to conduct the litigation effectively."). "Nothing about [Sanders's] interests appears to be antagonistic to the interests of the other class members; this appears to be a fairly common class action based on alleged violations of the Exchange Act where class members are relying on the same statements or omissions as the factual basis of their claims, and where the financial losses are tied to the drop in value that occurred after a specific statement or omission took place." *In re Sequans Commc'ns*, 289 F. Supp. 3d at 423. Finally, as noted earlier, Sanders suffered more than $100,000 in losses and thus has a sufficient financial interest in the case's outcome to suggest they will pursue the case with vigor. *See, e.g.*, *In re Gentiva*, 281 F.R.D. at 121 ("[T]here is no evidence that LACERS' interest would in any way conflict with those of other class members. They have a significant financial stake in the outcome of this litigation and this will motivate their vigorous pursuit of recovery for all other class members. Finally, LACERS has retained competent counsel . . . to assist them in zealously pursuing the claims of all class members."). Indeed, Sanders has attested to their commitment to the "zealous prosecution of this case." (Joint Decl. of Jeffrey Lynn

16

Sanders and Starr Sanders dated Mar. 4, 2019, attached as Ex. A to Sanders Reply, Dkt. No. 23 ("Sanders Decl.") ¶ 10).[7]

City of Warren argues that Sanders has "failed to even attempt to make the *prima facie* Rule 23 showing" because they provided their names "and nothing more" in their initial moving papers. (City of Warren Resp. at 1). This is not true. Sanders attested to purchasing Tenaris stock during the class period, and submitted sworn certifications stating they did not acquire Tenaris stock at the direction of counsel while indicating their willingness to serve as lead plaintiffs. (*See* Sanders Loss Chart; Sworn Certifications of Plaintiffs, attached as Ex. B to Portnoy Decl., Dkt. No. 10 ("Sanders Certifications")). They also submitted information on the qualifications of their chosen counsel, as described above. Nothing more has been required of putative lead plaintiffs, even when they are individuals rather than institutional investors. *See, e.g.*, *Altayyar v. Etsy, Inc.*, No. 15-CV-2785, 2015 WL 13742418, at \*2 (E.D.N.Y. Oct. 22, 2015).

The arguments made by City of Warren in disputing adequacy and typicality, (*see* City of Warren Resp. at 4-5), are without merit. City of Warren has provided no more information about itself than Sanders did.[8] To the extent that there are out-of-circuit

---

[7] City of Warren contends generally that "arguments . . . made for the first time in the Sanders Group's reply brief should be disregarded." (Reply Mem. in Supp., Dkt. No. 24 ("City of Warren Reply") at 2 n.2). City of Warren does not specify what argument Sanders has brought up for the first time in their reply. In any event, the Court does not consider the information provided in Sanders's Declaration regarding their residence, status as a married couple, and willingness to serve as lead plaintiffs to be new arguments, but rather a further explanation of why they satisfy Rule 23's requirements, and one that is appropriate for a reply brief.

[8] The certification provided by City of Warren indicates that it did not acquire Tenaris stock at the direction of counsel, its willingness to serve as lead plaintiff, and its other attempts to serve as lead plaintiff in a federal securities cases over the past three years. (Certification, attached as Ex. B to Rosenfeld Decl., Dkt. No. 17 ("City of Warren

cases holding that an individual cannot satisfy the typicality requirement without explaining her personal background, the Court finds such nonbinding cases unpersuasive; typicality in this Circuit is based on whether "the claims arise from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Symbol Techs.*, 2006 WL 1120619, at *3. It has nothing to do with the individual's particular personal circumstances. In any event, Sanders provided information on who they are, their understanding of the responsibilities of a lead plaintiff, and their willingness to take on the task. (*See generally* Sanders Decl.).

Sanders has met their burden under Rule 23, which "only [requires] a preliminary showing of typicality and adequacy" "at this stage of the litigation." *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 131 (S.D.N.Y. 2011); *In re OSI Pharm., Inc. Sec. Litig.*, No. 04-CV-5505, 2005 WL 6171305, at *4 (E.D.N.Y. Sept. 21, 2005) ("The inquiry [under the PSLRA] is not as stringent as that observed by a district court assessing a proposed class certification."). They are thus entitled to the PSLRA presumption that they should be lead plaintiff.

