**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ASTEC INDUSTRIES, INC., BENJAMIN G. BROCK and DAVID C. SILVIOUS,<br><br>Defendants. | No. 1:19-cv-00024-PLR-CHS<br><br>CLASS ACTION<br><br>Chief Judge Pamela L. Reeves<br><br>Mag. Judge Christopher H. Steger |

# AMENDED COMPLAINT

Lead Plaintiff Lynn Johnson ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Astec Industries, Inc. ("Astec" or the "Company"), analysts' reports and advisories about the Company, interviews with witnesses, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION


Case 1:19-cv-00024-CEA-CHS Document 56 Filed 08/26/19 Page 1 of 71 PageID #: 946

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded securities of Astec between July 26, 2016 and October 22, 2018, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class") and SEC Rule 10b-5 promulgated thereunder.

2. Based in Chattanooga, Tennessee, Astec designs, engineers, manufactures, markets, and finances equipment and components, including aggregate crushers, pavers, asphalt plants, wood pellet plants, and related components. The Company's manufacturing operations are divided into three primary business segments: road building, wood pellet production and related equipment (Infrastructure Group); aggregate processing and mining equipment (Aggregate and Mining Group); and equipment for the extraction and production of fuels, biomass production, and water drilling equipment (Energy Group).

3. The Company's Infrastructure Group has been involved in the wood pellet plant business since approximately 2013, when Astec began commercial production and marketing of wood pellet plants to potential customers that supply wood pellets to the utility and home-use industries. In 2016, the Infrastructure Group accounted for the majority of the Company's net sales, and pellet plant sales accounted for 22% of the Group's net sales.

4. The Company's pellet plants are made up of separate lines, with each line designed to produce 20 metric tons per hour ("TPH") of dense, dried wood pellets created from timber to be used as fuel for the creation of energy. During the Class Period, Astec's wood pellet plants were permitted for, marketed and sold to customers seeking to serve the needs of European Union ("EU") utilities, whose goal was to use biomass fuels for a minimum of 20% of their overall energy production.

5. Leading up to the start of the Class Period, the Company held itself out as the world's only single-source complete wood pellet plant manufacturer and touted the sale of two wood pellet plants, one in partnership with Highland Pellets, LLC, located in Pine Bluffs, Arkansas, and one to Hazlehurst Wood Pellets, LLC, located in Georgia.

6. For the Hazlehurst plant, Astec financed its customer's purchase of the three-line facility for $60 million. The Hazlehurst plant was designed to produce 400,000 metric tons of pellets per year. Because it financed the purchase of the Hazlehurst plant, Astec could not recognize revenue from the plant until its customer paid off the financing. In July 2014, Astec told investors that the Hazlehurst plant was being financed for a period of 24 months.

7. Astec described the Highland pellet plant as a four-line, 20 metric TPH per line plant capable of producing 600,000 metric tons of wood pellets annually. Astec was hired to design, install, test and get the Highland pellet plant running at full capacity. Astec stated the plant would become fully operational in the first quarter of 2018 and that it had "achieved recognition for being able to produce saleable pellets months ahead of what any competitive plant was able to accomplish to date." Astec received an initial down payment of $30 million on the plant in August 2015 and a final $122.5 million payment in March 2016.

8. Touting the Highland and Hazlehurst plants as models for the booming pellet plant industry, Astec told investors that the best was yet to come. In July 2016, the Company told investors that it expected another $80 million pellet plant order later that year. In October 2016, the Company boasted that its pellet plant business would record $100 million to $125 million in 2017—and this figure did not even include the $60 million owed to Astec for the Hazlehurst plant, which the Company instead counted as part of its inventory and "backlog." In November 2016, the Company told investors that it expected 35-50 pellet plants to be built in the United

States in the next 5 years, each worth about $100 million, and that the Company's plan was to build "maybe half" of them.

9. What the Company failed to disclose was that Defendants knew the plants were riddled with problems that prevented them from running at their promised operational or production capacity, posing a threat to the Company's pellet plant business, its overall financial performance, and its financial outlook. First, Defendants failed to disclose that neither the Hazlehurst nor the Highland plants were capable of producing enough low emission pellets to take advantage of the booming European market in which the Company had promised to become a major player. The plants needed to be run with wood-firing furnaces in order to satisfy pellet customers' European Union emissions requirements. The Highland plant initially ran using wood-burning furnaces, but Astec had to add supplemental natural gas furnaces to increase production. Highland plant's natural gas usage was strictly limited to ensure its pellets met EU emissions standards that governed its customer Drax, leaving the Highland plant unable to meet its contractual production targets to Drax. Similarly, Astec tried to switch the furnaces at the Hazlehurst plant from natural gas to wood-burning in 2016, but Defendants' repeated assurances about the success of the transition were knowingly false.

10. Second, Defendants failed to disclose that the Company's sales contract to Highland Pellets was contingent upon the plant being able to pass a "reliability run," which required the plant to produce 50,000 metric tons of high quality wood pellets in a 30 day period—the production level needed to fulfill Highland's 10-year contract to supply British utility company Drax with 600,000 metric tons of pellets per year. Moreover, Defendants failed to disclose that its contract with Highland Pellets contained a longstop date of April 15, 2018. If

the plant failed to pass the reliability run test by that date, Astec would be forced to refund the entire purchase price of the plant to Highland.

11. Rather than coming clean to investors about the Company's pellet plant failures, the Company issued a series of misleading partial disclosures downplaying the severity of the problems and the serious threat they posed to the Company's financial success.

12. Confidential witnesses and company documents confirm that Astec executives, including the Company's CEO, were well aware of the severity of the problems at the pellet plants while they were falsely assuring investors that not only were the current plants successes, but that the Company would soon land more pellet plant orders to sustain a $100 million annual net revenue source for the company. Indeed, while the Company's CEO was negotiating the as-yet-undisclosed $75 million payout to Highland Pellets, he unloaded nearly 60,000 shares of Astec stock for a total of $3.2 million. These stock sales were suspicious and unusual, as it was the CEO's first sales of Astec stock in over three years.

13. Finally, before the market opened on October 23, 2018, the Company surprised investors by reporting third quarter 2018 ("3Q2018") results that fell well short of the low end of the Company's guidance and the market's expectations. Among other things, the Company reported that net sales had decreased by 3.4% and domestic sales had decreased by 7.5% compared to the third quarter of 2017. The October 23, 2018 earnings release also stated that the Company's backlog, a key indicator of the Company's future financial performance, decreased 20.2% to $308.6 million at September 30, 2018, down from $386.5 million at September 30, 2017. All but $2.3 million of the $77.9 million decrease in the Company's backlog was attributable to pellet plants.

14. The Company's poor results prompted a downgrade from William Blair & Company, L.L.C. ("William Blair"), who stated that Astec "continues to disappoint" and "has squandered the entire upside in its end-markets" and "destroyed value through poor execution and other factors such as the performance of its pellet plants." William Blair added that "[w]e can no longer give management any benefit of the doubt on its optimism" and labeled the Company's 3Q2018 results "[a]nother [d]isaster."

15. The market reacted swiftly and negatively to the Company's poor 3Q2018 financial results. After closing at $47.27 per share on October 22, 2018, Astec stock opened at $43.11 per share and continued falling to a close of $35.51 per share on October 23, 2018, a decline of nearly 25%, on heavy trading volume of nearly 1.6 million shares traded.

16. On January 22, 2019, Astec unexpectedly announced that Benjamin Brock had resigned as President and Chief Executive Officer ("CEO") and as a member of the Board, effective as of the close of business on January 21, 2019. Upon information and belief, Brock was forced out as result of the fraud.

**JURISDICTION AND VENUE**

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Defendants conduct business and the Company is headquartered in this District.

20. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

21. Lead Plaintiff, as set forth in the previously filed Certification incorporated herein by reference, acquired Astec securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

22. Defendant Astec is a Tennessee corporation, and its principal executive offices are located in this District. Astec securities trade on the NASDAQ ticker under the ticker symbol "ASTE."

23. Defendant Benjamin G. Brock ("Brock") was the Company's CEO and President, a member of the Company's Board, and a member of the Board's executive committee until he resigned on January 21, 2019. He previously held the position of President of Astec, Inc. since 2006 and Group Vice President of the Asphalt Group since August 2012. Prior to 2006, Mr. Brock held the position of Vice President-Sales of Astec, Inc. from 2003 until 2006 and CEI Enterprises, Inc.'s Vice President/General Manager from 1997 until 2002. As described in Astec's proxy materials, Brock had primary responsibility for the operations of the Company, setting the Board agendas, and presiding over Board meetings, and provided the Board with invaluable industry experience and knowledge of the Company.

24. Defendant David C. Silvious ("Silvious") has served as the Vice President, Chief Financial Officer, and Treasurer of the Company since August 2011. He previously served as Corporate Controller of the Company from 2005 to 2011 and as Corporate Financial Analyst

from 1999 to 2005. Silvious also serves as Treasurer of each of the Company's U.S. operating subsidiaries and Vice President of Astec Insurance Company.

25. Defendant Malcolm Swanson is an Executive Officer of the Company and served as the President of Astec, Inc. from January 2014 through 2018. He previously served as Vice President – Engineering of Astec, Inc. from 1995 to 2013 and as Chief Engineer of Astec, Inc. from 1989 to 1995.

26. Brock, Silvious, and Swanson are sometimes referred to herein as the "Individual Defendants."

27. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

28. Astec is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

29. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Astec under *respondeat superior* and agency principles.

30. Defendant Astec and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31. Astec was founded by Brock's father in 1972 and completed its initial public offering in 1986. Brock's father served as the CEO of the Company from its founding until January 1, 2014, when Brock became CEO and President. Prior to being named CEO, Brock served as President of Astec, Inc. Malcolm Swanson assumed Brock's role as President of Astec, Inc. upon Brock's promotion.

32. Astec, Inc. is a business unit in the Company's Infrastructure Group that designs, engineers, manufactures and markets a complete line of asphalt and wood pellet plants and related components primarily for the asphalt paving and wood pellet industries. In 2016, the Infrastructure Group accounted for the majority of the Company's net sales and profits, and pellet plant sales accounted for 22% of the Group's net sales.

### Astec Enters the Wood Pellet Business

33. In the late 2000s, the EU began subsidizing burning wood for electricity under the presumption that doing so would be more environmentally friendly than coal or other traditional

power generation methods. To feed the wood-burning boilers of EU power plants, many EU-based companies started importing wood pellets from the United States. As a result, the southern United States became the world's largest wood pellet supplier, with EU-based power companies importing more than 4.7 million metric tons of U.S. wood pellets each year, up from just 500,000 tons in 2009.

34. A wood pellet manufacturing plant has two main tasks: to dry the wood to a point where it is efficient to burn in power plants and to turn the whole trees into pellets for easy transport. To begin the process, felled trees typically arrive by truck. Once at the facility, trees are debarked and then chipped in shredding machines called hammermills. The wood is then conveyed to a dryer, usually a large rotary dryer heated by burning wood and bark, where the moisture in the wood is reduced from about 50% by weight to around 10%. After the dryer, the wood is again processed by hammermills to reduce its size to a point where it can be formed into pellets.

35. The next unit is the pellet press, which presses the wood through holes in a die to create pellets, a process that requires large amounts of pressure and heat. The pellets are then deposited into a pellet cooler to reduce their temperature back to safe levels. The pellets are then ready for transport to a port, where they are usually stored for some time before being shipped to Europe. A typical facility produces between 50 and 70 tons of wood pellets per hour, or between 450,000 and 650,000 tons per year.

