# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## SOUTHERN DIVISION

| | |
|---|---|
| CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, ) ) ) ) | No. 1:19-cv-00024-PLR-CHS |
| Plaintiff, ) | CLASS ACTION |
| ) | |
| vs. ) ) | |
| ASTEC INDUSTRIES, INC., BENJAMIN G. BROCK and DAVID C. SILVIOUS, ) ) ) | Chief Judge Pamela L. Reeves |
| Defendants. ) ) | |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**Table of Contents**

I. Preliminary Statement .................................................................................................. 1

II. STATEMENT OF FACTS ............................................................................................ 5

  A. Parties ....................................................................................................................... 5

  B. Defendants' False and Misleading Statements .................................................... 1

  1. Defendants Mislead Investors About The Hazlehurst Plant ................................ 5

  2. Defendants Mislead Investors About Problems With The Highland Plant. ......... 8

  C. Astec's Stock Drops as Defendants Finally Reveal the Truth ......................... 13

III. The Complaint Satisfies the PSLRA's Pleading Requirements ............................ 14

  A. Standard of Review ............................................................................................... 14

  B. Defendants' False and Misleading Statements and Omissions ....................... 14

  1. Defendants Had a Duty To Tell the Whole Truth .............................................. 15

  2. The Complaint Explains How Defendants' Statements Were False and Misleading With Particularity .............................................................................. 16

  3. Defendants' Misstatements Are Actionable ...................................................... 18

  C. The Complaint Adequately Pleads That Defendants Acted With Scienter .... 21

  1. Standard of Review ............................................................................................. 21

  2. The Complaint Pleads a Strong Inference that Defendants Either Knew Their Statements Were False or Were Severely Reckless in Not Knowing ...........**Error! Bookmark not defined.**

  3. Brock's Stock Sales Strongly Support an Inference of Scienter ........................ 24

  D. The Individual Defendants Acted As Control Persons ..................................... 24

IV. CONCLUSION ............................................................................................................ 25

i

# TABLE OF AUTHORITIES

Cases

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................................... 19

*Ashland, Inc. v. Oppenheimer & Co.,*
648 F.3d 461 (6th Cir. 2011) ......................................................................... 19

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ....................................................................................... 19

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,*
399 F.3d 651 (6th Cir. 2005) ......................................................................... 25

*City of Pontiac Gen. Employees' Ret. Sys. v. Stryker Corp.,*
2011 WL 2650717 (W.D. Mich. July 6, 2011) .............................................. 23

*Dougherty v. Esperion Therapeutics, Inc.,*
905 F.3d 971 (6th Cir. 2018) ......................................................................... 23

*Frank v. Dana Corp.,*
646 F.3d 954 (6th Cir. 2011) .................................................................... 27, 28

*Grae v. Corr. Corp. of Am.,*
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) ........................................... 24

*Helwig v. Vencor, Inc.,*
251 F.3d 540 (6th Cir. 2001) .................................................................... 25, 28

*Hess v. Am. Physicians Capital, Inc.,*
2005 U.S. Dist. LEXIS 1162, *24 (W.D. Mich. Jan. 11, 2005) .................... 25

*In re Cardinal Health Inc. Sec. Litigations,*
426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................... 21, 24, 29

*In re Compuware Sec. Litig.,*
301 F. Supp. 2d 672 (E.D. Mich. 2004) ........................................................ 20

*In re Envision Healthcare Corp. Sec. Litig.,*
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ........................................... 26

*In re Ford Motor Co. Sec. Litig., Class Action,*
381 F.3d 563 (6th Cir. 2004) ......................................................................... 24

*JAC Holding Enterprises, Inc. v. Atrium Capital Partners, LLC,*
997 F. Supp. 2d 710 (E.D. Mich. 2014) ........................................................ 30

Case 1:19-cv-00024-CEA-CHS   Document 71   Filed 01/07/20   Page 3 of 30   PageID #: 1212

*Jones v. Robinson Prop. Grp., L.P.*,
427 F.3d 987 (5th Cir. 2005)........................................................................................... 31

*Laborers' Local #231 Pension Fund v. PharMerica Corp.*,
2019 WL 4645583 (W.D. Ky. Sept. 24, 2019) ................................................................ 23

*Lee v. Active Power, Inc.*,
29 F. Supp. 3d 876 (W.D. Tex. 2014)............................................................................... 31

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ........................................................................................................... 20

*Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016)............................................................................................ 12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
575 U.S. 175 (2015) ......................................................................................................... 26

*Palazzolo v. Fiat Chrysler Automobiles N.V.*,
2017 WL 6389573 (E.D. Mich. Dec. 14, 2017)............................................................... 28

*Rougier v. Applied Optoelectronics, Inc*,
2019 WL 6111516 (S.D. Tex. Mar. 27, 2019).................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights*, Ltd.,
551 U.S. 308 (2007) ......................................................................................................... 27

*U.S. S.E.C. v. Geswein*,
2011 WL 4541303 (N.D. Ohio Sept. 29, 2011) ............................................................... 23

*U.S. v. Ford Motor Co.*,
532 F.3d 496 (6th Cir. 2008)................................................................................. 20, 21, 23

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991) ....................................................................................................... 26

*Weiner v. Tivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019) ........................................................................... 20

Rules
Federal Rule of Civil Procedure 12 .................................................................................... 19, 22

iii

## I.     <u>Preliminary Statement</u>

This is a securities class action brought on behalf of purchasers of Astec Industries, Inc.'s ("Astec" or the "Company") publicly traded securities of Astec between July 26, 2016 and October 22, 2018, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder (the "Class").

