# Exhibit A

No *Shepard's* Signal™
As of: June 10, 2020 12:15 PM Z

# *Pittman v. Unum Group*

United States District Court for the Eastern District of Tennessee, Chattanooga Division

June 1, 2020, Filed

1:18-CV-000128-DCLC (lead); 1:18-CV-00154-DCLC; 1:18-CV-00169-DCLC

**Reporter**
2020 U.S. Dist. LEXIS 97379 *

CYNTHIA PITTMAN, et al., Plaintiffs, vs. UNUM GROUP, et al., DefendantsSCOTT CUNNINGHAM, Plaintiff, vs. UNUM GROUP, et al., DefendantsCITY OF TAYLOR POLICE AND FIRE RETIREMENT SYSTEM, Plaintiff, vs. UNUM GROUP, et al., Defendants.

## Core Terms

ratio, block, investors, long-term, premium, progress, misleading, disclosure, scienter, tracking, unfavorable, adequacy, omission, misrepresentations, mortality, misrepresented, estimated, interest-adjusted, terminations, exceeded, deviated, pretty, lapse, anticipated, benchmark, persistency, conceal, target, older, Consolidated

**Counsel: [\*1]** For Cynthia Pittman, Individually and on Behalf of All Others Similarly Situated, Plaintiff (1:18cv128): Charles H Linehan, Lionel Z Glancy, Robert V Prongay, LEAD ATTORNEY, PRO HAC VICE, Glancy Prongay & Murray, LLP (CA), Los Angeles, CA USA; Lesley F Portnoy, LEAD ATTORNEY, PRO HAC VICE, Glancy Prongay & Murray, LLP, New York, NY USA; Howard G Smith, PRO HAC VICE, Law Offices of Howard G. Smith, Bensalem, PA USA; Tricia Herzfeld, J. Gerard Stranch, IV, Branstetter, Stranch & Jennings, PLLC, Nashville, TN USA.

For City of Taylor Police And Fire Retirement System, Lead Plaintiff, Plaintiff (1:18cv128): Angel P Lau, LEAD ATTORNEY, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (CA), San Diego, CA USA; Christopher Martin Wood, LEAD ATTORNEY, Robbins Geller Rudman & Dowd LLP (Nashville), Nashville, TN USA; Jack Reise, Sabrina E Tirabassi, LEAD ATTORNEY, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (FL), Boca Raton, FL USA; Thomas C. Michaud, LEAD ATTORNEY, PRO HAC VICE, Vanoverbeke, Michaud & Timmony, P.C., Detroit, MI USA.

For Unum Group, Defendant (1:18cv128): Myla G Arumugam, LEAD ATTORNEY, Samuel George Darby, PRO HAC VICE, Brian T Frawley, Sullivan & Cromwell LLP, New York, NY USA; **[\*2]** James T Williams, IV, Jenna W Fullerton, Miller & Martin, PLLC (Chattanooga), Chattanooga, TN USA.

For Richard P. Mckenney, John F. Mcgarry, Daniel J. Waxenberg, Defendants (1:18cv128): James T Williams, IV, Jenna W Fullerton, Miller & Martin, PLLC (Chattanooga), Chattanooga, TN USA.

For Scott Cunningham, Plaintiff (1:18cv154): J. Alexander Hood, II, Jeremy A Lieberman, PRO HAC VICE, Pomerantz LLP, New York, NY USA; Patrick V. Dahlstrom, PRO HAC VICE, Pomerantz LLP (Chicago), Chicago, IL USA; Paul K Bramlett, Robert Preston Bramlett, Bramlett Law Office, Nashville, TN USA.

For Unum Group, Defendant (1:18cv154): Myla G Arumugam, LEAD ATTORNEY, PRO HAC VICE, Sullivan & Cromwell LLP, New York, NY USA; James T Williams, IV, Jenna W Fullerton, Miller & Martin, PLLC (Chattanooga), Chattanooga, TN USA.

For Richard P. Mckenney, John F. Mcgarry, Daniel J. Waxenberg, Defendants (1:18cv154): James T Williams, IV, Jenna W Fullerton, Miller & Martin, PLLC (Chattanooga), Chattanooga, TN USA.

For City of Taylor Police And Fire Retirement System, Individually, and on Behalf of All Others Similarly Situated, Plaintiff (1:18cv169): Angel P Lau, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP (CA), San

Diego, **[\*3]** CA USA; Brian E Cochran, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, Chicago, IL USA; Christopher Hamp Lyons, Christopher Martin Wood, Robbins Geller Rudman & Dowd LLP (Nashville), Nashville, TN USA; David C Walton, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Diego, CA USA; Thomas C. Michaud, PRO HAC VICE, Vanoverbeke, Michaud & Timmony, P.C., Detroit, MI USA.

For Unum Group, Defendant (1:18cv169): Myla G Arumugam, LEAD ATTORNEY, PRO HAC VICE, Sullivan & Cromwell LLP, New York, NY USA; James T Williams, IV, Jenna W Fullerton, Miller & Martin, PLLC (Chattanooga), Chattanooga, TN USA.

For Richard P. Mckenney, John F. Mcgarry, Daniel J. Waxenberg, Defendants (1:18cv169):

James T Williams, IV, Jenna W Fullerton, Miller & Martin, PLLC (Chattanooga), Chattanooga, TN USA.

For Steve Zabel, Defendant (1:18cv169): James T Williams, IV, Miller & Martin, PLLC (Chattanooga), Chattanooga, TN USA.

**Judges:** Clifton L. Corker, United States District Judge.

**Opinion by:** Clifton L. Corker

# Opinion

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Cynthia Pittman, Scott Cunningham and the City of Taylor Police and Fire Retirement System brought claims against Unum Group ("Unum") and four Unum executives ("Individual Defendants" and along **[\*4]** with Unum, the "Defendants"). Plaintiffs allege Defendants violated *Sections 10(b)* and *20(a)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)*, *78t(a)*, and Securities and Exchange Commission *Rule*

*10b-5*, *17 C.F.R. § 240.10b-5*. Defendants have filed a Motion to Dismiss [Docs. 53, 44, 41] and memorandum of support [Docs. 54, 45, 42] pursuant to *Fed.R.Civ.P. 9(b)*, *12(b)(1)*, and *12(b)(6)* and the Private Securities Litigation Reform Act of 1995, *15 U.S.C. §§ 78u-4*, *78u-5*. This motion is now ripe for resolution.

## I. INTRODUCTION

This is a putative securities class action brought against Unum and the individual Defendants on behalf of investors in Unum between October 27, 2016 and May 1, 2018 (the "Class Period"). Defendant Richard McKenney ("McKenney") served as Unum's President and Chief Executive Officer, and as a director on the board. Defendant John McGarry ("McGarry") served as Unum's Chief Financial Officer and Executive Vice President. Defendant Steve Zabel ("Zabel") served as President of Unum's Closed Book segment. Defendant Daniel Waxenberg ("Waxenberg") served as Unum's Senior Vice President and Chief Accounting Officer [Doc. 37, Amended Consolidated Complaint, ¶¶ 25-27]. Plaintiffs alleged these individual Defendants participated in various interviews, investor conferences, and presentations during **[\*5]** the Class Period, reviewed and approved the executed quarterly and annual Securities and Exchange Commission filings, including Forms 8-K and 10-K, and on Unum's behalf made material misrepresentations in violation of *Section 10(b)* of the Securities Exchange Act and *Rule 10b-5* and *Section 20(a)* of the Act.

## II. OVERVIEW

Unum is an insurance company that offers various insurance products and services, including at one point Long-Term Care ("LTC") policies [Doc. 37, ¶ 2][1] . LTC policies grew in popularity in the 1970s and were designed to cover costs associated with home care, assisted living care, adult day care, nursing home care, and the like [*Id.* at ¶ 4]. At the time, the assumptions the underwriters used to set the price for these LTC policies "projected [they] would pay less in claims than the capital they accumulated...." [*Id.* at ¶ 42]. This fueled expansive growth in the industry [*Id.* at ¶ 42]. As time passed, these underlying assumptions that drove the

---

[1] All document numbers shall refer to the document as filed in the lead case, *Pittman v. Unum*, No. 1:18-CV-128 (E.D.Tenn. Jan. 15, 2019).

interest in underwriting these policies proved faulty, resulting in insurance companies significantly underestimating the extent of their liabilities for the policies they had issued. [*Id.* at ¶ 45]. This caused many underwriters to stop issuing LTC policies [*Id.* at **[*6]** ¶ 4]. Unum stopped issuing any new LTC policies in 2012 [*Id.*].

This left Unum to manage its existing policies in its Closed Block,[2] and it did so by establishing an amount in LTC reserves to cover current and future liabilities associated with those LTC policies. The challenge was in estimating the appropriate amount of the reserves. Unum relied on several factors to set its LTC reserve amount. Those factors included premiums paid by policy holders, interest earned on the LTC reserves, lapses in LTC policies, and claims paid, among other things. But at the end of the day, it was still an estimate. When Unum considered its LTC reserves inadequate, it increased them. In 2014, Unum faced that very scenario: it determined its LTC reserves were not adequate and increased them by $698 million dollars and reset its reserve assumptions. Analysts and investors questioned Unum's management at nearly every opportunity regarding the adequacy of its LTC reserves. The metric Unum used primarily to gauge the health of its LTC reserves was its "interest-adjusted loss ratio."[3] As Plaintiffs explain in the Consolidated Complaint:

> An insurance loss ratio measures the ratio of losses from the **[*7]** payment of claims and benefits, to gains from premium income earned on a set of policies. The higher the loss ratio, the greater the claims in relation to earned premiums, and the lower the profitability (or the greater the losses) from these policies, and the higher the likelihood that the insurer will need to take statutorily mandated reserve charges or increase the amount

of its reserves to cover future claims. [Doc. 37, ¶ 12].

At its core, this lawsuit is about Unum's representations and omissions about its LTC reserves. Plaintiffs allege that (1) Unum misrepresented that it was "on track" for obtaining approval for premium rate increases, (2) misrepresented the composition of its LTC block, (3) misrepresented the factors included in its loss ratio were within its assumptions, and (4) failed to monitor appropriately its reserves, which, they claim, violated Generally Accepted Accounting Principles and Item 303. Plaintiffs contend that Unum's misrepresentations resulted in "artificially inflating and maintaining Unum's stock price" which declined 17% once Unum acknowledged the inadequacy of its LTC reserves.

## III. PROCEDURAL HISTORY

In June and July 2018, three complaints were filed **[*8]** against Unum alleging various violations of the Securities Exchange Act, claiming Unum made material misrepresentations concerning the adequacy of its LTC reserves. On November 9, 2018, the Court consolidated these cases and appointed lead counsel to represent the class [Doc. 34]. On January 15, 2019, lead counsel filed a 123 page Amended Complaint [Doc. 37]. On March 18, 2019, Defendants filed their motions to dismiss, which included a 56-page memorandum and an additional 630 pages of attachments [Doc. 54]. On May 10, 2019, Plaintiffs filed their 56-page response [Doc. 59]. Unum then filed its Reply which included another 118 pages, including attachments [Doc. 61]. In August 2019, this case was reassigned to the undersigned. The motion is now ripe for resolution.

