# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| CITY OF TAYLOR GENERAL | ) | |
| EMPLOYEES RETIREMENT SYSTEM, | ) | Case No. 1:19-cv-24 |
| | ) | |
| *Plaintiff*, | ) | Judge Atchley |
| | ) | |
| v. | ) | Magistrate Judge Steger |
| | ) | |
| ASTEC INDUSTRIES, *et al.*, | ) | |
| | ) | |
| *Defendant*s. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff City of Taylor General Employees Retirement System filed this class action on behalf of all persons who purchased Astec stock during the class period of July 26, 2016 to October 22, 2018. [Doc. 1]. Plaintiff Lynn Johnson intervened and was appointed as lead plaintiff. [Doc. 53]. Plaintiffs contend that Defendants Astec Industries, Benjamin Brock, David Silvious, and Malcom Swanson made false or otherwise misleading statements that artificially inflated the price of Astec's stock. In doing so, Plaintiffs argue that (1) all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5,[1] codified at 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 respectively, and (2) the individual Defendants, violated Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t. [Doc. 56 at 65–69].

Before the Court is Defendants' Motion to Dismiss Amended Complaint. [Doc. 63]. A claim made under the Securities Exchange Act is subject to the heightened pleading standards of both Federal Rule of Civil Procedure 9 and the Private Securities Litigation Reform Act of 1995

---

[1] When the Court refers to a violation of Section 10(b) for the rest of the opinion, it is referring to both Section 10(b) and Rule 10b-5.

("PSLRA"), 15 U.S.C. § 78u-4. The Amended Complaint fails to meet those requirements. Therefore, Defendants' Motion to Dismiss Amended Complaint [Doc. 63] is **GRANTED**. All of Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

## I. BACKGROUND

Astec is an industrial conglomerate that manufactures a variety of products and machinery; at issue in this case is its attempt to enter the wood pellet industry. [Doc. 56 at 2]. Brock was the Chief Executive Officer and President of Astec; he was also a member of the Board of Directors and a member of the Board Executive Committee for all times relevant to this litigation. [Doc. 56 at 7]. Since 2011, Silvious has served as the Vice President, Chief Financial Officer, and Treasurer of Astec. [*Id.*] Swanson served as the President of Astec from January 2014 to January 2018. [*Id.* at 8].

In the early 2010s, Astec began to enter the wood pellet industry. [*Id.* at 10]. Wood pellets are small pieces of wood that can be burned to create energy. They are a popular source of energy for countries in the European Union ("EU") because the EU requires a certain amount of energy generation to come from biomass sources. [*Id.* at 9–11]. Astec attempted to create the plants that would manufacture these pellets. [*Id.*] Astec told investors that it intended for these plants to use only Astec equipment on their production lines. [*Id.* at 10–11].

### A. The Hazlehurst Plant

Astec's first purchase for a plant was from Hazlehurst Wood Pellets, LLC located in Hazlehurst, Georgia. [*Id.* at 12]. Astec financed the plant with Hazlehurst Wood Pellets, so Hazlehurst Wood Pellets owed Astec the $60 million purchase price plus interest when Hazlehurst Wood Pellets received financing from other financial institutions for the plant. [*Id.* at 12–13]. Astec assured investors that Hazlehurst Wood Pellets would be able to pay the loan. [*Id.* at 13]. The loan

became due in July of 2017. [*Id.*]

The Hazlehurst Plant suffered from some defects. Most notably, Astec's burners which powered the plant did not burn wood pellets; they burned natural gas. [*Id.*] If the plant burned natural gas, the pellets could not be sold to the EU because they would not comply with EU environmental standards [*Id.*] In an attempt to comply with the standards, Astec purchased burners from another company. [*Id.* at 14]. On July 26, 2016, Brock told investors that the plant needed to "burn wood exclusively on each line, and we've hit a wall on that on our burners. So we're replacing the burners . . .." [*Id.*] Brock continued and stated that the plant needed to meet certain production goals, but he assured investors that Astec would meet those goals and that even with some issues, companies would invest in the Hazlehurst Plant:

> So the testing, proving that the lines will do what we said on tons per hour is fine. The other two have new burners on, they are running. We have to put the third burner in, but they could get financing on this plant without it and that's the rest of the story.
>
> I want to make sure everyone understands, we're not in a jam and at risk or anything, because there is no risk.

[*Id.* at 31] (emphasis omitted).

Even after the burners were replaced, the Hazlehurst Plant continued to run on natural gas when conducting its tests. [*Id.* at 15]. Astec extended the loan's due date by 18 months. [*Id.* at 15]. At the time, Brock said Astec extended the loan deadline because "Hazlehurst has been a good partner . . .." [*Id.* at 35] (emphasis omitted). But he also acknowledged that the Plant was struggling financially: "The main reason for the extension is a temporary low in wood pellet demand that is widely expected to recover late this year. We now expect the final payment in December 2018 . . .." [*Id.*] (emphasis omitted).

