# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 1:19-cv-00024-CEA-CHS |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | Judge Charles E. Atchley, Jr. |
| ASTEC INDUSTRIES, INC., BENJAMIN G. BROCK and DAVID C. SILVIOUS, | ) ) ) | Mag. Judge Christopher H. Steger |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................ 4

II.   JURISDICTION AND VENUE ...................................................................... 11

III.   PARTIES ....................................................................................................... 11

IV.   BACKGROUND ............................................................................................ 14

     A.   Astec ........................................................................................................ 14

     B.   Astec Enters the Wood Pellet Business ................................................ 14

     C.   WITNESSES ............................................................................................ 16

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD.......................................................................................... 17

     A.   Defendants Mislead Investors Regarding the Hazlehurst Plant................................... 17

        1.   Background of the Hazlehurst Plant ............................................... 17

        2.   Defendants' False and Misleading Statements About the Hazlehurst Plant During the Class Period ................................................................................. 22

     B.   Defendants Mislead Investors Regarding the Highland Plant ..................................... 29

        1.   Background.................................................................................... 29

        2.   Astec's False and Misleading Statements About the Highland Plant During the Class Period ................................................................................. 35

     C.   Defendants Violated Applicable Accounting Principles and Astec's Own Internal Accounting Policies ................................................................................. 40

        1.   Background.................................................................................... 41

        2.   GAAP and Astec's Own Accounting Policies Required Defendants to Defer Recognition of Revenue From the Highland Plant ................................... 41

        3.   Defendants' Class Period Financial Statements Were False and Misleading Because They Overstated Revenue And Violated GAAP ......................................... 47

4. GAAP and Astec's Own Accounting Policies Required Defendants to Disclose the Highland Guarantee As a Contingent Liability ....................................................... 52

5. Defendants' Class Period Financial Statements About Contingencies Were False and Misleading Because They Failed to Disclose the Highland Guarantee ........... 54

D. Defendants Misled Investors About Astec's Prospects For Selling Additional Wood Pellet Plants .......................................................................................................... 55

1. Background ........................................................................................................ 55

2. Defendants' False and Misleading Statements During the Class Period About Astec's Prospects For Future Pellet Plant Sales ........................................... 57

VI. DEFENDANTS FINALLY DISCLOSE THE TRUTH ..................................................... 59

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ....................................................... 60

VIII. PLAINTIFF'S CLASS ACTION ALLEGATIONS ..................................................... 65

IX. CAUSES OF ACTION .............................................................................................. 68

COUNT I ......................................................................................................................... 68

Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants ........................................................................................................ 68

COUNT II ....................................................................................................................... 71

Violations of Section 20(a) of The Exchange Act Against The Individual Defendants 71

X. PRAYER FOR RELIEF ................................................................................................ 72

XI. DEMAND FOR TRIAL BY JURY ............................................................................ 72

# [PROPOSED] SECOND AMENDED COMPLAINT

Lead Plaintiff Lynn Johnson ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Astec Industries, Inc. ("Astec" or the "Company"), analysts' reports and advisories about the Company, interviews with witnesses, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded securities of Astec between July 26, 2016 and October 22, 2018, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class") and SEC Rule 10b-5 promulgated thereunder.

2. Astec designs, engineers, manufactures, markets, and finances equipment and components, including aggregate crushers, pavers, asphalt plants, wood pellet plants, and related components. The Company's manufacturing operations are divided into three primary business segments: the Infrastructure Group (road building, wood pellet production and related equipment); the Aggregate and Mining Group (aggregate processing and mining equipment); and the Energy

Group (equipment for the extraction and production of fuels, biomass production, and water drilling equipment).

3.      The Company's Infrastructure Group has been involved in the wood pellet plant business since approximately 2013, when Astec began commercial production and marketing of wood pellet plants to potential customers that supply wood pellets to the utility and home-use industries. In 2016, the Infrastructure Group accounted for the majority of the Company's net sales, and pellet plant sales accounted for 22% of the Group's net sales.

4.      The Company's pellet plants are made up of separate lines, with each line designed to produce 20 metric tons per hour ("TPH") of dense, dried wood pellets created from timber to be used as fuel for the creation of energy. During the Class Period, Astec's wood pellet plants were permitted for, marketed and sold to customers seeking to serve the needs of European Union ("EU") utilities, whose goal was to use biomass fuels for a minimum of 20% of their overall energy production.

5.      Leading up to the start of the Class Period, the Company held itself out as the world's only single-source complete wood pellet plant manufacturer and touted the sale of two wood pellet plants, one in partnership with Highland Pellets, LLC, located in Pine Bluffs, Arkansas, and one to Hazlehurst Wood Pellets, LLC, located in Georgia.

6.      For the Hazlehurst plant, Astec financed its customer's purchase of the three-line facility for $60 million. The Hazlehurst plant was designed to produce 400,000 metric tons of pellets per year. Because it financed the purchase of the Hazlehurst plant, Astec could not recognize revenue from the plant until its customer paid off the financing. In July 2014, Astec told investors that the Hazlehurst plant was being financed for a period of 24 months.

7.    Astec described the Highland pellet plant as a four-line, 20 metric TPH per line plant capable of producing 600,000 metric tons of wood pellets annually. Astec was hired to design, install, test and get the Highland pellet plant running at full capacity. Astec stated the plant would become fully operational in the first quarter of 2018 and that it had "achieved recognition for being able to produce saleable pellets months ahead of what any competitive plant was able to accomplish to date." Astec received an initial down payment of $30 million on the plant in August 2015 and a final $122.5 million payment in March 2016.

8.    Touting the Highland and Hazlehurst plants as models for the booming pellet plant industry, Astec told investors that the best was yet to come. In July 2016, the Company told investors that it expected another $80 million pellet plant order later that year. In October 2016, the Company boasted that its pellet plant business would record $100 million to $125 million in 2017—and this figure did not even include the $60 million owed to Astec for the Hazlehurst plant, which the Company instead counted as part of its inventory and "backlog." In November 2016, the Company told investors that it expected 35-50 pellet plants to be built in the United States in the next 5 years, each worth about $100 million, and that the Company's plan was to build "maybe half" of them.

9.    What the Company failed to disclose was that Defendants knew the plants were riddled with problems that prevented them from running at their promised operational or production capacity, posing a threat to the Company's pellet plant business, its overall financial performance, and its financial outlook. First, Defendants failed to disclose that neither the Hazlehurst nor the Highland plants were capable of producing enough low emission pellets to take advantage of the booming European market in which the Company had promised to become a major player. The plants needed to be run with wood-firing furnaces in order to satisfy pellet

customers' European Union emissions requirements. The Highland plant initially ran using wood-burning furnaces, but Astec had to add supplemental natural gas furnaces to increase production. Highland plant's natural gas usage was strictly limited to ensure its pellets met EU emissions standards that governed its customer Drax, leaving the Highland plant unable to meet its contractual production targets to Drax. Similarly, Astec tried to switch the furnaces at the Hazlehurst plant from natural gas to wood-burning in 2016, but Defendants' repeated assurances about the success of the transition were knowingly false.

10. Second, Defendants failed to disclose that the Company's sales contract to Highland Pellets was contingent upon the plant being able to pass a "reliability run," which required the plant to produce 50,000 metric tons of high quality wood pellets in a 30 day period—the production level needed to fulfill Highland's 10-year contract to supply British utility company Drax with 600,000 metric tons of pellets per year. Moreover, Defendants failed to disclose that its contract with Highland Pellets contained a longstop date of April 15, 2018. If the plant failed to pass the reliability run test by that date, Astec would be forced to refund the entire purchase price of the plant to Highland.

11. Rather than coming clean to investors about the Company's pellet plant failures, the Company issued a series of misleading partial disclosures downplaying the severity of the problems and the serious threat they posed to the Company's financial success.

12. Confidential witnesses and company documents confirm that Astec executives, including the Company's CEO, were well aware of the severity of the problems at the pellet plants while they were falsely assuring investors that not only were the current plants successes, but that the Company would soon land more pellet plant orders to sustain a $100 million annual net revenue source for the company. Indeed, while the Company's CEO was negotiating the as-yet-undisclosed

$75 million payout to Highland Pellets, he unloaded nearly 60,000 shares of Astec stock for a total of $3.2 million. These stock sales were suspicious and unusual, as it was the CEO's first sales of Astec stock in over three years.

13. Astec's stock tumbled as the market reacted to a series of partially corrective disclosures revealing the true facts about Astec's pellet plant business. On July 25, 2017, the Company issued a release announcing its second quarter 2017 ("2Q2017") financial results for the quarter ended June 30, 2017 and hosted an investor call to discuss the same, on the call, Brock revealed that the margin for the Highland plant was "significantly less than we anticipated" due to an "underestimated cost" that resulted in the entire difference between the Company's expected and actual margin for the quarter. Brock attributed the loss to "a cost miss estimate really mainly by our guys." Brock promised investors that "it won't happen again." In response to these partial disclosures, the price of Astec stock dropped $4.33 per share, or approximately 8%, on July 25, 2017, damaging investors.

14. On October 2, 2017, Astec disclosed that it was undertaking "substantial design upgrades" to correct "design flaws" at its pellet plants so they could "achieve full production." The "significant design upgrades" to the Georgia and Arkansas plants were labeled an "additional investment" that would "negatively impact Astec's third quarter earnings by $0.54 to $0.58 per share." In response to these partial disclosures, the price of Astec stock dropped $3.51 per share, or approximately 6.3%, on October 2, 2017, damaging investors.

15. On July 24, 2018, the Company issued a news release reporting the Company's 2Q2018 financial results for the period ended June 30, 2018, and providing an update regarding its pellet plant business. The release shocked investors by disclosing that the Company would "pay $68 million in cash in the aggregate over the course of the next 120 days and forgive approximately

$7 million in receivables. In exchange, Highland agreed to release the Company from all contractual obligations related to the Arkansas wood pellet plan." The release's "Wood Pellet Plant Business Update" made clear that Astec would only supply equipment on pellet plant projects going forward, and would no longer construct, procure or engineer future projects. The July 24, 2018 earnings release also stated that the Company was commencing a strategic sourcing review to reduce costs and that the Board was reviewing the Company's capital allocation strategy. The market's reaction to the Company's 2Q2018 earnings release was swift and severe. After closing at $60.80 per share on July 23, 2018, the price of Astec stock dropped 20%, or $12.59 per share, to close at $48.21 per share on July 24, 2018, on elevated trading volume of more than 1.3 million shares.

16.     Finally, before the market opened on October 23, 2018, the Company surprised investors by reporting third quarter 2018 ("3Q2018") results that fell well short of the low end of the Company's guidance and the market's expectations. Among other things, the Company reported that net sales had decreased by 3.4% and domestic sales had decreased by 7.5% compared to the third quarter of 2017. The October 23, 2018 earnings release also stated that the Company's backlog, a key indicator of the Company's future financial performance, decreased 20.2% to $308.6 million at September 30, 2018, down from $386.5 million at September 30, 2017. All but $2.3 million of the $77.9 million decrease in the Company's backlog was attributable to pellet plants.

17.     The Company's poor results prompted a downgrade from William Blair & Company, L.L.C. ("William Blair"), who stated that Astec "continues to disappoint" and "has squandered the entire upside in its end-markets" and "destroyed value through poor execution and other factors such as the performance of its pellet plants." William Blair added that "[w]e can no

longer give management any benefit of the doubt on its optimism" and labeled the Company's 3Q2018 results "[a]nother [d]isaster."

18. The market reacted swiftly and negatively to the Company's poor 3Q2018 financial results. After closing at $47.27 per share on October 22, 2018, Astec stock opened at $43.11 per share and continued falling to a close of $35.51 per share on October 23, 2018, a decline of nearly 25%, on heavy trading volume of nearly 1.6 million shares traded.

