# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

CITY OF TAYLOR GENERAL
EMPLOYEES RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

Plaintiff,

vs.

ASTEC INDUSTRIES, INC., BENJAMIN G.
BROCK and DAVID C. SILVIOUS,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:19-cv-00024-CEA-CHS

CLASS ACTION

Judge Charles E. Atchley

Magistrate Judge Christopher H. Steger

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ...................................................... 3

ARGUMENT ...................................................................................................................... 7

I.  Applicable Standards Favor Class Certification In This Securities Action ................... 7

II.  The Requirements Of Rule 23(a) Are Satisfied ................................................. 8

    A.     Numerosity Is Established.............................................................................. 8

    B.     Commonality Is Established ......................................................................... 9

    C.     Typicality Is Established ............................................................................. 10

    D.     Adequacy Is Established .............................................................................. 10

III.  The Predominance And Superiority Requirements Of Rule 23(b)(3) Are Satisfied ..... 12

    A.     Common Questions Of Law And Fact Predominate ................................... 12

        1.     Plaintiff Is Entitled To A Presumption Of Reliance Under *Basic* .................. 13

            (a)     Astec's Listing On The NASDAQ Shows Market Efficiency ..................... 13

            (b)     The *Cammer* Factors Show Market Efficiency ............................................ 14

            (c)     The *Unger/Krogman* Factors Further Support A Finding Of Market Efficiency ...................................................................................................... 19

        2.     The *Affiliated Ute* Presumption Of Reliance Applies........................................ 20

        3.     Potential Individual Questions Of Damages Do Not Predominate ................. 21

        4.     The Same Common Issues Predominate As To The § 20(a) Claims .............. 22

    B.     A Class Action Is Superior To Other Methods Of Adjudication ......................... 22

IV.  The Class Is Ascertainable.............................................................................. 23

V.  The Rosen Law Firm Should be Appointed Class Counsel Under Rule 23(g) .............. 24

CONCLUSION .................................................................................................................. 24

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972) ..................................................................................... 2, 3, 20

*Amchem Prods., Inc. v. Winsdor*,
521 U.S. 591 (1997) ...................................................................................... 1, 7, 12

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ...................................................................................... 1, 8, 12

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................ 2, 12, 13, 14

*Bobbitt v. Acad. Of Court Reporting, Inc.*,
252 F.R.D. 327 (E.D. Mich. 2008) ........................................................................ 9

*Bond v. Clover Health Invs., Corp.*,
2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023) .................................................. 12, 13

*Brown v. Kelly*,
609 F.3d 467 (2d Cir. 2010) .................................................................................. 12

*Burges v. Bancorpsouth, Inc.*,
No. 3:14-CV-1564, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) .......................... 8, 14, 20

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ...................................................................... passim

*Castillo v. Envoy Corp.*,
206 F.R.D. 464 (M.D. Tenn. 2002) ......................................................................... 1

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
29 F.4th 802 (6th Cir. 2022) ............................................................................. 7, 21

*Cole v. City of Memphis*,
839 F.3d 530 (6th Cir. 2016) ............................................................................... 23

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................................. 21

*Cosby v. KPMG, LLP*,
2020 WL 3548379 (E.D. Tenn. June 29, 2020) ....................................................... 20

Case 1:19-cv-00024-CEA-CHS   Document 103   Filed 12/18/23   Page 3 of 32
PageID #: 1745

*Cosby v. KPMG, LLP*,
2021 WL 1828114 (E.D. Tenn. May 7, 2021) ............................................................ 18

*Dougherty v. Esperion Therapeutics, Inc.*,
2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ..................................................... 19, 20

*Erica P. John Fund, Inc. v. Halliburton Co.,*
*("Ha*lliburton I"), 563 U.S. 804 (2011) ............................................................... 8, 12

*Freeman v. Laventhol & Horwath*,
915 F.2d 193 (6th Cir. 1990) ................................................................................. 14

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
No. 3:09-00882, 2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) ............................ 8

*Grae v. Corr. Corp. of Am.*,
330 F.R.D. 481 (M.D. Tenn. 2019) ......................................................................... 8

*Halliburton Co. v. Erica P. John Fund, Inc.,*
*("Halli*burton II"), 134 S. Ct. 2398 (2014) ........................................................... 13

*In re Accredo Health, Inc. Sec. Litig.*,
2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) ...................................................... 14

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) ................................................................................. 10

*In re Direct Gen. Corp.*,
2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006) ....................................................... 11

*In re Enron Corp.,*
*Sec.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................................... 17

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013) ..................................................................... 20

*In re FirstEnergy Corp. Sec. Litig.*,
No. 2:20-CV-3785, 2023 WL 2709373 (S.D. Ohio Mar. 30, 2023) ........................ 23

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .......................................................... 10

*In re Merck & Co., Inc. Sec., Deriv. & "ERI*SA" Litig.,
2013 WL 396117 (D.N.J. Jan. 30, 2013) ................................................................ 22

*In re Petrobras Secs.*,
862 F.3d 250 (2d Cir. 2017)...................................................................................... 2, 13

*In re Pfizer Inc. Sec. Litig.*,
282 F.R.D. 38 (S.D.N.Y. 2012) ...................................................................................... 12

*In re Smith Barney Transfer Agent Litig.*,
290 F.R.D. 42 (S.D.N.Y. 2013) ...................................................................................... 20

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) .................................................................................... 15

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005).......................................................................................... 15

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ........................................................ 23

*Kasper v. AAC Holdings, Inc.*,
No. 15-CV-00923-JPM-JSF, 2017 WL 3008510 (M.D. Tenn. July 14, 2017) .................... 8, 22

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................ 19, 20

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014).......................................................................... 15, 16

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019).................................................................................... 18

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)........................................................................................................ 22

*Plumbers & Pipefitters Nat. Pension Fund v. Burns*,
967 F. Supp. 2d 1143 (N.D. Ohio 2013)....................................................................... 16

