# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | **)** **)** **)** **)** | No. 1:19-cv-00024-PLR-CHS |
| Plaintiff, | **)** **)** | CLASS ACTION |
| vs. | **)** **)** **)** | Judge Charles E. Atchley |
| ASTEC INDUSTRIES, INC. and BENJAMIN G. BROCK | **)** **)** **)** | Mag. Judge Christopher H. Steger |
| Defendants. | **)** **)** | |

## MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT AND CITATION OF AUTHORITY ......................................................... 2

I.     Legal Standard ............................................................................................... 2

II.    Plaintiff Fails to Meet His Burden to Show Market Efficiency, and Thus Cannot Rely on the "Fraud-on-the-Market" Presumption of Reliance. ........................................ 3

      A.    The Court Should Disregard Dr. Werner's First Event Study Because His Selection of Event Dates Renders the Study Unscientific. .................................... 5

      B.    Dr. Werner's Second Event Study Does Not Demonstrate Astec Stock Traded in an Efficient Market. ................................................................................. 8

III.    Plaintiff Cannot Establish That He Will Serve as an Adequate Class Representative Under Rule 23(a)(4). ............................................................... 12

IV.    Plaintiff Fails to Establish Typicality Because His Purported "Class-wide" Damages Model Creates Conflicts of Interest Within the Class. .................................... 19

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)................................................................................................11, 12

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)....................................................................................................3, 4

*Bell v. Ascendant Solutions, Inc.*,
    No. 3:01-CV-0166-N, 2004 U.S. Dist. LEXIS 12321 (N.D. Tex. July 1, 2004).................8, 11

*Brown v. China Integrated Energy Inc.*,
    No. CV 11-02559, 2014 U.S. Dist. LEXIS 117764 (C.D. Cal. Aug. 4, 2014).........................8

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ...............................................................................4, 5

*City of Taylor Gen. Emples. Ret. Sys. v. Astec Indus.*,
    No. 1:19-cv-24, 2019 U.S. Dist. LEXIS 106588 (E.D. Tenn. June 26, 2019) ........................16

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*,
    29 F.4th 802 (6th Cir. 2022) ........................................................................................12

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)....................................................................................................2, 12

*Darish v. N. Dynasty Minerals Ltd.*,
    No. 20-cv-6126, 20-cv-5917, 2021 U.S. Dist. LEXIS 50793 (E.D.N.Y. Mar. 17,
    2021) ..........................................................................................................................13

*Di Donato v. Insys Therapeutics, Inc.*,
    333 F.R.D. 427 (D. Ariz. 2019) ...................................................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)........................................................................................................3

*George v. China Auto. Sys., Inc.*,
    11 Civ. 7533, 2013 U.S. Dist. LEXIS 93698 (S.D.N.Y. July 3, 2013) ................................10

*Glazer v. Whirlpool Corp. ("In re Whirlpool Corp.")*,
    722 F.3d 838 (6th Cir. 2013) ..................................................................................19, 22

*Gooch v. Life Invs. Ins. Co. of Am.*,
    672 F.3d 402 (6th Cir. 2012) ........................................................................................2

*Griffin v. GK Intelligent Sys. Inc.*,
   196 F.R.D. 298 (S.D. Tex. 2000)...............................................................................................15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)..................................................................................................................3, 11

*Hedick v. Kraft Heinz Co.*,
   No. 19-cv-1339, 19-cv-1845, 19-cv-2807, 2019 U.S. Dist. LEXIS 174315 (N.D. Ill.
   Oct. 8, 2019) ...............................................................................................................................13

*In re Acadia Healthcare Co.*,
   No. 22-0506, 2023 U.S. App. LEXIS 12666 (6th Cir. May 23, 2023)....................................11

*In re Am. Med. Sys.*,
   75 F.3d 1069 (6th Cir. 1996) .....................................................................................................12

*In re BancorpSouth, Inc.*,
   No. 16-0505, 2016 U.S. App. LEXIS 16936 (6th Cir. Sept. 6, 2016)......................................3

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) .............................................................................................9, 10

*In re Kosmos Energy Ltd. Sec. Litig.*,
   299 F.R.D. 133 (N.D. Tex. 2014)...................................................................................13, 17, 18

*In re Zoom Sec. Litig.*,
   No. 20-cv-02353, 2021 U.S. Dist. LEXIS 70506 (N.D. Cal. Apr. 12, 2021).........................20

*Ind. Pub. Requirement Sys. v. AAC Holdings*,
   No. 3:19-cv-00407, 2023 U.S. Dist. LEXIS 31022 (M.D. Tenn. Feb. 24, 2023).................2, 3

*Kline v. Wolf*,
   88 F.R.D. 696 (S.D.N.Y. 1981) .................................................................................................18

*McDaniel v. Cnty. of Schenectady*,
   No. 1:04-CV-757, 2005 U.S. Dist. LEXIS 14852 (N.D.N.Y. July 21, 2005) .........................18

*Norfolk Ctny. Ret. Sys. v. Cmty. Health Sys.*,
   332 F.R.D. 556 (M.D. Tenn. 2019) ...........................................................................................19

*Ockerman v. May Zima & Co.*,
   27 F.3d 1151 (6th Cir. 1994) .......................................................................................................4

*Ogden v. AmeriCredit Corp.*,
   225 F.R.D. 529 (N.D. Tex. Jan. 5, 2005)..................................................................................15

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   No. 4:08CV0160, 2018 U.S. Dist. LEXIS 137229 (N.D. Ohio Aug. 14, 2018).................8, 11

*Rocco v. Nam Tai Elecs., Inc.*,
 245 F.R.D. 131 (S.D.N.Y. 2007) ................................................................................18

*Rolex Employees Retirement Trust v. Mentor Graphics Corp.*,
 136 F.R.D. 658 (D. Or. 1991) ....................................................................................15

*Shiring v. Tier Techs., Inc.*,
 244 F.R.D. 307 (E.D. Va. 2007) ................................................................12, 13, 14, 15

*Smith v. Lifevantage Corp.*,
 341 F.R.D. 82 (D. Utah 2022) ....................................................................................22