### iii. Rebuttal of Presumption

The presumption "may be rebutted only upon proof" that Sanders "will not fairly and adequately protect the interests of the class" or is "subject to unique defenses that render [them] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *accord Constance Sczesny Tr.*, 223 F.R.D. at 323. City of Warren does not attempt to provide proof to rebut this presumption; its sole focus is convincing the Court that *it* should be presumed to be lead plaintiff. In any event, there is no

---

Certification")). This is the standard certification described by 15 U.S.C. § 78u-4(a)(2)(A).

18

suggestion that Sanders is subject to unique defenses.  Therefore, City of Warren has not provided proof to rebut the presumption and Sanders is hereby appointed lead plaintiffs.  *See, e.g.*, *In re Gentiva*, 281 F.R.D. at 121 ("[B]ecause there is no indication that LACERS is subject to unique defenses or will be unable to fairly and adequately protect the interests of the class th[e] presumption is not rebutted.  Therefore, the motion by LACERS to be appointed lead plaintiff is granted.") (citations omitted).[9]

III.   Lead Counsel

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v); *see In re Sequans Commc'ns*, 289 F. Supp. 3d at 426.  "The Court generally defers to the plaintiff's choice of counsel, and will only reject the plaintiff's choice . . . if necessary to protect the interests of the class."  *Bray v. Frontier Commc'ns Corp.*, No. 17-CV-1617, 2018 WL 525485, at *11 (D. Conn. Jan. 18, 2018) (quotations omitted); *see Kuriakose v. Fed. Home Loan Mortg. Co.*, No. 08-CV-7281, 2008 WL 4974839, at *9 (S.D.N.Y. Nov. 24, 2008) ("The PSLRA . . . evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention.") (quotations omitted).

---

[9] In a footnote, City of Warren points out that "several courts have . . . appointed both the individual and institution as co-lead plaintiffs when faced with both individual and institutional investor movants."  (City of Warren Resp. at 7 n.3).  Although it is unclear whether City of Warren is asking the Court to appoint co-lead plaintiffs in this case, a court may do so on its own initiative.  *See Dolan*, 2005 WL 883008, at *5 (noting that "the PSLRA expressly contemplates the appointment of more than one plaintiff regardless of whether the groups move jointly or independently") (quotations and citation omitted).  However, because the Court has determined Sanders is able to adequately represent the class, there is no need to appoint both movants as lead plaintiffs.

19

"When making the decision to approve proposed lead counsel, courts in the Second Circuit have emphasized the counsel's experience." *Reitan*, 68 F. Supp. 3d at 401 (collecting cases).  Sanders is represented by Glancy, which, as discussed above, is experienced in securities class action litigation and has been appointed by other courts to serve as lead counsel or co-lead counsel.  (*See* Glancy Resume at 1-4).  There is no reason not to adhere to this choice, and the Court appoints Glancy Prongay & Murray LLP as lead class counsel.  *See, e.g.*, *Reitan*, 68 F. Supp. 3d at 401 ("Faruqi & Faruqi has extensive experience in the area of securities litigation and class actions.  The firm's resume indicates that it has litigated more than ten prominent securities class actions since its founding in 1995.  Faruqi & Faruqi achieved successful outcomes in many of these cases.  The Court finds that Faruqi & Faruqi has the requisite experience necessary to serve as lead counsel, and thus will be able to effectively prosecute the consolidated action.") (citations omitted).

CONCLUSION

Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, *Atanasio v. Tenaris S.A.*, case No. 18-CV-7059, and *Gross v. Tenaris S.A.*, case No. 19-CV-174, are hereby consolidated as *In re Tenaris S.A. Securities Litigation*.  All relevant documents and submissions shall be maintained as one file under Master File No. 18-CV-7059.  Any other securities class actions filed in, or transferred to, this District related to the facts alleged in the cases described above shall be consolidated into this action.

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B), the Court appoints Jeffrey Lynn Sanders and Starr Sanders as Lead Plaintiff and Glancy Prongay & Murray LLP as Class Counsel.  City of Warren's motion is denied.  The other motions—namely those filed by Local 103

20

and Atanasio—are denied as moot in light of their respective non-opposition and withdrawal.

SO ORDERED.

*/s/ Sanket J. Bulsara* April 29, 2019
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York

21