36. Astec's wood pellet plants have been in commercial production since 2013. The Company's pellet plants use a modular design that includes replicated parallel production lines (for example, a 60 TPH plant consists of three 20 TPH lines), which the Company has touted as resulting in very few points in the process where any individual equipment failure can shut the

entire plant down. For example, in the Company's 2017 annual report filed with the SEC on Form 10-K, Astec discussed the superior design of its pellet plants, as well as the turnkey nature of its pellet plant business, stating:

> In most other pellet plant designs, one small equipment failure, such as a dryer outage, would result in a total plant shutdown. If a dryer outage were to occur in a 60 TPH Astec plant, the plant could continue to operate at 40 TPH. In fact, there are very few reasons why the plant would ever be completely shut down. Even major maintenance cycles may be performed line-by-line while the plant continues to operate on the other lines.
>
> * * *
>
> The Company believes that it is the only company offering a single source for a complete pellet plant, as known competitors only sell individual plant components thereby requiring the customer to purchase the remaining plant components from other sources.

37. In an April 23, 2013 earnings call, Astec founder Don Brock stated the Company was relying on wood pellet plant sales to make up for lackluster sales from the rest of the Infrastructure Group: "We see this as a real opportunity for further growth in the wood pellet plant business. We see this product as filling the gap in our volume in the next few years as infrastructure continues to be somewhat slow."

38. In December 2013, Swanson wrote an article for Biomass Magazine touting the advantage of wood pellet plants that are designed and constructed by a single source instead of mixing and matching equipment from multiple sources. Swanson wrote, in part, that "with standard equipment, it is possible to reliably predict performance . . . [i]nvestors and owners will then be able to possess a high level of certainty concerning how long it will take to get a plant up and running, costs, production rates and pellet quality."[1]

**WITNESSES**

[1] http://biomassmagazine.com/articles/9821/what-the-wood-pellet-industry-needs

39. Confidential Witness 1 ("CW 1") was employed by Highland Pellets at the Pine Bluff pellet plant from January 2017 through April 2019. CW 1 held several positions during his tenure at Highland, including Lead Electrician, Electrical Superintendent, Maintenance Manager and Continuous Improvement Process Engineer. Throughout his employment at Highland, CW 1 reported directly to Highland Plant Manager Jody Doak. Pursuant to his job responsibilities at Highland, CW 1 was intimately familiar with Highland's pellet production process and regularly communicated with Astec engineers, Astec executives, and third-party consultants regarding ongoing issues at the plant.

40. Confidential Witness 2 ("CW 2") was an environmental health and safety consultant for Highland Pellets at the Pine Bluff pellet plant from April 2018 through July 2018. CW 2 reported directly to Highland Plant Manager Jody Doak.

41. Confidential Witness 3 ("CW 3") was a sustainability manager for Highland Pellets at the Pine Bluff pellet plant from October 2017 through February 2018. CW 3 reported directly to Highland Plant Manager Jody Doak throughout her tenure at Highland. CW 3's primary job responsibility was ensuring the wood Highland purchased was certified to meet the sourcing standards required by Highland's sole customer: Drax. CW 3 left Highland Pellets in March 2018 to work for Drax as a procurement forester.

**<u>Defendants Mislead Investors Regarding the Hazlehurst Plant</u>**

42. The Company's first pellet plant order was in 2013 from Hazlehurst Wood Pellets, LLC—a subsidiary of Fram Renewable Fuels, LLC ("Fram")—for a three-line facility located in Hazlehurst, Georgia. Rather than sell that plant, the Company financed it with the buyers for $60 million, meaning Astec could not recognize revenue from the plant until the loan

was repaid. Astec planned to be repaid once the buyer received financing from its banks and told investors that the financing would be repaid to Astec within two to three years.

43. Hazlehurst's 2013 application to Georgia's Environmental Protection Division ("EPD") for a permit to construct and operate the plant stated that the pellets would be sold to EU utility companies, which meant they would have to be produced with wood-burning furnaces to meet the strict EU environmental standards. Specifically, the permit application stated that "[t]he material produced will be put through pelletizers to produce wood pellets that are exported to markets in the European Union for powering utility boilers. Three 65 MMBtu/hr wood dust burners will supply heat for the three indirect-fired pre dryers and three indirect-fired primary dryer."

44. While Astec did not recognize revenue from Hazlehurst, it did include the $60 million plant in its reported inventory in its financial statements. Astec also included the $60 million plant in its backlog, a measure the company touted as a key indicator of future growth. For example, Brock told investors in an October 2016 conference call that the Company was "encouraged" by the increase in its backlog and that it was one of the "encouraging signs we believe that our fourth quarter this year will be better than our fourth quarter last year."

45. Even before the Class Period began, Astec and Fram were well aware of the Hazlehurst plant's inability to efficiently produce pellets that met the strict emissions standard of the European industrial clients that were necessary for the Hazlehurst plant to receive financing.

46. In March 2016, Fram informed Georgia's Environmental Protection Division ("EPD") that the Hazlehurst plant was planning on adding wood-fired burners manufactured by McConnell to each of the three lines at the Hazlehurst plant because the current Astec burners at the Hazlehurst plant had been running on natural gas and were inefficient in burning wood fuel:

> The Permittee has proposed to add new 50 MMBTU/hr wood-fired burner to each production line since the existing 65 MMBTU/hr ASTEC burner is inefficient in burning wood fuel and is mostly fired with natural gas. After installation of the new McConnell burners the existing Astec burners will serve as standby burners that will be used when the McConnell burners are down for maintenance or repairs. . . . Hazlehurst has not proposed any increase in production from the pellet mill.

47. On April 11, 2016, Fram wrote to Georgia's Environmental Protection Division ("EPD") stating that only one of the three lines (Line 3) at the Hazlehurst plant was currently in operation, and that the plant was adding McConnell burners to each of the three lines in an effort to burn wood fuel.

48. On June 20, 2016, Fram wrote to EPD stating that Line 2 of the Hazlehurst plant attempted to run burning wood fuel with the McConnell burner on June 10, but that Astec took Line 2 out of production for modifications after determining that there were feed-related issues with the wood fuel. Fram noted that Line 2 had previously been tested for emissions compliance while burning natural gas, and that a new compliance test would have to be run using the wood fuel.

49. On July 26, 2016, at the start of the Class Period, Brock acknowledged on an investor call that Hazlehurst needs to "be able to burn wood exclusively on each line, and we've hit a wall on that on our burners. So we're replacing the burners. . . . " However, Brock failed to inform investors that the replacement burners were purchased from a third party, which would have undermined Astec's marketing claim to being a one-stop shop for pellet plant equipment and installation. More egregiously, Brock assured investors that "testing and proving that the lines will do what we said on tons per hour is fine" and that "I want to make sure everybody understands, we're not in a jam or at risk or anything, because there is no risk. We have met that, and we are in good shape."

50. In an October 2016 call with investors, Brock stated that "assuming we are paid on Hazlehurst in 2017," that $60 million would be on top of the $100 million to $125 million in net pellet plant sales the Company expected to recognize in 2017. Asked by an analyst whether the use of the word "assumed" was implying that the payment was less than certain, Brock assured the analyst that "It's really, we get paid, but there is not really profit in it."

51. In a November 2016 speech at the Robert W. Baird Global Industrial Conference, Brock characterized the pellet plant industry as our growth story for us." Brock also acknowledged that the "[t]he pellet business is really created by the demand in the UK as they convert their coal fired energy plants to wood fire" and that "Most of the contracts that are driving these plants to be build are a 10-year supply contracts for pellets from our customers to the utilities."

52. Despite adding the McConnell wood-firing burners in 2016 and understanding that Hazlehurst needed to rely on wood-fired furnaces to secure financing, on January 31, 2017, Hazlehurst's pre-dryer baghouse was tested for emissions while combusting ***natural gas***, rather than wood. This test showed an emission rate more than five times higher than the same test had shown in August 2014 and December 2015 while combusting wood.[2]

53. In a February 2017 call with investors, Brock announced that Astec was extending the loan term for the Hazlehurst plant from July 2017 to December 2018, purportedly because Hazlehurst "has been a good partner." Brock did not disclose that Hazlehurst was unable to obtain financing because it was still unable to efficiently produce pellets with wood-firing furnaces.

---

[2] https://www.epa.gov/sites/production/files/2019-05/documents/highlandpelletssouthpetition2019.pdf

54. In calls with investors in April and July 2017, Brock falsely assured investors that the Company expected to receive the $60 million in financing from Hazlehurst—plus 6% interest—by December 2018.

55. In October 2017, the Company revealed what Defendants had known for more than a year: the Hazlehurst plant was still running on natural gas because Astec had never figured out how to efficiently produce pellets with wood-burning fuel sources. The Company claimed that it had discovered new issues related to the wood-burning furnaces just in the past 45 days as it attempted to ramp up production—a frank admission that its 2016 claims to have already switched to wood-burning furnaces that had passed production tests were false and misleading.

56. The Company disclosed that they had identified three problems at the Hazlehurst plant: baghouse related issues, gas buildup, and ash/dust buildup. Indeed, On September 20, Hazlehurst applied to EPD for a change in its operating permit to allow the plant to add additional baghouses to each line.[3] Despite the fact that the permit was not granted until November 15, 2017[4]—and despite the fact that Hazlehurst was still unable to efficiently produce pellets with wood-fired burners—Defendants again falsely assured investors that these unresolved problems did not change the Company's expectation of being fully reimbursed by Hazlehurst by December 2018.

57. At the Robert W. Baird Global Industrial Conference in November 2017, Brock admitted that he has weekly communications with the management of the Hazlehurst plant, and would thus be aware of the plant's limitations: "I talked to the management partner every other week. We communicate on email the weeks we don't talk."

---

[3] SIP Construction & Operating Permit And Title V 502(B)(10) Change Application Review, September 20, 2017.

[4] https://permitsearch.gaepd.org/permit.aspx?id=PDF-VF-65624

58. On investor calls in February and April 2018, the Company again falsely assured investors that the 2017 charges would be sufficient to resolve the ongoing problems at Hazlehurst and that the Company still expected Hazlehurst to pay off the $60 million in financing—plus interest—by December 2018. Defendants made these assurances despite knowing that the Hazlehurst had not met the production standards necessary to attain financing.

59. On a July 24, 2018, investor call, Brock announced that, after consultation with the Company's external auditor, Astec was finally removing the $60 million Hazlehurst order from the Infrastructure Group's backlog in order to "add clarity." However, Brock explained that the Company still refused to remove the Hazlehurst order from its inventory or otherwise take a charge for it because "[w]e have agreements in place on Hazlehurst" and because the Company still had a "reasonable degree of confidence" that it would recognize revenue from the Hazlehurst sale by the end of 2018.

60. In March 2019, the Company announced that it recorded a full write-off of $65.7 million related to the Hazlehurst plant in the fourth quarter of 2018, writing down the pellet plant inventory's net realizable value down to $0. The Company stated that it was taking the write-off because "the timing of a transaction and the ultimate sale price are uncertain," but those same conditions were true throughout the Class Period.

61. In July 2019, the Company announced that it had sold the Hazlehurst plant for $20 million—recouping just a fraction of the cost of the Company's initial $60 million financing with interest in 2013.

**Defendants Mislead Investors Regarding the Highland Plant**

62. On August 20, 2015, the Company announced it had entered into an agreement and received a related down payment to build, deliver and install the first production line of a

new turnkey wood pellet production facility in Arkansas. The Company's $30 million agreement with Highland Pellets, LLC included the option to add additional production lines, related equipment and installation services. The Company disclosed that the potential add-ons "could bring the total order amount to $143 million." Astec stated it expected to deliver the first production line and related equipment no later than early 2016. The Company disclosed that it was not financing the order, and that it would "generally recognize revenue on the first production line and any subsequent production lines when they are delivered to Highland Pellets."