Astec held itself out as the world's only single-source complete wood pellet plant manufacturer. Astec touted the sale of two wood pellet plants, one in partnership with Highland Pellets, LLC, located in Pine Bluffs, Arkansas, and one to Hazlehurst Wood Pellets, LLC, located in Georgia. Astec financed its customer's purchase of the three-line Hazlehurst facility for $60 million, meaning Astec could not recognize revenue from the plant until its customer paid off the financing. Rather the $60 million would be counted as inventory and "backlog" on Astec's books. Astec received an initial down payment of $30 million on the plant in August 2015 and a final $122.5 million payment in March 2016.

Throughout the Class Period, Defendants touted the Highland and Hazlehurst plants as models of success that would make Astec a leader in the booming pellet plant industry. In July 2016, the Company told investors that it expected another $80 million pellet plant order later that year. By October 2016, the Company boasted that its pellet plant business would record $100 million to $125 million in 2017. In November 2016, the Company told investors that it expected 35-50 pellet plants to be built in the United States in the next 5 years, each worth about $100 million, and that the Company's plan was to build "maybe half" of them.

Ultimately, the Company's foray into the wood pellet plan business was a complete disaster. In July 2018, the Company agreed to pay $68 million in cash and forgive approximately

1

$7 million in receivables to exit its obligations related to the Highland Plant. Astec recorded a full write-off of $65.7 million related to the Hazlehurst plant in the fourth quarter of 2018. The Company never received any other orders for pellet plants and ultimately exited the pellet plant business.

What the Company failed to disclose was that Defendants knew throughout the Class Period that the plants were riddled with problems that prevented them from running at their promised operational or production capacity, posing a threat to the Company's pellet plant business, its overall financial performance, and its financial outlook.

First, Defendants failed to disclose that neither the Hazlehurst nor the Highland plants were capable of producing enough low emission pellets to take advantage of the booming European market in which the Company had promised to become a major player.

Second, Defendants failed to disclose that the Company's sales contract to Highland Pellets was contingent upon the plant being able to pass a "Reliability Run" to produce 50,000 metric tons of high quality wood pellets in a 30 day period —the production level needed to fulfill Highland's 10-year contract to supply British utility company Drax with 600,000 metric tons of pellets per year. Defendants also failed to disclose that if the plant failed to pass the Reliability Run test by April 15, 2018, Astec would be forced to refund the entire purchase price of the plant, $____ million, to Highland.

Rather than coming clean to investors, Defendants issued a series of false and misleading disclosures assuring investors that the pellet plants were on track to meet their production requirements and downplaying the serious threat they posed to the Company's financial success. Confidential witnesses and internal documents confirm that Astec executives, including defendant CEO Benjamin Brock ("Brock"), were well aware or turned a blind eye to the severity of the

2

problems at the pellet plants while at the same time falsely assuring investors that not only were the current plants successes, but that the Company would soon land more pellet plant orders to sustain a $100 million annual net revenue source for the company.  Indeed, while defendant Brock was negotiating the as-yet-undisclosed $68 million payout and $7 million forgiveness in receivables to Highland Pellets, he unloaded nearly 60,000 shares of Astec stock for a total of $3.2 million. These stock sales were suspicious and unusual, as it was the Brock's first sales of Astec stock in over three years.

The truth materialized and was disclosed to investors on October 23, 2018 disappointing results for the third quarter 2018 ("3Q2018") caused by its pellet plant failures.  Astec's net sales had decreased by 3.4% and domestic sales had decreased by 7.5% compared to the third quarter of 2017. Astec's backlog, a key indicator of the Company's future financial performance, decreased 20.2% to $308.6 million at September 30, 2018, down from $386.5 million at September 30, 2017. All but $2.3 million of the $77.9 million decrease in the Company's backlog was attributable to pellet plants. This adverse news devasted Astec investors causing Astec's stock to fall nearly 25% or from $47.27 to $35.51 per share on October 23, 2018.

As demonstrated below, Defendants' motion to dismiss relies on mischaracterizations of the Complaint and the law to contest the elements of falsity and scienter, while conceding that the Complaint adequately pleads reliance and loss causation.

First, Defendants argue that certain of the misstatements identified in the Complaint are not actionable because they are forward-looking statements, immaterial puffery, or statements of opinion. These arguments ignore the well-settled law that defendants are liable for materially misleading statements, even if they are couched as opinions or predictions. The Complaint alleges in tremendous detail that Defendants had no factual basis for their optimistic projections,

3

predictions, and opinions. And, in fact, Defendants were fully aware that the ongoing production problems at the pellet plants were far worse than what was disclosed to investors and would ultimately preclude the Company from ever realizing the future pellet plan revenues Defendants repeatedly promised. Similarly, the statements Defendants dismiss as vague and inconsequential puffery were, in fact, specific claims about the pellet plants' production capabilities that a reasonable investor would find material. Defendants also argue that the formatting and length of the Complaint fall short of Rule 9(b)'s particularity requirements. This argument fails because the Complaint alleges in painstaking detail the "who, what, when, where and how" of Defendants' misrepresentations and omissions. Importantly, Defendants do not appear to challenge the falsity or materiality of several of the most egregious misstatements alleged in the Complaint.

Second, Defendants argue that the Complaint fails to plead scienter because the confidential witnesses had no meaningful contact with the Individual Defendants and because only one of the three Individual Defendants had suspicious stock sales during the Class Period. This argument misstates the facts alleged in the Complaint and the well-settled law in this Circuit. Defendants' argument ignores the well-pleaded allegations that Brock and Swanson attended meetings and received and discussed internal reports that directly contradicted Defendants' statements about the production capabilities of the pellet plants and that the Company viewed the pellet plant business as an essential countercyclical hedge for its other businesses. Defendants' also ignore the fact that CW 1 participated in the Reliability Run tests that the Highland plant never came close to passing, and that the reports of those tests were sent directly to the Individual Defendants. Finally, Defendants do not even attempt to provide an non-fraudulent inference for Brock's sale of nearly $3.2 million in Astec stock in May 2018—the first Astec stock Brock had sold in more than three years—just days after being briefed on the extensive production problems

4

at Highland that would prevent the plant from passing the Reliability Run prior to the drop dead date.