## IV. FACTUAL ALLEGATIONS

In their Amended Complaint, Plaintiffs identify four categories of misstatements or omissions that concern the adequacy of Unum's LTC reserves. The Court will focus on the factual allegations that Plaintiffs contend were false or misleading without restating the portions of the transcripts included in the Amended Complaint not alleged to be false.

### A. Unum's representations concerning premium rate increases [*9] on its LTC policies.

The first category of claims relates to Unum's representations concerning premium rate increases on

---

[2] A Closed Block are policies that are no longer sold but still must be accounted for on the financial statements.

[3] The loss ratio plays a significant role in this case. Unum titled its loss ratio the "Interest-adjusted loss ratio" and used it as a proxy to determine the adequacy of its LTC reserves. The numerator in the ratio was calculated by adding the total benefits to net reserve changes and reducing that sum by the interest earned on the reserves. The denominator consisted of total premium earned. Unum represented that it wanted its loss ratio to remain in the 85% to 90% range for it to feel comfortable with its reserve amount. If it exceeded that range for a prolonged period, Unum stated it would have to reassess its reserves.

its LTC policies [Doc. 37, ¶¶ 56-82]. Plaintiffs contend that Unum painted a much too rosy picture regarding its success with the various state insurance regulators on achieving premium rate increases [*Id.* at ¶ 56]. Plaintiffs have included transcripts of earnings calls and conferences in its Amended Complaint for the months before the Class Period and during the Class Period.[4] The Court begins with the statements Plaintiffs claim were made pre-Class Period and were false or misleading:

• **April 30, 2015** - McGarry stated, in response to a question from an analyst, "Long-term care, we're very pleased with the progress we're making on the rate increase front....we're very comfortable with where we are and very comfortable with the assumptions we've put into the reserve assumptions around rate increases." [*Id.* at ¶ 58].

• In the Form 10-Q SEC filings for **1Q2015, 2Q2015, 3Q2015, 1Q2016**, and **2Q2016** - Unum represented that "Premium income for long-term care increased slightly due [to rate increases and stable persistency]. We continue to file requests with various state insurance **[*10]** departments for premium rate increases on certain of our individual and group long-term policies. The rate increases reflect current interest rates and claim[] experience, higher expected future claims, longevity, persistency, and other factors related to pricing long-term care coverage....We expect operating revenue to decline over time as these closed blocks of business wind down, although we anticipate additional premium income associated with long-term care rate increases." [*Id.* at ¶ 60].

• **September 9, 2015** - McGarry, speaking at an investor conference, stated that "Within rate increase requests that we had filed in the states, we looked at our historical experience in terms of our success with states, and went actually state by state in looking at that to make the assumption. Our results thus far have been in line to slightly positive to those assumptions. We have a lot of those requests already approved. So we feel pretty good about where that assumption is." [*Id.* at ¶ 61].

---

[4] The Court notes that while "[a] defendant may be held liable ... only for the statements made during the class period," such pre-class period statements made be relevant on the issue of scienter. *In re REMEC, Inc. Sec. Litig., 702 F.Supp.2d 1202, 1222-23 (S.D. Cal. 2010)*.

• **December 17, 2015** - McGarry, speaking at a Unum investor meeting, stated that "We're going to continue to focus on rate increases. We've made good progress with the states and expect that to continue." McGarry **[*11]** also stated in response to a question about comparing group and individual policies, "It would be hard to say even how you would do that, whether it is a percent rate increase. I would say, overall, though, we have had pretty consistent success in both lines. I mean, we are in our third round of rate increases on the individual long-term care business. It is the winning spot option. It has been very successful. But we were very successful on our last round of significant rate increases on the group long-term care business." [*Id.* at ¶ 62].

• **February 3, 2016** - On 4Q2015 earnings call, McGarry stated "rate increase approvals and implementation are tracking in line with our reserve assumptions." In response to a question about success in achieving price increases versus assumptions in 2014, McGarry stated "so actually since we took the charge in 2014, things have been pretty much in line with our expectations. There's been some volatility quarter-to-quarter. But claim trends have stayed in that range at the 85% to 90% loss ratio. And we continue to make good progress on our rate increase assumptions. So both the rate of approvals and the actual implementation are pretty much in line with **[*12]** the underlying reserve assumptions." [*Id.* at ¶ 63].

• **February 10, 2016** - McKenney, speaking at an investors conference, responded to a question about price increases: "And so that progress has gone pretty well. We're achieving what we expected as part of our reserving process." [*Id.* at ¶ 64].

• **April 28, 2016** - McGarry addressed rate increases on its earnings call, "We continue to make significant progress on rate increases. We have built assumptions about the approvals we would get into our reserve assumptions when we took the charge in 2014. Our experience has been very consistent, or maybe slightly favorable to that. We think the market for rate increases ... actually continues to improve. More and more the states that aren't allowing rate increases are becoming the outliers, as opposed to the states that are. So, we feel pretty good about where we are, we feel good about our assumptions and we feel good about rate increases prospects going forward. [*Id.* at ¶ 65].

• **July 28, 2016** - McGarry stated during the 2Q2016 earnings call, "I'm pleased that we continue to make good progress on achieving rate increases in our in force long term care business.... In general, these hearings have **[*13]** been positive for rate increases." [*Id.* at ¶ 66].

• **September 7, 2016** - McKenney stated "Back in 2014, we set out a series of expectations around rate increases we would have over the next several years. I would tell you it was tracking well to our expectations." [*Id.* at ¶67].

These statements reveal that Unum reassessed its reserve assumptions in 2014 and took a state by state approach in setting its expectations. Those expectations were informed by its "historical experience in terms of [its] success with states." [*Id.* at ¶ 61]. From there, Unum repeatedly represented that it continued "to make significant progress on rate increases" but acknowledged that some states had disallowed rate increases, but those were "becoming the outliers, as opposed to the states that are [allowing rate increases]." [*Id.* at ¶ 65].

Plaintiffs then identified several statements made during the Class Period that they claim were false. The first set of representations, like those made before the Class Period, concerns the statements Defendants made about making "significant progress" or "good progress" against assumptions. On October 27, 2016, McGarry stated during the 3Q2016 earnings call that Unum was "making **[*14]** good progress with state regulators and receiving several new rate increase approvals this quarter...." [*Id.* at ¶ 68]. He represented that "less than a third of those rate increase assumptions remain outstanding." [*Id.*]. He noted again that Unum had established the reserve assumptions "on a best estimate basis using [its] current own experience, and our experience has been consistent with those expectations." [*Id.*]. He noted Unum was making "significant progress against them and [felt] very good about where the assumptions lie..." [*Id.*].

Plaintiffs claim that by October 2016, Unum was "vastly underperforming in its rate increase progress compared to its historical experience." [*Id.* at ¶ 80]. Plaintiffs claim that Unum's representations that its rate increases were tracking "very well relative to the rate increase assumptions" or "on pace with [its] original assumptions" were false [*Id.* at ¶ 79]. Plaintiffs contend Unum was not "on track with" or "right on top of" its assumptions established in 2014 as "vast numbers of Unum's

requests were disapproved, met with approval delays, approved with phase in requirements and/or encountered implementation delays." [*Id.*]. To demonstrate, Plaintiffs **[*15]** created a chart titled "States with Rate Increase Results Inconsistent with Historical Results." [*Id.*] This chart lists 25 states, the premium generated from policies in that state, and how the rate increase for that state compared with prior rate increase requests for that state for the years 2014 and before. This, however, was not for any point in the Class Period, but for 2014.

Similar representations were made about feeling good about the progress they were making on rate increases. On December 15, 2016, Zabel stated, "We are really right on top of how we thought about the impact of our premium rate increases...." [*Id.* at ¶ 70]. On February 2, 2017, McGarry stated, "We continue to make good progress in achieving rate increases in our in-force long-term care business." [*Id.* at ¶ 71]. Plaintiffs claim that on February 22, 2017, Plaintiffs claim that Unum should have but did not disclose the pressures on its LTC reserves and loss ratio caused by rate approval delays and the phasing in of some of its rate increase requests [*Id.* at ¶ 72]. Of course, the loss ratio included premiums earned so if Unum were not obtaining approvals for premium increases, it would necessarily show up in the **[*16]** loss ratio.

On April 27, 2017, McGarry spoke about Unum's progress on rate increases on the 1Q2017 earnings call. Again, he spoke about "good progress" and felt that Unum was "tracking well relative to the rate increase assumptions." [*Id.* at ¶ 73]. Zabel also addressed the rate increases relative to Unum's assumptions. Here Zabel noted that its assumptions were

> modeled out over several years.... You're going to get probably a majority or significant part of that kind of early on within the first 2 or 3 years. But with some states, there is caps on the approval limits....So these will be modeled over more years....We're still on track with what we put in our initial assessment within the GAAP reserve in 2014 and still feel really good about being able to achieve that level of rate increase.

[*Id.*]. On May 30, 2017, McGarry reminded investors that Unum was doing "everything [it] can to derisk the portfolio." [*Id.* at ¶ 74]. In that regard, McGarry stated that Unum had been "very effective with rate increases." [*Id.*]. On October 26, 2017, McGarry stated that Unum "continued to make good progress with rate increases on the in-force business with several additional

approvals, keeping us on pace **[*17]** to achieve, if not slightly exceed, the rate increase expectations assumed in our reserves." [*Id.* at ¶ 75]. He noted that its treatment of rate increases and investment returns have been "consistent with the actuarial guidance." [*Id.*]. McGarry did not reveal the exact amount of these rate increases or go through a state by state analysis either. He only represented that Unum had been "effective" with its requests for increases in its premiums.

On December 13, 2017, at its annual investor meeting, McGarry again sounded optimistic about making "great progress on rate increases." [*Id.* at ¶ 76]. Zabel noted that he saw "premium increases through our rate-increase strategy being offset by just normal decrements in the block, whether it's mortality or lapses..." [*Id.*]. He noted that Unum had achieved 85% to 90% of what its underlying GAAP reserve assumptions were that it had established in 2014 [*Id.*]. More importantly, he acknowledged the following:

> We've made some success in some larger states that have historically been fairly difficult.... Both of those increases will come in over time, though. That's one trend we're seeing quite a bit out there with the states is they may approve a significant **[*18]** increase, but they require us to lag into it over several years. What you'll find is that phasing in will create some short-term loss ratio pressure, even though, ultimately over time, that premium will begin flowing and we have seen that a little bit in our loss ratio.

[*Id.*]. In other words, Zabel noted the delays in approval for rate increases would negatively affect Unum's loss ratio. Indeed, the ratio increased. On February 1, 2018, McGarry noted that Unum still had "a few large rate requests yet to be decided." [*Id.* at ¶ 77]. He remained, however, "confident we will achieve the rate increase expectations assumed in our reserve assumptions." [*Id.*]. Again, he did not elaborate on what those expectations were specifically, nor did he identify with any detail the amount of those increases, nor did he discuss the effective dates for the rate approvals it did receive. He also did not address how quickly the state regulators were ruling on its requests.