Astec could not find a financial institution willing to invest in the Hazlehurst Plant for the purchase price. [*Id.* at 15]. Astec wrote off the Hazlehurst Plant as a loss claiming, "the timing of

a transaction and the ultimate sale price are uncertain." [*Id.* at 17]. Finally in July of 2019, the Hazlehurst Plant was sold for $20 million. [*Id.*]

## B. The Highland Plant

In 2015, Astec entered an agreement with Highland Pellets, LLC to build a second plant ("the Highland Plant.") [*Id.* at 17–18]. In the contract, Astec promised its plant could pass a "reliability test." [*Id.*] In the test, Astec would have to demonstrate that the Highland Plant could produce a sufficient number of pellets in a specific amount of time. The pellets produced in those tests would have to meet EU standards. [*Id.*] If the plant failed the test, Astec would have to reimburse Highland Pellets for the purchase price of the Highland Plant. [*Id.*]

The Highland Plant also ran into difficulty. Much like the Hazlehurst Plant, the Highland Plant's burners had to be replaced. [*Id.* at 21]. At first, Astec replaced the Astec burners with burners from another company that used wood as a fuel source. [*Id.*] However, Astec eventually transitioned to natural gas burners. [*Id.*]

In October of 2016, Brock visited the Astec plant. [*Id.* at 21]. He told investors that "the site looked great and the project is on schedule." [*Id.*] However, according to a confidential witness, the burners created dust and sparks that would spontaneously combust. [*Id.*] In June of 2017, Brock related to investors that Astec erred in estimating the cost of installation and expected profits for the Highland Plant. [*Id.* at 41]. As a result, the Plant was significantly less profitable. [*Id.*] Brock told investors that this error was caused by a late add-on with a subcontractor. [*Id.*]

In October 2017, Astec told its investors that it would need to undergo significant design changes in both plants:

> In the last 45 days, we identified significant design issues at our customers' Georgia and Arkansas wood pellet plants driven by the need for both facilities to achieve full production rates. Upon learning of these design flaws, which were different at each plant, we identified a clear path to success. . .. We remain very confident in

4

the near-term and long-term outlook for the wood pellet business and believe it has
been a good investment for our company.

[*Id.* at 43] (emphasis omitted). Brock told investors that he remained confident that the Highland

Plant would pass the Reliability Test. [*Id.* at 24].

In late 2018, two independent auditors examined the Highland Plant and prepared two

memoranda that identified problems which prevented the plant from reaching full productivity.

[*Id.* at 25]. The first memo was the "Transition Inspection Report." [*Id.*; Doc.72-3] The second

was the "Material Leakage Memo." [*Id.*; Doc. 72-4].[2] The Material Leakage Memo identified

several problems with the Highland Plant including issues with the hammer mills; the hammer

mills caused the Company problems in the past. [Doc. 56 at 54; Doc. 72-4]. The Transition

Inspection Report made several conclusions about issues in the Highland Plant, but the most

notable conclusions were about the weather. The Report noted that the Highland Plant's bark bins

were clogging, and it concluded that the unusually cold weather in Arkansas did not cause the

clogging. [Doc. 72-3 at 2].  The Report also stated that during high-wind conditions debris could

be blown from other parts of the Plant. [*Id.* at 5]. In April of 2018, Brock visited the Highland

Plant to discuss the ongoing issues. [*Id.* at 26–27].

On April 24, 2018, in a call to investors Brock stated:

we feel like in Georgia that we passed the test, we're meeting with them next week
to talk through that. In Arkansas, we actually have until June 19 now, we've had
weather issues, we've had some mechanical issues and we've modified some
equipment.

[*Id.* at 54] (emphasis omitted). On the same call, when asked if prior issues with the hammer mills

were fixed, Brock responded with:

Well, Stanley this is Ben and I think whenever we get into these, there's always
something that'll pop up, but thankfully what has popped up and mechanical issues
that we corrected has not been extremely major. And so the hammer mills that piece

---

[2] There was also the "Highland Issues List" which just listed various issues at the plant. [Doc. 56 at 25].

and all that we fixed, the extra bag houses we fixed, but as you start up, sometimes things happen like shafts on a drag will break and you figure out how to correct that and fix that and have a long term fix, so it's things like that.

[*Id.* at 54–55] (emphasis omitted).

From May 1 to May 4, 2018, Brock sold 60,000 shares of Astec stock and made $3.2 million off of the sale. [*Id*. at 27]. This was the first time in three years that Brock had sold any of his Astec stock. [*Id.*] In relative terms, Brock sold 23% of his Astec shares, and he made about 3.5 times the amount of his yearly salary. [*Id.* Doc. 66 at 23].