19. After the Class Period, on January 22, 2019, Astec unexpectedly and without notice announced that Benjamin Brock had resigned as President and Chief Executive Officer ("CEO") and as a member of the Board, effective as of the close of business on January 21, 2019. Upon information and belief, Brock was forced out as result of the fraud.

20. On March 18, 2019, the Company's Form 10-K identified certain control deficiencies in the Company's internal control over financial reporting as of December 31, 2018. One of the material weaknesses identified by the Company was the "accuracy and disclosure of revenue recognized from the Company's contracts with customers at certain of the Company's business units." Specifically, the Company failed to:

- design, implement and operate effective controls at a sufficient level of precision over the identification and allocation of the transaction price to multiple performance obligations in accordance with FASB ASC Topic 606, *Revenue from Contracts with Customers* ("ASC 606")

- design, implement and operate effective controls over the accuracy of pricing of parts sales; and

- design, implement and effectively perform controls over the identification of sales transactions by category for purposes of preparing disclosures required by ASC 606 and elimination of intercompany transactions.

21. Further, the Company also disclosed that it "did not perform an effective risk assessment process to understand the changes necessary to the financial reporting process and

related controls at these business units to address the risks relating to the recognition, measurement and presentation of revenue in accordance with the new accounting standard."

22. Additionally, the Company's independent auditor, KPMG LLP, issued a report on March 15 noting several material weaknesses at the Company, including "[i]neffective controls over the accuracy and disclosure of revenue at certain business units due to insufficient understanding of the requirements of revenue recognition and not performing an effective risk assessment" and "[i]neffective controls over the existence, accuracy and valuation of inventories at certain business units due to insufficient understanding of relevant risks of material misstatement."

## II.   JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

24. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

25. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Defendants conduct business and the Company is headquartered in this District.

26. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

27.     Lead Plaintiff, as set forth in the previously filed Certification incorporated herein by reference, acquired Astec securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

28.     Defendant Astec is a Tennessee corporation, and its principal executive offices are located in this District. Astec securities trade on the NASDAQ ticker under the ticker symbol "ASTE."

29.     Defendant Benjamin G. Brock ("Brock") was the Company's CEO and President, a member of the Company's Board, and a member of the Board's executive committee until he resigned on January 21, 2019. He previously held the position of President of Astec, Inc. since 2006 and Group Vice President of the Asphalt Group since August 2012.  Prior to 2006, Mr. Brock held the position of Vice President-Sales of Astec, Inc. from 2003 until 2006 and CEI Enterprises, Inc.'s Vice President/General Manager from 1997 until 2002. As described in Astec's proxy materials, Brock had primary responsibility for the operations of the Company, setting the Board agendas, and presiding over Board meetings, and provided the Board with invaluable industry experience and knowledge of the Company.

30.     Defendant David C. Silvious ("Silvious") served as the Vice President, Chief Financial Officer, and Treasurer of the Company since August 2011 and throughout the Class Period. He previously served as Corporate Controller of the Company from 2005 to 2011 and as Corporate Financial Analyst from 1999 to 2005. Silvious also serves as Treasurer of each of the Company's U.S. operating subsidiaries and Vice President of Astec Insurance Company.

31.     Relevant non-party Malcolm Swanson was an Executive Officer of the Company and served as the President of Astec, Inc. from January 2014 through 2018. He previously served

as Vice President – Engineering of Astec, Inc. from 1995 to 2013 and as Chief Engineer of Astec, Inc. from 1989 to 1995.

32. Brock and Silvious are sometimes referred to herein as the "Individual Defendants."

33. Each of the Individual Defendants:

   a. directly participated in the management of the Company;

   b. was directly involved in the day-to-day operations of the Company at the highest levels;

   c. was privy to confidential proprietary information concerning the Company and its business and operations;

   d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

   f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

   g. approved or ratified these statements in violation of the federal securities laws.

34. Astec is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

35. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Astec under *respondeat superior* and agency principles.

36. Defendant Astec and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. BACKGROUND

### A. Astec

37. Astec was founded by Brock's father, Don Brock, in 1972 and completed its initial public offering in 1986. Brock's father served as the CEO of the Company from its founding until January 1, 2014, when Brock became CEO and President. Prior to being named CEO, Brock served as President of Astec, Inc.

38. Astec, Inc. is a business unit in the Company's Infrastructure Group that designs, engineers, manufactures and markets a complete line of asphalt and wood pellet plants and related components primarily for the asphalt paving and wood pellet industries. In 2016, the Infrastructure Group accounted for the majority of the Company's net sales and profits, and pellet plant sales accounted for 22% of the Group's net sales. Malcolm Swanson assumed Brock's role as President of Astec, Inc. upon Brock's promotion to CEO.

### B. Astec Enters the Wood Pellet Business

39. In the late 2000s, the EU began subsidizing burning wood for electricity under the presumption that doing so would be more environmentally friendly than coal or other traditional power generation methods. To feed the wood-burning boilers of EU power plants, many EU-based companies started importing wood pellets from the United States. As a result, the southern United States became the world's largest wood pellet supplier, with EU-based power companies importing more than 4.7 million metric tons of U.S. wood pellets each year, up from just 500,000 tons in 2009.

40.     A wood pellet manufacturing plant has two main tasks: to dry the wood to a point where it is efficient to burn in power plants and to turn the whole trees into pellets for easy transport. To begin the process, felled trees typically arrive by truck. Once at the facility, trees are debarked and then chipped in shredding machines called hammermills. The wood is then conveyed to a dryer, usually a large rotary dryer heated by burning wood and bark, where the moisture in the wood is reduced from about 50% by weight to around 10%. After the dryer, the wood is again processed by hammermills to reduce its size to a point where it can be formed into pellets.

41.     The next unit is the pellet press, which presses the wood through holes in a die to create pellets, a process that requires large amounts of pressure and heat. The pellets are then deposited into a pellet cooler to reduce their temperature back to safe levels. The pellets are then ready for transport to a port, where they are usually stored for some time before being shipped to Europe. A typical facility produces between 50 and 70 tons of wood pellets per hour, or between 450,000 and 650,000 tons per year.

42.     Astec's wood pellet plants have been in commercial production since 2013. The Company's pellet plants use a modular design that includes replicated parallel production lines (for example, a 60 TPH plant consists of three 20 TPH lines), which the Company has touted as resulting in very few points in the process where any individual equipment failure can shut the entire plant down. For example, in the Company's 2017 annual report filed with the SEC on Form 10-K, Astec discussed the superior design of its pellet plants, as well as the turnkey nature of its pellet plant business, stating:

> In most other pellet plant designs, one small equipment failure, such as a dryer outage, would result in a total plant shutdown. If a dryer outage were to occur in a 60 TPH Astec plant, the plant could continue to operate at 40 TPH. In fact, there are very few reasons why the plant would ever be completely shut down. Even major maintenance cycles may be performed line-by-line while the plant continues to operate on the other lines.

* * *

The Company believes that it is the only company offering a single source for a complete pellet plant, as known competitors only sell individual plant components thereby requiring the customer to purchase the remaining plant components from other sources.

43.     In an April 23, 2013 earnings call, Astec founder Don Brock stated the Company was relying on wood pellet plant sales to make up for lackluster sales from the rest of the Infrastructure Group: "We see this as a real opportunity for further growth in the wood pellet plant business. We see this product as filling the gap in our volume in the next few years as infrastructure continues to be somewhat slow."

44.     In December 2013, Swanson wrote an article for Biomass Magazine touting the advantage of wood pellet plants that are designed and constructed by a single source instead of mixing and matching equipment from multiple sources. Swanson wrote, in part, that "with standard equipment, it is possible to reliably predict performance . . . [i]nvestors and owners will then be able to possess a high level of certainty concerning how long it will take to get a plant up and running, costs, production rates and pellet quality."[1]

C.  **WITNESSES**

45.     Confidential Witness 1 ("CW 1") was employed by Highland Pellets at the Pine Bluff pellet plant from January 2017 through April 2019. CW 1 held several positions during his tenure at Highland, including Lead Electrician, Electrical Superintendent, Maintenance Manager and Continuous Improvement Process Engineer. Throughout his employment at Highland, CW 1 reported directly to Highland Plant Manager Jody Doak. Pursuant to his job responsibilities at Highland, CW 1 was intimately familiar with Highland's pellet production process and regularly

---

[1] http://biomassmagazine.com/articles/9821/what-the-wood-pellet-industry-needs

communicated with Astec engineers, Astec executives, and third-party consultants regarding ongoing issues at the plant. CW 1 worked directly on each of the Reliability Run tests at the Highland plant.

46.     Confidential Witness 2 ("CW 2") was an environmental health and safety consultant for Highland Pellets at the Pine Bluff pellet plant from April 2018 through July 2018. CW 2 reported directly to Highland Plant Manager Jody Doak.

47.     Confidential Witness 3 ("CW 3") was a sustainability manager for Highland Pellets at the Pine Bluff pellet plant from October 2017 through February 2018. CW 3 reported directly to Highland Plant Manager Jody Doak throughout her tenure at Highland. CW 3's primary job responsibility was ensuring the wood Highland purchased was certified to meet the sourcing standards required by Highland's sole customer: Drax. CW 3 left Highland Pellets in March 2018 to work for Drax as a procurement forester.

48.     Confidential Witness 4 ("CW 4") was an electrician for Highland Pellets at the Pine Bluff pellet plant from September 2016 through December 2018. Highland initially hired CW 4 has an electrician, but Highland utilized CW 4 in a multi-craft role because of CW 4's previous mechanical and millwright experience. CW 4 worked directly on each of the Reliability Run tests at the Highland plant.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.  Defendants Mislead Investors Regarding the Hazlehurst Plant

#### 1.     Background of the Hazlehurst Plant

49.     Astec sold its first wood pellet plant in 2013 to Hazlehurst Wood Pellets, LLC—a subsidiary of Fram Renewable Fuels, LLC ("Fram")—for a three-line facility located in Hazlehurst, Georgia. Astec financed the $60 million sale to the buyer, meaning Astec could not

recognize revenue from the plant until the loan was repaid. Astec planned to be repaid once Hazlehurst secured a long-term pellet contract, which would allow Hazlehurst to receive financing from its banks. Astec initially told investors that the Company expected to repaid within two to three years.

50. In 2013, Hazlehurst submitted an application to Georgia's Environmental Protection Division ("Georgia EPD") for a permit to construct and operate the plant. The application stated that the plant would "produce wood pellets that are exported to markets in the European Union for powering utility boilers," which meant the plant would have to use wood-burning furnaces to meet strict EU emissions standards.

51. While Astec did not recognize revenue from Hazlehurst, it did include the $60 million plant in its reported inventory in its financial statements. Astec also included the $60 million plant in its backlog, a measure the Company used to preview future revenue from contracts that the Astec had not yet fulfilled. Defendants touted the backlog as a key indicator of future growth. For example, Brock told investors in an October 2016 conference call that the Company was "encouraged" by the increase in its backlog and that it was one of the "encouraging signs we believe that our fourth quarter this year will be better than our fourth quarter last year."

52. Communications between Fram and Georgia EPD show that, even before the Class Period began, Astec and Fram were well aware that Hazlehurst plant could not efficiently produce pellets using wood burners. The Hazlehurst plant's inability to effectively produce low-emission pellets using wood burners precluded Hazlehurst from securing a long-term contract with an EU client, which in turn precluded Hazlehurst from repaying the $60 million Astec loan. Astec financed the operations of the Hazlehurst plant and therefore knew that the plant was replacing Astec's burners with McConnell burners.