*Ross v. Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009)..................................................................................... 9

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ......................................................................................... 12

*Schuh v. HCA Holdings, Inc.*,
2014 WL 4716231 (M.D. Tenn. Sept. 22, 2014)............................................................. 9

*St. Clair Cnty. Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
    2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) ...................................................... 21

*Stein v. U.S. Xpress Enterprises, Inc.*,
    No. 1:19-CV-98, 2021 WL 1410035 (E.D. Tenn. Feb. 12, 2021) .............................. 8

*Todd v. STAAR Surgical Co.*,
    2017 WL 821662 (C.D. Cal. Jan. 5, 2017) .............................................................. 16

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) .................................................................................. 8, 13

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020) .............................................................. 14, 15, 21

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
    280 F.R.D. 332 (E.D. Mich. 2012) ...................................................................... 12, 14

*Willis v. Big Lots, Inc.*,
    242 F. Supp. 3d 634 (S.D. Ohio 2017) .............................................................. 9, 16, 23

*Yost v. First Horizon Nat'l Corp.,*
    2011 WL 2182262 (W.D. Tenn. June 3, 2011) ....................................................... 10

*Young v. Nationwide Mut. Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ............................................................................. 10, 22

*Zwick Partners, LP v. Quorum Health Corp.*,
    2019 WL 1450546 (M.D. Tenn. Mar. 29, 2019) .................................................... 14

## <u>Rules</u>

Fed. R. Civ. P. 23 ................................................................................................... passim

Lead Plaintiff William Lynn Johnson ("Plaintiff" or the proposed "Class Representative") respectfully submits this memorandum of law in support of his motion for class certification pursuant to Federal Rule of Civil Procedure 23, seeking (i) certification of the Class as defined herein; (ii) the appointment of Plaintiff as Class Representative; and (iii) the appointment of The Rosen Law Firm, P.A. (the "Rosen Law Firm") as Class Counsel.

## PRELIMINARY STATEMENT

Plaintiff are pursuing claims on behalf of a class of Astec Industries, Inc. ("Astec" or the "Company") investors under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against defendants Astec and David G. Brock ("Brock"), Astec's former Chief Executive Officer ("CEO"). The proposed Class is defined as:

> All persons and/or entities that purchased Astec Industries, Inc. publicly traded common stock during the period between July 26, 2016 and October 22, 2018, inclusive (the "Class Period").

> Excluded from the Class are: (a) persons who suffered no compensable losses; (b) persons who purchased or acquired Astec common stock from a private exchange or privately organized financial forum; and (c) Defendants; the present and former officers and directors of Astec at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, or any person excluded under this subsection (c), has or had a controlling interest at any time.

Both the United States Supreme Court and courts within this Circuit have long held that securities cases are especially well-suited to class-wide adjudication, and that the class action mechanism is an important tool to enforcing securities laws. *See, e.g.*, *Amchem Prods., Inc. v. Winsdor*, 521 U.S. 591, 624 (1997); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478 (2013); *Castillo v. Envoy Corp.*, 206 F.R.D. 464, 474 (M.D. Tenn. 2002) ("class actions are the most favorable means of adjudicating federal securities fraud claims").[1]

---

[1] All internal citations are omitted and emphasis is added unless otherwise indicated.

1

Consistent with this precedent, certification is appropriate here as the proposed Class satisfies all of the requirements of certification under Fed. R. Civ. P. 23. Astec securities were widely held and traded on the NASDAQ during the Class Period. Accordingly, the proposed Class numbers in the many thousands, satisfying Rule 23(a)(1)'s numerosity requirement. The nature of the proposed Class Representative's injuries, which resulted from Defendants' common course of conduct, is identical to that of the proposed Class members such that the Class Representative does not suffer from a conflict of interest that would impede the vigorous prosecution of this action, satisfying the commonality, typicality, and adequacy requirements of Rule 23(a)(2)-(4). Moreover, the Rosen Law Firm, P.A. ("Lead Counsel") possesses the requisite experience and resources to successfully prosecute this matter as a class action, further supporting adequacy under Rule 23(a)(4), as well as appointment of the Rosen Law Firm as Class Counsel under Rule 23(g).

This action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. Each of the elements of Plaintiff's § 10(b) and § 20(a) claims are susceptible to Class-wide proof based upon common facts. Specifically, the predominance requirement is satisfied because the Class is entitled to a presumption of reliance based on the *Basic v. Levinson* "fraud-on-the-market" doctrine as Astec's common stock traded in an efficient market. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *In re Petrobras Secs.*, 862 F.3d 250, 276-78 (2d Cir. 2017) (noting that "the Supreme Court has suggested that the burden required to establish market efficiency 'is not an onerous one.'") (citations omitted); *see also* Declaration of Adam Werner (the "Werner Report"), at ¶¶22-23.[2] Reliance can also be presumed on a class-wide basis pursuant to the Supreme Court's ruling in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972). Thus, any potential individual

---

[2] The Werner Report is attached as Exhibit 1 to the Declaration of Phillip Kim (the "Rosen Decl."), filed concurrently herewith.

questions of reliance do not predominate over common issues in this case. Moreover, the Werner Report explains how the calculation of damages is susceptible to a Class-wide methodology. *Id.* at ¶¶8, 118-121. Finally, a class action is a superior means of litigating Class members' claims because it is easily manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and least taxes judicial resources.

In sum, for the reasons set forth herein, Plaintiff respectfully requests that his Motion for Class Certification be granted in its entirety.

## BACKGROUND AND PROCEDURAL HISTORY

This case arises from Astec's disastrous foray into the wood pellet plant business. Throughout the Class Period, Defendants touted the Highland and Hazlehurst wood pellet plants as models of success that would make Astec a leader in the booming pellet plant industry. In July 2016, the Company told investors that it expected another $80 million pellet plant order later that year. ¶8.[3] By October 2016, the Company boasted that its pellet plant business would record $100 million to $125 million in 2017. *Id*. In November 2016, the Company told investors that it expected 35-50 pellet plants to be built in the United States in the next 5 years, each worth about $100 million, and that the Company's plan was to build "maybe half" of them. *Id*.