*Sprague v. Gen. Motors Corp.*,
 133 F.3d 388 (6th Cir. 1998) ......................................................................................19

*Unger v. Amedisys Inc.*,
 401 F.3d 316 (5th Cir. 2005) ........................................................................................4

*Waggoner v. Barclays PLC*,
 875 F.3d 79 (2d Cir. 2017).....................................................................................11, 12

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)......................................................................................................2

*West v. Prudential Sec., Inc.*,
 282 F.3d 935 (7th Cir. 2002) ........................................................................................3

*Young v. Nationwide Mut. Ins. Co.*,
 693 F.3d 532 (6th Cir. 2012) ...................................................................................2, 19

RULES

Federal Rule of Civil Procedure 23 .................................................................... passim

STATUTES

15 U.S.C.S. § 77z-1 ......................................................................................................16

15 U.S.C. §78u-4(e)(1) .................................................................................................20

Private Securities Litigation Reform Act (PSLRA).........................................12, 19, 20

OTHER AUTHORITIES

John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, "Measuring and Analyzing
 Abnormal Returns," *The Econometrics of Financial Markets* (1997)......................10

Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, The "Less Than" Efficient
Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud on the
Market Cases, 78 St. John's L. Rev. 81 (2004) ........................................................................7

Case 1:19-cv-00024-CEA-CHS    Document 106    Filed 01/22/24    Page 6 of 30
PageID #: 1988

Defendants Astec Industries, Inc. ("Astec" or the "Company") and Benjamin G. Brock (with Astec, the "Defendants") submit this memorandum of law in support of their Opposition to Lead Plaintiff's Motion for Class Certification.

**<u>INTRODUCTION</u>**

Lead Plaintiff Lynn Johnson ("Plaintiff" or "Mr. Johnson") asks this Court to certify a class of Astec investors under Federal Rule of Civil Procedure ("Rule") 23, appoint Plaintiff as class representative, and approve Plaintiff's selection of The Rosen Law Firm P.A. as class counsel. *See* Doc. 102 (the "Motion"). The Court should reject each request.

*First,* Plaintiff has failed to meet his burden to show Astec stock traded in an efficient market, a requirement for invoking the class-wide presumption of reliance upon which Plaintiff rests his motion for class certification. This failure bars class certification.

*Second*, a class cannot be certified because Plaintiff has failed to demonstrate he is an adequate representative member of the class he seeks to lead. Moreover, Plaintiff's lack of knowledge about this action and lack of engagement in discovery in this litigation to date raise questions regarding Plaintiff's fitness to serve as a fiduciary and representative of any class should such a class be certified. For these reasons, among others, Plaintiff has not satisfied the requisite rigorous test to be appointed class representative.

*Third,* Plaintiff's proposed common damages methodology creates a conflict of interest between class members who bought and sold at different times during the Class Period.[1] Plaintiff therefore cannot demonstrate typicality, which requires a showing that Plaintiff's interests are aligned with absent members of the class.

---

[1] "Class Period" refers to the alleged class period defined in the Amended Complaint (Doc. 56) ("AC") of July 26, 2016 through October 22, 2018.

1

For these reasons, and those set forth below, the Motion should be denied.

## ARGUMENT AND CITATION OF AUTHORITY

### I.   LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotations and citations omitted). A party seeking class certification bears the burden of affirmatively demonstrating it has satisfied each of the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). "Rule 23 does not set forth a mere pleading standard." *Id.* at 350. "[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable, and must be checked through rigorous analysis." *Ind. Pub. Requirement Sys. v. AAC Holdings*, No. 3:19-cv-00407, 2023 U.S. Dist. LEXIS 31022, at *19 (M.D. Tenn. Feb. 24, 2023) (quoting *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012)) (quotations and citations omitted).

Here, because Plaintiff has moved for certification pursuant to Rule 23(b)(3), he must also show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). If, and only if, "after rigorous analysis, the court is satisfied that the prerequisites of [Rule 23(a) and (b)] have been met[,]" will a class action be certified. *Ind. Pub. Requirement Sys.*, 2023 U.S. Dist. LEXIS 31022, at *16.

Moreover, unlike at the motion to dismiss stage, "allegations in the complaint—even if related primarily to the merits (and indirectly to class certification)—are not to be taken as true for purposes of class certification." *Id.* at *22-23; *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012) ("[T]he district court should not merely presume that the plaintiffs'

2

allegations in the complaint are true for the purposes of class motion without resolving factual and legal issues [unless there are no undisputed relevant factual or legal issues].").  Thus, in conducting its "rigorous analysis," the "court must probe behind the pleadings" and "must rely on information outside of the complaint to support any decision to certify a class" when, as here, there are factual and legal issues in dispute.  *Ind. Pub. Requirement Sys.*, 2023 U.S. Dist. LEXIS 31022, at \*23.  "A district judge may not duck hard questions by observing that each side has some support. . . . Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives."  *In re BancorpSouth, Inc.*, No. 16-0505, 2016 U.S. App. LEXIS 16936, at \*3-4 (6th Cir. Sept. 6, 2016) (vacating the district court's grant of a motion for class certification because the district court "did not set forth the standard requiring it to rigorously analyze Plaintiffs' claims") (quoting *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002)).

## II.   PLAINTIFF FAILS TO MEET HIS BURDEN TO SHOW MARKET EFFICIENCY, AND THUS CANNOT RELY ON THE "FRAUD-ON-THE-MARKET" PRESUMPTION OF RELIANCE.

The class cannot be certified because Plaintiff has failed to meet his burden to establish that Astec's stock traded "efficiently" on the market during the Class Period.  To succeed on his securities fraud claims, Plaintiff has the burden of proving that he relied on Defendants' alleged misstatements.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  "Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action," including reliance.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quotations and citations omitted).