63. On March 30, 2016, the Company announced that it had been asked to build an additional $122.5 million of equipment to round out the initial $30 million order for the first production line of the multi-line Highland pellet plant, bringing the total project order to $152.5 million.

64. Announcement of the Highland pellet plant was seen as a way for Astec to offset slower revenue growth in its Infrastructure Group, which at the time accounted for approximately 40% of the Company's sales. It was also seen as an additional growth area for the Company, with Astec poised to take advantage of the growing demand for wood pellets in the EU. Michael Swanson—Vice President of Engineering at Astec, Inc. and Malcolm Swanson's son—told the *Chattanooga Times Free Press* in April 2016 that the Company expected "wood pellet factory production to represent roughly a third of the company's sales this year."[5]

65. On May 3, 2016, *Bloomberg Intelligence* reported that increased demand for Astec's wood pellet plants "may help mitigate weakness in the Energy and Aggregate and Mining businesses amid a global mining slowdown and lower oil prices. . . . While pellet

[5] https://www.timesfreepress.com/news/business/aroundregion/story/2016/apr/14/astec-inc-expanding-build-biomass-fuel-factor/360022/

demand has slowed in recent years because of warm winters in Europe, Astec could book another $100 million order by the end of 2016, with a goal of one to one-and-a-half plants a year."

66. Highland's sole customer was Drax Power Limited ("Drax"), a British company that owns and operates the biggest renewable power plant in Europe. Highland contracted to provide Drax with 600,000 metric tonnes of wood pellets per year for ten years.

67. Unbeknownst to investors, the Company's contract with Highland contained two terms that would eventually cripple Astec's finances: (i) the plant had to pass a rigorous test ("Reliability Run") demonstrating that the plant could produce a sufficient quality and quantity of pellets to meet its contractual obligations to Drax; and (ii) the Company would have to refund the entire purchase price of the plant if the plant failed to pass the Reliability Run test by April 15, 2018.

68. The Reliability Run required the Highland plant to produce 49,315 metric tonnes of pellets within a period of 30 consecutive days, and each line would have to produce pellets at an average rate of 20 metric tonnes per hour for two period of 24 consecutive hours. The pellets produced must also meet the European Standards for average durability, average net calorific value, average bulk density, pellet moisture content, ash content, and fines content.

69. Astec staff and executives actively monitored Highland's day-to-day productivity and constantly had engineers on site to work with Highland employees. According to CW 1, Swanson was at the Highland plant 2-4 times per month and would sometimes stay for an entire week. Astec would rotate engineers through the Highland plant to ensure that at least one was on site every day. Those engineers included Seth Castleberry, Derek Acres,[6] and Daniel Edwards.

[6] Acres was an employee of an Astec sub-contractor.

Additionally, Astec Senior Field Service Technician Harvey Chapman would "come be on site for three weeks" out of every month.

70. CW 1 stated that Highland staff had a daily 8 a.m. operations meeting; following the Operations Meeting, at approximately 8:30 a.m., Swanson and Astec representatives would join the meeting, either in person or by conference call. CW 2 also attended the daily morning meeting with Highland personnel – including the maintenance manager, the plant controller and the procurement manager – and Astec personnel to discuss production targets. CW 2 recalled that Brock would join these meetings by conference call "at least a few times a week." These meetings often included discussions of Highland shortfall in production targets.

71. CW 1 also attended a daily 2 p.m. meeting with Highland management and Astec employees and consultants to discuss maintenance needs and other ongoing problems at the plant. At these meetings, Highland and Astec personnel would go line by line through the Astec/Highland Operations Issues List (the "Highland Issues List"), a spreadsheet documenting all ongoing operations issues at the plant identified by Highland, Astec's recommended actions, updates, and resolutions. A digital version of the spreadsheet was circulated via email to participants prior to the meeting, and a printed version was circulated at the meeting.

72. Through constant communication and on-site inspections, Astec engineers and executives were well aware that the Highland plant was riddled with production shortfalls, equipment failures, and inferior pellets from its inception. CW 1 stated that Swanson and the Astec engineers who rotated through Highland received daily production reports every 12 hours, which included data on the quantity and quality of pellets produced.

73. Just one month after Hazlehurst asked EPD to supplement its 65 MMBTU/hr Astec burners on each line with higher quality burners from a competitor, Highland made a

similar request to its own regulator. Highland's original permit from the Arkansas Department of Environmental Quality ("ADEQ") approved the plant's January 2015 proposal to run an Astec Phoenix BioMass PB-65 burner on each of the plant's 4 lines.[7] In April 2016, Highland applied for a modification to its permit, which included replacing the Astec Phoenix Biomass fuel burners with a Sigma Thermal bark fuel burners; upsizing the heater baghouse; and adding one pellet mill. These proposed changes—each of which applied to all 4 lines—were approved by AQED on September 13, 2016.[8] According to the Company's Form 10-K for 2017, Sigma Thermal is a "major competitor" of Astec's.

74. In October 2016, Brock boasted in a call with investors that "I was able to visit the Highland site a few weeks ago, and I am happy to report that the site looked great and the project is on schedule." However, according to CW 1, the bark burners were constantly creating fires by sending sparks into dust. CW 1 says that Highland's GreCon spark detector detected thousands of sparks per day at the Highland plant. In August 2017, the *Pine Bluff Commercial* reported that bags of wood pellets and sawdust spontaneously combusted in one of the baghouses at the Highland plant, destroying the bags of pellets inside.

75. Due to these issues with the bark burners—and the production delays caused by these problems—Highland began using natural gas burners on Lines 1 and 4 to increase production. While the switch to natural gas did help increase production, natural gas usage at Highland was strictly limited by the European Standard emissions regulations that governed Drax.

76. Astec did not disclose any problems with the Highland plant until July 25, 2017, when Brock informed investors on a conference call that a "cost miss estimate" due to a "late

---

[7] https://www.adeq.state.ar.us/downloads/WebDatabases/PermitsOnline/Air/2341-AOP-R0.pdf
[8] https://www.adeq.state.ar.us/downloads/WebDatabases/PermitsOnline/Air/2341-AOP-R1.pdf

add-on in the process" of installing the plant that caused a "major issue" with the Company's net income for the quarter. What Defendants failed to disclose was that—according to CW 1—the Highland plant was only running at 50% of the required production level, was relying on some natural gas usage to increase production, and had not come close to passing the Reliability Run.

77. On October 2, 2017, the Company told investors that it had discovered "design flaws" at the Highland plant in the past 45 days as it "ramped up production" from "low production rates." Asked how far off Highland was from reaching its production targets, Brock replied that the Company had guaranteed 20 tonnes per hour on each of the 4 lines and stated that one of the lines had reached that threshold for a short period of time. Defendants failed to disclose that the line that had reached its production goal for a short period of time did so by running partially on natural gas—which the plant could not do on all 4 lines due to emissions limits.

78. Brock also told investors that the Company does not anticipate "the creation of dust" being an issue at Highland because it used a different burner than Hazlehurst. But the creation of dust was a significant problem at the Highland plant, as well, leading to several fires from sparks from the burner.

79. Brock also told investors that the Company had "high confidence" that the charges announced on October 2 were sufficient to meet Astec's contractual obligations to Highland and that the Company did not anticipate additional charges caused by the plant missing production goals. Brock stated that April 15, 2018 was the "furthest out date" by which the Company believed the design flaws at Highland would be fixed, and that the Company has "a timeline that shows earlier than that internally." Defendants did not disclose that the Reliability

Run needed to be completed by April 15 or that the Company would have to refund the entire purchase if the plant failed to pass the Reliability Run.

80. On an October 24 earnings call, Brock stated that the upgrades at Highland were "more involved frontend work with green hammer mills, cement plant work." Brock also mentioned an April "drop dead" date for the Highland plant, but he failed to explain the significance of the Longstop Date in terms of the scale of the refund or the lofty requirements of the Reliability Run. Further, Brock conflated the April 15 deadline with the Company's internal goal of fixing the issues at the Hazlehurst plant by November 2017. The misleading nature of Brock's comments were evidenced by an analyst asking Brock about "the drop dead date November, then kind of April in terms of guaranteeing the throughput." Brock did not clarify his misleading comments; instead, he compounded the misstatement by stating only that the Company would be responsible for additional capital outlays to ensure production targets are met.

81. On February 20, 2018, Brock announced on an earnings call that "on the wood pellet plants, we are making good progress and believe that our announced charges during 2017 are adequate to cover our commitments to our customers." On March 1, however, the Company announced in its 2017 Form 10-K that it had amended its contract with Highland "whereby the Company agreed to compensate the customer for production shortfalls caused by the Company and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018. The Company incurred production shortfalls in January and February 2018. The Company expects to meet the contract's operational specifications prior to June 15, 2018." The Company still failed to disclose that the Company was not close to meeting

the operational specifications or that the Company was liable for refunding the entire purchase price.

82. The 2017 Form 10-K also listed a new "risk factor" that had not appeared in the Company's 2016 Form 10-K: "Production delays, design changes and adverse weather conditions, etc. can also result in construction and testing delays which can cause significant cost overruns or the missing of required completion dates. In certain circumstances, we may incur contractual penalties as a result of such delays or minimum production levels, and be liable to customers for other losses they incur in connection with such delays, including possible refund of the purchase price." The Company's decision to add a general risk factor about a potential refund instead of disclosing the actual risk of the Highland contract demonstrates an intent to mislead investors.

83. On an April 24, 2018 earnings call, Brock again assured investors that "on the wood pellet plants, we've made good progress and believe our announced charges during 2017 are adequate to fulfill our commitments to our customers." Brock stated that "the hammer mills that piece and all that we fixed." However, according to CW 1, it was clear within just a few days of the installation of the green hammer mills on December 22, 2017 that the new green hammer system was not keeping up and had a lot of maintenance issues. These problems with the green hammer mills are evidenced by the numerous entries in the Highland Issues List, which also demonstrates that Malcolm was intimately involved in attempting to resolve these issues.

84. That same day, the Company's Form 10-Q stated that the Company needed to pass the Reliability Run to void Highland's "right to any potential refund of the purchase price"—a disclosure which still falls short of acknowledging that Highland's right to a full refund upon the longstop date was contractual, not just a potential liability. The Company failed

to disclose that the Highland plant continued to suffer from operational issues that were crippling the plant's production levels; the plant's inability to consistently produce high quality pellets; the negotiations between Astec, Highland, and Highland's financers; and the impossibility of the Highland plant passing the Reliability Run by the Longstop Date.

85. On February 23, 2018, employees from Highland, Astec, and Nexus (a third party consultant) inspected the plant and to find solutions to some of the issues identified on the Highland Issues List. The results of the inspection and he group's recommendations were recorded in a memo (the "Transition Inspection Report") that was circulated to the team of people who attended the daily operations meetings—which, according to CW 1, included Malcolm Swanson. On April 14-15, 2018, a follow-up inspection was conducted, and the results were recorded in an April 16, 2018 memo (the "Material Leakage Memo") that was circulated to Astec executives, including Swanson and Brock at a meeting at the Highland plant to discuss the ongoing problems.