Defendants' motion to dismiss should be denied in its entirety.

## II. STATEMENT OF FACTS

### A. Parties

Defendant Astec is a Tennessee corporation headquartered in this District. Astec securities trade on the NASDAQ ticker under the ticker symbol "ASTE." Defendant Benjamin G. Brock ("Brock") joined Astec in 1997. At all relevant times herein, Brock served as CEO and President, a member of the Astec's Board, and a member of the Board's executive committee until he was forced out on January 21, 2019. Defendant David C. Silvious ("Silvious") has served as the Vice President, Chief Financial Officer, and Treasurer of the Company since August 2011. Defendant Malcolm Swanson ("Swanson") is joined Astec in 1989.  Swanson is an Executive Officer of the Company and served as the President of Astec, Inc. from January 2014 through 2018.  ¶¶ 22-24.

### B. Defendants' False and Misleading Statements

#### 1. Defendants Mislead Investors About The Hazlehurst Plant

The Company's first pellet plant order was in 2013 from Hazlehurst Wood Pellets, LLC— a subsidiary of Fram Renewable Fuels, LLC ("Fram")—for a three-line facility located in Hazlehurst, Georgia ("Hazlehurst"). Rather than sell that plant, the Company financed it with the buyers for $60 million, meaning Astec could not recognize revenue from the plant until the loan was repaid. Astec planned to be repaid once the buyer received financing from its banks and told investors that the financing would be repaid to Astec within two to three years. While Astec did not recognize revenue from Hazlehurst, it did include the $60 million plant in its reported inventory in its financial statements. Astec also included the $60 million plant in its backlog, a measure the

5

company touted as a key indicator of future growth. For example, Brock told investors in an October 2016 conference call that the Company was "encouraged" by the increase in its backlog and that it was one of the "encouraging signs we believe that our fourth quarter this year will be better than our fourth quarter last year." ¶¶ 42-44.

Hazlehurst's 2013 application to Georgia's Environmental Protection Division ("EPD") for a permit to construct and operate the plant stated that the pellets would be "exported to markets in the European Union for powering utility boilers," which meant they would have to be produced with wood-burning furnaces to meet the strict EU environmental standards. ¶ 43.

Even before the Class Period began, Astec and Fram were well aware of the Hazlehurst plant's inability to efficiently produce pellets that met the strict emissions standard of the European industrial clients that were necessary for the Hazlehurst plant to receive financing. ¶¶ 46-48.

On July 26, 2016, at the start of the Class Period, Brock acknowledged on an investor call that Hazlehurst needs to "be able to burn wood exclusively on each line, and we've hit a wall on that on our burners. So we're replacing the burners. . . . " However, Brock failed to inform investors that the replacement burners were purchased from a third party, which would have undermined Astec's marketing claim to being a one-stop shop for pellet plant equipment and installation. More egregiously, Brock assured investors that "*testing and proving that the lines will do what we said on tons per hour is fine*" and that "*I want to make sure everybody understands, we're not in a jam or at risk or anything, because there is no risk. We have met that, and we are in good shape*." ¶ 49.

In an October 2016 call with investors, Brock stated that "assuming we are paid on Hazlehurst in 2017," that $60 million would be on top of the $100 million to $125 million in net pellet plant sales the Company expected to recognize in 2017. Asked by an analyst whether the

use of the word "assumed" was implying that the payment was less than certain, Brock assured the analyst that "It's really, we get paid, but there is not really profit in it." ¶ 50.

In a November 2016 speech at the Robert W. Baird Global Industrial Conference, Brock characterized the pellet plant industry as our growth story for us." Brock also acknowledged that the "[t]he pellet business is really created by the demand in the UK as they convert their coal fired energy plants to wood fire" and that "most of the contracts that are driving these plants to be build are a 10-year supply contracts for pellets from our customers to the utilities." Despite adding the McConnell wood-firing burners in 2016 and understanding that Hazlehurst needed to rely on wood-fired furnaces to secure financing, on January 31, 2017, Hazlehurst's pre-dryer baghouse was tested for emissions while combusting **natural gas**, rather than wood. ¶¶ 51-52.

In a February 2017 call with investors, Brock announced that Astec was extending the loan term for the Hazlehurst plant from July 2017 to December 2018, purportedly because Hazlehurst "has been a good partner." Brock did not disclose that Hazlehurst was unable to obtain financing because it was still unable to efficiently produce pellets with wood-firing furnaces. ¶ 53.

In calls with investors in April and July 2017, Brock falsely assured investors that the Company expected to receive the $60 million in financing from Hazlehurst—plus 6% interest— by December 2018. In October 2017, the Company revealed what Defendants had known for more than a year: the Hazlehurst plant was still running on natural gas because Astec had never figured out how to efficiently produce pellets with wood-burning fuel sources. The Company claimed that it had discovered new issues related to the wood-burning furnaces just in the past 45 days as it attempted to ramp up production—a frank admission that its 2016 claims to have already switched to wood-burning furnaces that had passed production tests were false and misleading. ¶ 55.