On February 21, 2018, Unum disclosed in its Form 10-K unfavorable experiences:

> Premium income for long-term care increased slightly due to rate increases.... Long-term care benefits experience was consistent with the prior year as unfavorable **[*19]** policyholder

terminations, due primarily to mortality experience, offset by the impact of a large group case moving to an individual policy ported status during 2016. Also impacting benefits experience relative to 2016 was unfavorable mortality experience in our group pension product. Long-term care benefits experience was unfavorable relative to 2015 due to higher submitted claims as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016.

[*Id.* at ¶ 78].

Plaintiffs identify a May 2, 2018, earnings call where McGarry stated that Unum had "not Case 1:18-cv-00128-DCLC-CHS Document 67 Filed 06/01/20 Page 10 of 48 PageID #: received approvals as quickly as originally estimated, and those approvals received had been phased-in over a longer time period than originally anticipated....This had the effect of increasing our reported loss ratio in the recent past by 3% to 4%." [*Id.* at ¶ 82]. It noted it would reassess its LTC reserves, and the stock fell. In this way, Plaintiffs allege Unum misrepresented its premium rate increases.

**B. Unum's representations concerning Group and Individual LTC Policies**.

The second category of alleged misrepresentations **[*20]** or omissions concerns the composition of Unum's LTC Closed Block [*Id.* at ¶¶ 83-99]. Here Plaintiffs claim Unum misled investors by emphasizing the "low risk" nature of its LTC group policies while downplaying the risks associated with its LTC individual policies. The individual policies, however, made up 79% of the claims incurred. In this area, Plaintiffs contend Unum made materially false statements and omissions concerning "the true risk of Unum's LTC block by failing to disclose the deteriorating experiences in its individual block while simultaneously touting the group business as 'low risk' with 'conservative plan designs.'" [*Id.* at ¶ 83].

For example, on December 17, 2015, McGarry discussed at the annual investor's meeting the LTC block in detail:

> I'd like to give you a little background on the demographics of the block because it's significantly different than most of the long-term care blocks in the industry.... We only have 158,000 individual long-term care lives despite the fact that they generate the same premium. The reasons for that,

Courtney Quiros
PageID #: 1305

one, is the age of the block. So the attained age and the individual long-term care block is 70. It's only 51 in the group block.... The nature **[*21]** of the benefits is very different too. There's only - there's 40% lifetime benefits in the individual block, less than 5% lifetime benefits in the group block.... It is more heavily weighted to individual long-term care, in part because they have bigger premiums. It is an older block, so it is getting closer to [when] those benefits are actually going to be paid out. So that split is --- and I am not sure exactly what the split is, but it is heavily weighted toward individual long-term care.... That mature block, it tends to be more sensitive, in part because more of the world is behind you. So if benefits change, our ability to change premiums going forward relative to that mature block. [sic] The other thing that makes it more sensitive is just it has much higher persistency experience relative to the group life block. So you would expect more people to get out to claim on that block. So it tends to be more sensitive than group.

[*Id.* at ¶ 84]. McGarry distinguished the group block from the individual block, illustrating that the individual policies were riskier. The average age was 70 as compared to 51 in the group block. The policy holders were qualitatively different with a greater **[*22]** likelihood that those in the individual group would make a claim on their policies and continue to maintain coverage if not making a claim. On February 10, 2016, McKenney stated at an investor's conference that its group book looks "a lot different than the individual long-term care book that others are used to...." [*Id.* at ¶ 85]. McKenney again acknowledged that Unum had more policies on the group side and that this helped spread the risk. [*Id.* at ¶ 86].

On October 27, 2016, McGarry reiterated that "half of the block is group long-term care with employer funding and extremely conservative plan designs ... [and] has a substantially lower risk profile." [*Id.* at ¶ 87]. At the same time, Zabel described the individual policies as a "healthy high-end product," but contrary to Plaintiffs' allegations, it was not more beneficial for Unum. He clarified what he meant by that description: "higher lifetime benefits on the product, a much higher monthly benefit and higher average benefit period." [*Id.* at ¶ 88]. He then described the group policies as usually having "base type of coverage" with a lower risk [*Id.*]. He also noted that with employer paid plans, the "entire employee base" is covered **[*23]** which diversified the risk in the group space [*Id.*].

On February 1, 2018, McGarry was asked about whether he felt that Unum was different than GE, which had to significantly increase its LTC reserves.

We feel like we are different place than GE is. First, I'd point out that the blocks are very different. GE's block was reinsured block, which removes them one step from the customer. Our block was direct written.... The other big difference is 85% of our insured lives are group long-term care. They have a much younger profile. They - and most of those actual group long-term care insureds are employer-funded as opposed to employee-funded, much smaller benefit levels, much more conservative plan designs. The other - by comparison, the GE block was 100% long-term care and was a much older block than our block is. Second, we've aggressively and actively managed our block over time. Since - I know, we've had 10 full-time actuaries dedicated to the block since 2012 and for a period, I was one of them.

[*Id.* at ¶ 89].

Plaintiffs contend Unum disguised the true risk of its LTC block by failing to disclose the riskiness of the individual policies while touting the polices as "very healthy high-end **[*24]** product" and emphasizing the group policies as a "low risk" product. They claim Unum concealed that the "actual claims experience within the individual line had significantly deviated from Unum's assumptions." [*Id.* at ¶ 90]. Plaintiffs also contend Unum's statements distinguishing it from other LTC market participants were materially false as its individual policies actually "had similar characteristics as other LTC carriers' policies." [*Id.*].

Plaintiffs claim that Unum's actual experience with incurred claims significantly deviated from its assumptions regarding incurred claims. Its experience with actual incurred claims increased faster than its assumed rate of increase in those claims, resulting in a higher amount of accumulated actual incurred claims by the end of 2017 than anticipated. [*Id.* at ¶ 95]. Plaintiffs claim Unum's experience was like other LTC underwriters, but Unum told investors that it was different from GE by touting its group policies and concealing the fact that its individual line of business was similar [*Id.* at ¶ 96].

Plaintiffs claim that Unum was "most aggressive in its individual policies termination rate assumption." [*Id.* at ¶ 97]. Plaintiffs claim that Unum **[*25]** experienced more individual policy holders keeping their policies in force

than its expectation [*Id.*]. Plaintiffs argue that "it was pressure from the individual policies' actual experience, which deviated from assumptions, that ultimately led to the underfunding of reserves." [*Id.* at ¶ 99].

### C. Unum's representations concerning its interest-adjusted loss ratio.

The third category of statements Plaintiffs claim were false and misleading concerns the "interest-adjusted loss ratio." [*Id.* at ¶¶ 100-130]. This loss ratio was a function of the sum of total benefit payments and changes in net LTC reserves reduced by interest earned on the reserves to total premium earned on the LTC policies.[5] Unum utilized this ratio as a proxy for the health of its LTC reserves. Unum claimed that if this ratio remained in the 85%-90% range, its assumptions about the adequacy of its LTC reserves were sound. When the ratio exceeded 90%, Plaintiffs claim that Unum explained the rise on short-term volatility rather than acknowledging more dangerous systematic trends. According to Plaintiffs, this permitted Unum to conceal the fact that its LTC reserve assumptions were deteriorating.

Plaintiffs allege Unum made material **[*26]** misrepresentations "that actual experiences were closely tracking reserve assumptions as evidenced by the interest-adjusted loss ratio staying within its expected range of 85% to 90%." [*Id.* at ¶ 100]. While this category of representations certainly includes the first category concerning the rate increase assumptions, here Plaintiffs contend that Unum failed to disclose that not only the approval for premium rate increases were deviating from its assumptions, but also lapses in policies and incurred claims were as well.

Plaintiffs claim that Unum made materially false statements concerning the interest adjusted loss ratio before the Class Period. Plaintiffs first contend that McGarry lied in December 2014 when he stated, "I think longer-term we expect the long-term care loss ratio to hover in that 85% to 90% range." [*Id.* at ¶ 101]. On October 29, 2015, McGarry again stated that the interest-adjusted loss ratio has "been right in our target range, and we are yet to fully complete our reserve adequacy study, but there is nothing in the way the results have emerged that would cause us concerns." [*Id.* at ¶ 102]. On February 3, 2016, during the 4Q2015

earnings call, McGarry purportedly "misguided **[*27]** investors" by representing that "things have been pretty much in line with our expectations.... But claim trends have stayed in that range at the 85% to 90% loss ratio." [*Id.* at ¶ 103]. On April 28, 2016, McGarry stated, "We're not really seeing anything in underlying trends. There's some volatility in the results we see, but if you look at over the average, it's pretty close to right in the middle of that range, which is where we're comfortable." [*Id.* at ¶ 104].

At the beginning of the Class Period, Plaintiffs contend Unum continued with its misrepresentations with its purportedly bogus explanations for the rising loss ratio. On October 26, 2016, in its Form 8-K press release, Unum disclosed its loss ratio rose to 93.8 for the 3Q2016 compared to 89.9 for 3Q2015. Unum attributed the rise "to a higher average size of new claims and less favorable mortality experience, as well as unfavorable impact of a large group case moving to an individual policy ported status during 2016." [*Id.* at ¶ 105]. The next day, McGarry again attributed the rise in the loss ratio to the movement of the group case to individual polices because when that was accounted for, "the long-term care loss ratio would **[*28]** have been in the upper end of our 85% to 90% range." [*Id.* at ¶ 106]. He also acknowledged, however, that Unum was seeing pressure from new claims and "severity" from rate increase notifications to policyholders. He anticipated seeing these problems having an impact over the next several quarters [*Id.*].

In its 3Q2016 Form 10-Q, Unum acknowledged that its loss ratio was higher than its expectations. It disclosed that its "long-term care experienced volatility during the second and third quarters of 2016, with resulting interest adjusted loss ratios for the third quarter and first nine months of 2016 slightly higher than our range of expectations...." [*Id.* at 107]. Unum explained this was "due to a higher average size of new claims and less favorable mortality experience, as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016." [*Id.*].

On February 1, 2017, Unum disclosed its loss ratio had retreated into its target range. Unum noted its loss ratio had dropped to 89.1% in 4Q2016 as compared to 89.7% in 4Q2015 and attributed the drop to "favorable mortality experience and the impact of persistency[6] on

---

[5] Interest-adjusted loss ratio = (total benefits payments + net reserve changes - interest on reserves)/total premium earned.

[6] The term persistency in this context is the measure of Unum's retention of its policy holders without lapses or losing them to other competitors.

active life reserves." [*Id.* at ¶ 108]. On **[\*29]** February 2, 2017, McGarry placed the loss ratio in perspective since 2014:

> I will point out that since the fourth quarter of 2014 reserve adjustment, the interest adjusted loss ratio has been 89.4% within the long-term ratio of 85% to 90% that we expect. Adjusting for the impact of the large group case termination which impacted the loss ratio in the third quarter of 2016, this two-year cumulative loss ratio would be 89.1%.