On July 24th, Astec issued a news release that revealed that their pellet plant business was struggling financially. Astec revealed that it had entered a deal with Highland Pellets where Astec would pay Highland Pellets $68 Million and forgive an additional $7 Million in receivables to exit the contract. [Doc. 56 at 57]. The press release explained that Astec modified its contract with Highlands Pellets due to "unresolved issues, which inhibited the [Highland] [P]lant's ability to meet contractual provisions by the date required by the Company's sales contract with Highland." [*Id.*] In a call on the same day, Brock explained "[i]n mid-June, we ran into new technical issues that would not allow us to meet our obligations with regards to the timing of the reliability test for our customer." [*Id.* at 58]. Astec stayed on site to provide other logistical support. [*Id.* at 57].

### C.  Sales of Other Pellet Plants

While Astec ended up selling only two pellet plants, the Hazlehurst Plant and the Highland Plant, the executives of Astec were confident that they could sell more plants. In July of 2016, Brock stated that he expected to sell another pellet plant for 80 million dollars. [*Id.* at 29–30]. He also stated that he was confident that Astec could sell its plants to other customers:

I would say that we're talking to probably as many as ten people with five of them being pretty serious. So it is not only that one [the first customer for 80 million dollars] that we think can happen in the next 12 months or so.

. . .

[One] to 1.5 plants of these plants [sold] in 2017 is our goal and what we're working for.

[*Id.* at 30] (emphasis omitted). Brock expressed confidence that Astec could capture a large share of the wood pellet industry:

"We see the opportunity in this business in the next five years in the range of 35 to 50 plants being sold in the US. They would be in the size range of $100 million each. . . . [W]e would do our best to get a fair share of those; maybe half in that five-year period."

[*Id.* at 34] (emphasis omitted).[3]

While Astec did not sell a plant in 2017, the Company remained confident that it could receive an offer for another pellet plant. On April 24, 2018 Brock stated that they could deliver a complete pellet plant to another customer in 2019. [*Id*. at 53]. However, on July 24, 2018, Astec stated that it was no longer attempting to build additional plants. [*Id.* at 57]. Instead the Company would only sell components of the plants to other companies. [*Id.*]

## II.  STANDARD OF REVIEW

Generally, to survive a motion to dismiss the complaint must state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In interpreting a complaint, the Court must view it in the light most favorable to the plaintiff and accept all factual allegations in the complaint as true. *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)) However, the Court does not need to accept legal conclusions—couched as factual conclusions—as true. *Hensley Mfg. v. ProPride Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).

But when a plaintiff alleges that a defendant committed fraud, heightened pleading standards apply. Specifically, Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." For a complaint to

---

[3] Other sources shared Brock's optimism: two months before this statement, *Bloomberg Intelligence* claimed "Astec could book another $100 million order by the end of 2016." [Doc. 56 at 19].

satisfy Rule 9(b)'s requirements, it must satisfy four elements: "A plaintiff's complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *La. Sch. Emps. Retirement Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)). However, Rule 9(b) allows a plaintiff to allege "[m]alice, intent, knowledge, and other conditions of a person's mind . . . generally."

When a plaintiff alleges that a defendant violated Section 10(b), that standard is further heightened. *Doshi v. Gen. Cable Co.*, 823 F.3d 1032, 1039 (6th Cir. 2009). To stem the tide of what it viewed as abusive litigation, Congress enacted the PSLRA. *In re Comshare Inc. Secs. Litig.*, 183 F.3d 542, 548 (6th Cir. 2016). Specifically, the PSLRA makes two notable additions. First, the Act requires that when "the plaintiff alleges that the defendant made an untrue statement of material fact; or omitted a material fact necessary in order to make statements made . . . not misleading, the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(A)–(B). Second, the Act requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). To determine if there is a "strong" inference of scienter, "the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

## III.    ANALYSIS

To state a claim under Section 10(b), the plaintiff has to plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Defendants dispute only the first two elements.

Defendants have three primary objections. First, Defendants argue that Plaintiffs' long complaint is a "puzzle pleading" that just compiles a long list of statements with a general list of reasons. [Doc. 66 at 12–13]. Second, they claim that the Amended Complaint does not adequately allege facts that gives rise to a strong inference of scienter. [*Id.* at 19–25]. Third, they claim that the statements cited are not misleading or otherwise protected. For example, they claim that certain statements are not actionable because they are mere puffery. [Doc. 66 at 14]. The Court will not reach any conclusions as to the third objection because Plaintiffs complaint—taken as a whole—fails to meet the stringent standards set forth in the PSLRA as applied to Section 10(b).