53.     In March 2016, Fram informed Georgia EPD that the Hazlehurst plant was planning to add wood-fired burners manufactured by McConnell—an engineering company located in Alabama—to each of the three lines at the Hazlehurst plant because the current Astec burners at the Hazlehurst plant had been running on natural gas and were inefficient in burning wood fuel:

> The Permittee has proposed to add new 50 MMBTU/hr wood-fired burner to each production line since ***the existing 65 MMBTU/hr ASTEC burner is inefficient in burning wood fuel and is mostly fired with natural gas.*** After installation of the new McConnell burners the existing Astec burners will serve as standby burners that will be used when the McConnell burners are down for maintenance or repairs.

54.     On April 11, 2016, Fram wrote to Georgia EPD stating that only one of the three lines (Line 3) at the Hazlehurst plant was currently in operation, and that the plant was adding McConnell burners to each of the three lines in an effort to burn wood fuel.

55.     On June 20, 2016, Fram informed EPD that Line 2 of the Hazlehurst plant attempted to run burning wood fuel with the McConnell burner on June 10, but that Astec took Line 2 out of production for modifications after determining that there were feed-related issues with the wood fuel. Fram noted that Line 2 had previously been tested for emissions compliance while burning natural gas and that they would have to run a new compliance test using wood fuel.

56.     In a November 2016 speech at the Robert W. Baird Global Industrial Conference, Brock characterized the pellet plant industry as our growth story for us." Brock also acknowledged that the "[t]he pellet business is really created by the demand in the UK as they convert their coal fired energy plants to wood fire" and that "Most of the contracts that are driving these plants to be build are a 10-year supply contracts for pellets from our customers to the utilities."

57.     On January 31, 2017, Hazlehurst's pre-dryer baghouse was tested for emissions while combusting ***natural gas***, rather than wood. This test showed an emission rate more than five times higher than the same test had shown in August 2014 and December 2015 while combusting

wood.[2] Despite adding the McConnell wood-firing burners in 2016, the Hazlehurst plant still could not efficiently produce pellets without using natural gas—which precluded Hazlehurst from securing an EU contract and repaying the $60 million loan to Astec.

58. In February 2017, Astec announced that it had extended the maturity of the loan to Hazlehurst from July 2017 to December 2018.

59. In a February 2017 call with investors, Brock announced that Astec was extending the loan term for the Hazlehurst plant from July 2017 to December 2018.

60. In October 2017, the Company revealed what Defendants had known for more than a year: the Hazlehurst plant was still running on natural gas because Astec had never figured out how to efficiently produce pellets with wood-burning fuel sources. The Company claimed that it had discovered new issues related to the wood-burning furnaces just in the past 45 days as it attempted to ramp up production—a frank admission that its 2016 claims to have already switched to wood-burning furnaces that had passed production tests were false and misleading.

61. The Company disclosed that they had identified three problems at the Hazlehurst plant: baghouse related issues, gas buildup, and ash/dust buildup. Indeed, On September 20, 2017 Hazlehurst applied to EPD for a change in its operating permit to allow the plant to add additional baghouses to each line.[3] Despite the fact that the permit was not granted until November 15, 2017[4]—and despite the fact that Hazlehurst was still unable to efficiently produce pellets with wood-fired burners—Defendants again falsely assured investors that these unresolved problems

---

[2]https://www.epa.gov/sites/production/files/2019-05/documents/highlandpelletssouthpetition2019.pdf
[3] SIP Construction & Operating Permit And Title V 502(B)(10) Change Application Review, September 20, 2017.
[4] https://permitsearch.gaepd.org/permit.aspx?id=PDF-VF-65624

did not change the Company's expectation of being fully reimbursed by Hazlehurst by December 2018.

62.     At the Robert W. Baird Global Industrial Conference in November 2017, Brock admitted that he has weekly communications with the management of the Hazlehurst plant, and would thus be aware of the plant's limitations: "I talked to the management partner every other week. We communicate on email the weeks we don't talk."

63.     On investor calls in February and April 2018, the Company again falsely assured investors that the 2017 charges would be sufficient to resolve the ongoing problems at Hazlehurst and that the Company still expected Hazlehurst to pay off the $60 million in financing—plus interest—by December 2018. Defendants made these assurances despite knowing that the Hazlehurst had not met the production standards necessary to attain financing.

64.     On a July 24, 2018, investor call, Brock announced that, after consultation with the Company's external auditor, Astec was finally removing the $60 million Hazlehurst order from the Infrastructure Group's backlog in order to "add clarity."

65.     In March 2019, the Company announced that it recorded a full write-off of $65.7 million related to the Hazlehurst plant in the fourth quarter of 2018, writing down the pellet plant inventory's net realizable value down to $0. The Company stated that it was taking the write-off because "the timing of a transaction and the ultimate sale price are uncertain," but those same conditions were true throughout the Class Period.

66.     In July 2019, the Company announced that it had sold the Hazlehurst plant for $20 million—recouping just a fraction of the cost of the Company's initial $60 million financing with interest in 2013.

2.  Defendants' False and Misleading Statements About the Hazlehurst Plant During the Class Period

67.  On the July 26, 2016 investor call, Brock told investors regarding $60 million Astec had financed Hazlehurst with that "we expect the final payment in 2017." In response to an analyst's question about what remains for Astec to get paid on the $60 million for Hazlehurst, Brock responded:

> Well, so they are working out their banking relationship – their banking plan, I guess, because just getting the financing. So what we got to do is we've got to complete the retrofit and installation of one particular line, all three lines up and running, which two of them are at their current design, which is the final design so that first line needs to be retrofitted, and once that occurs, all three up and running according to spec, and then the banks are all in. So it's a matter of timing more than anything.

68.  Brock's statement that two of the lines were up and running at the final design was false and misleading because none of the three lines were "up and running" at the required production level with wood burners, and none of the lines were at their "final design." Brock's statement that the banks would be "all in" to refinance the loan as soon as the replacement burners were installed was false and misleading because it gave investors a false impression of the risk that replacing the burners would not resolve the production issues. In fact, the banks were not "all in" after the lines were retrofitted, and the new burners did not resolve the plant's manufacturing issues. Similarly, Brock's statement that Hazlehurst receiving financing—and Astec getting repaid—was only a "matter of timing" materially misled investors about the significant risk that Astec would not be able to fix the ongoing problems at the Hazlehurst plant preventing the ramping up of production without using natural gas.

69.  Brock then doubled down, boldly asserting that "**there is no risk**" that the Company would not get repaid:

> And more color on that, all three lines have run pellets at production. What we needed to do is be able to burn wood exclusively on each line and we hit a wall on

that on our burners, so we're replacing the burners. So the testing, proving that the lines will do what we said on tons per hour is fine. The other two have the new burners on, they are running. We have to put the third burner in, but they could get financing on that plant without it and that's the rest of the story.

I want to make sure everybody understands, we're not in a jam and at risk or anything, because there is no risk. We have met that and we are in good shape.

70. Brock's statement that the testing was "fine" was false and misleading because the testing on the two new burners was not "fine." None of the Hazlehurst lines had met production goals for tons per hour using the required wood burners. The lines were still running on natural gas in January 2017 because they were unable to meet production goals using wood burners. Brock's statement that "[w]e have to put the third burner in, but they could get financing on that plant without it" was false and misleading because Hazlehurst needed to run all three lines using wood burners to secure an EU contract and to secure financing. Brock's statement that there was "no risk" that Astec would fail to get repaid for the Hazlehurst plant was false and misleading because it gave a false impression of reality, conflicted with the known facts that the plant was unable to meet the production goals required to secure financing and repay the loan, and was without reasonable basis. Brock could not possibly guarantee that Astec would be able to fix the problems plaguing Hazlehurst. And, of course, that purportedly non-existent risk came to fruition when Astec extended the maturity of the loan and was eventually forced to write off the entire $60 million in 2018.

71. On the February 21, 2017 investor call, Brock revealed that Astec had significantly extended the payment deadline for the $60 million in financing on the Hazlehurst plant from July 2017 to December 2018. Brock stated that the "main reason for the extension is a temporary low in wood pellet demand that is widely expected to recover late this year. We now expect the final payment in December 2018."

72. Brock's statement that the "main reason for the extension is a temporary low in wood pellet demand" was false and misleading because the main reason Astec extended the maturity of the loan was the fact that Hazlehurst could not secure financing to repay the loan. And Hazlehurst could not secure financing because of the plant's inability to meet production goals using wood burners, not because of a temporary low in pellet demand. Brock's statement that a temporary low in wood pellet demand was preventing Hazlehurst from being financed was directly contrary to Brock's statements during the same call that Astec expected to book revenue from an additional pellet plant in 2017. Further, despite Brock's statement in November 2016 that Hazlehurst needed to move to wood-firing burners to secure financing, Hazlehurst was still running on natural gas during the plant's January 31, 2017 emissions test.

73. In an October 2, 2017 press release, Astec disclosed that it was undertaking "substantial design upgrades" to correct "design flaws" at its pellet plants so they could "achieve full production." Brock claimed that the design problem at the Hazlehurst plant had been identified "in the last 45 days." He stated that "the plant had been run with natural gas as the fuel source and was not run at full capacity utilizing wood as its fuel source" until market conditions recently improved, which "led to the identifying of the [design problems]." Brock claimed that "We have been working with being fired on wood for some time, but we only recently identified the ultimate fix as we attempted to ramp up production." Brock further boasted that Astec "identified a clear path to success" and "completed an updated analysis of the necessary all-inclusive investment needed to deliver on our commitments to our customers with regard to production rates." On the investor call later that day, Brock claimed that the design problems at Hazlehurst would be fixed by the first week of December 2017.

74. Brock's claim of having identified the "ultimate fix" and a "clear path" for Hazlehurst was false and misleading because Astec had not yet fixed any of the design problems. Hazlehurst's September 20, 2017 application for new baghouses for each line was not approved until November 15, 2017.

75. During the question-and-answer portion of the October 2, 2017 investor call, defendants were asked when they became aware of the need to make upgrades to the plants, why the need for the changes was not known when the plants were built, and why the Company was paying for an upgrade to a customer's plant. In response, Brock responded that Astec "really didn't find that we had the issues that we needed to fix until the last 45 days when we tried to ramp up to full production on wood. We run well on natural gas, have really pretty good success on that, pleased with that. They are running pellets. They are selling pellets. But we need to run full production on wood if they are going to get a long term supply contract that they have an opportunity for."

76. Brock's statement that Hazlehurst needed to run at full production on wood to secure financing was completely contrary to his July 26 statement claiming that Hazlehurst could secure financing even without a third working wood burner.

77. An analyst from Robert W. Baird challenged Brock on how the Hazlehurst problems encountered by switching to wood-burning furnaces could be newly discovered given that the Company had assured investors in 2016 that this same problem had already been resolved:

> **ANALYST**: I was going back through the last several conference call transcripts, and back in July of 2016 you talked, and my question's also on Hazlehurst, you talked about needing to burn wood exclusively on each line and so you were replacing the burners and you were testing them, improving the new burners. In October of 2016, you said line two is now running and has met the production targets in early start up. So, is this the same issue that you were talking about last summer that they needed to burn wood exclusively and you were swapping the burners? It seemed like that had been done, and again, at least in October line two

had met its production target and really nothing was mentioned on this issue the last several calls. Is this the same issue about switching to burning wood?

78. Brock responded that it was "not just the burner this time," it was also a baghouse issue, a glass buildup, and an ash buildup. Still, Brock continued to assure investors that he had "very high confidence" that the Company had finally identified all of the problems and that these problems would not prevent the Company from booking new pellet plants in 2018. As the call continued, an analyst asked Defendants how the Hazlehurst "setback" impacts the outstanding $60 million loan. In response, Brock assured investors that the Company still expected to receive the full $60 million plus interest from Hazlehurst because these fixes would secure a ten-year supply contract with a utility company in the UK.

79. Brock's statements that Astec had "very high confidence" that it had identified the manufacturing problems at Hazlehurst and still expected Hazlehurst to repay the $60 million loan by December 2018 were false and misleading because they gave investors the false impression that Astec had a reasonable basis to believe it had resolved the manufacturing issues at the plant, which would allow Hazlehurst to refinance the loan with a bank.