Ultimately, the Company's foray into the wood pellet plan business was a complete disaster. In July 2018, the Company agreed to pay $68 million in cash and forgive approximately $7 million in receivables to exit its obligations related to the Highland Plant. ¶152. Astec recorded a full write-off of $65.7 million related to the Hazlehurst plant in the fourth quarter of 2018. ¶60. The Company never received any other orders for pellet plants and ultimately exited the pellet plant business.

---

[3] Unless otherwise indicated, all citations to "¶" refer to the Amended Complaint, ECF 56.

What the Company failed to disclose was that Defendants knew throughout the Class Period that the plants were riddled with problems that prevented them from running at their promised operational or production capacity, posing a threat to the Company's pellet plant business, its overall financial performance, and its financial outlook. Defendants failed to disclose that neither the Hazlehurst nor the Highland plants were capable of producing enough low emission pellets to take advantage of the European market in which the Company had promised to become a major player. ¶9. The natural gas the plants used to produce pellets efficiently rendered the pellets unusable to European customers, and neither plant ever came close to meeting production targets using wood-burning burners.

Defendants also failed to disclose that the Company's sale of the Highland plant was contingent upon the plant being able to pass a "Reliability Run" to produce 50,000 metric tons of high-quality wood pellets in a 30-day period – the production level needed to fulfill Highland's 10-year contract to supply British utility company Drax with 600,000 metric tons of pellets per year. ¶10. Defendants also failed to disclose that if the plant failed to pass the Reliability Run test by April 15, 2018, Astec would be forced to refund the entire purchase price of the plant, $152 million, to Highland. *Id*. This omission was particularly material to investors because, by March 2018, Astec had already recognized over $140 million of revenue from the Highland sale.

Rather than coming clean to investors, Defendants issued a series of false and misleading disclosures assuring investors that the pellet plants were on track to meet their production requirements and downplaying the serious threat they posed to the Company's financial success. Confidential witnesses and internal documents confirm that Astec executives, including defendant CEO Brock, were well aware or turned a blind eye to the severity of the problems at the pellet plants. ¶12. Nevertheless, Astec and its executives continued to falsely assure investors that not

4

only were the current plants successes, but that the Company would soon land more pellet plant orders to sustain a $100 million annual net revenue source for the company. ¶149.

The truth about Astec's pellet plant business emerged through a series of partial corrective disclosures. On July 25, 2017, Astec disclosed earnings per share (EPS) for 2Q 2017 of $0.62, which was below analysts' consensus estimates of $0.80 per share, and that the Company's 2Q 2017 revenues for its Infrastructure Group segment had declined 6.1% from 2Q 2016 revenues. ¶¶124-126; Werner Report, at ¶52. On a conference call that day, Brock revealed that the margin for the pellet plants was "significantly less than we anticipated" due to an "underestimated cost" that "represents the main difference between our estimate at the end of last quarter and our actual result not only in Infrastructure Group but for the company as a whole." ¶125. In response to these partial disclosures, the price of Astec stock dropped $4.33 per share, or approximately 8%, on July 25, 2017, damaging investors. ¶127.

On October 2, 2017, Astec disclosed that it was undertaking "substantial design upgrades" to correct "design flaws" at its pellet plants so they could "achieve full production." ¶¶129-137. The "significant design upgrades" to the Georgia and Arkansas plants were labeled an "additional investment" that would "negatively impact Astec's third quarter earnings by $0.54 to $0.58 per share." *Id*.; Werner Report, at ¶52. In response to these partial disclosures, the price of Astec stock dropped $3.51 per share, or approximately 6.3%, on October 2, 2017, damaging investors. ¶138.

On October 24, 2017, the Company announced that Q3 2017 Infrastructure Group revenues dropped by 9.7%, falling from $109 million to $98 49 million, and that profit in the group swung to a loss, dropping 227% from a Q3 2016 profit of $9.8 million to a Q3 2017 loss of $12.5 million. ¶¶140-141. Astec noted that the previously announced "significant design upgrades to its customers' Georgia and Arkansas wood pellet plants to meet full production rates," had negatively

5

impacted the quarter's EPS by $0.59 per share, which was a larger negative impact than the range of $0.54 per share to $0.58 per share Astec announced on October 2, 2017. *Id*.; Werner Report, at ¶52. In response to these partial disclosures, the price of Astec stock dropped $2.02 per share, or approximately 3.9%, on October 24, 2017, damaging investors. *Id*., at ¶52 & Ex. 6 thereto.

On July 24, 2018, the Company disclosed unexpectedly poor financial results for 2Q 2018, including a 9.7% decrease in net sales, a 14.1% decrease in domestic sales, and a net loss of ($40.7) million, or ($1.76) per share, compared to earnings of $14.4 million, or $0.62 per share, for 2Q 2017, representing a decrease in EPS of 143.5%. ¶¶152-155; Werner Report, at ¶52. The release shocked investors by disclosing that the Company would pay $68 million and forgive an additional $7 million in receivables to exit its contract for the Highland pellet plant in Arkansas after failing to resolve issues related to pellet plant upgrades. ¶¶152-155. The release's "Wood Pellet Plant Business Update" made clear that Astec would only supply equipment on pellet plant projects going forward, and would no longer construct, procure or engineer future projects. *Id*. After closing at $60.80 per share on July 23, 2018, the price of Astec stock dropped 20%, or $12.59 per share, to close at $48.21 per share on July 24, 2018, on elevated trading volume of more than 1.3 million shares. ¶156.