In the Motion, Plaintiff's claims are premised on the rebuttable presumption of reliance set forth in *Basic Inc. v. Levinson*, which presumes reliance on alleged misstatements where the securities at issue traded on an efficient market.  485 U.S. 224, 241, 246-47 (1988).  To certify the

3

class in a securities case premised on the so-called *Basic* fraud-on-the-market presumption, a district court must determine whether Plaintiff has sufficiently demonstrated an efficient market existed. "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1158 (6th Cir. 1994) (citation omitted).

The fraud on the market theory only applies in an efficient market. *Basic*, 485 U.S. at 246-47. A market is said to be "efficient" when the price of the stock fully reflects all publicly available information about the company. *Id*. at 241-42, 246-47. An investor who buys or sells stock at the price set by the market may, therefore, be presumed to have relied on any public material representations made by defendants that are reflected in the trading price. *Id*. at 246-47.

At the class certification phase, the court "may not simply presume the facts in favor of an efficient market." *Unger v. Amedisys Inc.*, 401 F.3d 316, 319, 323 (5th Cir. 2005) (vacating order certifying class for "erroneously apply[ing] too lax a standard of proof to the plaintiffs' fraud-on-the-market allegations"). The court "must engage in thorough analysis, weigh the relevant factors, require both parties to justify their allegations, and base its ruling on admissible evidence." *Id.* at 325. To assess market efficiency with sufficient rigor, courts frequently consider five factors articulated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (the "*Cammer* factors."). The fifth *Cammer* factor, which considers "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in stock price," is particularly important because it addresses "the essence of an efficient market[.]" *Cammer*, 711 F. Supp. at 1287.

4

In his attempt to satisfy his burden of showing market efficiency, Plaintiff relies on the opinion of his expert witness, Dr. Adam Werner, Ph.D.  Dr. Werner has been engaged by The Rosen Firm on behalf of plaintiffs seeking certification approximately ***thirty-two*** times—or, in other words, in approximately 60 percent of the cases for which he served as an expert.  Ex. A, Excerpts from the January 9, 2024 Deposition of Plaintiff Through his Representative Dr. Adam Werner, Ph. D. (hereinafter "Werner Depo.") 30:22-32:2.  Conversely, he has never served as a defense expert in any securities litigation matter, nor could he recall more than one instance where he made an adverse finding regarding market efficiency.  Werner Depo. 34:2-6; 35:9-15.  Although Dr. Werner's report concludes that Astec's common stock traded in an efficient market during the Class Period, the two event studies Dr. Werner uses to support his conclusion that *Cammer* factor five weighs in favor of a finding of market efficiency are deeply flawed.  The Court should disregard these studies because: (1) Dr. Werner's first study relies upon an unscientific, results-oriented sample of "event dates" selected by Plaintiff to maximize the purported potential damages in this case; and (2) Dr. Werner's second study is similarly unscientific and results-oriented and does not show that Astec's stock had a statistically significant price response to most (*i.e.*, more than 50 percent) news days as required to demonstrate market efficiency.  Without these studies, Dr. Werner's report is insufficient to support the finding of market efficiency necessary for Plaintiff to rely on the fraud-on-the-market presumption.

**A.    The Court Should Disregard Dr. Werner's First Event Study Because His Selection of Event Dates Renders the Study Unscientific.**

Dr. Werner's first event study focused on "information related to the allegations in the Complaint" ("Allegation Study").  Werner Report (Doc. 104-1), ¶ 50 (hereinafter "Werner Report").  In this study, Dr. Werner purports to have tested whether the market responded "efficiently" to the release of news related to the allegations in the AC.  Werner Report, ¶ 50.  But

5

Dr. Werner's results-oriented, scientifically unsound use of "event dates" selected by Plaintiff and associated with large Astec stock price declines and willful blindness to "event dates" on which Astec released allegation-related information without experiencing a stock price decline undermines the validity and conclusions of this study, which must be disregarded. *See* Ex. B. Expert Report of Lucy P. Allen, dated January 22, 2024, ¶¶ 8-10 (hereinafter "Allen Report").

In the Allegation Study, Dr. Werner selects five "event dates" from the entire Class Period, all of which are identified in the AC as dates on which Astec's stock price declined, in order to test whether the market responded to news about Astec's wood pellet plant business: July 25, 2017, October 2, 2017, October 24, 2017,[2] July 24, 2018, and October 23, 2018. Werner Report, ¶ 52. According to Dr. Werner, these dates were selected specifically because he identified them as dates that were "corrective." Werner Depo. 88:17-19 ("I didn't look at the additional dates because they were not considered to be corrective in nature"); 89:9-11 ("Q: How did you determine which dates were corrective in nature? A. Based on the Complaint"); Allen Report, ¶ 9. Dr. Werner offers no "objective criteria for selecting the dates that he tests" in the Allegation Study. Allen Report, ¶ 18. The Werner Report admits that the five dates selected do not encompass all the dates cited in the AC as dates where Astec made wood pellet-related disclosures. Werner Report, ¶ 51, n.72 (stating Dr. Werner did not conduct a "comprehensive identification of all disclosures of information related to the alleged fraud" in selecting the five "event dates."). Dr. Werner's focus on purported "corrective disclosures" in the Allegation Study effectively ignores certain other dates where Astec released information related to its wood pellet business where its stock price did not decline, including the dates of other misrepresentations alleged in the AC. *See* Allen

---

[2] Dr. Werner arbitrarily included October 24, 2017 as a corrective disclosure date, although it is not identified as such in the AC. Allen Report ¶ 9.

Report, ¶ 22. Indeed, as described in the Allen Report, Dr. Werner's selection of the five dates used in the Allegation Study "appears to be an example of 'data snooping,' which means using what is already known to design an empirical test," and a plain example of selection bias. Allen Report, ¶¶ 20, 22.

Dr. Werner also fails to consider in the Allegation Study the implications of any confounding information that could be driving Astec's stock price reaction, including information related to parts of Astec's business unrelated to the wood pellet business. Allen Report, ¶¶ 26-27. Without considering the impact of confounding information disclosed on the five days Dr. Werner selected as "event dates" for the Allegation Study and determining how much of the stock price reaction was related to the allegation-related disclosures, it is unclear how Dr. Werner's test ascertains whether Astec's stock was efficient with respect to the particular information at issue in this case.