86. The Highland plant also continued having problems producing high quality pellets that met its contractual obligations to Drax. According to CW 3, Drax sent three entire train loads of pellets back from Baton Rouge to Highland Pellets. CW 3 explained that wood pellets for industrial use are supposed to have 7-8% moisture in order keep the pellet intact. When a pellet is crushed or does not stay intact, the industry term for such a destroyed pellet is "fine." The Highland contract with Drax set forth the moisture content required for pellet and also set forth the percentage of "fine" allowable per shipment. "If a pellet does not have enough moisture, the pellet will break down in the train car." CW 1 confirmed that that Highland had massive piles of unusable pellets in the parking lot. CW 1 recalled that the piles of pellets that could not be sold due to quality issues were so big that, by the end of 2017, you could see the

pellet piles from an airplane taking off from the Pine Bluffs, AR airport. The pellet piles were referred to internally as Mt. Reilly and Mt. Doak, named for the Highland co-founder Tom Reilly and Highland Plant Manager Jody Doak. Westbrook explained that the pellets "couldn't be used at all" and were "expensive waste."

87. As a result, in either January or February 2018, Highland informed Astec they were not even going to conduct the reliability run in either April or June 2018. From Highland's perspective, "it was a waste of time" to conduct the reliability runs in April or June 2018 given the multitude of issues on each of the lines that required constant maintenance that still did not bring the plant to full production.

88. CW 1 was part of at least three of the plant's attempts to pass the Reliability Run in 2017. CW 1 states that Highland never got close to passing the Reliability Run, and, in fact, "never got over three days of 12 hour shifts running before something messed up" and the test was canceled.

89. Starting in January 2018, Astec participated in negotiations with Highland and Highland's funders--Global Infrastructure Partners and Arkansas Teacher Retirement System—to relieve the tension caused by the plant's inability to meet contractual production obligations. According to ATRS board minutes, "[t]he original projections and loan timelines put GIP in a position in the near future of requiring the equipment vendor to pay the loan if certain date hurdles were not met. Those older agreements have placed undue pressure on the equipment vendor, the investors, including ATRS, and on GIP. Negotiations have been underway for several weeks in order to eliminate the pressure the 'put back' provision in the loan agreement has placed into the deal that jeopardizes the alignment of interest and the success of the plant."


Case 1:19-cv-00024-CEA-CHS Document 56 Filed 08/26/19 Page 26 of 71
PageID #: 971

90. It was also reported that "construction on Highland's Pine Bluff plant has seen several delays due to ongoing loan negotiations between New York-based Global Infrastructure Partners, Astec, ATRS and other investors in the project."[9]

91. According to CW 1, Brock visited the Highland plant in April 2018 and was given tour of the plant. During the tour, the problems identified in the Highland Issues List were conveyed to Brock. Following the tour, CW 1 participated in a 2-hour meeting with Astec personnel to go over the Highland Issues List. CW 1 noted that there was no sense of shock from any of the Astec personnel at the problems described at the plant.

92. Following his visit to the Highland plant—and before disclosing the impossibility of the plant passing the Reliability Run prior to the Longstop Date—Brock began unloading his Astec stock. From May 1 to May 4, 2018, Brock sold nearly 60,000 shares of Astec stock and pocketed nearly $3.2 million in profit from the sales at artificially inflated prices.

| Defendant | Date of Sale | Shares Sold | Acquisition Price | Sale Price | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Brock | 5/1/2018 | 11,000 | $0.00 | $54.41 | $598,510 | $598,510 |
| Brock | 5/2/2018 | 25,000 | $0.00 | $54.74 | $1,368,500 | $1,368,500 |
| Brock | 5/3/2018 | 5,000 | $0.00 | $54.40 | $272,000 | $272,000 |
| Brock | 5/4/2018 | 17,439 | $0.00 | $54.80 | $955,657 | $955,657 |
| **TOTAL** | | **58,439** | | | **$3,194,667** | **$3,194,667** |

93. These stock sales were significant and highly unusual. Prior to May 2018, Brock had not sold a single share of Astec stock for more than three years. The profit Brock made from these sales was more than 3.5 times larger than Brock's total compensation for 2018, as reported in the Company's proxy statement.

<u>Astec Admits a Material Weakness in its Internal Controls</u>

[9] https://talkbusiness.net/2018/11/atrs-hires-veteran-staffer-it-chief-to-lead-states-largest-retirement-fund/

94. On March 18, 2019, the Company's Form 10-K identified certain control deficiencies in the Company's internal control over financial reporting as of December 31, 2018. One of the material weaknesses identified by the Company was the "accuracy and disclosure of revenue recognized from the Company's contracts with customers at certain of the Company's business units." Specifically, the Company failed to:

- design, implement and operate effective controls at a sufficient level of precision over the identification and allocation of the transaction price to multiple performance obligations in accordance with FASB ASC Topic 606, *Revenue from Contracts with Customers* ("ASC 606")
- design, implement and operate effective controls over the accuracy of pricing of parts sales; and
- design, implement and effectively perform controls over the identification of sales transactions by category for purposes of preparing disclosures required by ASC 606 and elimination of intercompany transactions.

95. Further, the Company also disclosed that it "did not perform an effective risk assessment process to understand the changes necessary to the financial reporting process and related controls at these business units to address the risks relating to the recognition, measurement and presentation of revenue in accordance with the new accounting standard."

96. Additionally, the Company's independent auditor, KPMG LLP, issued a report on March 15 noting several material weaknesses at the Company, including "[i]neffective controls over the accuracy and disclosure of revenue at certain business units due to insufficient understanding of the requirements of revenue recognition and not performing an effective risk assessment" and "[i]neffective controls over the existence, accuracy and valuation of inventories at certain business units due to insufficient understanding of relevant risks of material misstatement."

**Identification of Additional Materially False and Misleading Statements Issued During the Class Period**

97. On July 26, 2016, the Company reported its second quarter 2016 financial results. The Company reported that its backlog had increased 58.8% to $364.5 million, which included $60 million from the Hazlehurst plant that the Company could not recognize until the Company's financing had been repaid. Discussing the pellet business, the Company's release quoted Brock as stating:

> "Our backlog is up 58.8% versus last year. The majority of the increase is in the Infrastructure Group, again mainly as a result of the Federal highway bill and the $122.5 million pellet plant order announced during the first quarter."

98. Also on July 26, 2016, the Company hosted a conference call to discuss its financial results. Brock stated that the Company was "able to recognize $18 million in pellet plant revenue during the [second] quarter." Brock then detailed the Company's plan to recognize the $122.5 million from the Highland order and the $60 million (plus interest) for the Hazlehurst order by the end of 2017. Brock also touted a new $80 million pellet plant order that the Company believed would be completed later that year:

> Changing subjects to the Hazlehurst, Georgia pellet plant, that's the original pellet plant that we shift [sic] that we have discussed on several calls. As a continual reminder, it's a new product that we chose to finance at the time. As a result, we will recognize the revenue for this plant as we are paid. This will have an effect on our cash and inventory until it's paid in full. ***The order for all three lines was for $60 million and we expect the final payment in 2017***. As a reminder, the interest rate on the note is 6%.
>
> We were pleased to report the $122.5 million pellet plant during the first quarter. And as a reminder, it's an add-on to the $30 million order that we recognized during the first quarter with Highland Pellets bringing in a total project order amount to $152.5 million. ***As we mentioned on our last call, our plan is to recognize the $122.5 million order as follows. During the second quarter we recognized $18 million, during the third quarter we would anticipate recognizing about $20 million, during the fourth quarter of about $35 million. The balance of the order, which is around the $45 to $50 million, will be recognized in 2017 as site work, installation and start-up are completed***.

> ***Updating our current pellet plant quote activity, we do have ongoing quote activity for new projects and we believe that we will have a new larger order late this year. We believe that that order will be in the range of $80 million***. As a reminder, these deals are long and complicated to get across the line. While we are optimistic that a new project will happen by the end of this year, it could always be longer than we anticipate.

99. When asked about the Company's anticipated $80 million pellet plant order, Brock said it was "pretty square" and touted five other "pretty serious" discussions for more pellet plant orders:

> I think that one is pretty square, but ***I would say we're talking to probably as many as ten people with five of them being pretty serious. So, it's not the only one***
> ***that we think can happen in the next 12 months or so***. And we can deliver the whole 80 of that next one next year if it came soon enough, but it would have to be pretty close to the end of the year for us to do that.

100. During the call, defendants were also asked about expectations for pellet plant demand. Brock responded:

> ***This is Ben, with whom we are talking with, 1 to 1.5 of these plants in 2017 is our goal and what we're working for. We would love to have it sooner than later, so we can balance demand and keep openings for our asphalt plants. But our goal would be in the $100 million to $125 million range of revenue in 2017 with pellet plants***.

101. When asked about the "original [pellet] plant that [Astec] financed, [and] what remains for you to get paid on the $60 million," Brock stated that Astec would get paid once its customer received financing from its banks—which was "a matter of timing more than anything." Brock explained that two of the three lines were "up and running," but that the third line needed to be retrofitted:

> Well, so they are working out their banking relationship – their banking plan, I guess, because just getting the financing. **So what we got to do is we've got to complete the retrofit and installation of one particular line, all three lines up and running, which two of them are at their current design,** which is the final design so that first line needs to be retrofitted, and once that occurs, all three up

> and running according to spec, and then the banks are all in. **So it's a matter of timing more than anything.**

102. Brock then stated to the same analyst that "all three lines have run pellets at production," that Astec needed to replace the burners on all three lines to burn wood exclusively, that the testing for "tons per hour is fine," that two of the new burners were already running, and that the customer could secure its financing even without the third line running. Importantly, Brock assured investors that "we're not in a jam and at risk or anything because ***there is no risk***."

> **And more color on that, all three lines have run pellets at production. What we needed to do is be able to burn wood exclusively on each line and we hit a wall on that on our burners, so we're replacing the burners. So the testing, proving that the lines will do what we said on tons per hour is fine. The other two have the new burners on, they are running. We have to put the third burner in, but *they could get financing on that plant without it and that's the rest of the story.***
>
> ***I want to make sure everybody understands, we're not in a jam and at risk or anything, because there is no risk.* We have met that and we are in good shape.** But as far as how much money do we still have to collect, we have collected a little interest, but we were just thinking about it internally, it is about $60 million plus the interest.

103. On August 5, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for 2Q2016, which reaffirmed the financial results announced in the July 26, 2016 press release. The 2Q2016 Form 10-Q was signed by Brock and Silvious and included signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the 2Q2016 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading.

104. The statements referenced in ¶¶ 97-103 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

105. On October 25, 2016, the Company reported its third quarter 2016 ("3Q2016") financial results, reporting a 17% increase in net sales to $247.8 million and EPS of $0.30, a 200% increase over the EPS of $0.10 in the prior year's third quarter. The Company reported that its domestic backlog increased 69% to $325.6 million and that total backlog increased 55% to $389.3 million at the end of 3Q2016—which, again, included the $60 million financing for Hazlehurst. The release quoted Brock as stating:

> "We were pleased to improve our earnings by 200% in the third quarter versus the third quarter of last year. ***We were able to secure and ship orders at a more profitable rate during the quarter mainly due to favorable infrastructure and woodpellet equipment activity***."
>
> . . . "Despite our strong overall performance, we still face several challenges. Low oil and natural gas prices have hurt our Energy Group sales. The mining slowdown has hurt our Aggregate and Mining Group sales. The strong U.S. Dollar continues to affect our ability to export from our U.S. based operations. Nonetheless, our year-to-date revenues are up 7% and our year-to-date earnings

> are up 47% versus last year. ***These positive results are mainly due to good domestic markets for our equipment targeted at the infrastructure and wood pellet industries*** and execution of our margin improvement plans at our operating subsidiaries. Finally, we are also pleased to report that our backlog is up 55% versus last year indicating continued strong demand for our products.

106. On November 7, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for 3Q2016, which reaffirmed the financial results announced in the October 25, 2016 press release. The 3Q2016 Form 10-Q was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 3Q2016 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading.