On a July 24, 2018 investor call, Brock announced that, after consultation with the Company's external auditor, Astec was finally removing the $60 million Hazlehurst order from the Infrastructure Group's backlog in order to "add clarity." However, Brock explained that the Company still refused to remove the Hazlehurst order from its inventory or otherwise take a charge for it because "[w]e have agreements in place on Hazlehurst" and because the Company still had a "reasonable degree of confidence" that it would recognize revenue from the Hazlehurst sale by the end of 2018. ¶ 59

In March 2019, the Company announced that it recorded a full write-off of $65.7 million related to the Hazlehurst plant in the fourth quarter of 2018, writing down the pellet plant inventory's net realizable value down to $0. The Company stated that it was taking the write-off because "the timing of a transaction and the ultimate sale price are uncertain," but those same conditions were true throughout the Class Period. ¶61.

### 2. Defendants Mislead Investors About Problems With The Highland Plant.

On August 20, 2015, the Company announced it had entered into an agreement and received a related down payment to build, deliver and install the first production line of a new turnkey wood pellet production facility in Arkansas. On March 30, 2016, the Company announced that it had been asked to build an additional $122.5 million of equipment to round out the initial $30 million order for the first production line of the multi-line Highland pellet plant, bringing the total project order to $152.5 million. ¶62-63.

Announcement of the Highland pellet plant was seen as a way for Astec to offset slower revenue growth in its Infrastructure Group, which at the time accounted for approximately 40% of the Company's sales. The Company expected "wood pellet factory production to represent roughly a third of the company's sales this year." On May 3, 2016, *Bloomberg Intelligence* reported that

8

increased demand for Astec's wood pellet plants "may help mitigate weakness in the Energy and Aggregate and Mining businesses amid a global mining slowdown and lower oil prices." ¶65-66.

Highland's sole customer was Drax Power Limited ("Drax"), a British company that owns and operates the biggest renewable power plant in Europe. Unbeknownst to investors, the Company's 2015 contract with Highland contained two terms that would eventually cripple Astec's finances: (i) the plant had to pass a rigorous test ("Reliability Run") demonstrating that the plant could produce a sufficient quality and quantity of pellets to meet its contractual obligations to Drax; and (ii) the Company would have to refund the entire purchase price of the plant if the plant failed to pass the Reliability Run test by April 15, 2018.[1]

The Reliability Run required the Highland plant to produce 49,315 metric tonnes of pellets within a period of 30 consecutive days, and each line would have to produce pellets at an average rate of 20 metric tonnes per hour for two period of 24 consecutive hours. The pellets produced must also meet the European Standards for average durability, average net calorific value, average bulk density, pellet moisture content, ash content, and fines content.

Astec staff and executives actively monitored Highland's day-to-day productivity and constantly had engineers on site to work with Highland employees. According to CW 1, Swanson was at the Highland plant 2-4 times per month and would sometimes stay for an entire week. CW 1 also attended a daily 2 p.m. meeting with Highland management and Astec employees and consultants to discuss maintenance needs and other ongoing problems at the plant. At these meetings, Highland and Astec personnel would go line by line through the Astec/Highland

---

[1] The Reliability Run Protocol, incorporated by reference in the Complaint (¶¶ 67-68), is attached as Exhibit 1 to the accompanying Declaration of Daniel Tyre-Karp. *See Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383 (6th Cir. 2016) ("The court consider[s] the complaint in its entirety, as well as ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.") (citation and internal quotation marks omitted).

9

Operations Issues List (the "Highland Issues List"), a spreadsheet documenting all ongoing operations issues at the plant identified by Highland, Astec's recommended actions, updates, and resolutions. A digital version of the spreadsheet was circulated via email to participants prior to the meeting, and a printed version was circulated at the meeting.[2] ¶69.

Astec did not disclose any problems with the Highland plant until July 25, 2017, when Brock informed investors on a conference call that a "cost miss estimate" due to a "late add-on in the process" of installing the plant that caused a "major issue" with the Company's net income for the quarter. What Defendants failed to disclose was that—according to CW 1—the Highland plant was only running at 50% of the required production level, was relying on some natural gas usage to increase production, and had not come close to passing the Reliability Run. ¶75.

On October 2, 2017, the Company told investors that it had discovered "design flaws" at the Highland plant in the past 45 days as it "ramped up production" from "low production rates." Asked how far off Highland was from reaching its production targets, Brock replied that the Company had guaranteed 20 tonnes per hour on each of the 4 lines and stated that one of the lines had reached that threshold for a short period of time. Defendants failed to disclose that the line that had reached its production goal for a short period of time did so by running partially on natural gas—which the plant could not do on all 4 lines due to emissions limits. ¶77.

Brock also told investors that the Company does not anticipate "the creation of dust" being an issue at Highland because it used a different burner than Hazlehurst. But the creation of dust was a significant problem at the Highland plant, as well, leading to several fires from sparks from the burner. ¶78

---

[2] The Highland Issues List, incorporated by reference in the Complaint (¶ 71), is attached as Exhibit 2 to the accompany Declaration of Daniel Tyre-Karp.

Brock also told investors that the Company had "high confidence" that the charges announced on October 2 were sufficient to meet Astec's contractual obligations to Highland and that the Company did not anticipate additional charges caused by the plant missing production goals. Brock stated that April 15, 2018 was the "furthest out date" by which the Company believed the design flaws at Highland would be fixed, and that the Company has "a timeline that shows earlier than that internally." Defendants did not disclose that the Reliability Run needed to be completed by April 15 or that the Company would have to refund the entire purchase if the plant failed to pass the Reliability Run. ¶79.

On an October 24 earnings call, Brock stated that the upgrades at Highland were "more involved frontend work with green hammer mills, cement plant work." Brock also mentioned an April "drop dead" date for the Highland plant, but he failed to explain the significance of the longstop date in terms of the scale of the refund or the lofty requirements of the Reliability Run. Further, Brock conflated the April 15 deadline with the Company's internal goal of fixing the issues at the Hazlehurst plant by November 2017. ¶80.