[*Id.* at ¶ 109]. Plaintiffs claim that Defendants should have recognized that the real reason for the higher ratio was "due to the individual policies experience significantly deviat[ing] from [its] assumption[s]" and not the bogus reasons it had provided [*Id.*]. At that time, Defendants disclosed that "long-term benefits experience was unfavorable compared to 2014 due to less favorable development in active life reserves as a result of higher persistency." [*Id.*].

For the 1Q2017, the loss ratio was 88.6% within Unum's target range compared to the 1Q2016 ratio of 89.4%, which was also within its desired range. On April 26, 2017, Unum attributed this positive change to be "primarily driven by favorable mortality experience." [*Id.* at ¶ 111]. But on September 6, 2017, McKenney **[\*30]** acknowledged the loss ratio could be volatile as it had exceeded Unum's target range for some quarters and was within its range in others. He still believed it had been "tracking reasonably well" in its 85%-90% range [*Id.* at ¶ 115]. Plaintiffs contend in this way, McKenney falsely assured investors that actual experiences had been tracking with expectations as reflected in the loss ratio.

On October 25, 2017, Unum disclosed that its loss ratio for the 3Q2017 rose to 93.3% compared to 93.8% for 3Q2016. Plaintiffs contend again that Unum should have disclosed that lapse experience for the individual business had been significantly deviating from its assumptions since 2014. Unum attributed the elevated ratio to "the impact of a large group case moving to an individual policy ported status in 2016" but noted that it also experienced "unfavorable policyholder lapses in the current quarter." [*Id.* at ¶ 116]. On December 13, 2017, McGarry reiterated his optimism about Unum's LTC reserves: "We feel good about where our reserves are, that interest margin has helped to offset the loss - the heightened loss ratio and so we feel good." [*Id.* at ¶ 119]. The loss ratio remained higher than desired **[\*31]** for 4Q2017 at 93.1%. Unum attributed that rise to unfavorable policy terminations related to mortality

experience. [*Id.* at ¶ 120].

On February 1, 2018, McGarry "falsely assured investors of the favorable emerging experience relating to rate increases and touted that Unum 'will achieve the rate increase expectations assumed in our reserve assumptions.'" [*Id.* at ¶ 121]. Plaintiffs contend these statements were materially false because Unum used its loss ratio "to conceal [its] worsening rate increase, policy termination, and incurred claims trends and experiences and ... to assure ... investors a manageable interest adjusted loss ratio validated the adequacy of [its] reserves."[7] [*Id.* at ¶ 123]. They claim Unum deflected investor inquiries into the actual trends by referring investors to the loss ratio.

On May 2, 2018, on the earnings call, McGarry acknowledged that "we have not received approvals as quickly as originally estimated, and those approvals received have been phased in over a longer time period than originally anticipated. This has had the effect of increasing our reported loss ratio in the recent past by 3% to 4%." [*Id.* at ¶ 130]. Because the loss ratio exceeded its benchmark **[\*32]** of 90% for, at this point, a prolonged period of time, it revisited its reserve assumptions, and the stock fell 17%.

### D. Unum's representations concerning its monitoring of adverse trends and their effect on its LTC reserves.

The final category concerns adverse trends. These allegations relate to Unum's failure to disclose or acknowledge material adverse trends affecting its underlying assumptions about the adequacy of its LTC reserves. Plaintiffs claim Unum's failure to account for these trends violated both *17 C.F.R. § 229.303* ("Item 303"), and Generally Accepted Accounting Principles (GAAP) [*Id.* at ¶¶ 131-185]. Plaintiffs claim that Unum should have disclosed the unfavorable trends associated with its requested rate increases and heightened risks in the individual policy business line. These adverse trends affected its interest-adjusted loss ratio as it continued to exceed 90%, the benchmark Unum had set for raising concerns about the adequacy of its LTC reserves. Plaintiffs claim that Unum knew of

---

[7] On this point, the Court will note the loss ratio accounts for premium earned, which would include premium rate increases, and total benefits paid, which would include newly incurred claims. So, if Unum was concealing anything, it was not doing a good job of it with its elevated loss ratio.

these adverse trends as of 4Q2016 and did not account for them, violating Item 303 and GAAP.

Plaintiffs claim Unum made materially false statements concerning its monitoring of emerging experiences to ensure [*33] its reserves were adequately funded. [*Id.* at ¶ 131]. They claim here that Unum ignored how its experience deviated from its assumptions which caused reserves to be inadequate during the Class Period. Prior to the Class Period, Plaintiffs allege Unum falsely claimed, "risk results were generally in line with our long-term expectations." [*Id.* at ¶ 133]. McGarry also stated on February 3, 2016, that "I would say we feel comfortable with where we are today.... we feel good about that reserve review and where it ended." [*Id.* at ¶ 136]. On February 10, 2016, McKenney stated that in 2014 Unum updated its assumptions and in 2015 its experience tracked "closely with that." [*Id.* at ¶ 137]. On September 7, 2016, Plaintiffs claim McKenney misrepresented that assumptions were "tracking reasonably well to our expectations at that point in time." [*Id.* at ¶ 138].

During the Class Period, Plaintiffs contend that on October 27, 2016, on its 3Q2016 earnings call, McGarry misled investors about the adequacy of Unum's reserve. Plaintiffs claim that McGarry stated "no special reserving" will be necessary, the LTC segment was in "better shape today than ... three years ago" and that claims experience tracked [*34] closely to assumptions.[8] [*Id.* at ¶ 139]. McGarry said "We will conclude this year's reserve review for long-term care over the next several weeks and currently believe that no special reserving will be necessary for year-end 2016." [*Id.*]. In fact, no special reserving occurred in 2016. He noted that

> when we established those reserves, we built in currently-filed rate increases using historical approval rates. Less than a third of those rate increase assumptions remain outstanding. We are making significant progress against them and feel very good about where the assumptions lie with only a small portion remaining....The third point I'd make is that our block's unique in the long-term care business, as approximately half of the block is group long-term care with employer funding and extremely conservative plan designs....[M]ost employees terminate their employer-funded coverage when they leave their employer.

[*Id.*]. Plaintiffs claim that for each of Unum's Form 10-Q filings, it falsely represented that it "continuously monitor[s] key indicators to assess our risks and attempt to adjust our business plan accordingly." [*Id.* at ¶ 140].

On December 15, 2016, at its annual Investor Day, McKenney [*35] and McGarry stated that its closed block has been stable over the course of the year, and they felt "comfortable with where the reserves are now." [*Id.* at ¶ 141]. In its Form 10-K, Unum noted that "the reserves reported in our financial statements ... are calculated in conformity with GAAP." [*Id.* at ¶ 142]. Regarding its policy reserves,[9] Unum stated that it used assumptions "that reflect our best estimate while considering the potential for adverse variances in actual future experience..." [*Id.*]. Unum noted that claims reserves[10] were subject to revision "as current claim experience and projections of future factors affecting claim experience change." [*Id.*].

On April 27, 2017, Plaintiffs allege McGarry falsely claimed that "claims experience has remained generally in line with our assumptions since the end of 2014" and that he falsely stated that nothing was pressuring Unum to take a reserve charge in 2017 [*Id.* at ¶ 143]. McGarry stated "I don't think there's anything pressuring us at the moment to take a charge in 2017. But again, we're going to look at it holistically around how we manage the block and what we think is in the best interests of shareholders." [*Id.*]. Unum did not [*36] take a reserve charge in 2017.

Plaintiffs contend that these statements were materially false because Unum ignored indications of actual experience deviating from assumptions which resulted in its reserves being underfunded. They alleged Unum continually ignored the deficiencies in rate increases and heightened risks in the individual policy business line caused by actual experiences deviating from assumptions. [*Id.* at ¶ 146]. Plaintiffs allege that claims reserves were inadequate. Plaintiffs contend that Unum's need to annually revise upward expected incurred claims for the individual block indicated that actual incurred claims experience was much worse than Unum's projections. [*Id.* at ¶ 151]. Unum "failed to adjust assumptions to conform to actual expenses." [*Id.*]. Plaintiffs make similar claims regarding policy reserves

---

[8] The Court notes that three years before this statement was made, it was 2013, a year before Unum had to increase its reserves significantly.

[9] Policy reserves are those reserves designated to cover future claims that have not been made [*Id.* at ¶ 152].

[10] Claim reserves are those reserves for policies that are already on claim [*Id.* at ¶ 147].



and that Unum's statements that the rate increase approvals were "making significant progress against" assumptions were false. [*Id.* at ¶ 154].

to actual incurred LTC claims exceeding expectations and other unfavorable trends in mortality and morbidity for the block.

### 1. Unum's representations concerning compliance with Generally Accepted Accounting Principles.

Plaintiffs claim that by the 4Q2016, Unum knew, or recklessly disregarded, the "adverse inputs and assumptions they would later apply **[*37]** in Unum's mid-2018 long-term care reserve analysis and reserve increase." [*Id.* at ¶ 156]. Plaintiffs claim that Unum falsely stated that it had "prepared [its] financial statements in accordance with GAAP." [*Id.* at ¶ 156]. Plaintiffs claim here that Unum falsely stated that its "estimates and assumptions could change in the future" because Unum already knew by 4Q2016 it should have increased the long-term care benefits reserve by at least an additional $750.8 million pretax. [*Id.* at ¶ 156-57]. They claim this caused Unum to materially understate its LTC reserve and overstate its earnings.

Plaintiffs also contend Unum misled investors "about the factors actually triggering the need for an increase in the long-term care benefits reserve by focusing primarily on Unum's long-term interest adjusted loss ratio." [*Id.* at ¶ 160]. McGarry in 4Q2014 noted that if the loss ratio were outside the 85%-90% range for a "prolonged period of time" it would pressure reserve assumptions. When the ratio exceeded that benchmark, McGarry explained that it was a "blip." [*Id.* at ¶ 161]. Plaintiffs claim these statements were false because Unum's LTC closed block component "was facing far more adverse facts **[*38]** and circumstances than they disclosed." [*Id.* at ¶ 162].

### 2. Unum's purported violation of Item 303

Plaintiffs also contend Unum violated Item 303 by falsely conveying to investors in the MD&A section of its SEC filing that "nothing material had changed in the Company's Closed Block segment, when the performance of the LTC component...had...materially deteriorated, requiring an increase to the long-term care reserve as of at least December 31, 2016." [*Id.* at ¶ 186]. They contend that Unum provided only "generic or boilerplate disclosures" identical from quarter to quarter [*Id.* at ¶ 188]. Plaintiffs contend Unum should have disclosed "known material trends." These trends, Plaintiffs argue, were undercutting Unum's assumptions regarding the adequacy of its LTC reserves. They point

### E. Factual Representations at the close of the Class Period - May 1, 2018

On May 1, 2018, Unum issued its 1Q2018 Form 8-K and revealed that its loss ratio for its LTC business had risen to 96.6% compared to only 88.6% for 1Q2017. This was significant because this level marked the third consecutive **[*39]** quarter that the loss ratio exceeded its 90% benchmark. [*Id.* at ¶ 201]. McGarry explained that new claims "ran much higher than expected" and policy terminations were at a lower level [*Id.* at ¶ 202]. He also acknowledged contributing to this increase was that state regulators were taking longer to approve its premium rate increase requests [*Id.*]. On that announcement, the stock fell 17% [*Id.* at ¶ 17].