To analyze the objections based on the PSLRA, the Court must examine the Plaintiffs' Amended Complaint. The majority of Plaintiffs' Amended Complaint consists of large sections of block quotations. Some of the statements are then followed by a general allegation. Here is one example:

> The statements referenced in ¶¶ 105-106 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements were materially false or misleading because: (i) defendants misleadingly used pellet plant sales and revenue to improve the Company's reported financial performance, despite the fact that the pellet plants suffered from material defects and undisclosed problems; (ii) the Company's pellet plants suffered from significant problems that prevented them from meeting their intended and/or required production capacity; (iii) the significant problems with the Company's pellet plants were preventing the Company from securing additional pellet plant orders; and (iv) as a result, Defendants' statements about Astec's business operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9

[Doc. 56 at 33]. This objection is repeated verbatim (except for the identification of the specific paragraphs) throughout the amended complaint. [*See, e.g.*, Doc. 56 at 36, 37, 39, 42, 51, 56, 60].

In the block quotations, Plaintiffs do not state that everything quoted is misleading. Instead, they claim (in their response) that when they bolded or italicized a section within that block quote, that part of the block quote was the misleading part. [Doc. 71 at 16]. The Amended Complaint also makes generalized statements about scienter. Specifically, in its section entitled "Additional Allegations of Scienter" Plaintiffs state that Defendants had access to financial records, and they were aware of the flaws at the Highland and Hazlehurst plants. [*Id.* at 62].

The PSLRA was intended "[a]s a check against abusive litigation by private parties . . .." *Tellabs*, 551 U.S. at 313. The Act is applied vigorously; it was described by the Sixth Circuit as a "elephant-sized boulder blocking" plaintiffs' suits. *In re Omnicare*, *Inc. Secs. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014). Because it is a check on unmeritorious litigation, the pleading requirements it describes are "[e]xacting," *Tellabs*, 551 U.S. at 313, and "not easily satisfied." *Omnicare*, 769 F.3d at 461. Plaintiffs' Amended Complaint fails to satisfy the heightened requirements of Rule 9(b) and the PSLRA as applied to Section 10(b) for two reasons: (1) it fails to adequately explain why the excerpted statements are misleading; and (2) it fails to allege facts which demonstrate a strong inference of scienter.

### A. Failure to Explain Why Statements Are Misleading

Plaintiffs fail to identify, with the level of specificity required, why the statements they believe are misleading are in fact misleading. *See La. Sch. Emps. Retirement Sys*. 622 F.3d at 478. For example, Plaintiffs identify the following statement as misleading:[4]

---

[4] There was some dispute in the briefing about whether one could even interpret the Amended Complaint and the way Plaintiffs identified allegedly misleading statements by bolding them within larger block quotations. [Doc. 71 at 16; Doc. 74 at 5–6]. In their response to the motion to dismiss, Plaintiffs provided a "key" by explaining that the bolded

> This is Ben, with whom, we are talking with, 1 to 1.5 of these plants in 2017 is our
> goal and what we're working for. We would love to have it sooner than later, so we
> can balance demand and keep openings for our asphalt plants. But our goal would
> be in the $100 million to $125 million range of revenue in 2017 with pellet plants.

[Doc. 56 at 30] (emphasis omitted). But that statement is simply about future goals. Plaintiffs do

not allege that Defendants failed to actively pursue additional pellet plant sales. Plaintiffs do not

allege that it was impossible or reckless to consider that Astec could receive another order for a

pellet plant. In fact, in the Amended Complaint Plaintiffs identify a statement from *Bloomberg*

*Intelligence*—made two months prior—that reported that Astec could sell another plant: "Astec

could book another $100 million order by the end of 2016." [Doc. 56 at 19].

Instead, Plaintiffs claim that "the significant problems with the Company's pellet plants

were preventing the Company from securing additional pellet plant orders." [*Id.* at 32]. But this

assertion is about Astec not being a well-run company; it is not an explanation as to why this

statement is false or misleading. Section 10(b) is not designed to punish businesses that (in

Plaintiffs' view) make bad decisions, it is intended to protect investors against misleading

statements. *See Comshare*, 183 F.3d at 548 (stating that Congress enacted the PSLRA because it

was concerned "frivolous securities fraud litigation unnecessarily increase[s] the cost of raising

capital and chill[s] corporate disclosure, [and is] often based on nothing more than a company's

announcement of bad news, not evidence of fraud.") (quoting S. Rep. No. 104–98 (1995) reprinted

in 1995 U.S.C.C.A.N. 679, 690) (alterations in original) (internal quotation marks omitted).