80. On a February 20, 2018 investor call, Brock stated that the Company was "making good progress" on fixing the design flaws and that Astec still expected to be paid the $60 million from Hazlehurst by December 2018.

81. Brock's statements that Astec had made "good progress" and still expected Hazlehurst to repay the $60 million loan by December 2018 were false and misleading because they gave investors the false impression that Astec had a reasonable basis to believe it had resolved the manufacturing issues at the plant, which would allow Hazlehurst to refinance the loan with a bank.

82.    On the April 24, 2018 investor call, Brock again reiterated that Astec had "made good progress and believe our announced charges during 2017 are adequate to fulfill our commitments to our customers." In response to a question about when Astec would take orders for new pellet plants, Brock stated that "we want to be completely finished at both places before we take an order and we feel like in Georgia that we passed the test, we're meeting with them next week to talk through that." Brock said he still expected Astec to be paid the $60 million from Hazlehurst by December 2018.

83.    Brock's statements that Astec had made "good progress" and had "passed the test" with the Hazlehurst plant were false and misleading because they gave investors the false impression that Astec had resolved the manufacturing problems at the Hazlehurst plant. The statement that Astec still expected Hazlehurst to repay the $60 million loan by December 2018 was false and misleading because it gave investors the false impression that Astec had a reasonable basis to believe it had resolved the manufacturing issues at the plant, which would allow Hazlehurst to refinance the loan with a bank.

84.    Astec's May 10, 2018 Form 10-Q stated that Astec still "expected" to receive $60 million from Hazlehurst in December 2018.

85.    Defendants' statement that Astec still expected Hazlehurst to repay the $60 million loan by December 2018 was false and misleading because it gave investors the false impression that Astec had a reasonable basis to believe it had resolved the manufacturing issues at the plant, which would allow Hazlehurst to refinance the loan with a bank or sell the plant for amount that would allow Hazlehurst to repay the principal on the loan.

86.    On the July 24, 2018 investor call, Brock disclosed that "Astec was finally removing the Hazlehurst, Georgia pellet plant from its backlog, causing the Infrastructure Group's

backlog to drop over 51%. Brock explained that "[a]fter consultation with our external auditor, we remove[d] the Georgia wood pellet plant from our backlog for clarity." When questioned about why Astec's auditors instructed the Company to remove Hazlehurst from the backlog, Brock added: "It adds clarity to the backlog for all of us." During the question-and-answer portion of the call, defendants were asked why Astec did not remove the Hazlehurst plant from its inventory or otherwise take a charge for it in light of the fact that Astec took a charge for the Highland plant and removed the Hazlehurst plant from the Company's backlog. In response, Brock stated: "We have agreements in place on Hazlehurst, and so we really – we don't need to do that."

87.     On the July 24, 2018 investor call, Brock also stated that "NDAs are in place with multiple prospects for this plant, and we believe the plant could be sold, at least, by December, if not before." Next defendants were asked whether, "with a reasonable degree of confidence," the Company could "still state that [it] expect[s] to recognize revenue in the fourth quarter of 2018 from Hazlehurst," Brock responded: "At this time, yes, we do."

88.     Brock's repeated claim that he expected Hazlehurst repay the $60 million financing in December 2018 was reckless and contrary to all available facts. The fact that he still expressed a "reasonable degree of confidence" that Hazlehurst would pay the $60 million by December after Astec's external auditor forced him to remove Hazlehurst from Astec's backlog demonstrates Brock's deliberate or reckless disregard for the truth.

89.     On August 9, 2018, the Company filed with the SEC its quarterly report on Form 10- Q for 2Q2018. The report stated that while the Hazlehurst plant "is currently operational and meeting its production goals, the customer has expressed its desire to further modify its obligations under the arrangement. As a result, the Company has removed the order from its June 30, 2018 backlog and the parties have agreed to jointly market the plant to a new buyer."

90.     Defendants' statement that the Hazlehurst plant was "currently operational and meeting its production goals" was false and misleading because the Hazlehurst plant was not meeting its production goals. Hazlehurst's production goal was to manufacture pellets using wood burning furnaces so that the plant could secure a long-term supply contract with an EU company. Hazlehurst was unable to secure financing to repay Astec precisely because the plant had been unable to meet its production goals. Further, Defendants' statement that Astec removed the $60 million from the Hazlehurst contract from its backlog because Hazlehurst "expressed its desire to further modify its obligations under the arrangement" was false and misleading because it intentionally obfuscates what actually happened: despite Defendants' many assurances otherwise, Hazlehurst could not repay the $60 million loan because the Hazlehurst plant could not effectively produce pellets by burning wood.

**B.  Defendants Mislead Investors Regarding the Highland Plant**

1.     Background

91.     On August 20, 2015, Astec announced it had entered into an agreement and received a related down payment to build, deliver, and install the first production line of a new wood pellet production facility in Pine Bluffs, Arkansas. The Company's $30 million agreement with Highland Pellets, LLC included the option to add additional production lines, related equipment, and installation services, which "could bring the total order amount to $143 million." Astec stated it expected to deliver the first production line and related equipment no later than early 2016. The Company disclosed that, unlike Hazlehurst, Astec was not financing the order, and that Astec would "generally recognize revenue on the first production line and any subsequent production lines when they are delivered to Highland Pellets."

92.     On March 30, 2016, the Company announced that Highland had ordered an additional $122.5 million of equipment, bringing the total project order to $152.5 million.

93.     Highland's sole customer was Drax Power Limited ("Drax"), a British company that owns and operates the biggest renewable power plant in Europe. Highland contracted to provide Drax with 600,000 metric tonnes of wood pellets per year for ten years.

94.     Unbeknownst to investors, the Company's contract with Highland contained two terms that would eventually cripple Astec's finances: (i) the plant had to pass a rigorous test ("Reliability Run") demonstrating that the plant could produce a sufficient quality and quantity of pellets to meet its contractual obligations to Drax; and (ii) the Company would have to refund the entire purchase price of the plant if the plant failed to pass the Reliability Run test by April 15, 2018.

95.     The Reliability Run required the Highland plant to produce 49,315 metric tonnes of pellets within a period of 30 consecutive days, and each line would have to produce pellets at an average rate of 20 metric tonnes per hour for two period of 24 consecutive hours. The pellets produced must also meet the European Standards for average durability, average net calorific value, average bulk density, pellet moisture content, ash content, and fines content.

96.     Astec staff and executives actively monitored Highland's day-to-day productivity and constantly had engineers on site to work with Highland employees. According to CW 1, Swanson was at the Highland plant 2-4 times per month and would sometimes stay for an entire week. Astec would rotate engineers through the Highland plant to ensure that at least one was on site every day. Those engineers included Seth Castleberry, Derek Acres,[5] and Daniel Edwards.

---

[5] Acres was an employee of an Astec sub-contractor.

Additionally, Astec Senior Field Service Technician Harvey Chapman would "come be on site for three weeks" out of every month.

97.     CW 1 stated that Highland staff had a daily 8 a.m. operations meeting; following the Operations Meeting, at approximately 8:30 a.m., Swanson and Astec representatives would join the meeting, either in person or by conference call. CW 2 also attended the daily morning meeting with Highland personnel – including the maintenance manager, the plant controller and the procurement manager – and Astec personnel to discuss production targets. CW 2 recalled that Brock would join these meetings by conference call "at least a few times a week." These meetings often included discussions of Highland shortfall in production targets.

98.     CW 1 also attended a daily 2 p.m. meeting with Highland management and Astec employees and consultants to discuss maintenance needs and other ongoing problems at the plant. At these meetings, Highland and Astec personnel would go line by line through the Astec/Highland Operations Issues List (the "Highland Issues List"), a spreadsheet documenting all ongoing operations issues at the plant identified by Highland, Astec's recommended actions, updates, and resolutions. A digital version of the spreadsheet was circulated via email to participants prior to the meeting, and a printed version was circulated at the meeting.

99.     Through constant communication and on-site inspections, Astec engineers and executives were well aware that the Highland plant was riddled with production shortfalls, equipment failures, and inferior pellets from its inception. CW 1 stated that Swanson and the Astec engineers who rotated through Highland received daily production reports every 12 hours, which included data on the quantity and quality of pellets produced.

100.     Just one month after Hazlehurst asked EPD to supplement its 65 MMBTU/hr Astec burners on each line with higher quality burners from a competitor, Highland made a similar

request to its own regulator. Highland's original permit from the Arkansas Department of Environmental Quality ("ADEQ") approved the plant's January 2015 proposal to run an Astec Phoenix BioMass PB-65 burner on each of the plant's 4 lines.[6] In April 2016, Highland applied for a modification to its permit, which included replacing the Astec Phoenix Biomass fuel burners with a Sigma Thermal bark fuel burners; upsizing the heater baghouse; and adding one pellet mill. These proposed changes—each of which applied to all 4 lines—were approved by AQED on September 13, 2016.[7] According to the Company's Form 10-K for 2017, Sigma Thermal is a "major competitor" of Astec's.

101. In October 2016, Brock boasted in a call with investors that "I was able to visit the Highland site a few weeks ago, and I am happy to report that the site looked great and the project is on schedule." However, according to CW 1, the bark burners were constantly creating fires by sending sparks into dust. CW 1 says that Highland's GreCon spark detector detected thousands of sparks per day at the Highland plant. In August 2017, the *Pine Bluff Commercial* reported that bags of wood pellets and sawdust spontaneously combusted in one of the baghouses at the Highland plant, destroying the bags of pellets inside.

102. Due to these issues with the bark burners—and the production delays caused by these problems—Highland began using natural gas burners on Lines 1 and 4 to increase production. While the switch to natural gas did help increase production, natural gas usage at Highland was strictly limited by the European Standard emissions regulations that governed Drax.

103. On February 23, 2018, employees from Highland, Astec, and Nexus (a third party consultant) inspected the plant and to find solutions to some of the issues identified on the Highland

---

[6] https://www.adeq.state.ar.us/downloads/WebDatabases/PermitsOnline/Air/2341-AOP-R0.pdf
[7] https://www.adeq.state.ar.us/downloads/WebDatabases/PermitsOnline/Air/2341-AOP-R1.pdf

Issues List. The results of the inspection and he group's recommendations were recorded in a memo (the "Transition Inspection Report") that was circulated to the team of people who attended the daily operations meetings—which, according to CW 1, included Malcolm Swanson. On April 14-15, 2018, a follow-up inspection was conducted, and the results were recorded in an April 16, 2018 memo (the "Material Leakage Memo") that was circulated to Astec executives, including Swanson and Brock at a meeting at the Highland plant to discuss the ongoing problems.

104. The Highland plant also continued having problems producing high quality pellets that met its contractual obligations to Drax. According to CW 3, Drax sent three entire train loads of pellets back from Baton Rouge to Highland Pellets. CW 3 explained that wood pellets for industrial use are supposed to have 7-8% moisture in order keep the pellet intact. When a pellet is crushed or does not stay intact, the industry term for such a destroyed pellet is "fine." The Highland contract with Drax set forth the moisture content required for pellet and also set forth the percentage of "fine" allowable per shipment. "If a pellet does not have enough moisture, the pellet will break down in the train car." CW 1 confirmed that that Highland had massive piles of unusable pellets in the parking lot. CW 1 recalled that the piles of pellets that could not be sold due to quality issues were so big that, by the end of 2017, you could see the pellet piles from an airplane taking off from the Pine Bluffs, AR airport. The pellet piles were referred to internally as Mt. Reilly and Mt. Doak, named for the Highland co-founder Tom Reilly and Highland Plant Manager Jody Doak. Westbrook explained that the pellets "couldn't be used at all" and were "expensive waste."