On October 23, 2018, the Company reported a 1.2% decrease in domestic sales and a 20.2% decrease in the Company's backlog for Q3 2018, with the domestic backlog contracting by 28.1%, which was being dragged down by the Company's pellet business. ¶159; Werner Report, at ¶52. For FY 2018, the Company cut its core revenue growth forecast to 1% to 3%, down substantially from 7% to 12%. *Id*. The Company also reported EPS of $0.30 for the quarter, widely missing the consensus estimate of $0.59. *Id*. After closing at $47.27 per share on October 22, 2018, the stock dropped 25% to close at $35.51 per share on October 23, 2018, on abnormally high trading volume

of 1.6 million shares. The stock continued to fall the following day, dropping another 7.5% to close at $32.79 per share on October 24, 2018. ¶161.

The initial complaint in this action was filed on February 1, 2019 by City of Taylor General Employees Retirement System. ECF No. 1. After being appointed Lead Plaintiff, Lynn Johnson filed the Amended Complaint (the "Complaint") on August 26, 2019. ECF No. 56. Defendants moved to dismiss the Complaint on October 25, 2019. The district court granted Defendants' motion to dismiss with prejudice on February 19, 2021. ECF No. 79. Plaintiff appealed the district court's dismissal to the Sixth Circuit. On March 31, 2022, the Sixth Circuit reversed the district court's dismissal as to Astec and Brock and affirmed the dismissal of Astec's former CFO David Silvious.[4] *See City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022) ("the complaint's theory of liability is clear: Defendants painted a rosy picture of Astec's performance without disclosing the plants' problems and without providing a fair disclosure of the financial consequences of the plants' failure to meet contractual obligations. These deceits led to an artificial inflation of Astec's stock price."). The Sixth Circuit remanded the case back to the district court.

## ARGUMENT

### I.  Applicable Standards Favor Class Certification In This Securities Action

The Supreme Court has long recognized that securities fraud claims are particularly well-suited for class treatment. *Amchem*, 521 U.S. at 625 (noting that predominance of common issues "is a test readily met in certain cases alleging . . . securities fraud").[5] And the Supreme Court

---

[4] Plaintiff did not appeal the district court's dismissal of former Astec executive Malcolm Swanson.

[5] Unless otherwise noted, internal quotations and citations are omitted and emphasis is added throughout.

continues to favor class certification in securities fraud cases. *See Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 812-13 (2011) (vacating appellate court denial of class certification); *Amgen*, 568 U.S. at 464-67 (affirming class certification). Likewise, courts within the Sixth Circuit have consistently found that class actions are appropriate vehicles to vindicate investors' rights in securities fraud actions.[6]

To be certified, a proposed class must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as one of the three provisions in Rule 23(b). *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017). Because these requirements are satisfied here, the Class should be certified.

## II.     The Requirements Of Rule 23(a) Are Satisfied

### A.     Numerosity Is Established

Rule 23(a)(1) is satisfied when a class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[T]he exact number of class members need not be pleaded or proved' for a class to be certified, as long as the class representatives can show that joinder would be impracticable." *Grae*, 330 F.R.D. at 501. Indeed, "[n]umerosity is generally assumed to have been met in class action suits involving nationally traded securities." *Burges*, 2017 WL 2772122, at *2.

During the Class Period, Astec's common stock was actively traded on the NASDAQ, with an its weekly trading volume ranging between 262,131 and 2,380,861 shares, representing an

---

[6] *See, e.g., Stein v. U.S. Xpress Enterprises, Inc.*, No. 1:19-CV-98, 2021 WL 1410035 (E.D. Tenn. Feb. 12, 2021); *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481 (M.D. Tenn. 2019); *Kasper v. AAC Holdings, Inc.*, No. 15-CV-00923-JPM-JSF, 2017 WL 3008510, at *5 (M.D. Tenn. July 14, 2017); *Burges v. Bancorpsouth, Inc.*, No. 3:14-CV-1564, 2017 WL 2772122, at *11 (M.D. Tenn. June 26, 2017); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012).

average of 3.18% of outstanding shares of Astec common stock. Werner Report, at ¶27. Numerosity is easily satisfied here. *Schuh v. HCA Holdings, Inc.*, 2014 WL 4716231, at *13 (M.D. Tenn. Sept. 22, 2014) (numerosity satisfied because "[t]his case involves the sale of millions of stock, and Plaintiff estimates that the number of purchasers is likely to be 'in the thousands' and that those purchasers reside in many states").

### B.     Commonality Is Established

Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The claims of the potential class members need not be factually identical," and "[t]he mere fact that questions peculiar to individual class members could remain does not necessarily defeat a finding of commonality." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 442 (S.D. Ohio 2009). Rather, commonality exists if there is at least "one question common to the class." *Id.*; *see also Bobbitt v. Acad. Of Court Reporting, Inc.*, 252 F.R.D. 327, 338 (E.D. Mich. 2008) ("The standard is not demanding").

Here, Plaintiff's allegations raise numerous questions common to all class members, including: (i) whether Defendants made materially false and misleading statements or omissions to investors concerning Astec's wood pellet plant business (Complaint ¶¶ 97-158); (ii) whether Defendants acted with scienter (*see, eg., id*. ¶¶162-163); (iii) whether Defendants' misrepresentations caused the putative Class to suffer damages, (*id*. ¶¶164-168; and (iv) whether Brock was a "control person" within the meaning of §20(a) of the Exchange Act (*id*. ¶¶184-189).

Given the numerous common questions of fact and law present in this case, the commonality requirement is established. *See Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 645 (S.D. Ohio 2017) "[q]uestions of misrepresentation, materiality, and scienter are the paradigmatic common question[s] of law in a securities fraud class action").