Dr. Werner's selection of flawed inputs and failure to consider confounding information renders the Allegation Study useless. As described by one of Dr. Werner's own cited sources, "[m]erely demonstrating a . . . small number of cases where there is an apparent cause and effect relationship is ***not enough***, since this measures only one point in time during the class period, and only the stock's response to one or a handful of disclosures." Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud on the Market Cases, 78 St. John's L. Rev. 81, 128 (2004) (cited in Werner Report, ¶98, n.148) (emphasis added). In fact, Dr. Werner's sources conclude that he should have *excluded* "those days alleged to be corrective disclosure(s)" (*i.e.*, all of the event dates included in the Allegation Study) because, since "plaintiffs would normally choose a class period where corrective disclosures coincide with large negative price movements[,]"

including those days in the analysis would bias the results." *Id.* at 119, n.155; *see also* Allen Report, ¶ 18.

Because Dr. Werner considered a biased, results-driven set of "event dates" in the Allegation Study, the results of the study and his conclusion that Astec stock traded in an efficient market are unreliable. Courts have repeatedly rejected event studies on the basis that the selection of the "event dates" used was subjective or results-oriented. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 U.S. Dist. LEXIS 137229, at *8 (N.D. Ohio Aug. 14, 2018) ("using the last day of a class period is not a scientifically valid way to test for market efficiency because, among other reasons, securities plaintiffs intentionally select such dates for purposes of increasing potential damages"); *Bell v. Ascendant Solutions, Inc.*, No. 3:01-CV-0166-N, 2004 U.S. Dist. LEXIS 12321, at *9 n.2 (N.D. Tex. July 1, 2004) (rejecting event study where the expert selected "six or seven 'information days,'" which included "dates that appear[ed] to be consciously chosen in order artificially to support his hypothesis of efficiency"), *aff'd and remanded*, 422 F.3d 307 (5th Cir. 2005); *Brown v. China Integrated Energy Inc.*, No. CV 11-02559, 2014 U.S. Dist. LEXIS 117764, at *23-24 (C.D. Cal. Aug. 4, 2014) (rejecting event study where it appeared that expert selected certain dates for the study based on subjective criteria, including an acknowledged price impact). Accordingly, the Allegation Study cannot be used to support a finding of market efficiency and the Court should disregard the Allegation Study in its entirety.

### B. Dr. Werner's Second Event Study Does Not Demonstrate Astec Stock Traded in an Efficient Market.

Dr. Werner's conclusions from his second event study are similarly deeply flawed. In this study, Dr. Werner claims to have tested whether the market responded "efficiently" to the release of news related to Astec generally (the "News Reaction Study"). Werner Report, ¶¶ 80-81. For

8

Plaintiff to meet his burden to show market efficiency using an event study analyzing the response of Astec's stock price to news, Dr. Werner "must show that the market price responds to **most** new, material news." *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 180 (S.D.N.Y. 2012) ("Freddie Mac") (emphasis added). It is not sufficient to demonstrate that "[some] news probably had some effect on [Astec's stock] price." *Id.* Plaintiff has not met his burden because Dr. Werner's second event study does not show that Astec's stock price reacted to "**most**" news days. *Freddie Mac*, 281 F.R.D. at 180 (emphasis added).

If anything, the News Reaction Study shows quite the opposite. To conduct this test, Dr. Werner applied three separate news-frequency based filters of 50%, 25%, and 10% (though he cites no support or basis for using these filters). Allen Report, ¶ 30. When considering the top 50% of "news days"—that is, the days with the greatest frequency of news articles related to Astec—Dr. Werner's Report could find no statistically significant difference[3] between Astec's stock price reaction on those days and the bottom 50% of "news days." Werner Report, ¶¶ 97, 100, 101, Exhibit 11.[4] Additionally, "[a]lthough he does not report the results, [Dr. Werner's] tests without the filters also result in a finding of no statistically significant difference between the news and non-news days." Allen Report, ¶ 16. Only when considering the top 10% (a filter that Dr.

---

[3] "Statistical significance" in this context refers to the 95% confidence level. Werner Report ¶¶ 100-101. When asked about the importance of the 95% confidence level, Dr. Werner testified that "scientists . . . for the most part, look at a 95 percent confidence internal when trying to determine whether or not two samples or observations are statistically different from one another." Werner Depo. 106:7-12.

[4] Dr. Werner attempts to explain this result by stating that this result is "unsurprising" because the 50% filter "loosens" the scope of "news days" to "focus on news that is less likely to be important or valuation-relevant," which causes the "distinction between ['news days'] versus ['non-news days']" to become "more obscure and therefore less statistically significant." Werner Report ¶ 100. But Dr. Werner cites no source for this assertion, which is inconsistent with his interpretation of the results of his application of the 50% filter in another case where the 50% filter yielded statistically significant results. *See* Allen Report, ¶¶ 34-35.

9

Werner testified was "extreme[]") and top 25% of "news days" could Dr. Werner conclude that there was a statistically significant difference between Astec's stock price reaction on those days and the bottom 90% and 75% of news days, respectively.  Werner Report, ¶¶ 100-101; Werner Depo. 107:16-17 ("I mean, if I'm looking at a 10 percent filter, I'm looking at two extremes, right?").  Further, as described in the Allen Report, Dr. Werner's use of the 10% and 25% filters is rendered unreliable because "large price movements *themselves* could cause the media to issue more news stories and conclude that information released on those days is more important to the stock price."  Allen Report, ¶ 31.  The sources cited by Dr. Werner himself flag this concern.  *See* John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, "Measuring and Analyzing Abnormal Returns," *The Econometrics of Financial Markets* (1997) (cited in Werner Report, ¶ 16, n. 24; stating that "[t]here are examples where an event is triggered by the change in the market value of a security, in which case the event is endogenous. For these cases, the usual interpretation will be incorrect.")  Accordingly, the use of these selective filters is inadequate to establish that Astec's stock price reacted to most news days.