107. The statements referenced in ¶¶ 105-106 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

108. On November 8, 2016, Astec participated in the Robert W. Baird Global Industrial Conference, where Brock talked about the Company's pellet plant business, stating, in part:

> ***We see the opportunity in this business in the next five years in the range of 35 to 50 plants being sold in the US. They would be in the size range of $100 million each. Our goal would be to get our fair share of them.*** We will not sell that many. So please don't put that down and say, boy, they are going to sell that many wood pellet plants. We're not going to sell that many wood pellet plants, but ***we would do our best to get a good fair share of those; maybe half over that five-year period***.

109. The statement referenced in ¶ 108 above was materially false and/or misleading because it misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statement was materially false or misleading because: (i) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (ii) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

110. On February 21, 2017, the Company issued a press release to report its fourth quarter 2016 ("4Q2016") and full-year 2016 financial results, including a backlog that continued to include the $60 million financing for the Hazlehurst plant:

> The Company's domestic backlog increased 13% to $294.8 million at December 31, 2016 from $261.8 million at December 31, 2015. The international backlog at December 31, 2016 was $62.6 million compared to $54.1 million at December 31, 2015, an increase of 16%. Total backlog increased 13% to a year-end record of $357.4 million at December 31, 2016 from $315.9 million at December 31, 2015.

111. The release quoted Brock as stating, in relevant part:

> "We were pleased with our results for the fourth quarter and for the year. We were able to grow revenues and net income both quarter over quarter and year

> over year. At the same time, we were able to grow our backlog at December 31, 2016 to $357.4 million, a December record." . . . "***The domestic market was strong for our Infrastructure Group's products*** targeted at the road construction industry and ***the group also recognized better than expected wood pellet plant revenues***."

112. On February 21, 2017, the Company hosted a conference call to discuss its 4Q2016 and full-year 2016 financial results. At the start of the call, Silvious touted that the construction schedule for the Highland plant:

> ***Our fourth quarter revenues were boosted by the recognition of higher than expected pellet plant revenues based on where we are in the delivery and in the construction schedule on that project***.

113. In his prepared remarks during the call, Brock stated:

> As David covered during his comments, ***we recognized a much larger than anticipated $70.6 million in pellet plant revenue during the quarter. Frankly we're just ahead of where we thought we were. It's a big project but I guess if you're going to be ahead it's better than being behind, but $70.6 million in pellet plant revenue during the quarter***.

114. Discussing the pellet plant business, Brock revealed that Astec had significantly extended the payment deadline for the $60 million in financing on the Hazlehurst plant from July 2017 to December 2018 because "Hazlehurst has been a good partner.":

> In December we agreed with the partners at Hazlehurst to extend the loan term to final payment due in December 2018 in lieu of July 2017. ***Given the fact that Hazlehurst has been a good partner,*** they helped us get into the business, and have allowed several potential customers including, Highland Pellets, our second pellet plant we sold, to visit the site for sales purposes we agreed to the extension. ***The main reason for the extension is a temporary low in wood pellet demand that is widely expected to recover late this year. We now expect the final payment in December 2018 and as a reminder the interest rate on the note is 6%.*** With regards to Hazlehurst please keep in mind that we are carrying it on our books at breakeven. So its effect to us is really only our inventory and cash.

115. Continuing to discuss the status of Astec's pellet plant business, Brock added that the Company still expected $20 million to $35 million in pellet plant revenues in 2017 in addition to the $15 million to $20 million anticipated from Highland:

> ***Based on what we know today and because we are now ahead on the Highland Pellets revenue recognition we project that our pellet plant revenues will be in the range of $40 million to $50 million in 2017. This includes the remaining $15 million to $20 million that we anticipate from the Highland Pellets project***. As we have said many times wood pellet plant deals are long and complicated to get across the line. While we are optimistic that a new project will happen in the timeframe mentioned it always could be longer than we anticipate.

116. The statements referenced in ¶¶ 110-115 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

117. On March 1, 2017, the Company filed with the SEC its annual report on Form 10-K for 2016, which reaffirmed the financial results announced in the February 21, 2017 press release. The 2016 Form 10-K was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2016 Form 10-K was

accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 2016 Form 10-K touted the superior design of Astec's wood pellet plants, stating:

> Astec's wood pellet plants have been in commercial production since 2013. Astec's modular design for its wood pellet plants includes replicated parallel production lines (for instance, a 60 ton-per-hour ("TPH") plant consists of three 20 TPH lines) resulting in very few points in the process where any individual equipment failure can shut the entire plant down. In most other pellet plant designs, one small equipment failure, such as a dryer outage, would result in a total plant shutdown. If a dryer outage were to occur in a 60 TPH Astec plant, the plant could continue to operate at 40 TPH. In fact, there are very few reasons why the plant would ever be completely shut down. Even major maintenance cycles may be performed line-by-line while the plant continues to operate on the other lines.

118. In March 2017, Swanson gave an interview to Biomass Magazine[10] touting the quality of the equipment at the Highland plant and Astec's proposals to build more pellet plants for other companies. Malcom stated, in part:

> We design the equipment on a modular basis, so that means that most of the equipment is completed here in a shop environment, and is highly shippable. ***That gives us better control of the construction of the equipment, and enables us to deliver equipment in a more completed and higher-quality state***.
>
> . . . The whole industry is in a little bit of a lull at the moment, but those in the industry who should know are saying it will be a short-lived lull. ***We are working on proposals for projects that other companies are currently planning to put together***.

119. The statements referenced in ¶¶ 117-118 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported

---

[10] https://issuu.com/bbiinternational/docs/march17-bmm-final/20

financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

120. On April 25, 2017, the Company issued a press release announcing its first quarter 2017 ("1Q2017") financial results, which revealed that the Company's domestic backlog had decreased by 25% to $290.4 million, down from $387.9 million at the end of the prior year's quarter, and that the total Company backlog had decreased 18%. If Astec's pellet plants were excluded from the backlog, however, the Company reported that its total backlog had increased by 14%.

121. Also on April 25, 2017, the Company hosted a conference call to discuss its 1Q2017 financial results. In his prepared remarks during the call, Brock stated the Company still expected the $60 million payment from Hazlehurst by December 2018 with 6% interest and that the Company still expected to recognize revenue from an additional pellet plan order by the end of 2017.

> Changing subjects to the Hazlehurst, Georgia pellet plant that we have discussed on several calls, as a reminder, it was a new product that we chose to finance. As a result, we'll recognize the revenue for this plant as we're paid. This will have an effect on our cash and inventory until it's paid in full. The order for all three lines of this plant was for $60 million. ***We expect the final payment in December of 2018***. As a reminder, the interest rate on the note is 6%. With regards to Hazlehurst, please keep in mind that we are carrying it on books at breakeven, so its effect to us is in our inventory and cash.

> ***Regarding the Highland Pellet plant in Arkansas, we are down to approximately $8 million in revenue that we expect to recognize on the Highland***
> ***Pellets project during the rest of 2017. Margin on the amount left to recognize is***
> ***slightly below normal major equipment margins, as it is site work, installation, and start-up type work***.
>
> * * *
>
> ***Based on what we know today and because we are now ahead on the Highland Pellets revenue recognition, we continue to project that our pellet plant***
> ***revenues will be in the range of $40 million to $50 million in 2017***. As we have said many times, wood pellet plant deals are long and complicated to get across the line. While we are optimistic that a new project will happen in the timeframe mentioned, it always could be longer than we anticipate.

122. On May 8, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for 1Q2017, which reaffirmed the financial results announced in the April 25, 2017 press release. The 1Q2017 Form 10-Q was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 1Q2017 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading.

123. The statements referenced in ¶¶ 120-122 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that

prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>The Truth Begins to Materialize and Emerge Through Partial Disclosures; Defendants Downplay the Problems and Falsely Reassure Investors</u>**

124. On July 25, 2017, the Company issued a release announcing its second quarter 2017 ("2Q2017") financial results for the quarter ended June 30, 2017. Among other things, the release stated that while the Company's 2Q2017 Infrastructure Group revenues had declined by 6.1%, falling from $152.5 million in 2Q2016 to $143.1 million in 2Q2017, the group's 2Q2017 profit had declined by 49.7% from its 2Q2016 levels. The release stated:

> Net sales for the second quarter of 2017 were $301.9 million compared to $294.4 million for the second quarter of 2016, a 3% increase. Earnings for the second quarter of 2017 were $14.4 million or $0.62 per diluted share compared to $18.2 million or $0.79 per diluted share for the second quarter of 2016, a decrease of 22% per diluted share.
>
> * * *
>
> The Company's backlog at June 30, 2017 was $352.4 million compared to $371.3 million at June 30, 2016, a decrease of $18.9 million or 5%. Domestic backlog decreased 13% to $276.2 million at June 30, 2017 from $316.4 million at June 30, 2016. The international backlog at June 30, 2017 was $76.2 million compared to $54.9 million at June 30, 2016, an increase of 39%. All prior year backlog amounts have been recast to include the backlog of Power Flame Incorporated which was acquired on August 1, 2016.
>
> Excluding pellet plant backlogs of $65.1 million and $144.4 million at June 30, 2017 and 2016 respectively, the Company's June 30, 2017 backlog increased $60.4 million or 27% compared to June 30, 2016.

125. On July 25, 2017, the Company hosted a conference call to discuss its 2Q2017 financial results. During his prepared remarks, Brock stated the Company still expected the $60 million payment from Hazlehurst by December 2018 with 6% interest. Additionally, Brock revealed that the margin for the Hazlehurst plant was "significantly less than we anticipated" due to an "underestimated cost" that resulted in the entire difference between the Company's expected and actual margin for the quarter. Brock promised investors that "it won't happen again." Further, Brock disclosed that the Company would not be recognizing any new pellet plant order in 2017, despite previous assurances.

> Changing subjects to the Hazlehurst, Georgia pellet plant that we've discussed on several calls, as a reminder, is a new product we chose to finance. As a result, we'll recognize the revenue for this plant as we're paid. ***This will have an effect on our cash and our inventory until we are paid in full. The order for all 3 lines is for $60 million. We expect that final payment in December of 2018***. And as a reminder, the interest rate on the note is 6%. With regards to the Hazlehurst plant, please keep in mind that we are carrying on our books at breakeven, so its effect to us is in our inventory and cash.
>
> Regarding the Highland pellets plant in Arkansas, we are down to approximately $4.8 million in revenue that we expect to recognize on the Highland pellets project during 2017. ***We have projected gross margin on the amount left to recognize. It's slightly below normal major equipment margins for the site work, installation, start-up, etc. The actual margin during the quarter was significantly less than we anticipated and represents the main difference between our estimate at the end of last quarter and our actual result not only in Infrastructure Group but for the company as a whole***.
>
> ***We're not going to sugarcoat this underestimated cost. It was a big miss on our part and it was a major issue with our net income result for the quarter. We've identified the root cause of our miss on this estimated cost and it won't happen again. As a result, we do not anticipate a significant margin effect moving ahead on this project***.
>
> ***With regards to the pellet plant revenues for this year, we had felt we had a good opportunity to add a large pellet plant order during the third quarter, which would have given us a chan[c]e to deliver a portion of the plant during the fourth quarter this year. That opportunity has passed as we have earned enough***

***infrastructure-related business to make delivery on any new pellet plant order not possible in 2017. As a result, we now project that our pellet plant revenues will be in the range of $20 million to $25 million in 2017.***

126. When asked to provide "a little more color" as to what the pellet plant cost issues were that impacted margins, Brock sought to reassure investors that it was "a mistake" that is "not something that shows back up again."