On February 20, 2018, Brock announced on an earnings call that "on the wood pellet plants, we are making good progress and believe that our announced charges during 2017 are adequate to cover our commitments to our customers." On March 1, however, the Company announced in its 2017 Form 10-K that it had amended its contract with Highland "whereby the Company agreed to compensate the customer for production shortfalls caused by the Company and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018. The Company incurred production shortfalls in January and February 2018. The Company expects to meet the contract's operational specifications prior to June 15, 2018." The Company

11

still failed to disclose that the Company was not close to meeting the operational specifications or that the Company was liable for refunding the entire purchase price. ¶81.

On an April 24, 2018 earnings call, Brock again assured investors that "[we] believe our announced charges during 2017 are adequate to fulfill our commitments to our customers." Brock stated that "the hammer mills that piece and all that we fixed." However, according to CW 1, it was clear within just a few days of the installation of the green hammer mills on December 22, 2017 that the new green hammer system was not keeping up and had a lot of maintenance issues. ¶83.

That same day, the Company's Form 10-Q stated that the Company needed to pass the Reliability Run to void Highland's "right to any potential refund of the purchase price"—a disclosure which still falls short of acknowledging that Highland's right to a full refund upon the longstop date was contractual, not just a potential liability. The Company failed to disclose that the Highland plant continued to suffer from operational issues that were crippling the plant's production levels; the plant's inability to consistently produce high quality pellets; the negotiations between Astec, Highland, and Highland's financers; and the impossibility of the Highland plant passing the Reliability Run by the longstop date. ¶84.

On February 23, 2018, employees from Highland, Astec, and Nexus (a third-party consultant) inspected the plant and to find solutions to some of the issues identified on the Highland Issues List. The results of the inspection and the group's recommendations were recorded in a memo (the "Transition Inspection Report") that was circulated to the team of people who attended the daily operations meetings—which, according to CW 1, included Malcolm Swanson.[3] On April 14-15, 2018, a follow-up inspection was conducted, and the results were recorded in an April 16,

---

[3] The Transition Inspection Report, incorporated by reference in the Complaint (¶ 85), is attached as Exhibit 3 to the Declaration of Daniel Tyre-Karp.

12

2018 memo (the "Material Leakage Memo") that was circulated to Astec executives, including Swanson and Brock at a meeting at the Highland plant to discuss the ongoing problems.[4] The Highland plant also continued having problems producing high quality pellets that met its contractual obligations to Drax. ¶85.

As a result, in either January or February 2018, Highland informed Astec they were not even going to conduct the Reliability Run in either April or June 2018. From Highland's perspective, "it was a waste of time" to conduct the Reliability Runs in April or June 2018 given the multitude of issues on each of the lines that required constant maintenance that still did not bring the plant to full production. CW 1 was part of at least three of the plant's attempts to pass the Reliability Run in 2017. CW 1 states that Highland never got close to passing the Reliability Run, and, in fact, "never got over three days of 12-hour shifts running before something messed up" and the test was canceled.

According to CW 1, Brock visited the Highland plant in April 2018 and was given tour of the plant. During the tour, the problems identified in the Highland Issues List were conveyed to Brock. Following the tour, CW 1 participated in a 2-hour meeting with Astec personnel to go over the Highland Issues List. CW 1 noted that there was no sense of shock from any of the Astec personnel at the problems described at the plant.

### C. Astec's Stock Drops as Defendants Finally Reveal the Truth

On October 23, 2018, the Company announced its financial results for 3Q2018, the period ended September 30, 2018. The Company reported a 1.2% decrease in domestic sales and a 20.2% decrease in the Company's backlog, with the domestic backlog contracting by 28.1%, which was being dragged down by the Company's pellet business. For 2018, the Company cut its core revenue

---

[4] The Material Leakage Memo, incorporated by reference in the Complaint (¶ 85), is attached as Exhibit 4 to the Declaration of Daniel Tyre-Karp.

growth forecast to 1% to 3%, down substantially from 7% to 12%. The Company also reported EPS of $0.30 for the quarter, widely missing the consensus estimate of $0.59. ¶ 159.

The market reacted negatively to the Company's poor financial results. After closing at $47.27 per share on October 22, 2018, the stock dropped 25% to close at $35.51 per share on October 23, 2018, on abnormally high trading volume of 1.6 million shares. The stock continued to fall the following day, dropping another 7.5% to close at $32.79 per share on October 24, 2018. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities Plaintiff and other Class members have suffered significant losses and damages. ¶161.

## III.     The Complaint Satisfies the PSLRA's Pleading Requirements

### A.     Standard of Review

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff" and "accept all well-pleaded factual allegations as true." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011) (citation omitted). The complaint's allegations must "state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission ("falsity"); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011). The Complaint adequately alleges all of these required elements, and Defendants contest only falsity and scienter.

### B.     Defendants' False and Misleading Statements and Omissions

Under the PSLRA, a plaintiff must plead falsity with particularity, "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u4(b)(1)(B). So long as a plaintiff pleads "sufficient detail – in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *U.S. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008).

### 1. Defendants Had a Duty To Tell the Whole Truth

"Once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019), *reconsideration denied*, 2019 WL 2211764 (M.D. Tenn. May 22, 2019) (citation omitted). Defendants repeatedly chose to speak about the status and production capabilities of its pellet plants during the Class Period and were thus obligated to provide complete and non-misleading information about the business.