On July 30, 2018, Unum filed its Form 8-K announcing that it "believes that it may need to increase its reserved for long-term care as part of its third quarter 2018 closing process." [*Id.* at ¶ 205]. Indeed, in its September 2018 Form 8-K, Unum announced that it expected to increase its long-term care GAAP reserves in 3Q2018 by approximately $750 million before tax [*Id.* at ¶ 206].

### F. Representations and allegations of scienter

Plaintiff has identified several facts that it argues support its theory that Unum acted with the requisite scienter. First, it identifies a separate lawsuit filed on May 17, 2013, in Los Angeles, California, that accused Unum of not calculating LTC benefits correctly. Plaintiffs argue this not only supports a "strong inference of scienter but supports an inference **[*40]** that Unum's LTC reserves were understated because of their failure to accurately calculate the benefits Unum owed its insureds." [*Id.* at ¶ 215].

Plaintiffs point to the closeness in time between Unum's representations in February 2018 that rate approvals were in line with its expectations and its May 1, 2018 announcement that rate increases were behind its expectations [*Id.* at ¶ 219]. They also allege that McGarry and McKenney had a motivation to engage in misconduct because portions of their compensation were tied to the performance of Unum's LTC business. [*Id.* at ¶ 236].

## V. STANDARD OF REVIEW

A motion to dismiss under *Rule 12(b)(6)* requires the Court to construe the allegations in the complaint in the light most favorable to the plaintiff and accept all the complaint's factual allegations as true. *Meador v. Cabinet for Human Res., 902 F.2d 474, 475 (6th Cir. 1990)*. The Court must liberally construe the complaint in favor of the party opposing the motion. *Miller V. Currie, 50 F.3d 373, 377 (6th Cir. 1995)*. However, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level," *Bell Atlantic Corp. V. Twombly, 550 U.S. 544, 555 (2007)*, and to "state a claim to relief that is plausible on its face." *Id. at 570*; *see also Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)*. Moreover, this Court need not "'accept as true a legal conclusion couched as a factual allegation.'" **[\*41]** *Twombly, 550 U.S. at 555* (quoting *Papasan v. Allain, 478 U.S. 265, 286 (1986))*; *see also Ashcroft, 556 U.S. at 678*. Lastly, this Court may consider documents central to the plaintiff's claims to which the complaint refers and incorporates as exhibits. *Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001)*.

In addition to satisfying *Rule 12(b)(6)* requirements, the complaint alleging securities fraud must also meet the heightened pleading standard of *Rule 9(b) of the Federal Rules of Civil Procedure* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. § 78u-4(b)(2)*. *Rule 9(b)* requires the plaintiff to "state with particularity" the circumstances constituting fraud. *In re Comshare Inc. Secs. Litig., 183 F.3d 542, 548 (6th Cir. 1999)*. The Sixth Circuit has interpreted *Rule 9(b)* as requiring the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc. (Omnicare I), 583 F.3d 935, 942-43 (6th Cir. 2009)* (citations and internal quotation marks omitted).

The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*. Scienter[11] must be pleaded separately as to each defendant. *See Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1039-43 (6th Cir. 2016)* (assessing scienter allegations as to each defendant). "A strong inference of scienter 'must be more than merely plausible **[\*42]** or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Doshi, 823 F.3d at 1039* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 127 S. Ct. 2499, 2504, 168 L. Ed. 2d 179 (2007)*. The proper inquiry for the Court in evaluating allegations of scienter is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets that standard." *Tellabs, 551 U.S. at 322-23* (emphasis in original); *see also Frank v. Dana Corp., 646 F.3d 954, 961 (6th Cir. 2011)* ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency.").

## VI. ANALYSIS

Plaintiffs primary claim is that Defendants made material misrepresentations concerning the adequacy of its LTC reserves in violation of *Section 10(b)* of the Exchange Act and SEC *Rule 10b-5* as well as "control person" claims in violation of *Section 20(a)* of the Exchange Act. To recover damages under *Section 10(b)* and *Rule 10b-5*, the plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or **[\*43]** omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Securities Litigation, 769 F.3d 455, 469 (6th Cir. 2014)* (internal quotation marks omitted). A failure to prove one element would result in a failure of the entire claim.

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *Omnicare, 769 F.3d at 470*. What a plaintiff must plead to survive a motion to dismiss depends on what the plaintiff claims the

---

[11] Scienter, a defendant's "intention to deceive, manipulate, or defraud" must be stated with particularity. *Tellabs, 551 U.S. at 313*.

defendant misrepresented. "When an alleged misrepresentation concerns 'hard information'— 'typically historical information or other factual information that is objectively verifiable'—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading." *Omnicare, 769 F.3d at 470* (quoting *In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997))*. In contrast is soft information, "which includes predictions and matters of opinion." *Zaluski v. United Am. Healthcare Corp., 527 F.3d 564, 572 (6th Cir. 2008)* (quoting *Sofamor Danek, 123 F.3d at 401*). For soft information, "a plaintiff must additionally plead facts showing that the statement was made with knowledge of its falsity." *Omnicare, 769 F.3d at 470* (internal quotations omitted).

Liability does not attach to mere corporate **[*44]** puffery or statements of corporate optimism. *In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004)*. Courts have consistently found immaterial "a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace - loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Id. at 570-71*. If the claim is a failure to disclose then materiality is established where there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Zaluski, 527 F.3d at 571* (quoting *Basic Inc. v. Levinson, 485 U.S. 224, 240 (1988))*.

Context matters. "Courts must look to the context in which statements are made to determine whether an omission renders prior statements misleading." *Lubbers v. Flagstar Bancorp. Inc., 162 F.Supp.3d 571, 578*. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Id.* (quoting *McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990)*. Specifically, the court should look to a statement's "ability...to accurately inform rather than mislead prospective buyers." *Id.* "Thus, a court must not 'pluck' **[*45]** disclosures out of their context and analyze their truth in a vacuum, but must look at the statements made in the light of the circumstances and events that create the context in which they were made." *The MJK Family LLC v. Corp. Eagle Mgt. Servs., Inc.*, No. CIV.09-12613, 2009 WL

4506418, at *7 (E.D.Mich. Nov. 30, 2009)(citing *City of Monroe v. Bridgestone Corp., 339 F.3d 651, 672 (6th Cir. 2005))*. With those guiding principles in mind, the Court turns to Plaintiffs' Complaint.

## A. Premium Rate Increases

Plaintiffs first contend that Unum misrepresented its success with state insurance regulators in obtaining premium rate increases for its LTC policies[12] [Doc. 37, ¶ 56]. When Unum updated investors on the status of these rate approvals, Plaintiffs contend Unum made material misrepresentations because state regulators were either rejecting them or delaying their effective date. Plaintiffs contend Unum was not "on track" with its underlying assumptions [Doc. 59, pg. 18]. Unum argues that its statements were not materially false or misleading [Doc. 42, pgs. 31-32].

In this case, Unum repeatedly represented that its rate approvals were "tracking well" with historical approvals and that it "felt good" about its progress. Plaintiff argues that this was false because "Unum's success in achieving rate increases **[*46]** was vastly underperforming the assumptions build [sic] into its reserves." [Doc. 59, pg. 18]. The trouble with this argument is that by October 2016, McGarry noted that already "[l]ess than a third of those rate increase assumptions remain outstanding." [Doc. 37, ¶ 68]. In other words, Unum had already achieved two-thirds of its rate increase assumptions. Throughout the Class Period, Unum stated that when it "established ... those reserves, [it] built in currently-filed rate increases using historical approval rates." [*Id.*; Doc. 54-15, pg. 16]. And for its approval rates, Unum claims its statements accurately reflected its success. "Approval" did not mean Unum received what it requested. Rather, in July 2016, McGarry stated that "We're getting what we expect to get, which is less than we request." [Doc. 61-8, pg. 17]. In any event, by May 2018, at the close of the Class Period, Unum had achieved 90% of its projected rate approvals [Doc. 54-32, pg. 9].

Unum described its progress with rate increases as "tracking well," "feeling good," "progress has gone pretty well," or "we are making significant progress on rate increases," "we've been effective with rate increases,"

---

[12] Since rate approvals are central to Plaintiffs' claims, this issue also overlaps with Plaintiffs' claim that Defendants misled investors concerning its loss ratio and its claim that Unum failed to monitor its reserves.

Courtney Quiros

an "we've made **[*47]** good progress with rate increases." Unum acknowledged that some of these approvals were delayed and that states which had been rejecting its requests for premium rate increases were increasingly becoming the outliers.

Plaintiffs do not contend that Unum misrepresented its actual approval rates. Instead, they criticize Unum for describing its approval rates as "tracking well" with its expectations or that it had made "good progress." But when is reaching 90% of its projected rate approvals not considered "good progress"? None of these statements was false. What state regulators do about approving rate increase requests and when they do it is a regulatory risk inherent for insurance companies like Unum. In *Bondali v. Yum! Brands, Inc., 620 F. App'x 482, 491 (6th Cir. 2015)*, the Sixth Circuit found that cautionary statements not actionable "to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results." *Id.* (quoting *In re FBR Inc. Sec. Litig., 544 F.Supp.2d 346, 362 (S.D.N.Y. 2008)*. The court noted that these disclosures were "inherently prospective" which "are not meant to educate investors on what harms are currently affecting the company." *Id.* It found that a "reasonable investor would be unlikely to infer anything regarding **[*48]** the current state of a corporation's ... operations from a statement intended to educate the investor on *future* harms." *Id.* Certainly, Unum faced that with state insurance regulators and it is unlikely that a reasonable investor would infer anything specific about Unum's premium rate requests because what Unum could anticipate state regulators would do necessarily involves the *future*.

Moreover, no reasonable investor would view these statements as "significantly changing the general gist of available information, and thus, are not material, even if they were misleading." *In re Ford Motor Co., 381 F.3d 563, 570 (6th Cir. 2004)* citing with approval *Nathenson v. Zonagen, Inc., 267 F.3d 400, 404, 419 (5th Cir. 2001)* ("broad, general statements" about "positive" and "statistically significant" test results of a new drug were puffery). Such descriptive phrases as "gone pretty well," "we've made good progress" or "we've been effective" are the kinds of statements that go directly to the speaker's optimistic opinion about the performance of the company. Such statements could not significantly change the general gist of available information. "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon **[*49]** Analyst Level 3 Litig., 350 F.Supp.2d 477, 489 (S.D.N.Y. 2004)*.