There are numerous other occasions where Plaintiffs identify statements as misleading, but

they fail to explain why the statement is misleading. For example, the statement "[t]he domestic

market was strong for our Infrastructure Group's products" was singled out as misleading without

---

words were the misleading parts of the statement. [Doc. 71 at 16]. That dispute is not relevant here because even when
using Plaintiffs' "key," the Amended Complaint fails to meet the standards of the PSLRA.

explanation. [*Id.* at 35] (emphasis omitted). When Astec disclosed that it had underestimated the cost of the Highland Plant, Plaintiffs' label almost the entire press release as misleading. [*Id.* at 41–42]. Yet, Plaintiffs do not claim that the release was false—that somehow Defendants did not underestimate cost. Nor do Plaintiffs state if the release gave rise to a duty to disclose some other attribute about the Highland Plant.

While the Court could state more examples of specific inadequacies in the Complaint, it does not need to. District courts have recognized that when a complaint is merely a long list of quotes followed by some generalized allegations of fraud, that complaint fails to meet the standards set forth by the PSLRA. *See, e.g.*, *In re Galena Biopharma, Inc. Secs. Litig.*, 336 F. Supp. 3d 378, 394 (D.N.J. 2018); *In re Wilmington Trust Secs. Litig.*, 852 F. Supp. 2d 477, 490 (D. Del. 2012); *In re Ferro Corp.*, 1:04-cv-1440, 2007 WL 1691358, at *19–20 (N.D. Ohio June 11, 2007); *In re Goodyear Tire & Rubber Co. Secs. Litig.*, 436 F. Supp. 2d 873, 904 (N.D. Ohio 2006).

The Plaintiffs respond that other district courts have allowed pleadings to go forth even if they are in fact improper "puzzle pleadings." [Doc. 71 at 17 n.5].[5] However, the cases cited by Plaintiffs could continue because the courts could glean why the statements were false based on the complaint. *See e.g.*, *Laborers' Loc. #231 Pension Fund v. PharMerica Corp.*, 3:18-cv-109, 2019 WL 4645583 at *10 n.3 (W.D. Ky. Sept. 24, 2019) ("[T]he Court believes that it can adequately decipher from the Complaint and Plaintiffs' response to the motion to dismiss which alleged omissions generally correspond to which proxy statements."). In this case, the Court

---

[5] Occasionally, courts seem to view the requirements of the PSLRA as discretionary—the courts will weigh factors to determine if dismissal is proper when a complaint fails to conform to established standards. *See City of Pontiac Emps. Retirement Sys. v. Stryker Corp.*, 1:10-cv-520, 2011 WL 2650717 at *6 (W.D. Mich. July 6, 2011) ("[T]he Court would be well within its discretion in dismissing the Amended Complaint and requiring Plaintiffs to amend to be more clear and direct in identifying the alleged false statements.") The Court is not sure it has the discretion to allow such an unclear pleading when doing so undermines the goals of the PSLRA. *See Comshare*, 183 F.3d at 548. Allowing an admittedly insufficient complaint would contradict the Supreme Court's clear instruction that the PSLRA's standards are "[e]xacting." *Tellabs*, 551 U.S. at 313.

cannot. Plaintiffs provided a hodge-podge of both statements and reasons and asks the Court to guess which reasons apply in which situations. *Cf. City of Pontiac*, 2011 WL 2650717 at *6 (noting that *every reason* applied to a certain group of statements; not that some reasons applied to some statements and other reasons to other statements). The Court cannot determine why Plaintiffs believe these statements are misleading. Thus, the Amended Complaint fails to comply with Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.

### B. Plaintiffs Fail to Adequately Plead Scienter

In addition to pleading fraud with sufficient particularity, under Section 10(b) Plaintiffs must also adequately plead scienter to survive a motion to dismiss. In the context of Section 10(b), scienter includes a "knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Doshi*, 823 F.3d at 1039 (quoting *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008)). To act recklessly, the defendant must engage in "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Comshare*, 183 F.3d at 550. "Before drawing an inference of recklessness, courts typically require multiple, obvious red flags demonstrating an egregious refusal to see the obvious, or investigate the doubtful." *Doshi*, 823 F.3d at 1039 (quoting *PR Diamonds*, *Inc. v. Chandler*, 364 F.3d 671, 686–87, 695 (6th Cir. 2004)) (internal quotation marks and citations omitted).

Under the PSLRA as applied to Section 10(b), Plaintiffs will survive a motion to dismiss only if they plead facts that give rise to a "strong inference" of scienter. *Id.* To determine if a plaintiff has met this standard, courts follow three steps: (1) they accept every fact stated in the complaint as true; (2) they consider the complaint in its entirety instead of scrutinizing individual allegations; and (3) they "take into account plausible opposing inferences." *Tellabs*, 551 U.S. at

322–23. "A strong inference of scienter must be . . . at least as compelling as any opposing inference of nonfraudulent intent." *Doshi*, 823 F.3d at 1039 (quoting *Tellabs*, 551 U.S. at 314) (internal quotation marks omitted). The Sixth Circuit has provided a list of nine non-exhaustive factors to consider:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulently statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig v. Vencor, Inc.* 251 F.3d 540, 552 (6th Cir. 2001) (en banc) (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)), *abrogated on other grounds by Tellabs*, 551 U.S. at 314. When courts analyze scienter, they generally do so on a party-by-party basis. *See Doshi*, 823 F.3d at 1041; *City of Monroe Emps. Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684–87 (6th Cir. 2005). Statements and knowledge from a corporation's officers are imputed to the corporation. *Doshi*, 823 F.3d at 1040.