105. As a result, in either January or February 2018, Highland informed Astec they were not even going to conduct the reliability run in either April or June 2018. From Highland's perspective, "it was a waste of time" to conduct the reliability runs in April or June 2018 given the

multitude of issues on each of the lines that required constant maintenance that still did not bring the plant to full production.

106. CW 1 was part of at least three of the plant's attempts to pass the Reliability Run in 2017. CW 1 states that Highland never got close to passing the Reliability Run, and, in fact, "never got over three days of 12 hour shifts running before something messed up" and the test was canceled.

107. Starting in January 2018, Astec participated in negotiations with Highland and Highland's funders--Global Infrastructure Partners and Arkansas Teacher Retirement System—to relieve the tension caused by the plant's inability to meet contractual production obligations. According to ATRS board minutes, "[t]he original projections and loan timelines put GIP in a position in the near future of requiring the equipment vendor to pay the loan if certain date hurdles were not met. Those older agreements have placed undue pressure on the equipment vendor, the investors, including ATRS, and on GIP. Negotiations have been underway for several weeks in order to eliminate the pressure the 'put back' provision in the loan agreement has placed into the deal that jeopardizes the alignment of interest and the success of the plant."

108. It was also reported that "construction on Highland's Pine Bluff plant has seen several delays due to ongoing loan negotiations between New York-based Global Infrastructure Partners, Astec, ATRS and other investors in the project."[8]

109. According to CW 1, Brock visited the Highland plant in April 2018 and was given tour of the plant. During the tour, the problems identified in the Highland Issues List were conveyed to Brock. Following the tour, CW 1 participated in a 2-hour meeting with Astec

---

[8] https://talkbusiness.net/2018/11/atrs-hires-veteran-staffer-it-chief-to-lead-states-largest-retirement-fund/

personnel to go over the Highland Issues List. CW 1 noted that there was no sense of shock from any of the Astec personnel at the problems described at the plant.

110. On July 24, 2018, the Company issued a news release reporting the Company's 2Q2018 financial results for the period ended June 30, 2018, and providing an update regarding its pellet plant business. The Company reported unexpectedly poor financial results, including a 9.7% decrease in net sales, a 14.1% decrease in domestic sales, and a net loss of ($40.7) million, or ($1.76) per share, compared to earnings of $14.4 million, or $0.62 per share, for 2Q2017, representing a decrease in EPS of 143.5%. The release shocked investors by disclosing that the Company would "pay $68 million in cash in the aggregate over the course of the next 120 days and forgive approximately $7 million in receivables. In exchange, Highland agreed to release the Company from all contractual obligations related to the Arkansas wood pellet plan."

2. Astec's False and Misleading Statements About the Highland Plant During the Class Period

111. On October 2, 2017, Astec issued a press release disclosing that it was undertaking "substantial design upgrades" to correct "design flaws" at both Hazlehurst and Highland so they could "achieve full production." The "significant design upgrades" to the Georgia and Arkansas plants were labeled an "additional investment" that would "negatively impact Astec's third quarter earnings by $0.54 to $0.58 per share." The release quoted Brock as stating: "Upon learning of these design flaws, which were different at each plant, we identified a clear path to success. In addition, this past Friday [September 29], we completed an updated analysis of the necessary all-inclusive investment needed to deliver on our commitments to our customers with regard to production rates."

112. Brock's claim of having identified the "ultimate fix" and a "clear path" for Highland was false and misleading because Astec had not yet fixed any of the design problems.

The Reliability Run that Astec attempted in October 2017 failed so spectacularly that Astec never even attempted another Reliability Run prior to the July 2018 agreement to exit the plant.

113. On the October 2, 2017 investor call, an analyst asked Defendants to explain "how short you were in percentage terms, or maybe even tons per hour terms on what you were supposed to guarantee and what you actually were running?" In response, Brock stated that "we have four lines at 20 tons per hour as the guarantee. We've had one of the lines up to that and over it actually but not for a long period of time." Brock also stated that Astec had "identified we have very high confidence" in reaching the production guarantees.

114. Brock's statement that one of the lines had reached the production threshold for a short period of time was false and misleading because it failed to disclose that the line that had reached its production goal for a short period of time did so by running partially on natural gas— which the plant could not do on all 4 lines due to emissions limits. By omitting this crucial fact, Brock gave investors the false impression that one of the lines had reached its production goal by burning only wood.

115. Brock's expression of "high confidence" that Highland would pass the Reliability Run was reckless and completely divorced from the facts. Brock's statement that the Company had "identified" that is had a high degree of confidence misled investors into believing that the Company has studied the issue and come to such a conclusion, but it was just more reckless optimism.

116. On the October 2 call, Brock also stated that the dust problems at Hazlehurst would not be a problem at Highland because the two plants used different burners: "So, they're different issues, there are different burners at each site, and so the creation of the dust, we don't anticipate that being an issue at Highland in Arkansas because they're different type burners. But it's more

of a front end issue that gets related through the whole plant to the press for the particle size at Arkansas."

117. Brock's statement that Astec does not anticipate dust being a problem at the Highland plant was false and misleading because the creation of dust was a significant problem at the Highland plant, as well, leading to several fires from sparks from the burner. According to CW 1, the bark burners were constantly creating fires by sending sparks into dust. CW 1 says that Highland's GreCon spark detector detected thousands of sparks per day at the Highland plant. In August 2017, the *Pine Bluff Commercial* reported that bags of wood pellets and sawdust spontaneously combusted in one of the baghouses at the Highland plant, destroying the bags of pellets inside. Further, CW 4 stated that whenever Highland attempted to increase the production volume, dust would clog up the escape duct and fall all over the hammermills. Highland had to constantly stop the line so that CW 4 and other workers could dig out the dust from the hammermills and clean out the clogged duct.

118. On the October 2. 2017 call, Brock stated that "April 15 is our furthest out date that we believe will be finished and proven out at Arkansas. We actually have a time line that shows earlier than that internally. So, that's kind of our drop-dead date, it's April 15."

119. Brock's statement that April 15 was "kind of our drop-dead date" was false and misleading because it gave investors the false impression that April 15 had been chosen based on Astec's own internal timeline. Further, once Brock raised the issue of a drop dead date for Astec's production guarantee, he had a duty to tell the whole truth about the guarantee. Crucially, Brock further misled investors because he did not disclose that the Reliability Run needed to be completed by April 15 or that the Company would have to refund the entire purchase if the plant failed to pass the Reliability Run

120. On Astec's October 24, 2017 investor call, an analyst asked Defendants whether Astec would be responsible for further cash outlays to upgrade the Hazlehurst and Highland plants if the design upgrades Astec announced on October 2 don't solve the problems and the plants still can't get to the guaranteed outputs. Brock responded "in the unlikely event that we don't, we would be."

121. Brock's response was false and misleading because it gave investors the false impression that Astec would only be responsible for cash outlays for further upgrades to the Highland plant—not that Astec would have to refund the entire purchase price in the event that Highland failed to pass the Reliability Run by the Longstop date. Once Brock chose to speak about the consequences of Astec failing to pass the Reliability Run by the Longstop date, he had an obligation to tell the whole truth to avoid being misleading. Brock's omission of the refund element of the guarantee thus misled investors.

122. On February 20, 2018, the Company hosted a conference call to discuss its 4Q2017 financial results. In his prepared remarks, Brock stated that the Company was "making good progress" on fixing the design flaws at the pellet plants and that Astec "believe[s] that our announced charges during 2017 are adequate to cover our commitments to our customers."

123. Brock's statement that Astec believed the charges announced in 2017 were adequate to cover Astec's commitments to Highland was false and misleading because Brock knew that the 2017 charges were inadequate and that Highland was not close to passing the Reliability Run. Just nine days later, on March 1, 2018, Astec disclosed in its 2017 Form 10-K that Highland "has not yet met the production output and the operational specifications set forth in the original contract" and that Astec entered into amended contract with Highland "in February 2018, whereby the Company agreed to compensate the customer for production shortfalls caused by the Company

and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018. The Company incurred production shortfalls in January and February 2018." Brock not only knew that the 2017 charges were inadequate, he also knew that Astec had already incurred further charges.

124. On March 1, 2018, the Company filed with the SEC its annual report on Form 10-K for 2017. Regarding the Highland plant, Defendants stated in the Form 10-K stated that Astec "expects to meet the contract's operational specifications prior to June 15, 2018."

125. Defendants' statement that Astec expected to pass the Reliability Run by June 15 was false and misleading because it gave investors the false impression that Astec had resolved the issues at Highland and was in a position to pass the Reliability Run by June 15. In fact, according to CW 1, in either January or February 2018, Highland informed Astec they were not even going to conduct the reliability run in either April or June 2018. From Highland's perspective, "it was a waste of time" to conduct the reliability runs in April or June 2018 given the multitude of issues on each of the lines that required constant maintenance that still did not bring the plant to full production.

126. On Astec's April 24, 2018 investor call, Brock again assured investors that "on the wood pellet plants, we've made good progress and believe our announced charges during 2017 are adequate to fulfill our commitments to our customers."

127. Brock's statement that the 2017 charges were adequate to fulfill Astec's commitments to Highland was false and misleading because Astec was already compensating Highland for production shortfalls due to the 2017 charges being inadequate. Further, Highland was still not close to passing the Reliability Run. Indeed, Brock had received an internal report (the Material Leakage Memo) on April 16, 2018 detailing the many ongoing problems at Highland.

128.     On the April 24, 2018 call, in response to a question about mechanical issues at Highland, Brock stated that "the hammer mills that piece and all that we fixed."

129.     Brock's statement was false and misleading because the hammer mills issue had never been fixed. According to CW 1, it was clear within just a few days of the installation of the green hammer mills on December 22, 2017 that the new green hammer system was not keeping up and had a lot of maintenance issues. These problems with the green hammer mills are evidenced by the numerous entries in the Highland Issues List, which also demonstrates that Swanson was intimately involved in attempting to resolve these issues.

130.     On May 10, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for 1Q2018. Defendants stated that Astec expected to continue to pay penalties to Highland through June 19 for Astec's failure to live up to contractual production guarantees, but that the Company still "expects to meet the contract's production outputs and operational specifications prior to the contractual deadline or an extension thereof."

131.     Defendants' statement that Astec expected to pass the Reliability Run by June 15 was false and misleading because it gave investors the false impression that Astec had resolved the issues at Highland and was in a position to pass the Reliability Run by June 15. In fact, according to CW 1, in either January or February 2018, Highland informed Astec they were not even going to conduct the reliability run in either April or June 2018.  From Highland's perspective, "it was a waste of time" to conduct the reliability runs in April or June 2018 given the multitude of issues on each of the lines that required constant maintenance that still did not bring the plant to full production.

C. **Defendants Violated Applicable Accounting Principles and Astec's Own Internal Accounting Policies**

###### 1. Background

132. Generally Accepted Accounting Principles ("GAAP") are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements. SEC and NYSE rules and regulations require that publicly traded companies such as Astec file financial statements in their annual and quarterly reports that comply with GAAP. *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX. Astec's filings throughout the Class Period purported to be prepared in accordance with GAAP.

133. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

134. Defendants violated GAAP and Astec's own publicly disclosed internal accounting policies by prematurely recognizing revenue and failing to recognize losses on the Highland contract and by failing to disclose the Highland performance guarantee as a contingent liability.

###### 2. GAAP and Astec's Own Accounting Policies Required Defendants to Defer Recognition of Revenue From the Highland Plant

135. The Financial Accounting Standards Board Accounting Standards Codification ("ASC") 605 sets forth, among other things, the requirements for the recognition of revenue by an entity in its internal accounting records and publicly filed financial statements.[9] "Revenue and gains generally are not recognized until realized or realizable," which occurs "when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash" and

---

[9] As explained below, ASC 606 replaced ASC 605 for annual periods beginning after December 15, 2017. Astec adopted ASC 606 beginning with its financial statements for the first quarter of 2018.

when "related assets received or held are readily convertible to known amounts of cash or claims to cash." ASC 605-10-25-1(a). "[R]evenue is not recognized until earned. . . . [A]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." ASC 605-10-25-1(b).