9

## C. Typicality Is Established

The claims and defenses of the proposed class representatives are typical if they arise "from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). "[A] plaintiff's burden to establish typicality is not onerous." *Yost v. First Horizon Nat'l Corp.,* 2011 WL 2182262, at *8 (W.D. Tenn. June 3, 2011). Here, Plaintiff's claims and legal theories are typical of the Class: he purchased Astec common stock during the Class Period and suffered losses when the truth about Astec's wood pellet plant business was disclosed. As with other Class members, Plaintiff's claims are based on Defendants' material omissions concerning Astec's wood pellet plant business. As such, typicality is satisfied. See *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009) ("[f]actual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct").

## D. Adequacy Is Established

The final requirement of Rule 23(a) is that "the class representatives . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To establish adequacy: (i) "'the representative must have common interests with unnamed members of the class'"; and (ii) "'it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012). The first adequacy factor overlaps with the commonality and typicality elements discussed above and seeks to ensure that the class representatives have interests aligned with, rather than antagonistic

to, the interests of the unnamed class members. *See In re Direct Gen. Corp.*, 2006 WL 2265472, at *4 (M.D. Tenn. Aug. 8, 2006). The second adequacy factor requires that the representatives have sufficient financial and personal involvement to encourage them to prosecute the action vigorously and adequate legal representation to meet the demands of maintaining the action. *Id*. Plaintiff clearly satisfies both prongs of Rule 23(a)(4)'s adequacy test.

The interests of the proposed Class Representative are aligned with those of the Class. The proposed Class Representative's claims are predicated on the same wrongful conduct that gives rise to the claims of the Class. The proposed Class Representative suffered sizable financial losses,[7] and has demonstrated a commitment to prosecute this action on behalf of absent Class members. *See* Rosen Decl. Ex. 2 (Declaration of Lynn Johnson). The proposed Class Representatives has participated in the action by communicating with Lead Counsel, monitoring the progress and status of the Action; reviewing pleadings, briefs, and other documents in this Action; and responding to Defendants' discovery requests.[8] In addition, he has attested to his understanding of the duty, as a Class Representative, to act in the interests of all other investors who are members of the Class.[9]

Moreover, Plaintiff retained counsel who are qualified, experienced, and generally able to conduct the proposed litigation. The Court has already recognized the Rosen Law Firm's extensive experience in the field of securities litigation,[10] and the Rosen Law Firm has vigorously pursued the Class's interests and advanced the Class's claims before this Court. *See also* Rosen Decl., Ex. 3 (Firm résumé of the Rosen Law Firm). In short, the adequacy requirement has been met because

---

[7] *See* PSLRA certification of Lynn Johnson, ECF 26-3.

[8] Rosen Decl., Ex. 2, at ¶6.

[9] Rosen Decl., Ex. 2 , at ¶¶8-9.

[10] ECF 53, at 6 (finding the Rosen Law Firm "are highly-qualified, experienced, and able to conduct this complex litigation in a professional manner").

Plaintiff's interests are not antagonistic of the Class, and Plaintiff's counsel are well-qualified and have demonstrated their competence prosecuting this case.

## III.    The Predominance And Superiority Requirements Of Rule 23(b)(3) Are Satisfied

### A.    Common Questions Of Law And Fact Predominate

"[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (citation omitted). "Predominance is a test readily met in certain cases alleging securities fraud." *Amchem*, 521 U.S. at 625.

In cases under §10(b) of the Exchange Act, the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof.[11] Thus, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *See Halliburton I*, 563 U.S. at 810. Here, the predominance requirement is satisfied in two separate ways because reliance may be presumed on a class-wide basis pursuant to (a) the presumption of reliance applicable to omission claims under *Affiliated Ute*, and (b) the fraud-on-the-market presumption under *Basic*, 485 U.S. at 224.[12] Each presumption is independently sufficient for class certification, and both apply here. *Bond v. Clover Health Invs., Corp.*, No. 3:21-CV-00096, 2023

---

[11] *See Amgen*, 568 U.S. at 459 (materiality "is question common to all members of the class"); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (all elements of a Section 10(b) claim, "*other than reliance in cases that are not premised on fraud-on-the-market*, are subject to class wide proof in securities litigation") (emphasis added).

[12] *See generally Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at *10 (M.D. Tenn. Feb. 14, 2023) ("The fraud-on-the-market theory greatly simplifies the reliance inquiry in a securities fraud case by providing a factual and legal basis for reliance that can be applied easily to all investors."); *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 280 F.R.D. 332, 337 (E.D. Mich. 2012) ("class certification in cases where 'fraud-on-the-market' doctrine applies is 'routine' because 'each investor's loss usually can be established mechanically, [and] common questions predominate....'") (quoting *Schleicher v. Wendt*, 618 F.3d 679 (7th Cir. 2010)).

WL 1999859, at *10 (M.D. Tenn. Feb. 14, 2023) ("The fraud-on-the-market theory greatly simplifies the reliance inquiry in a securities fraud case by providing a factual and legal basis for reliance that can be applied easily to all investors.").

### 1.    Plaintiff Is Entitled To A Presumption Of Reliance Under *Basic*

Plaintiff is entitled to a presumption of reliance under the "fraud-on-the-market" theory espoused in *Basic*, 485 U.S. at 224. Pursuant to the *Basic* fraud-on-the-market doctrine, Plaintiff may show reliance "by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 134 S. Ct. 2398, 2417 (2014).

To invoke this presumption, Plaintiff must show, based on a holistic analysis of the totality of evidence presented, that Astec's shares traded in an efficient market. *Petrobras*, 862 F.3d at 276-78 (affirming class certification where plaintiffs provided direct and indirect evidence of market efficiency, and noting that courts have "consistently suggest[ed] that the burden [of showing market efficiency] is not an onerous one"); *Waggoner*, 875 F.3d at 89, 98-99 (holding that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies" and affirming class certification where plaintiffs provided "'indirect' indicia of an efficient market"). As set forth below, Plaintiff has shown, based on the totality of the evidence presented, that Astec's securities traded in an efficient market, and Plaintiff is therefore entitled to a presumption of reliance under *Basic*.