Numerous courts have concluded that a company's stock price must exhibit statistically significant price movements on "**most**" news days, and that reactions only to the top 10% or 25% of news days is not sufficient.  *See Freddie Mac*, 281 F.R.D. at 180 (concluding that an expert's event study did not support a finding of market efficiency when it showed the stock reacted to only 28% of news days); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 440 (D. Ariz. 2019) (declining to find plaintiff's expert had sufficiently shown market efficiency when "only one-third of the 'news days' were associated with statistically significant price movements; two-thirds were not"); *George v. China Auto. Sys., Inc.*, 11 Civ. 7533, 2013 U.S. Dist. LEXIS 93698, at *36 (S.D.N.Y. July 3, 2013) (declaring that even if the expert's methodology was proper, the result of

the expert's analysis was an "insufficient foundation upon which to pronounce market efficiency [where the stock reacted] . . . less than 50% [of the time]"). Accordingly, the News Reaction Study does not support a finding of market efficiency.[5]

Because Dr. Werner's event studies reflect these methodological flaws, and thus do not support his conclusions, the Court should afford his conclusions little weight. *Ohio Pub. Emps. Ret. Sys.*, 2018 U.S. Dist. LEXIS 137229, at *8, *48 (concluding that methods used for expert's event study were "not a scientifically valid way to test for market efficiency" and declining to find that expert established market efficiency when the study "suffer[ed] from numerous fundamental design flaws [including a limited sample size] that infect[ed] it"). Dr. Werner's model and event study are not reliable, much less compelling, proof of market efficiency. Giving the Werner Report the significant discount it deserves, Plaintiff has not met his burden to prove market efficiency during the Class Period and is not entitled to the fraud-on-the-market presumption of reliance, thereby precluding class certification. *Halliburton*, 573 U.S. at 276 ("The burden of proving [market efficiency] still rests with plaintiffs and … must be satisfied before class certification.")[6]

---

[5] Dr. Werner's evaluation of Astec's stock price reaction on the small subsection of days when Astec issued earnings announcements, which results in a nine (9) day sample from the 566 day Class Period, or a sample size of **only 1.5%** of days during Class Period, *see* Werner Report, ¶ 92, should be rejected for the same reason. *Bell*, 2004 U.S. Dist. LEXIS 12321, at *9 n.2 (finding an expert's event study was unreliable where the expert selected "six or seven 'information days,'" which included "dates that appear[ed] to be consciously chosen in order artificially to support his hypothesis of efficiency").

[6] The Motion includes two brief paragraphs asserting that the *Affiliated Ute* presumption of reliance applies. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); *see* Mem. ISO Pl.'s Mot. for Class Certification (Doc. 103), 27 ("Mem. ISO Class Cert."). The Sixth Circuit has yet to "determine whether *Affiliated Ute* applies in cases with both misstatements and omissions." *In re Acadia Healthcare Co.*, No. 22-0506, 2023 U.S. App. LEXIS 12666, at *9 (6th Cir. May 23, 2023). This Court need not make that determination either. In *Affiliated Ute*, the Supreme Court explained that, in a case "*involving primarily a failure to disclose*, positive proof of reliance is not a prerequisite to recovery." 406 U.S. at 153 (emphasis added). Thus, the *Affiliated Ute* presumption does not apply in circumstances where, as here, the AC "alleges numerous affirmative misstatements by the Defendants" and "focus[es] the[] claims on those

### III. PLAINTIFF CANNOT ESTABLISH THAT HE WILL SERVE AS AN ADEQUATE CLASS REPRESENTATIVE UNDER RULE 23(A)(4).

A proposed class representative must "affirmatively demonstrate" that he can and will adequately protect the class he seeks to represent. Rule 23(a)(4); *Comcast Corp.*, 569 U.S. at 33 (citation omitted). This requirement is "essential to due process, because a final judgment in a class action is binding on all class members." *In re Am. Med. Sys.*, 75 F.3d 1069, 1083 (6th Cir. 1996). "In the securities fraud context[,] the adequacy inquiry must be particularly searching . . . because the [Private Securities Litigation Reform Act ("PSLRA")] was 'intended to empower investors so that they, not their lawyers, control securities litigation.'" *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007) (citation and quotation marks omitted).

To meet this standard, Plaintiff must "demonstrate[] sufficient knowledge and control of the litigation," a requirement that "is satisfied only where plaintiff demonstrates that he understands the action in which he is involved and, notably that this 'understanding [is] not . . . limited to derivative knowledge acquired solely from counsel.'" *Id.* at 315-16. Moreover, "plaintiffs seeking certification must produce actual, credible evidence that the proposed class

---

affirmative misstatements." *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017); *see, e.g.,* AC ¶¶ 42-123. In an attempt to bolster his assertion that *Affiliated Ute* applies, Plaintiff selectively quotes from the Sixth Circuit's ruling remanding this case for further proceedings. Plaintiff states, "Further, the Sixth Circuit held that Brock's 'relentless, unfounded optimism [] was contradicted by the undisclosed facts.' Plaintiff is thus entitled the *Affiliated Ute* presumption of reliance." Mem. ISO Class Cert. (Doc. 103), 27 (citations omitted). But the first half of the quoted sentence, omitted in Plaintiff's brief, makes clear that the Sixth Circuit was focused on Defendants' *statements*, not any alleged omissions. The sentence in full, along with the preceding sentence, reads: "Regarding Brock's misleading *statements* to investors, we need not go through these *statements* one-by-one because that would 'risk[] losing the forest for the trees.' Suffice it to say that a holistic review of Brock's *statements* reveals a theme: relentless, unfounded optimism that was contradicted by the undisclosed facts." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*, 29 F.4th 802, 813 (6th Cir. 2022) (emphasis added). Because Plaintiff bases his case on Defendants' allegedly misleading *statements*, the *Affiliated Ute* presumption does not apply. *See Waggoner*, 875 F.3d at 96.

representatives are informed, able individuals, *who are themselves—not the lawyers*—actually directing the litigation." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145 (N.D. Tex. 2014) (emphasis added).[7] In making this determination, courts consider the credibility of the plaintiff, as "honesty and trustworthiness are relevant factors in assessing a candidate's ability to serve as an adequate fiduciary for a class." *Hedick v. Kraft Heinz Co.*, No. 19-cv-1339, 19-cv-1845, 19-cv-2807, 2019 U.S. Dist. LEXIS 174315, at *37 (N.D. Ill. Oct. 8, 2019) (citation omitted) (collecting cases). "Thus, if plaintiff displays a lack of credibility regarding the allegations being made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that [the adequacy requirement] is not satisfied." *Shiring*, 244 F.R.D. at 315 (citation and quotations omitted).