> ***At the end of the day, when we were putting the plant up, we had a late add-on in the process, a change order with the construction firm that was our sub. We had a cost miss estimate really mainly by our guys and what we thought it would cost. It's embarrassing. It's a big mistake but it's a mistake made and it's one that's behind us. And we know how we would handle that going forward. But it is behind us. It's not something that shows back up again.***

127. In response to these partial disclosures, the price of Astec stock dropped $4.33 per share, or approximately 8%, on July 25, 2017, damaging investors.

128. The statements referenced in ¶¶ 124-127 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's

business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

129. On October 2, 2017, Astec disclosed that it was undertaking "***substantial design upgrades***" to correct "***design flaws***" at its pellet plants so they could "***achieve full production***." The "***significant design upgrades***" to the Georgia and Arkansas plants were labeled an "***additional investment***" that would "***negatively impact Astec's third quarter earnings by $0.54 to $0.58 per share***." The release quoted Brock as stating:

> "***In the last 45 days, we identified significant design issues at our customers' Georgia and Arkansas wood pellet plants driven by the need for both facilities to achieve full production rates. Upon learning of these design flaws, which were different at each plant, we identified a clear path to success. In addition, this past Friday [September 29], we completed an updated analysis of the necessary all-inclusive investment needed to deliver on our commitments to our customers with regard to production rates*** . . . . While we are very disappointed to be announcing this added investment to achieve full production in Georgia and Arkansas, one of our core values is delivering superior service to our customers."
>
> . . . "***We remain very confident in the near-term and long-term outlook for the wood pellet business and believe it has been a good investment for our company. In total, we will have invested approximately $31 million over seven years to open up an opportunity for a $100 million per year business***.

130. The press release purported to describe the problems at the Hazlehurst and Highland plants. The Company claimed that it only discovered the problems at Hazlehurst once the Company tried switching the natural gas furnaces to wood-burning furnaces—a change the Company had previously assured investors had been implemented months earlier. The release did not describe the problems at the Highland plant other than to assure investors that they were not related to the construction issues that had previously plagued the plant.

**Georgia Plant**

> In December 2010, Astec, Inc., a subsidiary of Astec Industries, opened a work order to design, build, erect and operationally run a 5 ton per hour prototype pellet plant. The prototype plant, which ran at Astec, Inc. from September 2011 through May 2012, supported the company's entry into the market and ushered in its largest order at the time, with Hazlehurst Wood Pellets in Georgia. ***While the last segment of that order was received on January 30, 2014, due to market conditions the plant had been run with natural gas as the fuel source and was not run at full capacity. Market conditions have since improved, and as a result, the plant needs to run at full capacity utilizing wood as its fuel source. This led to the identification of the aforementioned design flaws that will need to be corrected***.
>
> **Arkansas Plant**
>
> ***Significant design issues at the company's Highland Pellets plant in Arkansas were also recently identified as production has increased. As communicated during Astec Industries' second quarter 2017 earnings conference call, the construction-related cost issue is no longer impacting the company's performance and is unrelated to the recently identified design issues.***

131. Later that day, the Company hosted a conference call to discuss the "design upgrades" to its pellet plants. In his prepared remarks, Brock stated claimed that the design flaws were only discovered in the last 45 days when the plants attempted to ramp up production and assured investors that the Company continued to believe that pellet plants would become a $100 million per year business for Astec:

> ***As we look to ramp up production rates [at Hazlehurst,] a series of the design flaws were uncovered, and we are working diligently to correct them. We have been working with being fired on wood for some time, but we only recently identified the ultimate fix as we attempted to ramp up production***. Our experience at the Georgia site gave us the confidence to pursue the largest single order in our history with Highland Pellets in Arkansas. The last segment of this order was received in March of 2016. ***This plant has also been running at low production***
> ***rates, and as we ramped up production we found design flaws as well that are different than those we experienced in Georgia***.
>
> ***I want to reiterate the design flaws we uncovered in Georgia and Arkansas were identified in the last 45 days***. In addition, to avoid any confusion, in Arkansas these upgrades are unrelated to the construction related cost issues we experienced last quarter, which we believe are behind us. While the design issues are not identical at both sites, they each require our full attention and effort to get

> them to full production. ***We are confident in our ability to do so for our customers, and the investment we have announced is the amount that we believe will cover the entire cost associated with completing our commitments to our customers with regards to production rates***.
>
> ***Despite today's announcement, we are very confident in the near term and long term outlook for pellet plants and our success at these sites will put us in a strong leadership position for orders as we move ahead. Including today's announced charge we will have invested approximately $31 million over seven years to get into what we believe is a $100 million per year business***. We believe that the investment is a good one for our company.

132. During the question-and-answer portion of the October 2, 2017 call, defendants were asked when they became aware of the need to make upgrades to the plants, why the need for the changes was not known when the plants were built, and why the Company was paying for an upgrade to a customer's plant. In response, Brock stated:

> Originally, when the plant was bought, Hazlehurst did not go for the long-term supply contract, was really going more on the open market when the private supply of pellets, they got more per ton. It got warm in Europe and that market fell apart, so market conditions really went down and the need for large scale production there wasn't necessarily there. If you'll recall, we agreed, we went longer on the loan to December of 2018. When we did that, they were facing that but also they helped us get in the business. They did a great job with us and gave us something to show, and that actually led to us being able to get the Hazlehurst order.
>
> ***We knew we needed to fire on wood. We started working on that, did a lot of work on that, and really didn't find that we had the issues that we needed to fix until the last 45 days when we tried to ramp up to full production on wood. We run well on natural gas, have really pretty good success on that, pleased with that. They are running pellets. They are selling pellets. But we need to run full production on wood if they are going to get a long term supply contract that they have an opportunity for***.
>
> ***I hope that answers the question. But until we stared [sic] to ramp up and go full bore on wood, we knew we had to do it, couldn't identify the issues that, I hate to say reared their ugly head, but that's kind of what they are. And we're working on it now as we speak***.

* * *

> ***Each line at Hazlehurst is 15 tons per hour, and so until we really had to ramp up and run on wood at full production rate we didn't identify that on the lines. And that is our design flaw, that's not the customer's to fix*.**

133. When asked whether the design flaw would impact the Company's ability to secure more pellet plant business and whether the Company needed to evaluate its current bids and project negotiations, Brock stated that the Company would not accept a new order until it had fixed the problems at the existing plants. Still, Brock assured investors that the Company anticipated another pellet plant order in the second quarter of 2018. Brock also stated that the Company would resolve the design issues by early December, 2017 in Hazlehurst and by April 15, 2018 in Highland. Further, Brock disclosed that Astec would no longer construct pellet plants for customers.

> We are definitely reevaluating those as we find out what we found out. We are not going to accept a new order until we're across the line at these two sites. We don't think that would be a good idea, although we do have several inquiries.
>
> We feel like at Georgia, timing-wise, we actually thought we'd be early November. The hurricane that came through Florida dumped a lot of rain and wreaked havoc on things down there, so that delayed us. ***We're probably into November, the first week of December on finishing there. Then April 15th is our furthest out date that we believe we'd be finished and proving out at Arkansas. We actually have a timeline that shows earlier than that internally, but that's our drop dead date is April 15th***.
>
> ***Based on that, we would anticipate another order sometime in Q2, with some of that volume having a good chance of being in Q4. We'd have to be probably pretty lucky to have it in Q3, so we're looking at in the range of maybe $15 million in pellet plant revenue in 2018, and then that would be a piece of a larger plant. We have very good confidence in this business and seeing it as a $100 million business going forward, and that would be in 2019. We see it as being a profitable business in goods and gross margin***.
>
> . . . Then, the other thing I would add to it is we are not going to be a construction company going ahead. If somebody else wants to be the full EPC contractor, that's great. We're going to be equipment suppliers. We're not construction guys, we found that out, so we are happy to be a part of a bigger group that's doing that,

but our expertise is in supplying equipment. So, we aren't going to be taking on the general contract going forward.

134. An analyst from Robert W. Baird challenged Brock on how the Hazlehurst problems encountered by switching to wood-burning furnaces could be newly discovered given that the Company had assured investors in 2016 that this same problem had already been resolved. Brock responded that it was "not just the burner this time," it was also a baghouse issue, a glass buildup, and an ash buildup. Still, Brock continued to assure investors that he had "very high confidence" that the Company had finally identified all of the problems and that these problems would not prevent the Company from booking new pellet plants in 2018.

> **ANALYST**: I was going back through the last several conference call transcripts, and back in July of 2016 you talked, and my question's also on Hazlehurst, you talked about needing to burn wood exclusively on each line and so you were replacing the burners and you were testing them, improving the new burners. In October of 2016, you said line two is now running and has met the production targets in early start up. So, is this the same issue that you were talking about last summer that they needed to burn wood exclusively and you were swapping the burners? It seemed like that had been done, and again, at least in October line two had met its production target and really nothing was mentioned on this issue the last several calls. Is this the same issue about switching to burning wood?
>
> **BROCK**: Kind of, Joe. ***The only thing is that as we ramped up and needed to get all three going, another thing we've run into is a baghouse issue related to the dust that's created from burning the wood. We could get up to the 15 tons per hour, and we would run for some time, and then we would hit a wall on dust collection, and so we were trying different methods to get there***. But the absolute need to get to 45 tons really hadn't surfaced at that point. It's there now, so ***there's baghouse related issues***.
>
> ***Also, we're burning wood that has bark in it, that has sand in it, and at the temperatures that we use in the combustion chamber, when it gets hot it creates glass build up that needs to be cleaned out. That won't necessarily go away 100%***
> ***but we're trying to make it to where the time between cleanouts is long enough that it makes sense. So, we're working on the combustion zone a little bit there***.
>
> ***Then, the ash that's created with that wood and the bark wood will build up in the coils that have pins on them in the heater and we're fitting an apparatus to be able to just blow that off the pipes because that hurts your heat transfer.***

***So, it's not just the burner this time, there's things behind the burner that have surfaced as we've gone to higher production rates.***

**<u>ANALYST</u>:** Got it. And what's your level of confidence that the fix has been identified and that this will be kind of [indiscernible] as far as additional expenses for these two plants?

**<u>BROCK</u>:** Very high confidence.

**<u>ANALYST</u>**: Okay. All right. And I mean, is it kind of safe to say at this point that Hazlehurst and Arkansas really aren't going to be kind of profitable all in?

**<u>BROCK</u>**: I think it's still fair to say – David is here – but a zero at Hazlehurst and there's about a 5% gross margin still in at Highland.

**<u>ANALYST</u>**: Okay. All right. But again, just to kind of repeat from earlier, now that you've kind of identified these fixes and once the fixes had been kind of tested out, if you were to book a plant in Q2 of next year, the growth margin of that going forward would be acceptable or favorable?

**<u>BROCK</u>**: It would be favorable

135. Later, defendants were asked "how short you were in percentage terms, or maybe even tons per hour terms on what you were supposed to guarantee and what you actually were running?" In response, Brock stated the Company had guaranteed four lines as 20 tons per hour, which the Company was only able to accomplish on one line for a short period of time. Brock also stated that the dust problems at Hazlehurst would not be a problem at Highland because the two plants used different burners:

***I think probably four lines at 20 tons per hour is the guarantee. We've had one of the lines up to that, and over it actually, but not for a long period of time. Where we're undersized is in the front end at the Hammermill site. It's mainly related to the particle size that they need at the press, and along with that there are some things in the main plant that we need to fix too. By the time you upsize the green Hammermill capacity, the electrical, the site work, the controls of that, and the related things within the main plant, it's a big number.***

***Thankfully, we've identified we have very high confidence in getting there. So, they're different issues, there are different burners at each site, and so the creation of the dust, we don't anticipate that being an issue at Highland in Arkansas because they're different type burners. But it's more of a front end***

***issue that gets related through the whole plant to the press for the particle size at Arkansas***.

136. When asked whether pellet plants are sustainable if they burn wood as their fuel source, Brock stated that to take advantage of the renewable fuel market in Europe, the pellet plants needed to run off of burning wood:

> It comes down to where it's going, so for the sustainability piece of the utilities in the UK they need to burn wood for renewable fuel. If you want the ten-year supply contract, you're going to burn wood. If you're going to other markets, industrial private market, home heating, or other type markets, natural gas is an option. But they're also limited on natural gas, too, at the Hazlehurst site, so ultimately they need to run wood.