Ignoring the fact that Defendants repeatedly volunteered detailed positive information about the Highland and Hazlehurst plants, Defendants argue that they had no duty to disclose the plants' significant manufacturing problems or the material effects of those manufacturing problems on Astec's revenue. *See* Motion at 10 & n.20. "[A] company may choose silence or speech elaborated by the factual basis as then known - but it may not choose half-truths." *In re Compuware Sec. Litig.,* 301 F. Supp. 2d 672, 682 (E.D. Mich. 2004) (citation omitted). For example, the Company's disclosures about production problems at the Highland plant in July and October 2017 (¶¶ 76-79, 125-138) triggered a duty to disclose the fact that the $152 million in revenue it recorded from the Highland contract would need to be refunded if the plant failed to

15

pass the Reliability Run by the longstop date. Without this disclosure, Defendants' optimistic statements about its pellet plant business misled investors. Further, Brock's October 2, 2017 disclosure that the Highland plant had "ramped up production" and had managed to meet the guaranteed 20-tonnes-per-hour on one of the four production lines was misleading because Brock failed to disclose that this output was only reached by running the burner on natural gas—which the plant could not use to meet its production guarantee due to the strict emissions limits placed on the Company's EU customer.

### 2. The Complaint Explains How Defendants' Statements Were False and Misleading With Particularity

So long as a plaintiff pleads "sufficient detail – in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *U.S. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008). The Complaint more than amply alleges the "who, what, when, where and how" details of Defendants' misrepresentations and omissions. *See In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 742 (S.D. Ohio 2006).

For each misstatement, the Complaint identifies the speaker, identifies the time and manner of its utterance, and explains the reasons it was false and misleading. For example, the Complaint explains that Brock's statement on a February 21, 2017 investor call that Astec was extending loan term for the Hazlehurst plant from July 2017 to December 2018 because "Hazlehurst has been a good partner" was false and misleading because Brock omitted the material information that Hazlehurst was unable to meet the July 2017 deadline because it was unable to obtain financing because the plant was still unable to efficiently produce pellets with wood-firing furnaces. ¶¶ 53; 112; 114; 116.

16

Defendants attempt to escape liability by arguing that the Complaint is confusing because it alleges too many misstatements over too long of a time period. But Defendants' propensity to make repeated misstatements regarding the same topics is not a pleading deficiency. Defendants also complain that they are confused by the Complaint's use of bolding to identify misstatements in the instance in which the Complaint reproduces longer disclosures to provide the reader with the context for the misstatements. Defendants' complaint about the formatting style of the alleged misstatements is precisely the type of issue this Court's Order Governing Motions to Dismiss is intended to prevent. Dkt. No. 5 ("A motion pursuant to Federal Rule of Civil Procedure 12(b) is discouraged if the defect is likely to be cured by filing an amended pleading. Therefore, the parties must meet and confer prior to the filing of a motion to dismiss to determine whether it can be avoided.") As noted in Defendants' Notice of Certification of Conferral (Dkt. No. 63), the parties met and conferred on October 22, 2019 to discuss whether an amended pleading could cure any purported defects in the Complaint. Defendants did not raise their confusion over the Complaint's bolding. Defendants' feigned confusion is further belied by their admission that they "anticipate" this precise explanation; the fact that Defendants understood the purpose of the bolding is an admission that the Complaint provided satisfied the particularity requirements of Rule 9(b) by providing "sufficient detail . . . to allow the defendant to prepare a responsive pleading." *Ford Motor Co.*, 532 F.3d, at 504.[5]

---

[5] *See also Laborers' Local #231 Pension Fund v. PharMerica Corp.*, 2019 WL 4645583, at \*10 (W.D. Ky. Sept. 24, 2019) ("While Plaintiffs' Complaint lists the alleged omissions separately from the Proxy statements those omissions allegedly make misleading, the Court believes that it can adequately decipher from the Complaint and Plaintiffs' response to the motion to dismiss which alleged omissions generally correspond to which proxy statements."); *City of Pontiac Gen. Employees' Ret. Sys. v. Stryker Corp.*, 2011 WL 2650717, at \*6–7 (W.D. Mich. July 6, 2011) ("With regard to Plaintiffs' use of a single set of reasons to explain why various statements were false, the Court believes that this is an acceptable means of identifying the reasons for falsity in these circumstances.") *Rougier v. Applied Optoelectronics, Inc*, 2019 WL 6111516, at \*8 (S.D. Tex. Mar. 27, 2019) (rejecting defendants' complaint about "puzzle pleading" because "[a]lthough Plaintiff recites the same boilerplate reasons for why Defendants' statements are misleading, Plaintiff's explanations for the falsity of Defendants' statements logically correspond with each alleged misstatement.")

### 3. Defendants' Misstatements Are Actionable

#### a) *No Safe Harbor*

Defendants argue that certain of the alleged misstatements are protected by the PSLRA's safe harbor because they are forward-looking statements and because the Complaint does not plead that Defendants had actual knowledge that these misstatements were false or misleading at the time they were made. Motion at 13-15. This argument fails for two reasons.

First, "[a]lthough it is true that [many of these] statements concern an event in the future, that alone does not automatically make them forward-looking statements. . . . 'The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made. . . .'" *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018). Many of the misstatements identified by Defendants, when viewed in their original context, are verifiable statements at least partially about current or past events. *See, e.g.,* ¶¶ 98, 114, 125, 133.