In this case, Plaintiffs have not alleged that the speakers did not hold the beliefs they professed. Rather, they argue the supporting facts they supplied were untrue, that is, the rate increases were not tracking well from a historical perspective. Here though, this is a tough claim to make because Unum never misrepresented anything about its rate increase approvals. They represented that they experienced delays in implementation, but they experienced that prior to 2014. That was nothing new. Even Plaintiffs' chart detailing the premiums from 25 states for 2014 showed that Unum regularly encountered delays in achieving rate approvals. That is how many state regulators handled the rate increase requests. Unum acknowledged that getting less than what it had asked for in rate approvals was expected. In its July 28, 2016 earnings call, McGarry stated that "We're getting what we expect to get, which is less than we request. But we didn't put what we requested into our reserve assumptions. We put our expectation. So in some states you'll get 50%, in some states it'll be spread out over three years." [Doc. 61-8, pg. 17]. Delays in rate approvals should not have shocked any **[*50]** reasonable investor.

Plaintiffs claim Unum misrepresented the rate increases because actual experiences included delayed increases. Unum noted, however, that delayed implementation caused the short-term elevation of its loss ratio. Indeed, included in the loss ratio was premium earned on the polices. If a state does not approve a rate increase, then Unum cannot increase the premium, and that will necessarily affect its loss ratio. What Unum represented was consistent with its actual experience. Overall, Unum's statements were not false nor misleading. Plaintiff has not demonstrated that what Defendants represented concerning how its rate increases were tracking relative to the rate increase assumptions was false.

Plaintiffs allege Unum concealed rate increase delays which resulted in an increase in its loss ratio in December 2016 [Doc. 59, pgs. 18-19]. But contrary to their assertions, Unum did not make affirmative misrepresentations about its rate approvals. In fact, when it did address them, what it said was accurate. In Unum's Form 8-K disclosure, dated December 13, 2017, it acknowledged that "phasing in approvals and the remaining undecided states are taking *longer* than we anticipated." **[*51]** [Doc. 54-28, pg. 14] (emphasis added). On the February 1, 2018, earnings call, McGarry stated that "5 years is a drop in the bucket in

the long-term care business. And really that trade off, we would hope that any reserve assumptions we built into request for rate increase would survive a 5-year period." [Doc. 54-29, pg. 12]. In other words, Unum was focused on the long term.

Even though in May 2018, Unum noted that it had "not received approvals as quickly as originally estimated, and those approvals received had been phased-in over a longer time period than originally anticipated," this statement is not particularly revealing because of its ambiguity. It very well may be speaking of how quickly state regulators were addressing its rate requests not whether they were actually approving or rejecting the requests. Those statements track with what Unum had been saying all along, and Unum was still "on track with the estimates in [the] 2014 assumption set." [Doc. 54-32, pg. 7].

Unum revisited its reserve assumptions because its loss ratio remained elevated over its 90% benchmark for too long. It was not only because of delays in rate increases but also, as McGarry explained, new claims **[*52]** "ran much higher than expected" and policy terminations were at a lower level [Doc. 37, ¶ 202]. Simply put, none of what Unum represented was false. This claim is without merit.

### B. Composition of LTC Block

Plaintiffs allege Unum misled investors by emphasizing the "low risk" nature of its LTC group while downplaying the risks associated with its LTC individual policies. Unum's LTC block is mostly composed of group policies that were bought and paid for by employers for the benefit of their employees [*Id.* at ¶ 38]. Unum represented that it was "a little unique [compared to other LTC carriers] in that so much of it is in the group space." [*Id.*]. The remaining policies were purchased by individuals, which made up approximately 15% of the block [*Id.*]. However, these individual policies posed higher risk and represented 80% of all claims [*Id.* at ¶ 39].

Plaintiffs do not dispute the fact that what Unum said about its LTC group polices was true. Rather, Plaintiff argues that Unum should have disclosed more information about the individual policies so that investors would be more informed of the risks associated with them. Plaintiffs also contend that Unum falsely distinguished itself from the **[*53]** block composition of its competitors, such as Genworth and GE. Unum claims it was not obligated to reveal "all facts

contributing to or undermining the company's recent successes." [Doc. 42, pg. 36-37].

"In lieu of targeting a defendant's misleading or false statements, a plaintiff may focus on a defendant's omission—its failure to disclose information when it had a duty to do so." *In re Omnicare, Inc., 769 F.3d at 471*. "Silence, absent a duty to disclose, is not misleading." *Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)*. "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 45 (2011)*. "For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." *Thesling v. Bioenvision, Inc., 374 F. App'x 141, 143 (2d Cir. 2010)*. "A duty to affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure,' or, ... 'an inaccurate, incomplete[,] or misleading prior disclosure.'" *Bridgestone*, 399 F.3d at 669 (quoting *In re Digital Island Sec. Litig., 357 F.3d 322, 329 n. 10 (3d Cir. 2004))*. Finally, a company must not "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." *17 C.F.R. § 240.10b-5*.

Unum did not misrepresent any fact about its individual **[*54]** policies. It acknowledged its individual policies have higher benefit levels, benefits payable over longer periods of time; lower lapse rates, and higher claims frequency due to the older profile. *See* [Doc. 54, pg. 18; Doc. 54-29, pg. 8]. Specifically, Unum disclosed that "there's 40% lifetime benefits in the individual block, less than 5% lifetime benefits in the group block." [Doc. 37, ¶ 84]. Unum acknowledged that the reserve "is more heavily weighted to individual long-term care, in part because they have bigger premiums. It is an older block, so it is getting closer to [when] those benefits are actually going to be paid out. So that split [of reserves and in-force premiums] is...heavily weighted toward individual long-term care." [*Id.*]. "So you would expect more people to get out to claim on that block. So it tends to be more sensitive than group." [*Id.*]. "[T]he benefit sizes [for the group policies] are much smaller than you would see on the individual business." [*Id.* at ¶ 86]. The individual block has "[h]igher lifetime benefits on the product, a much higher monthly benefit and higher average benefit paid." [*Id.* at ¶ 88].

Because investors were concerned about the LTC market **[*55]** after the downfall of GE and Genworth's

LTC blocks, Plaintiffs claim more disclosure was required regarding the individual block's lapse rate, claim incidents and incurred claims where they deviated from Unum's assumptions [Doc. 59, pg. 21]. Here, Unum disclosed facts as to the composition of its LTC block, both the favorable facts as to the group and individual policies, such as the higher lapse rates of the group policies and the higher premiums of the individual policies and the unfavorable facts, such as individual policies were older, which meant they were closer in time to being paid out and were typically paid out at higher levels. Unum had no duty to disclose every fact about Unum's LTC block. The key is whether what Unum disclosed was misleading. It was not. The information Unum provided was accurate as not to be misleading about the characteristics of the block. Unum provided accurate information for investors to assess the risk associated with Unum's individual LTC policies. The disclosure of this information did not trigger further disclosure regarding its LTC block. Requiring additional disclosure here "would require almost unlimited disclosure on any conceivable topic **[*56]** related to an issuer's financial condition whenever an issuer released any kind of financial data." *Miller v. Champion Enterprises Inc., 346 F.3d 660, 682 (6th Cir. 2003)*; *Pension Fund Group v. Tempur-Pedic Intern., Inc., 614 F. App'x 237, 246 (6th Cir. 2015)* ("Holding an earnings call did not obligate them to disclose all facts contributing to or undermining the company's recent successes.").

Plaintiff argues that Unum wrongfully differentiated itself from GE and Genworth with its higher quantity of group policies compared to the individual policies of its competitors. GE had to significantly increase its LTC reserves. Unum stated that "GE's LTC block was riskier and older than Unum's block" while later admitting "that much of Unum's individual block was 'not inconsistent with GE.'" [Doc. 59, pg. 21; Doc. 37 ¶ 98]. First, a reasonable investor would understand the serious limits in making such comparisons between companies. This is especially true when it is comparing insurance companies in the LTC business where there are so many variables affecting estimating LTC reserves. Second, context matters. On this topic, McGarry stated the following:

> I would say, if you compare reserves, you can't compare Unum's reserves to GE, because we have the - half of our business is a group business. The bulk of which are working-age people being covered. **[*57]** They have nothing to do with what GE looks like. If you compare GE to our older

[ILTC] block, which was the block that was issued before 2004, our average reserve in that block is kind of orders of magnitude today, $50,000 per policy. That reserve will double per policy in the next 10 years. And so it's not on top of GE, but it's not inconsistent with GE, either when you take kind of a similar situated block.

[Doc. 37, ¶ 98; Doc. 61-9, pg. 7]. Considering the context of McGarry's statements, it is clear that he maintained the differences in the blocks while only referring to one small part of Unum's LTC block, individual policies that were issued prior to 2004, not the entire LTC block, as Plaintiff argues [Doc. 42, pg. 37, n.14]. Plaintiffs submit that Unum admitted its previous statements comparing Unum's LTC block to GE and Genworth's were false. But that is not supported by the facts. Not only does this statement acknowledge one similarity in the blocks, but at the same time, it notes how Unum has addressed the issue differently than GE, i.e. assigning a reserve of $50,000 for each of the older policies. This issue is without merit.

## C. Interest-Adjusted Loss Ratio

The third category **[*58]** of statements that Plaintiffs claim were false and misleading concerns the "interest-adjusted loss ratio." [Doc. 37, ¶¶ 100-130]. As Plaintiffs explain in the Consolidated Complaint:

> An insurance loss ratio measures the ratio of losses from the payment of claims and benefits, to gains from premium income earned on a set of policies. The higher the loss ratio, the greater the claims in relation to earned premiums, and the lower the profitability (or the greater the losses) from these policies, and the higher the likelihood that the insurer will need to take statutorily mandated reserve charges or increase the amount of its reserves to cover future claims.

[Doc. 37, ¶ 12]. The interest-adjusted loss ratio served "as a proxy for the adequacy of the Company's LTC reserves." [*Id.* at ¶ 11].

Plaintiffs argue that Unum's statements about its interest-adjusted loss ratio

> were materially false and/or misleading when made because Defendants used their disclosures about Unum's interest-adjusted loss ratio to (1) conceal Unum's worsening rate increase, policy termination, and incurred claims trends and experiences; and (2) assure ... investors a manageable interest-adjusted loss ratio validated the **[*59]** adequacy of

Unum's reserves.

[*Id.* at ¶ 123]. Plaintiffs do not contend Defendants misrepresented the loss ratio, only that the loss ratio was misleading and used to distract investors and conceal Unum's deteriorating assumptions. Plaintiffs are challenging truthful disclosures about a metric used to evaluate the adequacy of LTC reserves. This type of challenge faces a strong headwind because "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997)*. That data "does not become misleading even if less favorable results might be predictable by the company in the future." *Id.* (citing *In re VeriFone Sec. Litig., 784 F.Supp. 1471, 1484-85 (N.D. Cal. 1992)*, *aff'd*, *11 F.3d 865 (9th Cir. 1993))*.