### 1. Silvious

In their response to the motion to dismiss, Plaintiffs did not argue that any of the *Helwig* factors applied to Silvious. [Doc. 71 at 22–35]. In fact, there is only one statement made by Silvious quoted in the complaint, a statement about revenue in the fourth quarter of 2016. [Doc. 56 at 34]. Plaintiffs have not pled facts that would demonstrate that Silvious acted with the required scienter. Furthermore, by failing to defend that allegation, Plaintiffs have waived their argument that Silvious acted with the required scienter. *Taylor v. UnumProvident Corp.*, 1:03-CV-1009, 2005 WL 3448052, at *2 (E.D. Tenn. Dec. 14, 2005) ("A responding party waives any opposition to an

opponent's argument in one of two ways: either by expressly conceding a point or by failing to respond to opponent's argument.") Because Plaintiffs failed to plead facts giving rise to "strong inference of scienter" the claims against Silvious are insufficient under the PSLRA and Section 10(b).

### 2. Swanson

Plaintiffs argue that Swanson acted with the required scienter because Swanson received reports that contradicted his public statements. [Doc. 71 at 22–23]. Specifically, Plaintiffs allege that Swanson received information from the Highland Plant including the Highland Issues List and the Material Leakage Memo that contradicted any positive statement about the Highland Plant's progress. [*Id.*] While it is only one of the nine *Helwig* factors, divergence between internal reports and external statements is an especially important factor in pleading an inference of recklessness. *See Doshi*, 823 F.3d 1032, 1041–42; *City of Monroe*, 399 F.3d at 688–89.

However, Plaintiffs failed to identify which, if any, of these internal reports contradict Swanson's statements. The only statement credited to Swanson in the Amended Complaint is a statement to a magazine about the general future of the wood pellet business for Astec. [Doc. 56 at 37]. Swanson is not credited with a single statement about the future viability or health of the Highland Plant. Therefore, Plaintiffs did not plead facts which demonstrate that Swanson made statements that were contradicted by the Astec's internal reports. As a result, Plaintiffs fail to plead any of the *Helwig* factors that are probative for scienter. Therefore as to Swanson, they have failed to adequately plead facts that give rise to a strong inference of scienter.

### 3. Brock

Plaintiffs contend that Brock acted with the required scienter because he: (1) made statements that contradicted internal reports; (2) engaged in a suspicious amount of insider trading;

(3) disregarded the most current factual information before making statements; (4) made a false statement close in time to the disclosure of inconsistent information; and (5) was motivated by his self-interest to keep his job. [Doc. 71 at 22–25]. The Court will address each of these arguments in turn.

First, Plaintiffs argue that Brock made statements which contradicted Astec's internal reports. More specifically they allege Brock contradicted the Transition Inspection Report and the Material Leakage Memo when he said there had been weather issues and that the hammer mills had been fixed at the Highland Plant. [Doc. 71 at 22–23].[6] First, the Transition Inspection Report does not seem to contradict any of these statements. The Transition Inspection Report states that the bark bins were "plugged up," and it concluded that specific issue was not related to the weather. [Doc. 72-3 at 2]. But other issues could have been caused by the weather. [*Id.*] For example, the same report concludes that high-wind conditions cause other issues at the plant. [*Id.* at 5].[7] In short, the fact that one memo concluded that one issue was not caused by cold temperatures does not contradict the statement that weather may have caused some issue at the Highland Plant.

---

[6] Specifically, Plaintiffs refer to these statements:

> we feel like in Georgia that we passed the test, we're meeting with them next week to talk through that. In Arkansas, we actually have until June 19 now, we've had weather issues, we've had some mechanical issues and we've modified some equipment.
>
> . . .
>
> Well, Stanley this is Ben and I think whenever we get into these, there's always something that'll pop up, but thankfully what has popped up and mechanical issues that we corrected has not been extremely major. And so the hammer mills that piece and all that we fixed, the extra bag houses we fixed, but as you start up, sometimes things happen like shafts on a drag will break and you figure out how to correct that and fix that and have a long term fix, so it's things like that.

[Doc. 56 at 54–55] (emphasis omitted).

[7] Furthermore, there was precedent of weather causing a disruption. In a separate incident, Brock stated that a hurricane had disrupted operations at the Hazlehurst Plant. [Doc. 56 at 46].