136. GAAP allows companies to account for revenue and losses on contracts using the "completed-contract" method. This method requires companies to wait until a contract is substantially complete before recognizing revenue received from the contract, and "income is recognized only when a contract is completed or substantially completed." ASC 605-35-25-88. Under this accounting method, "billings and costs are accumulated on the balance sheet [during the period of performance of the contract], but no profit or income is recorded before completion or substantial completion of the work." *Id.*.

137. In certain circumstances, however, GAAP permits entities to recognize revenue prior to the completion of the contract. This accounting method is referred to as the "percentage-of-completion" method. It allows companies to recognize income as work on a contract progresses, so long as the revenue and expected costs are recognized on a prorated basis according to the percentage of the project that is complete. *See* ASC 605-35-25-82. Companies often prefer the percentage-of-completion accounting method because it permits them to book income on a project before the project is actually done and, as a result, issue financials showing profits on a contract prior to its completion. GAAP states that the decision between using the "completed-contract" method or the "percentage of completion" method is a "basic accounting policy decision"

and that "the two methods should not be acceptable alternatives for the same circumstances." ASC 605-35-25-1.

138. The percentage-of-completion accounting method is straightforward to apply. As noted above, revenues and profits are booked according to the percentage of the contract that is complete. To determine the percentage of the contract that is complete, the company compares its costs incurred to date to the total costs it estimates it will expend to complete the job. In the language of GAAP, this means that revenues and profits are "measured by the relationship of costs already incurred to the total of costs already incurred and future costs expected to be incurred." *See* ASC Master Glossary. Thus, for example, if a company has incurred 50% of the costs that it has estimated it will incur during the life of the project, then it may deem the project 50% complete, and book 50% of the profit. Conversely, if the company's cost calculations demonstrate that the costs exceed the revenues under the contract, the company must recognize the full contract losses in the reporting period in which they become evident, and not wait until the completion of the contract.

139. There are limits on when a company may use percentage-of-completion accounting. Most fundamentally, a company may use percentage-of-completion accounting only if it can reliably estimate its costs on the project. *See* ASC 605-35-25-56. As explained by GAAP, "[t]he use of the percentage-of-completion method depends on the ability to make reasonably dependable estimates." *Id*. When a company cannot reliably estimate its costs, it cannot use the percentage-of-completion accounting method, and must account for the contract using the completed-contract method. GAAP provides that "[a]n entity using the percentage-of-completion method as its basic accounting policy shall use the completed-contract method for a single contract

or a group of contracts for which reasonably dependable estimates cannot be made or for which inherent hazards make estimates doubtful." ASC 605-35-25-61.

140. Further, GAAP limits a company's use of percentage-of-completion accounting to contracts where "[t]he contractor can be expected to perform all contractual obligations."

141. Astec accounted for the Hazlehurst contract using the "completed-contract" method and the Highland contract using the "percentage-of-completion" method. By disclosing its use of the percentage-of-completion method for the Highland contract, Astec represented that the costs related to the Highland plant were based on "reasonably dependable estimates." *See* ASC-605-35-25-56. Indeed, as set forth in GAAP, "the ability to produce reasonably dependable estimates is an *essential element* of the contracting business," and an "entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of GAAP." ASC-605-35-25-45 and 58. By using the percentage of completion method, Defendants also represented to investors that Astec could be expected to perform all contractual obligations.

142. Further, GAAP requires companies to update their cost estimates at each reporting period to reflect any additional costs it has incurred or anticipates incurring. GAAP specifically requires that "estimates of cost to complete ... be reviewed periodically and revised as appropriate to reflect new information." *See* ASC 605-35-25-44. Once the costs exceed the revenue under the contract, "GAAP requires recognition of the entire anticipated [contractual] loss as soon as the loss becomes evident." ASC 605-32-25-45.

143. Astec's own publicly-disclosed internal accounting policies generally matched GAAP. Astec's Form 10-K for 2016 disclosed that "[r]evenue is generally recognized on sales at the point in time when persuasive evidence of an arrangement exists, the price is fixed or determinable, the product has been delivered or services have been rendered and there is

reasonable assurance of collection of the sales proceeds." Astec's 2016 10-K also disclosed that the Company used both the "completed contract" method and the "percentage of completion" method:

> Certain contracts include terms and conditions through which the Company recognizes revenues upon completion of equipment production, which is subsequently stored at the Company's plant at the customer's request. Revenue is recorded on such contracts upon the customer's assumption of title and risk of ownership and when collectability is reasonably assured. In addition, there must be a fixed schedule of delivery of the goods consistent with the customer's business practices, the Company must not have retained any specific performance obligations such that the earnings process is not complete and the goods must have been segregated from the Company's inventory prior to revenue recognition. . . . The Company has certain sales accounted for under the percentage of completion method using the ratio of costs incurred to estimated total costs. Revenue, in an amount equal to cost incurred, is recognized until there is sufficient information to determine the estimated profit on the project with a reasonable level of certainty. The factors considered in this evaluation include the stage of design completion, the stage of equipment manufacturing completion, the state of construction completion, the status of outstanding subcontracts, certainty of quantities of labor and materials, certainty of schedule and the relationship with the customer.

144.    GAAP required Astec to use the completed-contract method for the Highland contract because Astec could not make dependable estimates of the extent of progress toward completion, contract revenues, or costs. Astec had never successfully completed a contract for the construction of a pellet plant. Astec also claimed to be "the only company offering a single source for a complete pellet plant, as known competitors only sell individual plant components thereby requiring the customer to purchase the remaining plant components from other sources." Accordingly, Astec had no basis to estimate the progress or costs of the Highland contract.

145.    The SEC interpretations of accounting standards[10] provide a comparable example: Company E enters into an arrangement with a new customer to deliver a version of its standard product modified as necessary to be integrated into the customer's new assembly line while still

---

[10] https://www.sec.gov/interps/account/sabcodet13.htm

meeting all of the standard published vendor specifications with regard to performance. The customer may reject the equipment if it fails to meet the standard published performance specifications or cannot be satisfactorily integrated into the new line. Company E has never modified its equipment to work on an integrated basis in the type of assembly line the customer has proposed. In response to the request, Company E designs a version of its standard equipment that is modified as believed necessary to operate in the new assembly line. The modified equipment still meets all of the standard published performance specifications, and Company E believes the equipment will meet the requested specifications when integrated into the new assembly line. However, Company E is unable to replicate the new assembly line conditions in its testing.

146.    Under the SEC's interpretation, Company E would have to wait until customized equipment has met the customer-specific criteria before recognizing revenue from the sale: "This contract includes a customer acceptance clause that is based, in part, on a customer specific criterion, and Company E cannot demonstrate that the equipment shipped meets that criterion before shipment. Accordingly, the staff believes that the contractual customer acceptance provision has not been met at shipment. Therefore, the staff believes that Company E should wait until the product is successfully integrated at its customer's location and meets the customer-specific criteria before recognizing revenue. While this is best evidenced by formal customer acceptance, other objective evidence that the equipment has met the customer-specific criteria may also exist (*e.g.*, confirmation from the customer that the specifications were met).

147.    Concepts Statement 5, paragraph 83(b) states "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." If an arrangement expressly requires customer acceptance, the SEC staff "generally believes that customer acceptance should occur before the entity has

substantially accomplished what it must do to be entitled to the benefits represented by the revenues, especially when the seller is obligated to perform additional steps."

148.     Further, GAAP required Astec to use the completed-contract method for the Highland contract because Astec could not be expected to perform all contractual obligations. Unbeknownst to investors, the Highland contract obligated Astec to build the Highland plant to meet specific production parameters by early 2018. If the Highland plant failed to pass the reliability run, the contract obligated Astec to refund the entire purchase price.

149.     Astec demonstrated its inability to make dependable estimates for the Highland contract by recognizing substantially all of the revenue from the contract by the end of 2016 despite the fact that Astec had not come anywhere close to fulfilling its obligations under the contract. After recognizing $70.6 million of revenue from the Highland contract in the fourth quarter of 2016, Astec had recognized over $130 million in revenue from the $155 million Highland contract. By the second quarter of 2018, after Astec had booked over $143 million in income for the Highland project, Astec's inability to meet its contractual obligations forced the Company to take a $75.3 million charge against net sales—an admission that Defendants had improperly booked the revenue.

3.     Defendants' Class Period Financial Statements Were False and Misleading Because They Overstated Revenue And Violated GAAP

150.     For the reasons described in Section V(C)(2) above, each of Astec's quarterly and annual financial statements from the start of the Class Period through the first quarter of 2018 violated GAAP and Astec's internal accounting policies by improperly revenues for the Highland

contract. Accordingly, each of these financial statements was false and misleading because they overstated Astec's revenues and because they violated GAAP. Brock and Silvious signed each quarterly and annual financial statement during the Class Period and are thus both considered to have made the statements therein:

    a.  On August 5, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for 2Q2016. The 2Q2016 Form 10-Q was signed by Brock and Silvious and included signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the 2Q2016 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 10-Q was false and misleading because it improperly recognized $18.1 million in revenue for the Highland sale despite Astec's inability to produce dependable estimates of the extent of progress toward completion, contract revenues, or costs—violating GAAP and Astec's own publicly-disclosed accounting policies.

    b.  On November 7, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for 3Q2016, which reaffirmed the financial results announced in the October 25, 2016 press release. The 3Q2016 Form 10-Q was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 3Q2016 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 10-Q was false and misleading because it improperly

recognized $19.1 million in revenue for the Highland sale despite Astec's inability to produce dependable estimates of the extent of progress toward completion, contract revenues, or costs—violating GAAP and Astec's own publicly-disclosed accounting policies.

c. On March 1, 2017, the Company filed with the SEC its annual report on Form 10-K for 2016, which reaffirmed the financial results announced in the February 21, 2017 press release. The 2016 Form 10-K was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2016 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 10-K was false and misleading because it improperly recognized $70.6 million in revenue for the Highland sale despite Astec's inability to produce dependable estimates of the extent of progress toward completion, contract revenues, or costs—violating GAAP and Astec's own publicly-disclosed accounting policies.

d. On May 8, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for 1Q2017, which reaffirmed the financial results announced in the April 25, 2017 press release. The 1Q2017 Form 10-Q was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 1Q2017 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 10-Q was false and misleading because it improperly recognized

$10.4 million in revenue for the Highland sale despite Astec's inability to produce dependable estimates of the extent of progress toward completion, contract revenues, or costs—violating GAAP and Astec's own publicly-disclosed accounting policies.

e.  On August 7, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for 2Q2017, which reaffirmed the financial results announced in the July 25, 2017 press release. The 2Q2017 Form 10-Q was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2Q2017 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 10-Q was false and misleading because it improperly recognized $4.1 million in revenue for the Highland sale despite Astec's inability to produce dependable estimates of the extent of progress toward completion, contract revenues, or costs—violating GAAP and Astec's own publicly-disclosed accounting policies.

f.  On March 1, 2018, the Company filed with the SEC its annual report on Form 10-K for 2017, which reaffirmed the financial results announced in the February 20, 2018 press release. The 2017 Form 10-K was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 2017 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 10-K was false and misleading because it improperly recognized $5.6 million in revenue for the Highland sale in the fourth quarter of 2017 despite Astec's inability to

produce dependable estimates of the extent of progress toward completion, contract revenues, or costs—violating GAAP and Astec's own publicly-disclosed accounting policies.

g. On May 10, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for 1Q2018, which reaffirmed the financial results announced in the April 24, 2018 press release. The 1Q2018 Form 10-Q was signed by Brock and Silvious and included signed SOX certifications stating that the financial information contained in the 1Q2018 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting, and that it did not contain any untrue statements or omit to state any material facts necessary to make the statements made not misleading. The 10-Q was false and misleading because it improperly recognized all previous revenue for the Highland sale despite Astec's inability to produce dependable estimates of the extent of progress toward completion, contract revenues, or costs—violating GAAP and Astec's own publicly-disclosed accounting policies.