### (a)    Astec's Listing On The NASDAQ Shows Market Efficiency

Astec's common stock trades on the NASDAQ – one of "the massive, extraordinarily active public securities markets that normally provide the setting for a finding of market efficiency in a U.S. fraud-on-the-market case." *Clover Health*, 2023 WL 1999859, at *10. The Sixth Circuit

has held that a stock's listing on "securities traded in national secondary markets" are "are well suited for application of the fraud on the market theory." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990).

At the least, "the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency." *Basic*, 485 U.S. at 241-42.

### (b) The *Cammer* Factors Show Market Efficiency

Neither the Supreme Court nor the Sixth Circuit has adopted a formal test for market efficiency. Courts in the Sixth Circuit and elsewhere, however, routinely consider the non-exhaustive factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), in determining whether a security trades in an efficient market. *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990). Those factors include:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*Zwick Partners, LP v. Quorum Health Corp*., 2019 WL 1450546, at *12 (M.D. Tenn. Mar. 29, 2019).[13] No single *Cammer* factor is determinative; nor are the factors to be applied as a "checklist." *Burges*, 2017 WL 2772122, at *8 n.10; *In re Accredo Health, Inc. Sec. Litig*., 2006 WL 1716910, at *10 (W.D. Tenn. Apr. 19, 2006). An analysis of each of the foregoing factors, evaluated both individually and collectively, shows that Astec's common stock traded in an

---

[13] *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 132 (M.D. Tenn. 2020) ("In analyzing whether an efficient market exists, many courts employ the so-called 'Cammer factors'"); *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 280 F.R.D. 332, 342–43 (E.D. Mich. 2012) ("The Sixth Circuit has recognized the usefulness of these factors in determining market efficiency.") (citing *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990)).

efficient market.

**Factor One – Astec's High Weekly Trading Volume:**

During the Class Period, Astec's common stock had an average weekly trading volume of 3.18% of the outstanding shares. Werner Report, at ¶27. That turnover rate is nearly 60% more than the 2% threshold set by *Cammer* as giving rise to a "strong presumption" of market efficiency. *See Cammer*, 711 F. Supp. at 1286; *see also Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 133 (M.D. Tenn. 2020) ("It is also significantly higher than the weekly 1% trading volume that establishes a "substantial presumption of an efficient market."). Accordingly, Astec's weekly trading volume supports a strong presumption that its common stock traded in an efficient market.

**Factor Two – Substantial Coverage By Financial Analysts:**

The presence of substantial analyst coverage on a security "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013). This factor is measured alternatively by the *number of analysts* covering the company or security, or by the *number of analyst reports* published about the company or security, during the relevant period.[14] Courts also consider the extent of analyst coverage in connection with related factors, including the amount of news coverage on a company and the degree of institutional ownership.[15]

---

[14] *Compare, e.g.*, *id.* ("the number of securities analysts") *with McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014)("the existence of a significant number of analyst reports").

[15] *E.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005) (affirming district court's determination of market efficiency, where only one analyst followed the company's stock and issued only one report during a 16 month class period, but information about the company was widely distributed through other sources, including news articles, press releases, and SEC filings,

Here, at least 21 analyst firms covered Astec during the Class Period, including at least 14 firms that issued recommendations or research reports.[16] Werner Report, at ¶29 . And a total of more than 140 analyst reports were issued during the Class Period. *Id.* By comparison, the *Cammer* court found efficiency where the security at issue (the common stock of Coated Sales, Inc.) was the subject of "[a]t least 15 research reports" during the entire one-year class period. 711 F. Supp. at 1283 n.30, 1287. Additionally, over 330 news stories, press releases, and SEC filings featuring Astec appeared in financial publications and newswires during the Class Period. *Cammer*, 711 F. Supp. at 1283, n. 30; Werner Report, at ¶30.

The number of analysts and volume of public dissemination of news involving Astec strongly supports market efficiency. *See Willis*, 242 F. Supp. 3d at 654 (finding that analyst reports from 16 brokerage firms indicates market efficiency "in this Circuit"); *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1162 (N.D. Ohio 2013) (finding that "at least fifteen analysts" who "issued numerous reports" indicates market efficiency).

### <u>Factor Three – Market Makers, Institutional Investors, and Arbitrageurs:</u>

The third *Cammer* factor concerns whether there are a sufficient number of market makers and/or arbitrageurs to facilitate the efficiency of the market. *See McIntire*, 38 F. Supp. 3d at 431-32. During the Class Period there were at least 126 market markers for Astec common stock,

---

and institutional investors invested in the stock); *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (ownership of company's stock by major institutions bolstered determination that efficiency was indicated by second *Cammer* factor).

[16] BB&T Capital Market, Brean Capital, LLC, CFRA Equity Research, Credit Suisse, Dougherty & Company LLC, Griffin Securities, Inc., Marktfeld, Maxim Group, Roth Capital Partners, Inc., S&P Capital IQ, Seaport Global Securities LLC, William Blair & Company, William O'Neil + Co., and Zacks Equity Research all issues recommendations or reports on Astec during the Class Period. Werner Report, at ¶29. Additionally, G. Research, LLC, Gabelli & Co., GAMCO Investors, Morgan Dempsey Capital Management, Robert W. Baird, Inc., Stifel Nicolaus, and Thompson Research Group participated in Astec's conference calls during the Class Period.

including well-known firms such as Credit Suisse, Goldman Sachs, J.P. Morgan, Morgan Stanley, and UBS. Tabak Report, at ¶34; Exhibit 5 thereto. That is more than sufficient to create a strong presumption of market efficiency. *See Cammer*, 711 F. Supp. at 1286-1287 ("Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.").

Moreover, at least 439 unique institutional investors – presumed to be "sophisticated and professional full-time investors" – owned Astec common stock during the Class Period contributes to a finding of market efficiency here. *See* Werner Report, at ¶¶37-38; *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 756 (S.D. Tex. 2006) (a "substantial number of institutional investors" is consistent with an efficient market).