Here, Plaintiff has not met his burden to "affirmatively demonstrate" he is an adequate class representative because: (1) his testimony demonstrates that he does not have sufficient "knowledge and control" of this litigation; (2) the only evidence he has offered in support of a finding of adequacy are boilerplate pronouncements undermined by his personal, contemporaneous communications; and (3) his engagement during discovery belies his claim that he is an adequate representative. *See In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. at 146

---

[7] Plaintiff admits that courts must set a higher bar for adequacy at the class certification stage than at the appointment of lead plaintiff stage. *See* Mem. ISO Mot. for Appointment as Lead Pl. (Doc. 22-1), 5 ("In making its determination that Movant [for appointment as lead plaintiff] satisfies the requirements of Rule 23, the Court need not raise its inquiry to the level required in ruling on a motion for class certification."); *see also Darish v. N. Dynasty Minerals Ltd.*, No. 20-cv-6126, 20-cv-5917, 2021 U.S. Dist. LEXIS 50793, at *17 (E.D.N.Y. Mar. 17, 2021) (distinguishing the "wide ranging analysis under Rule 23" at the class certification stage from the "preliminary showing" at the appointment of lead plaintiff stage).

("Adequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy.") (citation omitted).

First, Plaintiff's testimony demonstrates that he does not have the "knowledge and control" necessary to manage this litigation, and, that from the earliest stages of this lawsuit, Plaintiff left direction of this action to his attorneys. *Shiring,* 244 F.R.D. at 316. For example, Plaintiff testified that he did not know how many complaints had been filed in this action ("guess[ing]" incorrectly that three had been filed) and admitted that he had not reviewed the complaint filed before the AC. Ex. C, Excerpts from the January 12, 2024 Deposition of Lead Plaintiff Lynn H. Johnson (hereinafter "Johnson Depo.") 67:17-68:13. Plaintiff further testified that he did nothing to ensure the accuracy of the allegations in the AC before the AC was filed and instead "left that to my attorneys." Johnson Depo. 69:9-12 ("Q: Did you do anything to ensure that the allegations in the Amended Complaint were accurate before it was filed? A: No, I left that to my attorneys"). With respect to the substance of the AC, during his deposition Plaintiff initially deferred "to [his] law firm to answer" the question of whether the AC even alleged misrepresentations. Johnson Depo. 94:15-18. Plaintiff then testified that he could not identify a single alleged misrepresentation in the AC. Johnson Depo. 95:19-21 ("Q: What were . . . those alleged misrepresentations in the [AC]? A: Don't know."). He also lacked knowledge about certain key facts underlying the allegations in the AC. Plaintiff testified he did not know when Astec stopped producing wood pellets—a basic fact that goes to the heart of this action. Johnson Depo. 65:22-66:12. Regarding the very nature of the claims asserted in the action, Plaintiff could only identify "fraud," stating "[i]f you want to be more specific than that, you should ask my attorneys." Johnson Depo. 65:17-21.

Moreover, it is not at all clear that Plaintiff is working closely with his attorneys to shape the litigation or manage the action. Plaintiff testified that he had "no idea" how many times he had spoken with his attorneys at The Rosen Law Firm during this litigation and could not confirm that he had spoken with class counsel more than ten times during the more than three years he has served as Lead Plaintiff. Johnson Depo. 84:19-85:18. Despite deferring completely to his attorneys for tasks such as ensuring the accuracy of the AC, Plaintiff did almost no research into the suitability of those attorneys who are acting as class counsel—identifying them through "I think . . . an Internet search" and declining to consider hiring another law firm because he "was satisfied with how they appeared." Johnson Depo. 83:19-84:8. Plaintiff exhibited a similarly uninformed approach to discovery, having no recollection of whether he produced any documents in this case or whether he received Defendants' interrogatories. *See, e.g.,* Johnson Depo. 132:13-15 ("I don't even remember the interrogatories, so maybe I got them, and maybe I didn't"); 143:8-11 ("Q: Did you produce any documents in response to Defendants' document requests in this case? A: I don't – I do not remember").

Courts have repeatedly rejected similarly uninformed plaintiffs as class representatives. *See Shiring*, 244 F.R.D. at 316 (rejecting class representative on basis of adequacy when he "took no significant steps to supervise this action," his "testimony demonstrate[d] a lack of knowledge regarding the allegations contained in the Complaint," and he repeatedly "defer[ed] to counsel"); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 534 (N.D. Tex. Jan. 5, 2005) (declining to appoint class representative who could not describe portions of her complaint, was unfamiliar with the facts supporting her complaint, and did "little to no research regarding the suitability of her attorneys acting as class counsel[,]" despite deferring to them); *Griffin v. GK Intelligent Sys. Inc.,* 196 F.R.D. 298, 302 (S.D. Tex. 2000) (concluding plaintiffs were inadequate class

15

representatives because they were not familiar with many of the substantive allegations in the complaint and did not adequately supervise counsel); *Rolex Employees Retirement Trust v. Mentor Graphics Corp.,* 136 F.R.D. 658, 666 (D. Or. 1991) (finding plaintiff was inadequate representative where he lacked knowledge about the allegations in the complaint and did not contribute to its drafting).