137. As the call continued, defendants were asked how the "setback on the Hazlehurst plant impact[s] the receivable that's outstanding?" In response, Brock assured investors that the Company still expected to receive the full $60 million plus interest from Hazlehurst because these fixes would secure a ten-year supply contract with a utility company in the UK:

> ***Right now, it does not. We don't plan on that being an effect. They are running it, selling pellets out of the plant. It's just at a low level, and this will help them secure a ten-year supply contract, and so we don't anticipate that changing***.

138. In response to these partial disclosures, the price of Astec stock dropped $3.51 per share, or approximately 6.3%, on October 2, 2017, damaging investors.

139. The statements referenced in ¶¶ 129-138 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and

undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

140. On October 24, 2017, the Company issued a press release announcing its third quarter 2017 ("3Q2017") financial results for the period ended September 30, 2017. The release stated that Infrastructure Group revenues dropped by 9.7%, falling from $109 million to $98 million, and that profit in the group swung to a loss, dropping 227% from a 3Q2016 profit of $9.8 million to a 3Q2017 loss of $12.5 million. The release added:

> ***The net loss for the third quarter of 2017 was $2.7 million, or $0.12 per share, compared to earnings of $6.8 million, or $0.30 per diluted share, for the third quarter of 2016, a decrease of 140.0% per diluted share. As previously announced, the company initiated significant design upgrades to its customers' Georgia and Arkansas wood pellet plants to meet full production rates, which negatively impacted earnings per share by approximately $0.59 during the third quarter of 2017***.

141. The October 24, 2017 release quoted Brock as stating, in part:

> "While we exited the third quarter with a strong backlog, product mix and contracted delivery schedules have tempered our expectations for the fourth quarter. We believe that we still have a good opportunity to drive slight year-over-year sales growth for 2017; however, ***our originally anticipated uptick in sales and earnings growth during the fourth quarter will be pushed into 2018***. ***Sequentially, we expect earnings in the fourth quarter of 2017 will be slightly below this quarter's earnings, adjusting for the wood pellet investment***. As we look to 2018, we are very optimistic on our outlook given our backlog, quote activity and conversations with our customers.

142. On February 20, 2018, the Company hosted a conference call to discuss its 4Q2017 financial results. In his prepared remarks, Brock stated that the Company was "making

good progress" on fixing the design flaws, still expected to be paid the $60 million from Hazlehurst by December 2018, and still anticipated completing and new pellet plant order in 2019:

> Changing subjects to wood pellet plants, 2017 was an extremely challenging year to us with regards to these plants as we took significant charges related to getting the two plants we have delivered installed and up to speed on production for our customers. ***As an update on our progress on the wood pellet plants, we are making good progress and believe that our announced charges during 2017 are adequate to cover our commitments to our customers***.
>
> Updating our current pellet plant quote activity, we do have ongoing quote activity for new projects; however, as previously announced, we are not going to sign a new pellet plant order until we have finished it, both at the sites that the charges were announced for during last year. ***Given our progress at the two pellet plant sites, we still believe we'll be in position to add an order in time to deliver a complete wood pellet plant in 2019***. As a reminder, if we do get an order for another wood pellet plant, we'll only do so as a supplier of equipment in accordance with our traditional equipment parts and service offerings.
>
> * * *
>
> Looking ahead to the first quarter of 2018, we believe our first quarter 2018 revenue will be slightly higher than Q4 2017 and with regards to earnings in the first quarter of 2018, we expect our earnings per share to be slightly better than our first quarter 2016 earnings per share. Our current outlook for the full year of 2018 is core revenues up 7% to 12% versus last year, with a much improved net income for the year. ***We expect to be paid on the pellet plant in Georgia in December, which would add $60 million to the sales number, but as a reminder, the sale will be at breakeven margin***.

143. The statements referenced in ¶¶ 140-142 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and

undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

144. On March 1, 2018, the Company filed with the SEC its annual report on Form 10-K for 2017, which reaffirmed the financial results announced in the February 20, 2018 press release. The 2017 Form 10-K was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2017 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 2017 Form 10-K disclosed that it amended the Highland contract to compensate Highland for production shortfalls that the Company had guaranteed. Still, defendants claimed that it expected to fix the problems by June 15, 2015—two months later than the previously announced April 15 "drop dead date."

> The Company has a sales contract with the purchaser of a large wood pellet plant, on which revenues of $7,987 and $135,187 were recorded in 2017 and 2016, respectively. As the plant has not yet met the production output and the operational specifications set forth in the original contract, as amended through December 31, 2017, the Company entered into a contract amendment in February 2018, whereby the Company agreed to compensate the customer for production shortfalls caused by the Company and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018. The Company incurred production shortfalls in January and February 2018. ***The Company expects to meet the contract's operational specifications prior to June 15, 2018***.

145. On April 24, 2018, the Company issued a press release announcing its first quarter 2018 ("1Q2018") financial results for the period ended March 31, 2018. The release stated that Infrastructure Group 1Q2018 revenues had decreased by 11%, from $165 million to $147 million, and that 2018 profit declined by 18% from 2017 levels, falling from $18 million to $14.8 million. The release claimed that the Company had a $444.9 million backlog, which still included the $60 million Hazlehurst payment.

146. Also on April 24, 2018, the Company hosted an earnings call to discuss its 1Q2018 financial results. During his prepared remarks, Brock again claimed the Company was "making good progress" on fixing the design flaws, still expected to be paid the $60 million from Hazlehurst by December 2018, and still anticipated completing and new pellet plant order in 2019:

> Changing the subject to wood pellet plants, 2017 was an extremely challenging year to us with regards to these plants as we took significant charges last year related to getting the two plants to be delivered, installed it and getting them up to speed on production for our customers. ***As an update on our progress on the wood pellet plants, we've made good progress and believe our announced charges during 2017 are adequate to fulfill our commitments to our customers***.
>
> ***Updating our current pellet plant quote activity, we do have ongoing quote activity for new projects. However, as previously announced we are not going to sign a new pellet plant order until we have finished at both of the current plant sites. We believe we will be in position to add an order in time to deliver a complete plant, a complete wood pellet plant in 2019***. As a reminder, if we do get an order for another big pellet plant, we will only do so as a supplier of the equipment in accordance with our traditional equipment, parts and service offerings.
>
> * * *
>
> ***Looking ahead to the second quarter of 2018, we believe our second quarter of 2018 revenue will be slightly higher than our first quarter 2018 revenue, and with regards to earnings in the second quarter of 2018, we expect our earnings per share to be slightly better than our first quarter of 2018 earnings per share which was $0.87***. ***Our current outlook for the full year of 2018 is core revenue***

> ***is up 7% to 12% versus last year . . . with a much improved net income for the year versus 2017***.

147. During the question-and-answer part of the call, defendants were asked to be more specific regarding the potential for Astec to secure a pellet plant order for 2019 delivery. Brock responded that the Company had "passed the test" at the Hazlehurst plant and had "a pathway to finish" at Highland—the deadline for which had now been extended from June 15 to June 19:

> Well, we want to be completely finished at both places before we take an order and ***we feel like in Georgia that we passed the test, we're meeting with them next week to talk through that. In Arkansas, we actually have until June 19 now, we've had weather issues, we've had some mechanical issues and we've modified some equipment.*** It is tight at Arkansas. We have a pathway to finish, but it is tight and so we're all hands on deck on that, but I feel like with what we committed to we have the, the charge we took last year is adequate but we have to finish, so we're all hands on deck in Arkansas and that's where we stand. We're just not going to take an order unless we do and if we don't get one in time to deliver in 2019, we don't. We want to finish first.

148. As the call continued, defendants were asked whether the charges, weather and mechanical issues were "related to the same sorts of issues" involving the "hammer mill press that you guys had last time?" Brock responded:

> Well, Stanley this is Ben and I think whenever we get into these, there's always something that'll pop up, but ***thankfully what has popped up and mechanical issues that we corrected has not been extremely major***. And so the hammer mills that piece and all that we fixed, the extra bag houses we fixed, but as you start up, sometimes things happen like shafts on a drag will break and you figure out how to correct that and fix that and have a long term fix, so it's things like that. We're in a position where we need to be cranking up and running full production and going through testing and we have a lot of people on site to do that.
>
> ***Fortunately for the charge that we took for the commitments we made we feel like we have adequate coverage. It's a little bit like an asphalt plant, every now and then and something pops up and you have to fix it fairly quickly and that's what we're doing as we get ramped up.***

149. When asked about the Company's expectations and outlook for future pellet plant sales and the size of that opportunity, Brock amazingly repeated his standard line that the Company still expected pellet plants to become a $100 million per year business for Astec:

> Well, for us, ***just speaking for Astec, once we're through what we do and we offer the plants as they run, we see it as a potential of being about $100 million year business for us***. There could be more plants sold than that and there should be based on the projections of pellets needed for – the production needed for pellets in the UK and Japan particularly, ***but for us we see it as a potentially $100 million a year business***.

150. On May 10, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for 1Q2018, which reaffirmed the financial results announced in the April 24, 2018 press release. The 1Q2018 Form 10-Q was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 1Q2018 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 1Q2018 Form 10-Q stated the Company was still including the $60 million from Hazlehurst in its backlog despite the fact that the customer still had not been able to secure financing from its banks. Further, defendants disclosed that Astec expected to continue to pay penalties to Highland through June 19 for its failure to live up to contractual production guarantees, but that the Company still expected to meet this guarantees by June 19 or by an extended deadline:

> Included in the March 31, 2018 and 2017 backlogs is approximately $60,000 for a three line pellet plant from one customer under a Company-financed arrangement whereby the Company will record the related revenues when payment is assured, which is expected in December 2018. ***The customer for the pellet plant has indicated that if they are unable to obtain financing for the plant, they will explore other alternatives for payment to the Company, including possible sale of the plant to a third-party buyer prior to the December 2018 deadline***. The

> Company is unable to determine whether the changes in backlogs were experienced by the industry as a whole; however, the Company believes the changes in backlogs reflect the current economic conditions the industry is experiencing.
>
> * * *
>
> The Company has a sales contract with the purchaser of a large wood pellet plant, on which inception to date revenues of $142,487 have been recorded through March 31, 2018. Revenues for the three months ended March 31, 2018 were not significant. As the plant had not yet met the production output and operational specifications set forth in the original contract, the Company entered into a contract amendment in February 2018, whereby the Company agreed to compensate the customer for production shortfalls caused by the Company and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018. The Company incurred penalties related to production shortfalls in the three-month period ended March 31, 2018 (penalties are recorded as reductions in revenues) and expects to incur additional penalties during the three-month period ended June 30, 2018. ***The customer's ultimate acceptance of the plant, and forfeiture of their right to any potential refund of the purchase price, is contingent upon the plant operating at the aforementioned production output and operational specifications during a 30 day test period. Under the terms of the contract, as currently amended, the original test period deadline of June 19, 2018 could potentially be extended by 120 to 180 days, during which time the customer may be entitled to additional damages. The Company expects to meet the contract's production outputs and operational specifications prior to the contractual deadline or an extension thereof***.