Second, the Complaint repeatedly alleges with particularity that Defendants had actual knowledge that these statements were false or misleading at the time they were made. ¶¶ 9; 55; 58; 67-72; 162-163. As explained further, *infra*, the Complaint alleges with particularity that Defendants had actual knowledge based on a variety if information sources, including internal reports, confidential witnesses, and corrective disclosures. "[B]ecause the Court concluded that Plaintiffs adequately pled scienter based on their numerous allegations, the Court finds that Plaintiffs' allegations are, for pleading purposes, sufficient to show scienter as to Cardinal Defendants' forward-looking statements." *In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 756 (S.D. Ohio 2006), *judgment entered sub nom. In re Cardinal Health Inc. Sec. Litig.*, 2007 WL 1026347 (S.D. Ohio Mar. 29, 2007).

*b)*      *Defendants' Misstatements Are Not Vague Puffery*

"The Sixth Circuit has made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism." *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at \*14 (M.D. Tenn. Dec. 18, 2017). Here, Defendants' expressions of confidence, when considered in context, are not "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71(6th Cir. 2004); Motion at 16. Rather, the statements that Defendants characterize as "puffery" are specific claims about the core issues in this action: the financial consequences of the inadequate production capabilities of the Hazlehurst and Highland plants.

For example, Brock's October 2, 2017 statement that the Company was "'confident in [its] ability to' get to full production" (Motion at 16; ¶ 131) superficially appears to be a statement of general optimism. However, when considered in the context of Brock's entire statement, Brock is making a specific claim that Astec had not only "identified the ultimate fix" that would allow the Hazlehurst plant to run at full production with wood-burning furnaces, but that Company would not incur and further costs "associated with completing [its] commitments to [its] customers with regards to production rates." ¶ 131. Further, Brock's next statement that the Company is "confident in the near term and long term outlook for pellet plants" also superficially appears vague and general. But, viewed in context of Brock's full statement, Brock is making a specific claim that the Company will be able to attract $100 million per year in pellet plant orders on the basis of its success with Hazlehurst and Highland. *Id.*

19

These were not "vague self praises that a reasonable investor would not seriously consider." *Hess v. Am. Physicians Capital, Inc.*, 2005 U.S. Dist. LEXIS 1162, *24 (W.D. Mich. Jan. 11, 2005) (cited in Motion at 17).[6] Rather, these were actionable misstatements intended to reassure investors that the serious design flaws at the Hazlehurst and Highland plants were under control and that the Company's pellet plant business was still on track to become a $100 million per year cash cow. *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 672 (6th Cir. 2005) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation") (citation omitted); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir. 2001) (rejecting defendants' puffery argument because "we do not agree that [defendant's] estimates of strong earnings were so uncertain or casually disregarded by the marketplace. . . . [T]he projections were framed as material reassurances of continued good fortune.")

c)   *Defendants Statements of Opinion Are Actionable*

Defendants argue that certain misstatements are not actionable because they are statements of opinion, and "[i]n *Omnicare II*, the Supreme Court held that opinion statements cannot support a claim unless a plaintiff pleads facts demonstrating that the defendants disbelieved the statements ***at the time they were made***." Motion at 17-18 (emphasis in original). Defendants' argument fails because it is based on a misstatement of the law and a mischaracterization of the well-pleaded facts in the Complaint.

---

[6] Further cementing the fact that a reasonable investor would find these statements important to the total mix of information available, an analyst for RW Baird followed up with Brock to determine his precise "level of confidence" that Astec would not incur further expenses for the two plants. Brock assured him that he had "very high confidence." ¶¶ 79; 134.

20

First, Defendants brazenly misstate the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund* ("*Omnicare II*"), 575 U.S. 175 (2015), which explicitly rejected the argument that statements of opinion are only actionable if a plaintiff pleads subjective falsity. Instead, *Omnicare II* held that statements of opinion are actionable if a plaintiff identifies "particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*. at 194; *see also In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *11 (M.D. Tenn. Nov. 19, 2019) ("merely appending 'we believe' or 'we think' does not automatically render statements non-actionable. A statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion."). The well-pleaded facts of the Complaint adequately allege that Defendants' statements about the manufacturing capabilities of the pellet plants and Astec's ability to attract more pellet plant orders misled investors into believing that Defendants had an adequate basis for these beliefs, when in fact Defendants' statements omitted crucial adverse information that the severity of the production issues precluded Astec from receiving future plant order. *See, e.g., Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093–94 (1991) ("such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading")

Second, as discussed infra, the well-pleaded allegations in the Complaint extensively allege that Defendants knew their statements of opinion were false at the time the statements were made.

**C.  The Complaint Adequately Pleads That Defendants Acted With Scienter**

    1.  Standard of Review.

21

To evaluate scienter allegations, courts must accept the alleged facts as true and consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 322-23 (2007) (emphasis in original). An inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324. Rather, scienter may be pled even when reasonable, nonculpable inferences exist. *Id*. at 325. A complaint will survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id*. at 324Scienter may take the form of "[1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness." *Frank v. Dana Corp.*, 646 F.3d 954, 958-59 (6th Cir. 2011) (citation omitted). Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id*.

Here, the Complaint alleges in detail that defendants knew of, or recklessly disregarded, facts contradicting their public statements.[7]

### 1. Defendants Received Internal Reports That Contradicted Their Statements

The Complaint alleges that Brock and Swanson received internal reports detailing the extensive manufacturing problems at the Highland plant that directly contradicted Defendants' optimistic statements. Swanson visited the Highland plant several times each month in 2017 and 2018 and would attend daily meetings with Highland personnel to discuss production targets. ¶¶70-72. Brock joined these meetings by conference call at least a few times per week. ¶70. Swanson

---

[7] The Sixth Circuit references a "non-exhaustive list of factors that do not necessarily establish scienter, but are "usually relevant" to its analysis (the "Helwig Factors"). *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *Helwig*, 251 F.3d at 552).

also received daily production reports that that included data on the quantity and quality of the pellets. ¶72.[8] Despite receiving these regular oral and written reports detailing the shortfalls in the quantity and quality of the pellets being produced at Highland, Defendants continued misleading investors by painting an overly optimistic picture of the short term and long term outlooks for the Company's wood pellet business.