Unum alleges that it was clear with investors on how the loss ratio worked and how it might affect its reserve assumptions. During an annual investor meeting on December 16, 2014, McGarry stated that

> longer-term we expect the long-term care loss ratio to hover in that 85% to 90% range. I think if it were outside of that range *for a prolonged period of time*, it would begin to put pressure on the reserve assumptions. The thing I would note though is these are very long-term assumptions. You look at one or two quarters worth of new information **[*60]** relative to the entire history of a block and it just doesn't move that quickly. So over the two-, three-, four-year timeframe you may begin to get pressure but it is not something that we would react to as a result of one or two quarters of either favorable or adverse experience.

[Doc. 37, ¶ 101] (emphasis added). McGarry made clear that Unum was playing a long game when it came to its assessment of its LTC reserves.

Unum reported its interest-adjusted loss ratio as follows:

🔲*Go to table1*

For 4Q2015, Unum acknowledged "some volatility quarter-to-quarter. But claim trends [have] stayed in that range at the 85% to 90% loss ratio." [Doc. 37, ¶ 103]. When the loss ratio for 3Q2016 remained over Unum's 90% benchmark, Unum attributed the increase to "a higher average size of new claims and less favorable mortality experience, as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016." [*Id.* at ¶ 105]. Unum claimed

that the main contributor to **[*61]** the rising loss ratio was the transfer of the large group case to individual policies. Excluding that, Unum noted the loss ratio would have been within its target range of between 85% and 90% [*Id.* at ¶ 106]. But for 4Q2016, 1Q2017, and 2Q2017, the loss ratio trended positive. For 4Q2016, Unum attributed the drop "primarily to favorable mortality experience and the impact of persistency on active life reserves." [*Id.* at ¶ 108]. It was not until 3Q2017, that the loss ratio would exceed the benchmark. At that point, it spiked to 93.3%, which Unum attributed to unfavorable policyholder lapses [*Id.* at ¶ 116]. For 4Q2017, the loss ratio was 93.1%, which Unum explained was due to unfavorable policy terminations related to mortality experience [*Id.* at ¶ 120].

Plaintiffs contend Unum should have revealed that it was the deteriorating individual block that was the driving force behind the rise in the loss ratio. To be sure, Unum's unfavorable experience in its individual block contributed to the rising loss ratio. But so did policy lapse experiences, persistency issues, and mortality issues. It was not fraud to speak truthfully about all these issues. Plaintiffs argue that without more information, **[*62]** the loss ratio was misleading. The information a company provides must "accurately inform" investors. *See Lubbers, 162 F.Supp.3d at 578* (citing *McMahan &Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990))*. But Plaintiffs do not claim investors did not understand the loss ratio, or that Unum lied about it, only that Unum should have acknowledged the adverse "systematic trends." [Doc. 37, ¶ 128].

To put this in perspective, the loss ratio rose in the middle of 2016 which Unum attributed to various negative factors in its LTC block. But the ratio remained within Unum's target range for the next three quarters. Through the second quarter of 2017, the loss ratio had only been above its benchmark for two out of the past eight quarters, but then increased for the next three consecutive quarters [*Id.* at ¶¶ 113, 116, 130]. When the loss ratio exceeded 90% at the end of 1Q2018, it marked the fifth out of the last eight quarters the loss ratio exceeded 90%. At this point, Unum, consistent with its obligation to monitor its LTC reserves, determined that the time to do so had arrived. Thus, this was consistent with how Unum had said it would use its loss ratio. Back in 2014, McGarry said that if the loss ratio stayed above its target range of 85%-90% for a "prolonged period of time" **[*63]** then Unum would have to reevaluate its LTC reserves. That is what happened. The loss ratio served the purpose for which Unum had

designed it, a proxy for the adequacy of its LTC reserves. Unum did not misrepresent or conceal anything about its loss ratio.

"Corporate officials need not be clairvoyant" to avoid a finding of recklessness; "they are only responsible for revealing those material facts reasonably available to them." *Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)*. "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.; see J&R Mktg., SEP v. Gen. Motors Corp., 549 F.3d 384, 391 (6th Cir. 2008)* (distinguishing between trends that are "known" versus merely "knowable"); *Tumminello v. Father Ryan High Sch., Inc., 678 F. App'x 281, 286 (6th Cir. 2017)* (alleging that a defendant "knew or should have known" does not "plausibly establish ... actual knowledge"). When was the loss ratio trending over 90% for a prolonged period of time? That is an important question because it was at that point Unum said it would reevaluate its reserves. Unum never defined "prolonged period of time." When the loss ratio exceeded 90% for five out of the last eight quarters, Unum announced it intended to reevaluate its LTC reserves. Perhaps they **[*64]** could have revisited their assumptions earlier, but its failure to do so was not securities fraud. The Court finds that Unum's use of the loss ratio was not false or misleading. This claim is without merit.

**D. Unum's representations concerning its monitoring of trends on its LTC reserves as required by GAAP and Item 303**.

**1. GAAP**

Plaintiff complains that Unum did not prepare its SEC forms in accordance with GAAP [Doc. 37, ¶ 156] because it did not monitor "emerging experiences to ensure its reserves were adequately funded" [*Id.* at ¶ 131]. Specifically, "[h]ad Defendants prepared their financial statements in accordance with GAAP, they would have incorporated estimates and assumptions that properly reflected the specific facts and circumstances pertinent to the long-term care component of their Closed Block segment." [*Id.* at ¶ 157]. Essentially, Plaintiffs argue that Unum knew as early as the 4Q2016 that the 2014 reserve increase was "not only insufficient, but vastly understated" and

therefore, Unum should have increased its reserves then. Because it did not, it was not in compliance with GAAP, and its financial statements were misleading [*Id.* at ¶ 157, 160]. Defendants argue that "Plaintiff **[*65]** fails to plead any facts suggesting that Unum's reserves were inadequate in any period prior to its LTC reserve strengthening in 2018." [Doc. 42, pg. 33].

Plaintiffs' claim fails for various reasons. First, ASC-944-40-35-9[13] only specifies that "an insurance entity shall *regularly* evaluate estimates...." Unum did just that, using its loss ratio to do so. Unum, while not clairvoyant in its assessment of its LTC reserves, was clear with investors on what factors it considered in managing its reserve assumptions at the time. In this case, Unum reviewed its assumptions quarterly and yearly based on its reserve principles. Unum did not misstate or misrepresent the metrics underlying its reserve assumptions.

Second, the Sixth Circuit has held that "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 553 (6th Cir. 1999)* (internal citation omitted). To succeed, Plaintiffs must put forward "evidence of corresponding fraudulent intent," separate and apart from the accounting violations themselves. *Tellabs, 551 U.S. at 323-24* (internal quotation marks omitted). Plaintiffs have not done so.

In *Ap-Fonden*, the district court addressed a similar **[*66]** lawsuit alleging General Electric violated the Securities Exchange Act in not setting its LTC reserves in compliance with GAAP and Item 303. *Sjunde Ap-Fonden v. Gen. Elec. Co., 417 F.Supp.3d 379 (S.D.N.Y. 2019)*. It found that the plaintiffs had failed to allege conscious misbehavior or recklessness. It found the alternative explanation that it had used "out of date actuarial assumptions and sloppy practices, and then made disclosures and adjustments as they learned about the scale of the problem - is more compelling than the inference of fraud." *Id. at 399*. The same conclusion can be reached here. Defendants utilized the loss ratio as an indicator of the adequacy of its reserves. When it exceeded that 90% benchmark for a prolonged period,

_____

[13] The Accounting Standard Codification is maintained by the Financial Accounting Standards Board and is the source of authoritative generally accepted accounting principles recognized by the FASB to be applied to nongovernmental entities. *See FASB Accounting Standards Codification: About the Codification*, v. 4.10 (2014). https:asc.fasb.org/imageRoot/71/58741171.pdf.

Unum did what it said it would do: reassess its reserves. Plaintiffs have not shown conscious misbehavior or recklessness.

## 2. Item 303

"Item 303(a)(3)(ii) of SEC Regulation S-K, *17 C.F.R. § 229.303(a)(3)(ii)* ... pertains to management's discussion and analysis of financial condition and results of operations for full fiscal years...." *In re Sofamor Danek Group, Inc., 123 F.3d 394, 402 (6th Cir. 1997)*. Item 303 of SEC Regulation S-K requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or **[*67]** revenues or income from continuing operations" in their Form 10-Q filings. *17 C.F.R. § 229.303(a)(3)(ii)*. The SEC has provided guidance on Item 303, clarifying that disclosure is necessary "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835, 43 S.E.C. Docket 1330, 1989 WL 1092885, at *4 (May 18, 1989) [hereinafter Exchange Act Release No. 6835]. There is some debate about whether a violation of Item 303 may form the basis for liability under *Rule 10b-5*. S*ee In re Sofamor, 123 F.3d at 402-03* (recognizing that "courts have been reluctant to recognize a private right of action under Item 303"). The Court will assume that failing to comply with Item 303 by omitting *known* trends or uncertainties from a registration statement or prospectus could be actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933 if the omission was material. *See J & R Mktg. v. Gen. Motors Corp., 549 F.3d 384, 392 (6th Cir. 2008)* ("While Section 11 does not require any additional knowledge, that does not change the fact that the duty of disclosure arising from Item 303 does require knowledge.").

Plaintiff alleges that Defendants' failure to reveal that "the performance of the LTC component of the Closed Block had, in fact, materially deteriorated, requiring an increase **[*68]** to the long-term care reserve as of at least December 31, 2016" was a violation of the MD&A section of the company's SEC filings as described in Item 303 of SEC Regulation S-K [Doc. 37, ¶ 186-187]. Specifically, "Defendants provided 'generic or boilerplate disclosure[s]' in the Company's 'Segment Outlook' in the MD&A sections for the Closed Block segment that were

*virtually identical* from quarter-to-quarter and year-to-year." [*Id.* at ¶ 190] (emphasis in original). According to Plaintiffs, this language was misleading because Defendants knew that there had been material changes and adverse trends in the block which would lead to a reserve increase [*Id.* at ¶ 192, 195].

Assuming a private right of action for a violation of Item 303, the claim still fails for the reasons discussed. The Complaint does not allege facts that anyone at Unum had identified an adverse trend as of 4Q2016, as required, to constitute a "known" trend or uncertainty. Plaintiff also fails to plead "with particularity facts giving rise to a strong inference" of severe recklessness with respect to this claim. *15 U.S.C. § 78u-4(b)(2)(A)*. While the loss ratio exceeded 90% for a couple of quarters, these facts do not present "multiple, obvious red **[*69]** flags...demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Doshi, 823 F.3d at 1039* (quotations and citations omitted). Any delays in rate approval delays and any rise in incurred claims would all be wrapped in the loss ratio. This issue is without merit.

## E. Scienter

Even if the Amended Complaint had adequately alleged a material misstatement or omission, the claims pursuant to *§ 10(b)* of the Exchange Act would nonetheless fail because the Amended Complaint does not adequately allege scienter. To plead scienter, a plaintiff must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)(A)*. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 907 (6th Cir. 2007)*. The Court must "take into account plausible opposing inferences" and consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, 551 U.S. at 323-24*. The inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id. at 314*.