Second, Plaintiffs argue that Brock said the hammer mills were fixed, and that conclusion is contradicted by the Material Leakage Memo. An investor asked Brock if the issues in the Highland Plant were "related to the same sorts of issues" involving the "hammer mill press that you guys had last time?" [Doc. 56 at 54]. The Amended Complaint does not explain what the issue was last time. Also, Brock does not answer the question "no." Plaintiffs argue the statement "so the hammer mills that piece and all that we fixed," means that the hammer mills were in perfect condition. [Doc. 71 at 23]. But Brock stated that the hammer mills may still break: "but as you start up, sometimes things happen like [other mechanical errors]." [Doc. 56 at 54]. Plaintiffs are correct that the Material Leakage Memo identifies some errors in the hammer mills, but it appears that Brock admitted that the hammer mills suffered some defects. Therefore, it does not appear that the Material Leakage Memo contradicted Brock's statements.

Third, Plaintiffs argue that Brock engaged in a suspicious amount of insider trading. From May 1 to May 4, 2018, Brock sold almost 60,000 shares of Astec stock for $3.2 million dollars. [*Id.* at 24]. The last time Brock sold shares before May 1 was over three years prior. [*Id.*] Insider trading at suspicious times or in suspicious amounts has "long been recognized as probative of scienter." *Greebel*, 194 F.3d at 197–98. "[A]t a minimum, the trading must be . . . unusual, well beyond the normal pattern of trading by those defendants." *Id.* at 198. Generally courts consider three factors: (1) whether the timing of the alleged trades is unusual for the insider; (2) "whether the profits reaped were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have an incentive to commit fraud;" and (3) whether the sale is unusual compared to the total amount of the insider's stock holdings (i.e. the percent of stock sold). *In re Cardinal Health Inc. Secs. Litig.*, 426 F. Supp. 2d

688, 728 (S.D. Ohio 2006) (quoting *In re MicroStrategy. Inc. Secs. Litig.*, 115 F. Supp. 2d 620, 644 (E.D. Va. 2000)) (internal quotation marks omitted).

Plaintiffs successfully allege that Brock engaged in a suspicious amount of insider trading. First, the timing was unusual; this sale was the first time in three years that Brock sold any of his Astec stock. *See Nursing Home Pension Fund*, *Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (holding that first sale of stock in five years was suspicious). Furthermore, Defendants have not provided an alternative reason as to why Brock would suddenly decide to sell his stock. *See Greebel*, 194 F.3d at 206–07 (offering alternative explanations as to the timing of Defendants' sales). As Brock provides no other explanation for the sudden departure from his prior trading patterns, the timing of the transaction was unusual.

Furthermore, the amount of trading was substantial. In three days, Brock made almost $3.2 million. That was more than three times the amount of Brock's normal annual compensation. [Doc. 71 at 24]. And he traded away 23% of his total Astec holdings. [Doc. 66 at 23]. Defendants argue that this is not sufficient to establish a suspicious amount of trading, but there is no bright-line rule as to when the amount of stocks sold will be suspicious. While some Courts have held that a sale of over 30% did not support an inference of scienter, *see In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) *abrogated on other grounds by Tellabs*, 551 U.S. at 314, others have found sales of over 20% will support that inference. *See MicroStrategies* 115 F. Supp. 2d at 644 n.46 (citing *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996)). In short, the question of whether insider sales are suspicious "is highly context-specific and dependent on other allegations in the complaint." *Id.* at 644. Here, the sale of his stock was a significant departure from Brock's prior trading, he reaped a significant profit, and it was a significant percentage of his total Astec

holdings. Therefore, this was a suspicious amount of insider trading and it supports an inference of scienter.

Third, Plaintiffs argue that Brock disregarded the most current factual information before making statements. [Doc. 71 at 74]. Plaintiffs do not explain which factual information Brock disregarded. Furthermore, as explained above the internal reports do not contradict Brock's statements. Therefore, this factor does not weigh in favor of an inference of scienter.

Fourth, Plaintiffs argue that there was closeness in time between an allegedly fraudulent statement and a later disclosure of inconsistent information. [Doc. 71 at 24]. Plaintiffs specifically argue that Brock told investors on April 24, 2018, that the repairs the Company undertook of its plants would allow them to fulfill their contractual obligations, and he stated Astec could sell another pellet plant in 2019. [Doc. 56 at 54–55]. On July 24, 2018—three months later—the Company revealed that it was not going to sell any more pellet plants and that it would pay to exit the deal with Highland Pellets on the Highland Plant contract. [Doc. 56 at 57–58].