151. Defendants' significant overstatements of revenue were not mere negligence in forecasting future costs on a project. Rather, they arose from the deliberate or reckless failure to account for costs that were apparent based on construction defects and delays on two of the most significant ongoing contracts during the Class Period. The applicable accounting rules in such a circumstance are not complicated, and their application is straightforward.

152. Defendants further conceded their reckless or deliberate GAAP violations when Astec and its auditor identified a laundry list of material weaknesses in Astec's internal control over financial reporting. In Astec's 2018 Form 10-K, the Company's management revealed control deficiencies as of December 31, 2018 related to goodwill impairment, income taxes, general

information technology controls, revenue recognition, and inventories. With regard to revenue recognition, the 2018 10-K stated "[w]e did not design and operate effective controls over the accuracy and disclosure of revenue recognized from the Company's contracts with customers at certain of the Company's business units." Additionally, report of Astec's independent auditor stated that Astec had "[i]neffective controls over the accuracy and disclosure of revenue at certain business units due to insufficient understanding of the requirements of revenue recognition and not performing an effective risk assessment."

4. GAAP and Astec's Own Accounting Policies Required Defendants to Disclose the Highland Guarantee As a Contingent Liability

153. GAAP and Astec's own accounting policies required Defendants to disclose a loss contingency related to the Company's performance guarantee of the Highland plant. GAAP required Astec to disclose the guarantee because a loss was at least reasonably possible.

154. A loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur. *See* ASC 450-20-20. Loss contingencies include (i) actual or possible claims and (ii) pending or threatened litigation. *See* ASC 450-20-05-10.

155. Under GAAP, an issuer must disclose a material loss contingency—such as the liability resulting from the Highland plant failing the Reliability Run—if a loss is at least reasonably possible. A loss is considered "reasonably possible" when the chance of the future event or events occurring is more than remote but less than likely. A loss is considered "remote" when the chance of the future event or events occurring is slight. Additionally, an issuer must record an accrual for a material loss contingency, as a charge against income in its financial statements, if a loss is probable and reasonably estimable. *See* ASC 450-20-25-2.

156. ASC 450-20-20 uses the terms probable, reasonably possible, and remote to identify three areas within that range:

a. <u>Probable</u>. The future event or events are likely to occur.

b. <u>Reasonably possible</u>. The chance of the future event or events occurring is more than remote but less than likely.

c. <u>Remote</u>. The chance of the future event or events occurring is slight.

157. An estimated loss from a loss contingency shall be accrued by a charge to income if (i) it is probable that an asset has been impaired or a liability has been incurred as of the date of the financial statements and (ii) the amount of the loss can be reasonably estimated. ASC 450-20-25-2.

158. The probability of Astec failing to meet its performance obligations under the Highland guarantee was more than remote at the start of the Class Period, and the probability of triggering the refund clause increased every quarter. Defendants knew that the Highland plant had not come close to passing the Reliability Run, they knew about the guarantee, and the necessity of disclosing the guarantee was therefore obvious.

159. Astec's disclosure of its own accounting policy for contingencies generally matched GAAP. Astec's 2017 Form 10-K stated, in relevant part:

> The Company is currently a party to various claims and legal proceedings that have arisen in the ordinary course of business. If management believes that a loss arising from such claims and legal proceedings is probable and can reasonably be estimated, the Company records the amount of the loss (excluding estimated legal fees) or the minimum estimated liability when the loss is estimated using a range and no point within the range is more probable than another. As management becomes aware of additional information concerning such contingencies, any potential liability related to these matters is assessed and the estimates are revised, if necessary. If management believes that a loss arising from such claims and legal proceedings is either (i) probable but cannot be reasonably estimated or (ii) reasonably possible but not probable, the Company does not record the amount of the loss, but does make specific disclosure of such matter.

5.      Defendants' Class Period Financial Statements About Contingencies Were False and Misleading Because They Failed to Disclose the Highland Guarantee

160.    Defendants partially disclosed Astec's performance guarantee for the Highland plant as a contingency for the first time in the Company's 2017 Form 10-K:

> The Company has a sales contract with the purchaser of a large wood pellet plant, on which revenues of $7,987 and $135,187 were recorded in 2017 and 2016, respectively. As the plant has not yet met the production output and the operational specifications set forth in the original contract, as amended through December 31, 2017, the Company entered into a contract amendment in February 2018, whereby the Company agreed to compensate the customer for production shortfalls caused by the Company and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018. The Company incurred production shortfalls in January and February 2018. The Company expects to meet the contract's operational specifications prior to June 15, 2018.

161.    While this disclosure revealed that the Highland contract contained production output and the operational specifications that had not been met, the disclosure still violated GAAP because it failed to disclose that the contract required Astec to refund the entire purchase price of the contract if the production guarantee was not met.

162.    In the first quarter of 2018, Defendants finally disclosed Astec's performance guarantee as a contingency. The disclosure stated that "[t]he customer's ultimate acceptance of the plant, and forfeiture of their right to any potential refund of the purchase price, is contingent upon the plant operating at the aforementioned production output and operational specifications during a 30-day test period."

163.    Each of Astec's quarterly and annual financial statements from the start of the Class Period until the first quarter of 2018 were false and misleading because they violated GAAP by failing to disclose Astec's performance guarantee as a contingent liability. As discussed supra in Section V(C)(3), Defendants were well aware that the Highland plant had never come close to

passing the Reliability Run despite a plethora of redesigns and product replacements. Defendants deliberately or recklessly failed to disclose a material risk that was at least reasonably possible.

**D. Defendants Misled Investors About Astec's Prospects For Selling Additional Wood Pellet Plants**

1. Background

164. Astec portrayed the Highland sale as a way to offset slower revenue growth in its Infrastructure Group, which at the time accounted for approximately 40% of the Company's sales. Astec also told analysts that the Highland sale indicated that pellet plants would be a growth area for the Company, with Astec poised to take advantage of the growing demand for wood pellets in the EU. Michael Swanson—Vice President of Engineering at Astec, Inc. and Malcolm Swanson's son—told the *Chattanooga Times Free Press* in April 2016 that the Company expected "wood pellet factory production to represent roughly a third of the company's sales this year."[11]

165. Defendants' repeated false assurances about imminent new pellet plant orders successfully convinced analysts and the media that the new business line would save Astec's bottom line. For example, Brock boasted on a February 23, 2016 investor call that the Company was "very optimistic" that Astec would announce a new pellet plant order "in the coming weeks" that would be "in the $115 million to $125 million range" and would be booked in 2016. Brock repeated this assertion on an April 26, 2016 investor call, stating Astec expected to book another pellet plant sale "closer to the $100 million range" by the end of 2016. On May 3, 2016, *Bloomberg Intelligence* repeated Brock's false assertions, reporting that increased demand for Astec's wood pellet plants "may help mitigate weakness in the Energy and Aggregate and Mining businesses amid a global mining slowdown and lower oil prices. . . . While pellet demand has slowed in recent

---

[11] https://www.timesfreepress.com/news/business/aroundregion/story/2016/apr/14/astec-inc-expanding-build-biomass-fuel-factor/360022/

years because of warm winters in Europe, Astec could book another $100 million order by the end of 2016, with a goal of one to one-and-a-half plants a year."

166. Throughout the Class Period, Defendants repeatedly falsely assured investors that Astec was on the verge of securing new pellet plant orders that would lead to $100 million annual business for Astec. Defendants' assurances not only ignored the devastating ongoing production problems at both the Hazlehurst and Highland plants, Defendants told investors that the Astec's succes

167. On the July 26, 2016 investor call, Brock told investors "we do have ongoing quote activity for new projects and we believe that we will have a new larger order late this year. We believe that that order will be in the range of $80 million." When asked about the Company's anticipated $80 million pellet plant order, Brock said it was "pretty square" and touted ten other discussion—"five of them being pretty serious" for more pellet plant orders. Brock stated the company's goal was to book "1 to 1.5 of these plants" and "$100 million to $125 million" in pellet plant revenue in 2017.

168. On November 8, 2016, Astec participated in the Robert W. Baird Global Industrial Conference, where Brock talked about the Company's pellet plant business. Brock stated that Astec sees "the opportunity in this business in the next five years in the range of 35 to 50 plants being sold in the US. They would be in the size range of $100 million each. Our goal would be to get our fair share of them." Brock clarified that Astec would not be selling all 35-50 pellet plants, "but we would do our best to get a good fair share of those; maybe half over that five-year period."

169. On the Company's February 21, 2017 investor call, Brock stated that he still expected to book $20 million to $35 million in new pellet plant revenues in 2017 in addition to the $15 million to $20 million anticipated from Highland.

170. On an April 25, 2017 investor call, Brock repeated again that "we continue to project that our pellet plant revenues will be in the range of $40 million to $50 million in 2017."

2. Defendants' False and Misleading Statements During the Class Period About Astec's Prospects For Future Pellet Plant Sales

171. On the July 25, 2017 investor call, Brock lowered his estimate of pellet plant revenues for 2017 to "$20 million to $25 million" and conceded that Astec had still not booked another pellet plant. Brock stated that "[t]hat opportunity has passed as we have earned enough infrastructure-related business to make delivery on any new pellet plant order not possible in 2017."

172. This statement was false and misleading because Astec's failure to book a new pellet plant contract was due to Astec's failure to adequately design or construct either of the plants it had already booked—not because the Company had too much other new infrastructure-related business.

173. In an October 2, 2017 press release announcing significant design issues at both the Hazlehurst and Highland plants, Brock reiterated that he expected pellet plants to be a "$100 million per year business" by 2019. Brock stated that the Company would not accept a new order until it had fixed the problems at the existing plants. Still, Brock assured investors that the Company anticipated another pellet plant order in the second quarter of 2018. Brock assured investors that "we are very confident in the near term and long term outlook for pellet plants and our success at these sites will put us in a strong leadership position for orders as we move ahead."

174. Brock's statement that he expected Astec to generate $100 million per year on pellet plants by 2019 was false and misleading because it gave investors the false impression that Astec's ability to generate new pellet plant orders had not been diminished by the Company's repeated failures at Hazlehurst and Highland. Brock's statement that "our success at these sites will put us

in a strong leadership position for orders as we move ahead" was false and misleading because Brock is making a specific claim that the Company will be able to attract $100 million per year in pellet plant orders on the basis of its success with Hazlehurst and Highland while at the same time misleading investors about the depth of the problems riddling production at both plants.

175. On a February 20, 2018 investor call, Brock stated that "we do have ongoing quote activity for new projects" and that "[g]iven our progress at the two pellet plant sites, we still believe we'll be in position to add an order in time to deliver a complete wood pellet plant in 2019.

176. Brock's statement that Astec "still believe[s] we'll be in position to add an order in time to deliver a complete wood pellet plant in 2019" was false and misleading because it gave investors the false impression that Astec's ability to generate new pellet plant orders had not been diminished by the Company's repeated failures at Hazlehurst and Highland. Further, given Defendants' statements that Astec would not take on a new pellet plant order until it had fixed the problems at Hazlehurst and Highland, Brock's statement that Astec would be able to deliver a new complete pellet plant in 2019 gave investors a false impression that Astec had found a solution to the production problems at Hazlehurst and Highland.

177. Apparently using the same script on the April 24, 2018 investor call, Brock again repeated that "we do have ongoing quote activity for new projects" and "believe we will be in position to add an order in time to deliver a complete plant, a complete wood pellet plant in 2019." When asked about the Company's expectations and outlook for future pellet plant sales and the size of that opportunity, Brock amazingly repeated his standard line that the Company still expected pellet plants to become "potentially $100 million a year business" for Astec.