**Factor Four – Astec Met the Float Requirement to File Form S-3:**

Eligibility for S-3 registration with the SEC is an indicator of market efficiency because it is associated with characteristics that correlate with efficiency, including size, transparency, and the availability of relevant financial information. *See Cammer*, 711 F. Supp. at 1284-85, Werner Report, at ¶¶39-40. In order to be eligible for an S-3 registration, a company must be "seasoned," *i.e.*, it must have filed Exchange Act reports with the SEC for twelve months, and it must meet a certain minimum threshold for public float. *See Cammer*, 711 F. Supp. at 1284-85; Werner Report, at ¶¶39-40. The public float requirement has been loosened from the time of *Cammer* (from $150 million to $75 million), but Astec exceeded both levels with a public float ranging from $1.03 billion to $1.63 billion during the Class Period. Werner Report, at ¶41 & Ex. 3 thereto. Astec's eligibility to file Form S-3 supports a finding of an efficient market for Astec common stock.

**Factor Five – Astec's Share Price Reacted to News:**

The fifth *Cammer* factor examines whether empirical evidence demonstrates "a cause and

effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. In cases where it is undisputed that a company's shares trade on an open and developed exchange like the NASDAQ, conducting an event study to prove the stock price responded to new, Company-specific information is superfluous. *See Cosby v. KPMG, LLP*, 2021 WL 1828114, at *4 (E.D. Tenn. May 7, 2021) ("The weight of authority indicates that the fifth *Cammer* factor is not necessary"); *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 384 (N.D. Ga. 2019) (noting that the First, Second, Third, Fourth, Fifth and Eleventh Circuits had found that "the fifth *Cammer* factor is not a prerequisite to a finding of market efficiency").

Nevertheless, Plaintiff submits the expert report of Adam Werner, Ph.D., which sets forth two event study analyses empirically examining the efficiency of the market for Astec common stock: (i) an event study focusing on allegation-related information events during the Class Period; and (ii) a series of collective event studies comparing the frequency of stock price reactions between news days and lesser or non-news days. Werner Report, at ¶¶42-104. Dr. Werner found that it did, *i.e.*, the share price reacted to news, such that Astec's stock traded in an efficient market during the Class Period. *Id.* at ¶¶99-104 & Ex. 8 thereto.

More specifically, Dr. Werner's event study analysis showed that the percentage of "news" days with statistically significant changes in the price of Astec's common stock was statistically significantly greater than the percentage of "non-news" days with statistically significant price changes during the Class Period. *Id.* at ¶¶99-104 & Ex. 8 thereto. Dr. Werner found that these "collective tests demonstrate that Astec stock traded in an efficient market during the Class Period." *Id.* at ¶103

Accordingly, the fifth *Cammer* factor weighs in favor of a finding of market efficiency.

### (c) The *Unger*/*Krogman* Factors Further Support A Finding Of Market Efficiency

Courts also consider three other factors identified in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (1) market capitalization ("the number of shares multiplied by the prevailing share price"); (2) bid-ask spread ("the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares"); and (3) float ("the percentage of shares held by the public, rather than insiders"). *See also Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *3 (E.D. Mich. Nov. 19, 2020) (noting that "many courts, including several in this circuit, have also considered the three factors enumerated in *Krogman*").

The larger the market capitalization, the more likely the stock is to attract analyst and news media coverage, and gain the attention of investors, including large institutional investors. All of these characteristics promote market efficiency. Werner Report, at ¶106. During the Class Period, the average market value of Astec's common stock was $1.33 billion, making its market capitalization greater than at least 70% of all other publicly-traded companies in the United States. Werner Report, at ¶108, n.153 & Ex. 3 thereto.

A stock's public float is the percentage of shares held by the public, rather than insiders and affiliated entities. Werner Report, at ¶33. Under *Krogman*, a large public float helps support a finding of an efficient market. *See Krogman*, 202 F.R.D. at 478. During the Class Period, the average market value of Astec's float was $1.3 billion, representing 98.2% of Astec's 23.1 million outstanding shares. Werner Report, at ¶¶110-112.

The final *Krogman* factor is the bid-ask spread, which is the difference between the price at which investors are offering to buy and sell the security. Werner Report, at ¶¶113-114. The bid-ask spread will tend to be narrow for actively traded securities where information is readily

19

available.[17] Here, the average bid-ask spread for Astec's common stock during the Class Period was only 0.05% of the same day's bid and ask quotes, which is significantly narrower than the 0.53% average spread for all stocks in the CRSP database during the Class Period. Werner Report, at ¶115.

In sum, the three *Krogman* factors also strongly weigh in favor of finding that Astec's common stock traded in an efficient market. *Esperion*, 2020 WL 6793326, at *4 (market capitalization of $1.08 billion, bid-ask spread between 0.22% and 0.29%, and 97% of its outstanding shares stock were held by outsiders "all suggest an efficient market").

### 2. The *Affiliated Ute* Presumption Of Reliance Applies

The Supreme Court has instructed that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153, 92. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131. "Where plaintiffs' claims are based on a combination of omissions and misstatements, courts have acknowledged the applicability of the *Affiliated Ute* presumption as to the element of reliance with regard to alleged omissions." *Cosby v. KPMG, LLP*, 2020 WL 3548379, at *26 (E.D. Tenn. June 29, 2020), *report and recommendation adopted,* 2021 WL 1828114 (E.D. Tenn. May 7, 2021) (quoting *Burges,* 2017 WL 2772122, at *10).[18]

---

[17] Conversely, a large bid-ask spread is indicative of inefficiency. *Krogman*, 202 F.R.D. at 478.

[18] The *Affiliated Ute* presumption is rooted in the reality that "as a practical matter [reliance on an omission] is impossible to prove." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013). This is because "[w]hen a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).