Second, the representations about Plaintiff do not square with the documents produced by Plaintiff in this case. This Court appointed Mr. Johnson as Lead Plaintiff after determining he made a *prima facie* showing that he satisfied Rule 23's adequacy requirement based on his representations about the size of his purported financial losses on his Astec investment. *See City of Taylor Gen. Emples. Ret. Sys. v. Astec Indus.*, No. 1:19-cv-24, 2019 U.S. Dist. LEXIS 106588, at *9-10 (E.D. Tenn. June 26, 2019). These representations included, among other things, a written declaration signed by Plaintiff stating, "[t]he losses I suffered in Astec securities *are material.*"[8] Decl. Lynn Johnson (Doc. 34-2), ¶ 4 (emphasis added). During the Court's hearing on that motion, Plaintiff's counsel emphasized the "materiality" of Plaintiff's loss as a critical factor supporting his appointment as Lead Plaintiff. Transcript of May 7, 2019 Lead Plaintiff Hearing [Doc. 92] 11:12-16 ("[Plaintiff's Counsel:] You want to be a lead plaintiff, because you want to take an active role in the case, you're interested in the legal process, and that the financial interest or the loss that you suffered is something that's material to you. And it is with respect to Mr. Johnson.").

---

[8] The lead plaintiff analysis does not require a statement regarding the materiality of the alleged losses. Plaintiff volunteered this information. *See* 15 U.S.C.S. § 77z-1 (outlining the factors courts must consider when appointing a lead plaintiff).

16

Nevertheless, the single e-mail produced by Plaintiff during nearly eighteen months of discovery in this action[9] undermines Plaintiff's repeated representations about the "materiality" of his purported loss. Less than three weeks after filing the AC, and a few months after the Court appointed Mr. Johnson as Lead Plaintiff, Mr. Johnson explained to his own twin brother that he had all but forgotten that he even owned Astec stock. The only email record produced by Plaintiff includes the following conversation between Plaintiff and his twin brother, Larry Johnson, on September 13, 2019:

> **Larry Johnson**: "Did you know that ASTE was at $41 on our birthday, but now has dropped to $31. Do you still own it . . . Still not making a profit and still has a negative free cash flow with a puny 1% dividend. What do they DO all day?"
>
> **Plaintiff**: "***Oh, Jeez, yes, I still own it and haven't looked at it***. I may have to just bite the bullet and dispose of this one. I purchased it for $100k—it is now worth $50k."

Ex. D, Email dated September 13, 2019 Among Lead Plaintiff Lynn H. Johnson and Larry Johnson, produced by Lead Plaintiff Lynn Johnson on November 2, 2024 (emphasis added). Plaintiff, who just months earlier represented to this Court that he was driven by his purportedly material losses to want to take an active role in this litigation, was behind the scenes explaining that he was "surprised" by the decline in Astec's stock price since his birthday on April 13, despite filing a 71-page complaint less than a month before alleging Defendants had defrauded him and other similarly situated investors. Johnson Depo. 120:9-18 (A: And I think the question is, Was I surprised at the price of the stock when he – when he e-mailed me, and, yes, I was surprised."). It is hard to reconcile this private admission that he was not monitoring the investment with the polished representations about his capability and willingness to lead the class.

---

[9] In total, Plaintiff has produced three documents during discovery, in comparison to the more than 35,000 documents produced by Defendants.

17

In light of this, the formal declaration offered as evidence in support of Plaintiff's claim of adequacy does not satisfy Plaintiff's burden to affirmatively demonstrate adequacy. *See* Declaration of Lead Plaintiff Lynn Johnson ISO Pl.'s Mot. for Class Certification (Doc. 104-2) ("Declaration"). The Declaration "contains little more than formulaic, boiler-plate assertions over [three] pages of substantive text," which is insufficient to support a showing of adequacy. *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. at 146-47 (finding that a similar declaration submitted by lead plaintiff in support of her adequacy requirement, "with its dearth of supporting facts" failed to demonstrate adequacy). In fact, courts have concluded that nearly identical statements that lead plaintiff has participated in the matter by "communicating with counsel," "reviewing pleadings, reviewing and responding to Defendants' discovery requests, and otherwise monitoring the progress and status of the Action" fail to provide the evidence necessary to meet the Rule 23 adequacy standard. Declaration, ¶ 6. "Indeed, *any* potential class representative in *any* securities case could make almost identical assertions." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. at 146 (noting that "this type of generic detail is really no detail at all").

In particular, there are reasons to question the assertion that Plaintiff has been "reviewing and responding to Defendants' discovery requests." Declaration, ¶ 6. For instance, Plaintiff's discovery efforts are not suggestive of an active interest in the litigation. Plaintiff waited nearly six months to provide Defendants with a simple hit report for Defendants' proposed search terms and, through counsel, initially refused to conduct a basic, linear review of the few thousand documents identified using those search terms. To date, in response to Defendants' forty-seven document requests served in August of 2022, Plaintiff produced a total of three documents, consisting of a single email, Plaintiff's retention agreement with his counsel, and his trading records in Astec stock. This history casts doubt on Plaintiff's ability to act as a fiduciary for the

absent class and is an indication of inadequacy in and of itself. *See, e.g., Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136-37 (S.D.N.Y. 2007) (finding named plaintiff inadequate where he refused to produce documents until compelled by a court order); *McDaniel v. Cnty. of Schenectady*, No. 1:04-CV-757, 2005 U.S. Dist. LEXIS 14852, at *10 (N.D.N.Y. July 21, 2005) ("Refusing to answer proper discovery inquiries inexpugnably suggests that the representative would be less than adequate."); *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y. 1981) ("failure to comply with proper discovery inquiry may be considered on the issue as to whether a class representative lives up to his fiduciary obligation."). Accordingly, Plaintiff has not shown the adequacy requirement of Rule 23 is satisfied, as is required to grant a motion for class certification.

## IV. PLAINTIFF FAILS TO ESTABLISH TYPICALITY BECAUSE HIS PURPORTED "CLASS-WIDE" DAMAGES MODEL CREATES CONFLICTS OF INTEREST WITHIN THE CLASS.