151. The statements referenced in ¶¶ 144-150 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from

securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

152. On July 24, 2018, the Company issued a news release reporting the Company's 2Q2018 financial results for the period ended June 30, 2018, and providing an update regarding its pellet plant business. The Company reported unexpectedly poor financial results, including a 9.7% decrease in net sales, a 14.1% decrease in domestic sales, and a net loss of ($40.7) million, or ($1.76) per share, compared to earnings of $14.4 million, or $0.62 per share, for 2Q2017, representing a decrease in EPS of 143.5%. The release shocked investors by disclosing that the Company would ***pay $68 million and forgive an additional $7 million*** in receivables to exit its contract for the Highland pellet plant in Arkansas after failing to resolve issues related to pellet plant upgrades. The release's "Wood Pellet Plant Business Update" made clear that Astec would only supply equipment on pellet plant projects going forward, and would no longer construct, procure or engineer future projects. Specifically, the release stated:

> During the second quarter, after careful consideration in partnership with Highland, its wood pellet plant customer in Arkansas, the Company and Highland decided it was in both parties' best interest to restructure the Company's obligations related to Highland's wood pellet plant and exit the Company's obligations regarding the plant. The decision was driven by unresolved issues, which inhibited the plant's ability to meet contractual provisions by the date required by the Company's sales contract with Highland. ***Under the terms of the agreement to exit the contract, which was effective on July 20, 2018, the Company agreed to pay $68 million in cash in the aggregate over the course of the next 120 days and forgive approximately $7 million in receivables. In exchange, Highland agreed to release the Company from all contractual obligations related to the Arkansas wood pellet plant. The Company will remain available for onsite and telephonic technical advice***.
>
> In connection with the agreement to exit the contract with Highland, and in consideration of the historical impact of the wood pellet business on the Company's overall results, ***the Company has redefined its wood pellet plant strategy to limit its participation in the wood pellet plant market to offering***

> ***proven technology for sale as an equipment supplier, not as an Engineer, Procure, Construct (EPC) organization or a participating lender on wood pellet plant projects***. The Company will continue to offer for sale after-market parts and service support for wood pellet plants.

153. The July 24, 2018 earnings release also stated that the Company was commencing a strategic sourcing review to reduce costs and that the Board was reviewing the Company's capital allocation strategy, stating:

> The Company recently retained Maine Pointe, a globally recognized operations consulting firm, to assist management in conducting a comprehensive strategic sourcing review. Maine Pointe will coordinate with the Company's Director of Procurement and recently hired VP of Operational Excellence to streamline procurement operations to improve the quality of the Company's products and services while reducing costs. Also, as a function of a comprehensive strategic plan review, the Company's management team and Board of Directors are evaluating the Company's capital allocation strategy to ensure capital is directed to the areas that will drive the greatest value for shareholders.

154. On July 24, 2018, the Company also hosted a conference call, when Brock used his prepared remarks to discuss the Company's "decision to exit the Arkansas wood pellet plant agreements" and reveal that Astec was finally removing the Hazlehurst, Georgia pellet plant from its backlog, stating:

> Our backlog at June 30, 2018 was $302.9 million, which is up 3% and remains, historically, very good. Our Infrastructure Group backlog was down 51.2%. After consultation with our external auditor, we remove[d] the Georgia wood pellet plant from our backlog for clarity.
>
> * * *
>
> Turning to our decision to exit the Arkansas wood pellet plant agreements and define our wood pellet strategy. As we mentioned in our last earnings call, we were on track, but tight, with regards to running the test required to fulfill our obligations to our customer. ***In mid-June, we ran into new technical issues that would not allow us to meet our obligations with regards to the timing of the reliability test for our customer***.
>
> ***Given our original agreements with the customer and our position with regards to the reliability test, we worked in great partnership with our customer to come to an agreement that satisfies all of our obligations, with regards to all***

> ***agreements with the customer. While the charge to finalize our obligations on this project is significant, we believe it is in the best interest of the Company and our shareholders***.
>
> Today's announced charge will help us focus in a better way in our core business while we continue to offer aftermarket and onsite service and parts for wood pellet plants, as well as ***continue to offer proven wood pellet plant equipment for sale as equipment suppliers only***. We remain confident in the wood pellet industry's potential over the long-term.
>
> Referencing our first pellet plant delivered to our customer in Georgia, the plant is running in our agreements and $60 million loan remain in place. As a reminder, the loan is due in December. ***We are working collaboratively with the customer in Georgia, as a potential sale of this plant is being contemplated***. NDAs are in place with multiple prospects for this plant, and we believe the plant could be sold, at least, by December, if not before.

155. During the question-and-answer portion of the July 24, 2018 conference call, defendants were asked why Astec did not take a charge for the Hazlehurst pellet plant in light of the fact that it took a charge for the Highland plant and removed the Hazlehurst plant from the Company's backlog. In response, Brock stated: "We have agreements in place on Hazlehurst, and so we really – we don't need to do that." When questioned about why Astec's auditors instructed the Company to remove Hazlehurst from the backlog, Brock added: "It adds clarity to the backlog for all of us." Next defendants were asked whether, "with a reasonable degree of confidence," the Company could "still state that [it] expect[s] to recognize revenue in the fourth quarter of 2018 from Hazlehurst," Brock responded:

> At this time, yes, we do. If it sells before then, I mean, who knows if it does or not? We do have multiple prospects looking at the plant. It could pull forward – as we've said before, it is breakeven.

156. The market's reaction to the Company's 2Q2018 earnings release was swift and severe. After closing at $60.80 per share on July 23, 2018, the price of Astec stock dropped 20%, or $12.59 per share, to close at $48.21 per share on July 24, 2018, on elevated trading volume of more than 1.3 million shares. Market analysts reacted negatively as well, with William Blair

calling the write-off of the Arkansas pellet plant a "surprise," while noting that "[o]perating performance at Astec has deteriorated considerably over the past few years" and that the Company was "activist bait."

157. On August 9, 2018, the Company filed with the SEC its quarterly report on Form 10- Q for 2Q2018, which reaffirmed the financial results announced in the July 24, 2018 press release. The 2Q2018 Form 10-Q was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2Q2018 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 2Q2018 Form 10-Q stated, in part:

> Included in the June 30, 2017 backlog is approximately $60 [million] for a three-line pellet plant from one customer under a Company-financed arrangement whereby the Company expected to record the related revenues when payment became assured. **While the plant is currently operational and meeting its production goals, the customer has expressed its desire to further modify its obligations under the arrangement.** As a result, the Company has removed the order from its June 30, 2018 backlog and the parties have agreed to jointly market the plant to a new buyer.

158. The statements referenced in ¶¶ 152-157 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from

securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**Defendants Finally Disclose the Truth**

159. On October 23, 2018, the Company announced its financial results for 3Q2018, the period ended September 30, 2018. The Company reported a 1.2% decrease in domestic sales and a 20.2% decrease in the Company's backlog, with the domestic backlog contracting by 28.1%, which was being dragged down by the Company's pellet business. For 2018, the Company cut its core revenue growth forecast to 1% to 3%, down substantially from 7% to 12%. The Company also reported EPS of $0.30 for the quarter, widely missing the consensus estimate of $0.59. Revenue came in light as well, with Astec reporting $256.6 million for 3Q2018, below analysts' expectations of $276.8 million.

160. On October 23, 2018, the Company also hosted a conference call to discuss its 3Q2018 earnings. One analyst asked for an "update on the loan repayment." Brock stated the Company could end up owning the Hazlehurst plant, which would contradict the Company's recently announced strategy to only be an equipment supplier to the pellet plant industry. Specifically, Brock stated:

> Coming back to the previous question, it's due in December, and if it doesn't sell, the question is, what's the worst case scenario? And it goes back to not our first choice but we could be in the pellet business. And if we are, we are. We feel like it could make money. It would be less than, again, less than 5% of our business, probably more like 4% range. It would be an additional company that we might sell later, but if it's making money, we would hold on to. But we have the people that could run it if we wanted to do that or it ended up that way. That's not our first choice.

161. The market reacted negatively to the Company's poor financial results. After closing at $47.27 per share on October 22, 2018, the stock dropped 25% to close at $35.51 per

share on October 23, 2018, on abnormally high trading volume of 1.6 million shares. The stock continued to fall the following day, dropping another 7.5% to close at $32.79 per share on October 24, 2018.

## ADDITIONAL ALLEGATIONS OF SCIENTER

162. By virtue of his role as a Director, Brock had access to all relevant information regarding the problems at the Hazlehurst and Highland pellet plants. As Astec's corporate governance guidelines state, "Board members shall have unrestricted access to the Company's senior management. Furthermore, the Board encourages senior management, from time to time, to bring to Board meetings officers and managers who (a) can provide additional insight to matters before the Board because of such person's involvement in the areas being discussed, or (b) are officers and managers with potential for future advancement that senior management believes should be given exposure to the Board. As necessary and appropriate, Board members shall also have access to outside legal, accounting and other professional advisors to assist them in carrying out their duties and responsibilities as Directors."

163. Brock's and Swanson's extremely detailed statements about the purpose, mechanics, implementation, and progress of the manufacturing, design, and installation demonstrate that they each had intimate knowledge of the flaws at the Highland and Hazlehurst plants.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

164. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Astec securities publicly traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded

from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

165. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Astec securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NASDAQ or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

166. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

167. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

168. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Astec;

c. whether the Individual Defendants caused Astec to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of Astec securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

169. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

170. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Astec securities are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiff and members of the Class purchased, acquired and/or sold Astec securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

171. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

172. Plaintiff and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violations of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

173. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

174. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

175. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Astec securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Astec securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

176. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Astec securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Astec's finances and business prospects.

177. By virtue of their positions at Astec, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

178. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Astec securities from their personal portfolios.

179. Astec showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Astec, the Individual Defendants had knowledge of the details of Astec's internal affairs.

180. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Astec. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Astec's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Astec securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Astec's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Astec securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market

for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

181. During the Class Period, Astec securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Astec securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Astec securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Astec securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

182. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

183. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Violations of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

184. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

185. During the Class Period, the Individual Defendants participated in the operation and management of Astec, and conducted and participated, directly and indirectly, in the conduct of Astec's business affairs. Because of their senior positions, they knew the adverse non-public information about Astec's current financial position and future business prospects.

186. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Astec's business practices, and to correct promptly any public statements issued by Astec which had become materially false or misleading.

187. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Astec disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Astec to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Astec within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Astec securities.

188. Each of the Individual Defendants, therefore, acted as a controlling person of Astec. By reason of their senior management positions and/or being directors of Astec, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Astec to engage in the unlawful acts and conduct complained of herein. Each of the Individual

Defendants exercised control over the general operations of Astec and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

189. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Astec.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 26, 2019

Respectfully submitted,

**BRAMLETT LAW OFFICES**

By: /s/ *Paul Kent Bramlett*

PAUL KENT BRAMLETT #7387
ROBERT PRESTON BRAMLETT #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215-0734
Telephone: 615-248-2828
Facsimile: 866-816-4116
Email: PKNASHLAW@AOL.COM

-and-

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

This is to certify that I have filed the above and foregoing ***AMENDED COMPLAINT*** on the Court's CM/ECF system, which will effectively serve all registered attorneys of record with a true and exact copy.

SO CERTIFIED on August 26, 2019.

s/*Paul Kent Bramlett*
PAUL KENT BRAMLETT