The Highland Issues List corroborates Swanson's intimate knowledge of the extensive issues that prevented the Highland plant from ever getting close to passing the Reliability Run. Swanson is listed as the responsible person for items 13, 50, 52, 56, and 75. Malcolm was also sent the Transition Inspection Report, which detailed the problems with the bark and chip conveyors.

In mid-April 2018, Brock was given a tour of the Highland plant. During the tour, Brock was told about the significant problems detailed in the Highland Issues List. Brock was also given the Material Leakage Memo, which was a follow-up to the Transition Inspection Report. The Material Leakage Memo detailed damaged or otherwise faulty equipment on three of the plant's four lines that affected the bark distribution, chip distribution, and green hammer mills (GHM). Despite having just been briefed on the extensive problems at the Highland plant, Brock told investors on April 24 that "we've made good progress and believe our announced charges during 2017 are adequate to fulfill our commitments to our customers." ¶ 146. Brock also tells investors that "hammer mills" were fixed and blames "weather issues" for any setbacks (¶¶ 147-148), which directly contradict the Transition Inspection Report ("it was not related to the colder

---

[8] Defendants assertion that none of the Confidential Witnesses ever "met with any of the Individual Defendants" (Motion at 22) is simply wrong. *See* ¶¶ 70-71, 85, 91; *see also Palazzolo v. Fiat Chrysler Automobiles N.V.*, 2017 WL 6389573, at *10 (E.D. Mich. Dec. 14, 2017) (The witnesses describe in great detail the severity of the manufacturing problems at Caraco. Plaintiffs do not rely solely on the allegations of these confidential witnesses in their Amended Complaint to plead their case of securities fraud. The witnesses' allegations corroborate Plaintiffs' claims that Defendants, despite being aware of Caraco's vast problems, made public comments that did not provide a full and accurate picture of the situation.")

temperatures") and the Material Leakage Memo (listing deficiencies at three different GHM locations).

### 2. Brock's Stock Sales Strongly Support an Inference of Scienter.

"Courts generally consider the following factors in analyzing allegations of insider trading: (1) whether the alleged trades were 'normal or routine' for the insider; (2) whether profits reaped 'were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud'; and (3) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious." *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 728 (S.D. Ohio 2006). Here, Brock's stock sales are highly suspicious in volume, timing, and departure from standard practice, and Defendants do not even attempt to provide a nonculpable explanation for these trades.

Just days after his April 2018 tour of the Highland plant—and before disclosing the impossibility of the plant passing the Reliability Run prior to the longstop date—Brock began unloading his Astec stock. From May 1 to May 4, 2018, Brock sold nearly 60,000 shares of Astec stock and pocketed nearly $3.2 million in profit from the sales at artificially inflated prices. These stock sales were significant and highly unusual. Prior to May 2018, Brock had not sold a single share of Astec stock for more than three years. The profit Brock made from these sales was more than 3.5 times larger than Brock's total compensation for 2018, as reported in the Company's proxy statement.

### 3. Other Helwig Factors

In addition to the internal reports contradicting external statements and the suspicious insider stock sales, the Complaint also pleads three other Helwig Factors.

- **Closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; disregard of the most current**

24

**factual information before making statements**: Brock repeatedly reassured investors that the Highland and Hazlehurst plants would be successful long past the point of plausible optimism. For example, Brock told investors on April 24, 2018 that the charges the company took in 2017 were sufficient to fulfill the Company's commitments to Highland and Hazlehurst and that the Company expected to be able to fulfill an order for a new pellet plant in 2019. ¶¶ 146-147. Three months later, on July 24, the Company announced that (i) it was unable to meet its contractual obligations and agreed to pay $68 million and forgive approximately $7 million in receivables to exit the Highland deal, and (ii) it would no longer construct pellet plants, but would instead only supply equipment to plants. ¶¶ 152-154.

- **The self-interested motivation of defendants in the form of saving their salaries or jobs**: Despite being the son of Astec's founder, Brock was forced out of his job shortly after the Company finally acknowledge the collapse of its pellet plant business that he had personally overseen.

Taken as a whole, the Complaint supports a strong inference of scienter that is at least as strong as the implausible "eternal optimist" inference suggested by Defendants. *See JAC Holding Enterprises, Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735–36 (E.D. Mich. 2014)

### D. The Individual Defendants Acted As Control Persons

Defendants seek dismissal of the control-person claims solely on the ground that Plaintiffs have failed to establish an independent violation of the securities laws. Because the Complaint supports a claim under the Exchange Act, the Motion to Dismiss the Section 20(a) claim must be denied. *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 890-891 (W.D. Tex. 2014).

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss in its entirety.[9]

---

[9] While plaintiffs are confident the Complaint more than satisfies the applicable pleading requirements, should the Court conclude that any of the allegations in the Complaint are not sufficient to support a claim, plaintiffs request leave to amend the Complaint to cure any defect identified by the Court. *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002).

Dated: January 7, 2020

Respectfully submitted,

**BRAMLETT LAW OFFICES**

**By: /s/ Daniel Tyre-Karp**

PAUL KENT BRAMLETT #7387
ROBERT PRESTON BRAMLETT #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215-0734
Telephone: 615-248-2828
Facsimile: 866-816-4116
Email: PKNASHLAW@AOL.COM

-and-

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Daniel Tyre-Karp
275 Madison Avenue, 40h Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        dtyrekarp@rosenlegal.com

*Counsel for Plaintiff*

26