The court also considers nine, non-exhaustive factors in determining whether a plaintiff adequately **[*70]** pleaded scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly

fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi, 823 F.3d at 1039-40* (citing *Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2011)*(en banc)). Plaintiffs do not present any evidence as to factors (1), (2), (4), (7), and (8).

As to factor (3), Plaintiffs claim that the timing of Unum's announcement in May 2018 that it was reassessing its LTC reserves suggests a strong inference of fraud because in February **[\*71]** it was confident it would achieve its rate increase expectations assumed in its reserve assumptions. On May 1-2, 2018, Defendants stated that it had not receive approvals as quickly as originally estimated and those approvals were phased in over a longer period that originally anticipated. [Doc. 37, ¶ 218-219].

"The longer the gap between those two events, the less likely it is that this factor will be probative of the scienter element." *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-*CV-1106, 2019 WL 6251435, at *5 (N.D. Ohio Nov. 22, 2019)*. While the passage of one week between an allegedly fraudulent statement and a subsequent inconsistent disclosure supports an inference of scienter, the passage of four months did not. *Bridgestone*, 399 F.3d at 684, 688; *see also Miss. Pub. Emps' Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 91 (1st Cir. 2008)* (concluding the passage of one week between public remarks and a later disclosure was "strong evidence" of scienter). There is no bright line test on this issue. For example, in a recent case, the passage of six weeks weighed "minimally" in the plaintiffs' favor. *Doughtery v. Esperion Therapeutics, Inc., 905 F.3d 971, 981 (6th Cir. 2018)*. Indeed, the use of timing of disclosures as evidence of scienter must be a fact specific inquiry. In this case, the fact that three months separated the disclosures is not dispositive because the loss ratio was disclosed on a quarterly **[\*72]** basis. The real issue is what was represented and when.

Plaintiffs allege on February 1, 2018, McGarry noted that Unum still had "a few large rate requests yet to be decided." [Doc. 37, ¶77]. He remained, however, "confident we will achieve the rate increase expectations assumed in our reserve assumptions." [*Id.*]. Plaintiffs claim this was deceptive because he stated that in May it had "not received approvals as quickly as originally estimated." [Doc. 37, ¶ 130]. But on that same call, McGarry stated that "5 years is a drop in the bucket in the long-term care business. And really that trade off, we would hope that any reserve assumptions we built into request for rate increase would survive a 5-year period." [Doc. 54-29, pg. 12]. McGarry's representations were not false. Moreover, at this same time, Unum disclosed that it had experienced "unfavorable policyholder terminations, due to mortality experience, offset by the impact of a large group case moving to individual policy ported during 2016." [Doc. 37, ¶ 78]. It also disclosed unfavorable LTC benefits experience, that is, higher submitted claims. [*Id.*]. Several factors were converging unfavorably that caused Unum to consider increasing **[\*73]** its LTC reserves.

As to factor (5), Plaintiffs point to a lawsuit filed against Unum in May 2013 that alleged that it improperly delayed increases on LTC benefit amounts. It also alleged Unum improperly used inflation riders that decreased benefit payments. The suit settled in October 2013. [Doc. 37, ¶ 212]. A plaintiff may create a strong inference of scienter in part by alleging the defendant company has quickly settled a lawsuit alleging fraud or asserting non-fraud claims supported by "closely related evidence." *Bridgestone*, 399 F.3d at 685. This suit provides no such insight. The focus of that suit was not on the adequacy of Unum's LTC reserves but on the amount of benefit payments under its LTC policies, and it settled *prior* to Unum revisiting its 2014 reserve assumptions.

As to factor (6), Plaintiffs contend Defendants ignored current information and trends while reassuring investors regarding Unum's LTC reserves. Here, they repeat the allegations that Unum should not have represented its rate approvals were on track with its assumptions. When McGarry announced Unum was revising its LTC reserve assumptions, Unum had achieved 90% of its rate approvals of what it had established in its underlying GAAP reserve **[\*74]** assumptions in 2014. [*Id.* at ¶ 76].

Plaintiffs next claim that Defendants refused to provide investors with the information necessary to evaluate the adequacy of its LTC reserves as evidence of scienter. [*Id.* at ¶ 226-234]. They point to McGarry's refusal to "disclose our new money rates for the quarter" and the fact that during the May 2, 2018, 1Q2018 earnings call, McGarry did not provide additional information about the level of persistency in mortality and morbidity [*Id.* at ¶ 228]. "*Section 10(b)* and *Rule 10b-5(b)* do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)* (*quoting 17 C.F.R. § 240.10b-5(b)*). "Silence, absent a duty to disclose, is not misleading under *Rule 10b-5*." *Basic Inc., 485 U.S. at 239 n. 17*. As discussed, the failure of Unum to provide more detailed information did not make its prior disclosures misleading.

Finally, as to factor (9), Plaintiffs argue that McKenney's and McGarry's compensation were tied to the operating results in Unum's LTC business. To show this, Plaintiffs point to Unum praising McKenney for making "significant progress" in executing Unum's **[*75]** long-term Closed Block strategy for the FY2016. They also show that McGarry received incentive compensation during FY2017 with the Compensation Committee praising the performance of the Closed Block as one of McGarry's accomplishments. The Compensation Committee did not indicate how much of the incentive compensation was tied to management of its LTC reserves.

The court finds that, as in *Dougherty*, "Plaintiffs' motive allegations are too general and speculative to support an inference of scienter under the ninth *Helwig* factor." *Dougherty*, 905 F.3d at 982. When "the courts distinguish motives common to corporations and executives generally from motives to commit fraud," they note that "an executive's desire to protect his position within a company or increase his compensation" is not a sufficient motive for fraud. *PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 690 (6th Cir. 2004)* (*abrogated on other grounds by Matrixx, 563 U.S. at 48-50*). "Earnings-based bonuses ... are common among executives and have limited probative value as to scienter." *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp., 865 F. Supp. 2d 811, 835 (W.D. Mich. 2012)* (internal citations omitted); *see also In re Omnicare, 769 F.3d at 484* ("If a well-pleaded complaint can allege only that a corporation intended to defraud

based on a desire to continue earning money, without showing a particular link between the actual statement and a specific payment, then **[*76]** the heightened pleading standard for scienter has no bite.").

Reviewing "all the allegations holistically," the Court determines that a reasonable person would not "deem the inference of scienter" presented by Plaintiffs as "cogent and at least as compelling" as the opposing inference presented by Defendants. *Matrixx, 563 U.S. at 48* (quoting *Tellabs, Inc., 551 U.S. at 324-25*). Plaintiffs allegations do not provide significant support for inferring scienter against Unum.

## F. The Amended Complaint fails to state a violation under *§ 10(b)* or under *§ 20(a)*.

The Court finds that as Plaintiffs have failed to state a claim in accordance with *Fed.R.Civ.P. 9(b)* and *12(b)(6)* and the heightened standard of the PSLRA, *15 U.S.C. § 78u-4*, the claims against Unum are DISMISSED. Any claim for 'control person' liability under *§ 20(a)* of the Exchange Act must be predicated on a primary violation of securities law. *Doshi, 823 F.3d at 1045*; *see 15 U.S.C. § 78t(a)*). Because Plaintiffs have failed to state a claim for a primary violation against Unum, it cannot establish control person liability. Accordingly, the claims against the Individual Defendants are also DISMISSED.

## VII. REQUEST TO AMEND

At the end of Plaintiffs' response, they request that "while [P]laintiff is confident the Complaint more than satisfies the applicable pleading requirements," if the Court disagrees, **[*77]** it should be allowed to amend the Consolidated Complaint [Doc. 59, pg. 53]. While Plaintiff spent approximately 50 pages arguing that its consolidated complaint was sufficient, they also want to reserve a second bite at the apple if the Court does not agree. However, Plaintiffs do not give any reasoning as to what additional information it could provide that would make a difference.

The Sixth Circuit has held "that the PLSRA restricts the scope of Rule 15(a) in the context of securities litigation such that plaintiffs have more limited ability to amend their complaints." *Louisiana School Employees' Retirement System v. Ernst & Young, LLP, 622 F.3d 471, 486 (6th Cir. 2010)* (citing *Miller v. Champion Enters., Inc., 346 F.3d 660, 692 (6th Cir. 2003)*). As the PLSRA was enacted to protect defendants from

frivolous lawsuits, "[t]his objective would be thwarted if, considering the history of this case, plaintiffs were liberally permitted leave to amend again; this is particularly true where, as here, there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA." *Miller, 346 F.3d at 692* (quoting *In re NAHC, Inc. Secs. Litig., 306 F.3d 1314, 1333 (3d Cir. 2002))*.

In this case, the Court is faced with a perfunctory request in Plaintiff's response that "did not point to any additional factual **[*78]** allegations that would cure the complaint." *Graham v. Fearon, 721 F. App'x 429, 439 (6th Cir. 2018)*. Therefore, Plaintiffs' request to amend is DENIED.

**VIII. CONCLUSION**

As discussed above, the Court finds that Plaintiffs have not demonstrated that Defendants made a material misrepresentation or omission and consequently have failed to state a claim under *Section 10(b)* and *Rule 10b-5*. Therefore, Defendants' Motion to Dismiss [Docs. 53][14] is **GRANTED** and Plaintiffs' claims are **DISMISSED** with prejudice. A separate order dismissing this case shall enter.

SO ORDERED:

/s/ Clifton L. Corker

United States District Judge

**ORDER AND JUDGMENT**

This case came before the Court on Defendant's Motion to Dismiss [Docs. 53, 44, 41] in the consolidated case. For the reasons stated in the accompanying Memorandum Opinion and Order, Defendant's Motion to Dismiss is **GRANTED**, and this case is **DISMISSED WITH PREJUDICE**. The Clerk is **DIRECTED** to close the case.

SO ORDERED:

———————————————

[14] For *Cunningham v. Unum*, No. 1:18-cv-154, the docket entry is [Doc. 44] and for *City of Taylor Police and Fire Retirement System*, No. 1:18-cv-169, the motion is docket entry [Doc. 41]. The clerk is directed to term those motions as well.

/s/ Clifton L. Corker

United States District Judge

2020 U.S. Dist. LEXIS 97379, *78

**Table1 (***Return to related document text***)**

| Quarter | Loss Ratio | Citation [Doc. 37] |
|---------|-----------|--------------------|
| 3Q2015 | 89.9% | ¶ 106 |
| 4Q2015 | 89.7% | ¶ 108 |
| 1Q2016 | 88.9% | ¶ 111 |
| 2Q2016 | 92.6% | ¶ 113 |
| 3Q2016 | 93.8% | ¶ 106 |
| 4Q2016 | 89.1% | ¶ 108 |
| 1Q2017 | 88.6% | ¶ 111 |
| 2Q2017 | 89.4% | ¶ 113 |
| 3Q2017 | 93.3% | ¶ 116 |
| 4Q2017 | 93.1% | ¶ 120 |
| 1Q2018 | 96.6% | ¶ 130 |

**Table1 (***Return to related document text***)**

---

**End of Document**