The case law reveals that three-month gap is insufficient to support a finding of scienter. In *Doshi* the Sixth Circuit concluded that an 86-day gap between the relevant statements was insufficient to allow for an adverse inference of scienter. 823 F.3d at 1042. In *Bridgestone*, the Sixth Circuit concluded that a four-month gap did not support a finding of scienter. 399 F.3d at 684. And in *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018), the court concluded that a delay of six weeks weighed "minimally" in the plaintiff's favor. Here, the delay was 91 days. That is larger than the gap in *Doshi* and far larger than the gap in *Dougherty* which was only "minimally" helpful to the plaintiff's case. Therefore, this factor cannot support an inference of scienter.

Finally, Plaintiffs contend that scienter can be supported because Brock was interested in saving his job, and that this can be shown because he was forced out of his position at Astec. The Sixth Circuit has found that general allegations—such as a desire to keep a job—are not sufficient to plead motive for fraud. *See PR Diamonds*, 364 F.3d at 690; *Dougherty*, 905 F.3d at 981–82. As explained by the court of appeals in *PR Diamonds*, "[a]ll corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud." 364 F.3d at 690. That same warning against generalized statements applies when there is a generalized desire to protect one's position in a corporation. *Id.* Therefore Plaintiffs' generalized allegation does not support an inference of scienter.[8]

Therefore, out of the nine *Helwig* factors only one weighs in favor of an inference of scienter. The other eight do not. The question is whether that one factor makes the inference that Brock acted knowingly or recklessly as likely as an innocent explanation. *Tellabs*, 551 U.S. at 324. It does not. The alternative offered by Defendants, that Brock was simply optimistic about the Company's wood pellet business, is more likely than the required scienter under Section 10(b). Therefore, pursuant to the PSLRA as applied to Section 10(b), Plaintiffs failed to adequately plead that Brock acted with the required scienter.

### 4. *Astec*

It seems plausible that an inference of scienter is not cognizable as to any individual employee, but when the allegations are taken together scienter can be imputed to the corporation. However, it is not plausible here. As explained above no adverse inference of scienter can be made against Silvious or Swanson. *Supra* § III.B.1–2. Furthermore, the only factor which would encourage an adverse inference of scienter for Brock—suspicious insider trading—becomes

---

[8] Furthermore, Plaintiffs failed to allege that Brock was "forced out" of his position at Astec in the Amended Complaint.

weaker when the Court considers the whole company. Neither Silvious nor Swanson sold any stocks. *See MicroStrategy Inc.*, 115 F. Supp. 2d at 644 (examining the trades of all of the individual defendants). Therefore, the Court cannot impute the required scienter to Astec.

In conclusion, the facts alleged by Plaintiffs do not give rise to a "strong inference of scienter" as to any Defendant. As a result, the Amended Complaint does not state a claim under Section 10(b) which further means that the Amended Complaint does not state a claim under Section 20(a) because Section 20(a) is dependent on a primary violation of securities law. *Doshi*, 823 F.3d at 1045. Thus, the only remaining question is the proper disposition of this case

### C. Leave to Amend

In a footnote at the end of Plaintiffs' response, they ask for leave to amend the complaint. [Doc. 71 at 25 n.9]. Plaintiffs cite *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002), where the Sixth Circuit remarked "leave to amend is particularly appropriate where the complaint does not allege fraud with particularity." But since then, the Sixth Circuit has clarified "the PSLRA restricts the scope of Rule 15(a) in the context of securities litigation such that plaintiffs have more limited ability to amend their complaints." *La. Sch. Emps. Retirement Sys.* 622 F.3d at 486. Furthermore, the Sixth Circuit has explained "a bare request in an opposition to a motion to dismiss—without any indication on the particular grounds on which the amendment is sought . . . does not constitute a motion within the contemplation of Rule 15(a)." *Id.* at 486 (quoting *PR Diamonds, Inc.*, 364 F.3d at 699).

Plaintiffs do not cite any grounds for their amendment, and they have not submitted a motion to amend that preceded the motion to dismiss. Essentially, Plaintiffs ask for an insurance policy to prevent dismissal of their case. Granting such "insurance" is improper. When Plaintiffs fail to amend a complaint before the Court considers a motion to dismiss, the Sixth Circuit has

been clear; dismissal with prejudice—not leave to amend—is the proper disposition *See Id.*;

*Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) ("Absent [a prior Rule

15(a) motion] Defendant was entitled to review of the complaint as filed pursuant to Rule 12(b)(6).

Plaintiffs were not entitled to an advisory opinion from the Court informing them of the

deficiencies of the complaint and then an opportunity to cure those deficiencies.") (emphasis

omitted). Thus, Plaintiffs will not be given leave to amend their complaint.

## IV.    CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss Amended Complaint [Doc. 63] is

**GRANTED**. All Claims against all Defendants are **DISMISSED WITH PREJUDICE**.

SO ORDERED.

/s/ *Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**