178. Brock's statement that Astec "still believe[s] we'll be in position to add an order in time to deliver a complete wood pellet plant in 2019" was false and misleading because it gave

investors the false impression that Astec's ability to generate new pellet plant orders had not been diminished by the Company's repeated failures at Hazlehurst and Highland. Further, given Defendants' statements that Astec would not take on a new pellet plant order until it had fixed the problems at Hazlehurst and Highland, Brock's statement that Astec would be able to deliver a new complete pellet plant in 2019 gave investors a false impression that Astec had found a solution to the production problems at Hazlehurst and Highland.

179.    Despite Brock's assurances quarter after quarter that another pellet plant contract was just around the corner, Astec never secured another pellet plant contract before exiting the business in 2018. The fact that Brock made the same false claims about future pellet plant business every quarter—despite Astec disclosing worse and worse news about its inability to meet production goals at its current pellet plants—demonstrates a total disregard for the most current factual information and a divergence from internal reports on the same subject.

A.  Defendants' Other Misstatements During the Class Period

## VI.    **DEFENDANTS FINALLY DISCLOSE THE TRUTH**

180.    On October 23, 2018, the Company announced its financial results for 3Q2018, the period ended September 30, 2018. The Company reported a 1.2% decrease in domestic sales and a 20.2% decrease in the Company's backlog, with the domestic backlog contracting by 28.1%, which was being dragged down by the Company's pellet business. For 2018, the Company cut its core revenue growth forecast to 1% to 3%, down substantially from 7% to 12%. The Company also reported EPS of $0.30 for the quarter, widely missing the consensus estimate of $0.59. Revenue came in light as well, with Astec reporting $256.6 million for 3Q2018, below analysts' expectations of $276.8 million.

181. On October 23, 2018, the Company also hosted a conference call to discuss its 3Q2018 earnings. One analyst asked for an "update on the loan repayment." Brock stated the Company could end up owning the Hazlehurst plant, which would contradict the Company's recently announced strategy to only be an equipment supplier to the pellet plant industry. Specifically, Brock stated:

> Coming back to the previous question, it's due in December, and if it doesn't sell, the question is, what's the worst case scenario? And it goes back to not our first choice but we could be in the pellet business. And if we are, we are. We feel like it could make money. It would be less than, again, less than 5% of our business, probably more like 4% range. It would be an additional company that we might sell later, but if it's making money, we would hold on to. But we have the people that could run it if we wanted to do that or it ended up that way. That's not our first choice.

182. The market reacted negatively to the Company's poor financial results. After closing at $47.27 per share on October 22, 2018, the stock dropped 25% to close at $35.51 per share on October 23, 2018, on abnormally high trading volume of 1.6 million shares. The stock continued to fall the following day, dropping another 7.5% to close at $32.79 per share on October 24, 2018.

## VII.  ADDITIONAL ALLEGATIONS OF SCIENTER

183. Following Brock's visit to the Highland plant—and before disclosing the impossibility of the plant passing the Reliability Run prior to the Longstop Date—Brock began unloading his Astec stock. From May 1 to May 4, 2018, Brock sold nearly 60,000 shares of Astec stock and pocketed nearly $3.2 million in profit from the sales at artificially inflated prices.

| Defendant | Date of Sale | Shares Sold | Acquisition Price | Sale Price | Proceeds | Profit |
|---|---|---|---|---|---|---|
| Brock | 5/1/2018 | 11,000 | $0.00 | $54.41 | $598,510 | $598,510 |
| Brock | 5/2/2018 | 25,000 | $0.00 | $54.74 | $1,368,500 | $1,368,500 |
| Brock | 5/3/2018 | 5,000 | $0.00 | $54.40 | $272,000 | $272,000 |
| Brock | 5/4/2018 | 17,439 | $0.00 | $54.80 | $955,657 | $955,657 |
| TOTAL | | 58,439 | | | $3,194,667 | $3,194,667 |

184. These stock sales were significant and highly unusual. Prior to May 2018, Brock had not sold a single share of Astec stock for more than three years. The profit Brock made from these sales was more than 3.5 times larger than Brock's total compensation for 2018, as reported in the Company's proxy statement

185. Brock and Silvious each disregarded the most current factual information before making statements.

a. Brock and Silvious both signed each quarterly and annual financial statement during the Class Period and are thus considered to have made all statements therein.

b. These financial statements (i) recognized substantially all revenue from the Highland contract by the end of 2016 despite factual developments throughout 2016 and 2017 demonstrating that Astec had not come close to fulfilling its guaranteed contractual obligations; (ii) included the Hazlehurst plant in the Company's backlog throughout the Class Period despite factual developments throughout the Class Period demonstrating that the plant was incapable of producing enough pellets with wood burners to secure financing; and (iii) failed to disclose the Highland guarantee as a contingent liability despite the approaching Longstop date and plant's inability to pass the Reliability Run.

c. Brock repeatedly assured investors throughout the Class Period that Astec was close to booking new pellet plant orders despite the fact that Astec failed to book any pellet plant orders during the Class Period.

186. Brock and Swanson each received internal reports that diverged from Defendants' optimistic external statements on the same topics.

a. Internal reports include the contents of meetings at which senior corporate officers were present.

b. Swanson visited the Highland plant several times each month in 2017 and 2018 and attended daily meetings with Highland personnel to discuss production targets. Brock joined these meetings by conference call at least a few times per week. These internal reports demonstrated that Highland was never close to passing the Reliability Run, yet Brock claimed that Highland was on track to pass the test and that he expected the plant to do so.

c. Swanson received daily production reports that included data on the quantity and quality of pellets produced by Highland. Swanson also received the Transition Inspection Report, which detailed problems with Highland's bark and chip conveyers. Brock received the

187. Brock frequently made misstatements that were contradicted a short time later. Brock stated on a February 20, 2018 investor call that Astec believed the charges the Company had taken for improvements on the Highland plant in 2017 were sufficient to fulfill Astec's obligations to Highland. Just nine days later, on March 1, 2018, Astec filed its 2017 Form 10-K disclosing that the Highland plant had "not yet met the production output and the operational specifications set forth in the original contract and that Astec "entered into a contract amendment in February 2018, whereby the Company agreed to compensate the customer for production shortfalls caused by the Company and other potential costs (depending upon the market price of wood pellets), from January 1, 2018 through June 15, 2018." Further, the Form 10-K revealed that Astec had already "incurred production shortfalls in January and February 2018."

188. Brock's and Swanson's extremely detailed statements about the purpose, mechanics, implementation, and progress of the manufacturing, design, and installation demonstrate that they each had intimate knowledge of the flaws at the Highland and Hazlehurst plants.

189. Brock was highly motivated to protect his job and salary. Brock's father founded Astec and served as the Company's CEO and Chairman until Brock succeeded him as CEO in 2013. Brock intended to carry out his father's legacy, and he viewed pellet plant business as his own personal mark on the Company. Brock understood that he would likely lose his job once the Company finally wrote off its losses on the pellet plants, and he was correct. Brock resigned from his positions as CEO and Director without notice to shareholders, and the Company was forced to appoint an interim CEO while conducting a search for a permanent CEO and President.

190. The magnitude, pervasiveness, and repetitiveness of Defendants' GAAP violations further supports an inference of scienter. The $75.3 million Highland charge and $65.7 million Hazlehurst write off the Company took in 2018 were both, individually, larger than Astec's net income in any fiscal year. The risk and materiality of the Highland guarantee were both obvious and known to Defendants, yet Defendants hid this guarantee from investors for at least two years. Astec's decision to recognize more than 95% of the revenue of the Highland contract by October 2017 on a percentage-of-completion basis was an obvious violation of GAAP given how far Astec was from fulfilling its contractual obligations at that point in time.

191. Swanson's knowledge of the severe engineering problems at Highland and Hazlehurst can be imputed to Astec. Swanson served as an executive officer and President of Astec, Inc., which is Astec's largest subsidiary and part of the Company's critical Infrastructure Group.

192. Astec's 2017 Form 10-K listed a new "risk factor" that had not appeared in the Company's 2016 Form 10-K: "Production delays, design changes and adverse weather conditions, etc. can also result in construction and testing delays which can cause significant cost overruns or the missing of required completion dates. In certain circumstances, we may incur contractual penalties as a result of such delays or minimum production levels, and be liable to customers for other losses they incur in connection with such delays, including possible refund of the purchase price." However, the 2017 Form 10-K did not disclose that the Highland contract required Astec to refund the purchase price if the plant failed to pass the Reliability Run. Defendants' decision to add a general risk factor about a potential refund instead of disclosing the actual risk of the Highland contract demonstrates an intent to mislead investors.

193. By virtue of his role as a Director, Brock had access to all relevant information regarding the problems at the Hazlehurst and Highland pellet plants. As Astec's corporate governance guidelines state, "Board members shall have unrestricted access to the Company's senior management. Furthermore, the Board encourages senior management, from time to time, to bring to Board meetings officers and managers who (a) can provide additional insight to matters before the Board because of such person's involvement in the areas being discussed, or (b) are officers and managers with potential for future advancement that senior management believes should be given exposure to the Board. As necessary and appropriate, Board members shall also have access to outside legal, accounting and other professional advisors to assist them in carrying out their duties and responsibilities as Directors."

194. Brock and Silvious each signed SOX certifications referenced in ¶¶ [__] were false and misleading because they each accompanied financial statements that violated GAAP, that

contained false or misleading statements, and were issued while the Company had unidentified material weaknesses in internal control over financial reporting.

195. Brock and Silvious both served in positions within Astec that made them duty bound to keep apprised of the true facts regarding the Company.

## VIII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

196. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Astec securities publicly traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

197. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Astec securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NASDAQ or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

198. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

199.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

200.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Astec;

c.     whether the Individual Defendants caused Astec to issue false and misleading financial statements during the Class Period;

d.     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.     whether the prices of Astec securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

201.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

202. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Astec securities are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiff and members of the Class purchased, acquired and/or sold Astec securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

203. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

204. Plaintiff and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    CAUSES OF ACTION

### COUNT I

### Violations of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

205.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

206.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

207.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Astec securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Astec securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

208.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Astec securities. Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Astec's finances and business prospects.

209. By virtue of their positions at Astec, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

210. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Astec securities from their personal portfolios.

211. Astec showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Astec, the Individual Defendants had knowledge of the details of Astec's internal affairs.

212. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Astec. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Astec's businesses,

operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Astec securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Astec's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Astec securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

213. During the Class Period, Astec securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Astec securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Astec securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Astec securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

214. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

215. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of The Exchange Act
### Against The Individual Defendants

216. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

217. During the Class Period, the Individual Defendants participated in the operation and management of Astec, and conducted and participated, directly and indirectly, in the conduct of Astec's business affairs. Because of their senior positions, they knew the adverse non-public information about Astec's current financial position and future business prospects.

218. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Astec's business practices, and to correct promptly any public statements issued by Astec which had become materially false or misleading.

219. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Astec disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Astec to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Astec within the meaning of Section 20(a) of the Exchange Act. In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Astec securities.

220. Each of the Individual Defendants, therefore, acted as a controlling person of Astec. By reason of their senior management positions and/or being directors of Astec, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Astec to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Astec and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

221. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Astec.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 19, 2021                  Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

**By:** /s/ Daniel Tyre-Karp

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Daniel Tyre-Karp
275 Madison Avenue, 40h Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
      lrosen@rosenlegal.com
      dtyrekarp@rosenlegal.com

-and-

**BRAMLETT LAW OFFICES**
PAUL KENT BRAMLETT #7387
ROBERT PRESTON BRAMLETT #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215-0734
Telephone: 615-248-2828
Facsimile: 866-816-4116
Email: PKNASHLAW@AOL.COM

*Counsel for Lead Plaintiff*