Reliance here may be presumed because Plaintiff alleges Defendants' omission of material facts relating to the performance of the pellet plants and the substantial risk the Company faced from missing its performance guarantees. The Sixth Circuit recognized as much in holding the Complaint stated a claim, explaining that the Complaint adequately alleged that "Defendants painted a rosy picture of Astec's performance without disclosing the plants' problems and without providing a fair disclosure of the financial consequences of the plants' failure to meet contractual obligations." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022). Further, the Sixth Circuit held that Brock's "relentless, unfounded optimism [] was contradicted by the undisclosed facts." *Id.*, at 813. Plaintiff is thus entitled the *Affiliated Ute* presumption of reliance. *See St. Clair Cnty. Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, at *8 (M.D. Tenn. Sept. 30, 2022), *leave to appeal denied sub nom. In re Acadia Healthcare Co., Inc.*, 2023 WL 3620955 (6th Cir. May 23, 2023) (finding *Affiliated Ute* presumption applicable because "Plaintiffs allege situations where Defendants' failure to disclose certain information is what makes the alleged misrepresentations misleading or false").

### 3. Potential Individual Questions Of Damages Do Not Predominate

Following the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), courts in the Sixth Circuit have held that damages in securities cases present common questions because they can be calculated by measuring the price impact of company-specific information alleged to be a corrective disclosure on a class-wide basis. *See Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020) ("Use of the out-of-pocket damages model in securities case is hardly new or novel – it is the standard measurement of damages in Section 10(b) securities cases. Comcast did not change this, or render the model improper.").

Here, damages can be readily calculated on a class-wide basis in this action using the same kind of generally accepted event study methodology. Werner Report, at ¶¶118-120. Using such an

event study, the artificial inflation caused by false statements and omissions can be measured on a class-wide basis by analyzing the change in the stock price caused by a corrective disclosure. *Id.* at ¶119. Once the daily levels of price inflation have been calculated for each day during the Class Period, a Class member's actual trading activity in the security can be used to calculate damages on an individual basis for each Class member. *Id.* Because this methodology is consistent with the class-wide theory of liability and allows for measurement of damages on a class-wide basis, common issues predominate *See AAC Holdings*, 2017 WL 3008510, at \*14 (finding that individual damages issues will not predominate and noting the "use of an event study to calculate damages on a classwide basis . . . . is often viewed by courts as consistent with Plaintiffs' theory of liability based on misrepresentations or omissions in securities litigation").

### 4. The Same Common Issues Predominate As To The § 20(a) Claims

Plaintiff's showing above that the § 10(b) claim meets the reliance presumption likewise shows that Plaintiff's claim under § 20(a) is also satisfied. *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2013 WL 396117, at \*13 (D.N.J. Jan. 30, 2013) (finding that the same predominance analysis applies to § 20(a) claims as for Rule 10b-5 violations).

### B. A Class Action Is Superior To Other Methods Of Adjudication

"[C]ases alleging a single course of wrongful conduct are particularly well-suited to class certification," and "where a threshold issue is common to all class members, class litigation is greatly preferred." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012).[19] The following factors are relevant to the superiority assessment:

---

[19] The Supreme Court has recognized that "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability…of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

"Defendants' alleged securities fraud caused economic injury to a large number of geographically dispersed investors, making the cost of pursuing individual claims impracticable and inefficient." *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *26 (M.D. Tenn. Feb. 24, 2023) ("The alternatives to a class action are not superior."). Further, this District is a desirable forum for this Class Action because Astec is headquartered here and Plaintiff's claims arise out of actions that occurred in this District. Plaintiff does not foresee any likely difficulties in managing this class action.

Thus, a class action is the superior method for the efficient adjudication of the Class's claims. *See Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 659 (S.D. Ohio 2017) ("It is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions.").

## IV. <u>The Class Is Ascertainable</u>

Finally, the Sixth recognizes that Rule 23 contains an "implicit requirement" that the members of a proposed class be ascertainable. *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016). "The determination that a class is ascertainable requires only the existence of objective criteria upon which class membership is based." *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-CV-3785, 2023 WL 2709373, at *12 (S.D. Ohio Mar. 30, 2023), *opinion clarified,* No. 2:20-CV-03785, 2023 WL 8105252 (S.D. Ohio Apr. 18, 2023). The proposed Class is ascertainable because the identity of its members can be determined from the books and records maintained by Astec and its transfer agents. *See id.* ("This Court finds it administratively feasible to determine

objectively whether a person purchased or otherwise acquired" the defendant's securities during the class period)

**V.      The Rosen Law Firm Should be Appointed Class Counsel Under Rule 23(g)**

Rule 23(g)(1)(A) sets forth the factors to consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to the case. Under these criteria, the Rosen Law Firm is eminently qualified. The Law Rosen Law Firm specializes in litigating securities fraud class actions under federal and state laws. *See* Rosen Decl. Ex. 3. In sum, Plaintiff respectfully submits that the requirements of Rule 23(g) are met, and thus request that the Court approve the Rosen Law Firm as Class Counsel.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the motion in its entirety.

Dated: December 18, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

**By**: */s/ Phillip Kim*
Phillip Kim
Daniel Tyre-Karp
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         dtyrekarp@rosenlegal.com
         lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

24

**BRAMLETT LAW OFFICES**
Paul Kent Bramlett #7387
Robert Preston Bramlett #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215-0734
Telephone: 615-248-2828
Facsimile: 866-816-4116
Email: pknashlaw@aol.com
    Robert@BramlettLawOffices.com

*Liaison Counsel for Lead Plaintiff*

25

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on December 18, 2023, I served true and correct copies of the foregoing by posting the document electronically to the ECF website of the United States District Court for the Eastern District of Tennessee, for receipt electronically by the parties listed on the Court's Service List.

*/s/ Phillip Kim*
Phillip Kim