To satisfy his burden under Rule 23(a)(3), Plaintiff must show that his claims are "typical of the class members' claims." *Young*, 693 F.3d at 542. "This requirement [e]nsures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Glazer v. Whirlpool Corp. ("In re Whirlpool Corp.")*, 722 F.3d 838, 852-53 (6th Cir. 2013) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). Plaintiff cannot satisfy the element of typicality because the lack of specificity in his common damages methodology creates conflicts of interest among class members related to how damages, if any, are calculated and apportioned. Allen Report, ¶ 38; *Norfolk Ctny. Ret. Sys. v. Cmty. Health Sys.*, 332 F.R.D. 556, 567 (M.D. Tenn. 2019) ("Lead Plaintiff's interests must be aligned with those of the putative class and, in pursuing its own claims, Lead Plaintiff must also advance the interests of the class members.") (citation omitted). Because Plaintiff cannot show that his interests are aligned with all class members, he cannot satisfy the element of typicality.

19

The conflict of interest presented by Plaintiff's common damages methodology arises from the lack of specificity in how Plaintiff proposes applying the damages limitation provision of the PSLRA, which sets forth the maximum amount an investor can be awarded when an investor sells stock outside the "90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market" ("Damages Limitation Provision"). *See* 15 U.S.C. §78u-4(e)(1); Allen Report, ¶ 37. The Damages Limitation Provision can be applied two ways:

- **Scenario 1: Application to the Last Alleged Corrective Disclosure:** Plaintiff's common damages methodology only specifies the application of the Damages Limitation Provision to the last corrective disclosure alleged in the AC. Werner Report, ¶ 119(iii) (identifying the "final corrective disclosure date" as the date from which the Damages Limitation Provision would apply). In Plaintiff's view, each class member's damages are limited to the difference between the price at which they purchased their Astec stock and the mean trading price during the 90-day period following the final alleged corrective disclosure date on October 23, 2018. For example, in this scenario, Class Member A who purchased stock in November 2016 at $65 per share and sold stock after the end of the Class Period would have their damages capped by the 90-day lookback price after the end of the Class Period of $34.21. Class Member B who purchased stock in August 2017 at $45 per share and sold in mid-October 2017 would not be affected by the 90-day lookback price after the end of the Class Period because they sold before the end of the Class Period. *See* Allen Report, ¶ 41.

- **Scenario 2: Application to Each Alleged Corrective Disclosure:** The Damages Limitation Provision could also be applied to each corrective disclosure alleged in the

20

AC.  *See In re Zoom Sec. Litig.*, No. 20-cv-02353, 2021 U.S. Dist. LEXIS 70506, at *2-3 (N.D. Cal. Apr. 12, 2021) ("Nothing in the plain language of the Private Securities Litigation Reform Act (PSLRA) prohibits the use of multiple disclosure dates to determine a plaintiff's financial stake in the litigation.").  Applied this way, each class member's damages are limited to the difference between the price at which they purchased their Astec stock and the mean trading price during the 90-day period following the last corrective disclosure *before they sold their stock*.  In this scenario, like in Scenario 1, Class Member A who purchased stock in November 2016 at $65 per share and sold stock after the end of the Class Period would have their damages capped by the 90-day lookback price after the end of the class period of $34.21.  But Class Member B who purchased stock in August 2017 at $45 per share and sold in mid-October 2017, after the second corrective disclosure, would have their damages capped by the 90-day lookback price after the second corrective disclosure of $53, rather than the cap after the final corrective disclosure.  In this scenario, Class Member B would receive no damages since their purchase price was below the 90-day lookback price.  *See* Allen Report, ¶ 42.

Plaintiff's common damages methodology, summarized above in Scenario 1, creates a conflict of interest between Class Member A and Class Member B.  Class Member A would prefer and have a larger economic interest in Scenario 2, which limits the recovery of class members who sold before the last alleged corrective disclosure, including those who made a profit on their Astec stock, leaving a larger portion of the recovery for class members who held through the entire period.  *See* Allen Report, ¶ 43.  On the flip side, Class Member B would prefer and only receive damages under Scenario 1 because the Damages Limitation Provision is only applied to the last

21

alleged corrective disclosure, after they sold their shares. The conflicts raised by the choice between Scenarios 1 and 2 could potentially affect a large portion of putative class members because Astec's stock price returned to or exceeded its previous trading price after multiple corrective disclosures, meaning that there are innumerable trading patterns that could place a class member in the same conflicted situation as Class Member B.

It is not clear that Plaintiff even thought about this conflict, as he offers no proposal to resolve it in his description of his common damages methodology. Given the conflict of interest raised by the common damages methodology selected by Plaintiff, and Plaintiff's failure to grapple with this issue, Plaintiff cannot demonstrate his "interests are aligned with the interests of the represented class members" or that he is able to "advocate the interests of the class members," as is required to satisfy the typicality requirement of Rule 23(a). *In re Whirlpool Corp.*, 722 F.3d at 852-53; *see also Smith v. Lifevantage Corp.*, 341 F.R.D. 82, 114 (D. Utah 2022) (denying class certification in a securities fraud case because plaintiffs had not demonstrated "why the multiple individualized damages determinations apparently needed in this case would not overwhelm the common issues").

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Motion be denied. This 22nd day of January, 2024.

**ALSTON & BIRD**

/s/ Elizabeth Gingold Clark
Elizabeth Gingold Clark *(admitted pro hac vice)*
elizabeth.clark@alston.com
John A. Jordak, Jr. *(admitted pro hac vice)*
john.jordak@alston.com
Courtney E. Quirós *(admitted pro hac vice)*
courtney.quiros@alston.com
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

22

Telephone: (404) 881-7000
Facsimile: (404) 881-7777

**CHAMBLISS, BAHNER & STOPHEL, P.C.**

John G. Jackson
jjackson@chamblisslaw.com
605 Chestnut Street, Suite 1700
Chattanooga, Tennessee 37450
Telephone: (423) 756-3000

*Attorneys for Defendants Astec Industries, Inc. and Benjamin G. Brock.*

23

## CERTIFICATE OF SERVICE

I hereby certify that on January 22nd, 2024 I electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing upon all Counsel of Record.

**ALSTON & BIRD**

By: <u>/s/ Elizabeth Gingold Clark</u>
Elizabeth Gingold Clark
(*admitted pro hac vice*)