# Exhibit A

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

CITY OF TAYLOR GENERAL          )  No.
EMPLOYEES RETIREMENT SYSTEM,    )  1:19-cv-00024-CEA-CHS
Individually and on Behalf      )
of All Others Similarly         )  CLASS ACTION
Situated,                       )
                                )
                Plaintiff,      )
                                )
       vs.                      )
                                )
ASTEC INDUSTRIES, INC.,         )
BENJAMIN G. BROCK and DAVID     )
C. SILVIOUS,                    )
                                )
                Defendants.     )
_____)

CONFIDENTIAL

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

ADAM WERNER, Ph.D.

January 9, 2024

9:05 a.m.

Pismo Beach, California

Reported by:  Marcella Daughtry, RPR, RMR

CA CSR 14315

GA No. 6595-1471-3597-5424

Case 1:19-cv-00024-CEA-CHS   Document 106-2   Filed 01/22/24   Page 2 of 11
PageID #: 2017

cases where you prepared a report. So I am asking about cases that you worked on.

Do you -- can you estimate the number of cases that you worked on where The Rosen Law Firm represented the plaintiff either as counsel or co-counsel?

A So "worked on" is an extremely -- I -- I have no idea as I sit here today.

Again, I can go -- I can tell you which cases -- or I can attempt to tell you which cases or how many cases I have been retained as an expert by The Rosen Law Firm. And when I say "expert," meaning that I was asked to either prepare a report, be deposed, et cetera.

Q How many cases were you retained as an expert by The Rosen Law Firm?

A So let's -- let's go through this.

Q An estimate is fine, unless you cannot provide an estimate.

A Well, how many -- how many cases are there in my vitae where I'm listed as an expert? Do you want me to count those and then tell you a percentage of that? Do -- or do you want me to do something else?

Q I'm asking if you can estimate the number of cases where you've been retained by The Rosen Law Firm as an estimate. Is --

MR. TYRE-KARP: Objection. Asked and answered.

Case 1.19-cv-00024-CEA-CHS    Document 106-2    Filed 01/22/24    Page 3 of 11
PageID #: 2018

THE WITNESS:  As an --

Q   BY MS. SHEAR:  Is the only way that you --

A   I'm sorry, now I'm confused.  So now you want an estimate, but -- you didn't say "expert."  I'm assuming we're still talking about when I'm serving as an expert in this case?

I mean, look, if you want to go -- I'm happy to count -- count through all the cases.  I would guess 60 percent of the cases where I'm listed as an expert in my -- in Exhibit 1 to this -- this matter or to this deposition.

But again, if you want me --

Q   Sure.

A   -- to go ahead and try to count them --

Q   Let's count them --

A   -- I'm happy --

Q   -- yeah.

A   -- to do that.

Is that how you want me to do that?

Q   Yeah.

A   Okay.  I believe 31, but that's -- that's just an estimate.

Q   So --

A   Oh, I didn't include this one.  So 32.

And so again, to the extent that I have

testified in over 50 cases, that's around that 60 percent figure I was discussing earlier.

Q   To your knowledge, has The Rosen Firm ever recommended you to other lawyers who subsequently engaged you as an expert in a class action -- in a securities class action?

MR. TYRE-KARP:  Objection to --

THE WITNESS:  Not to --

MR. TYRE-KARP:  -- form.

THE WITNESS:  -- my knowledge, no.  Not to my knowledge.

Q   BY MS. SHEAR:  Have you been deposed before?

A   I have.

Q   How many times?

A   Including today?

Q   Yes.

A   Well, let's go -- let's go back to my report.  I believe 31 times, but that's -- I may have missed a couple.

Q   Have you testified in court or at arbitration?

MR. TYRE-KARP:  Objection to form.

THE WITNESS:  Yes.

Q   BY MS. SHEAR:  How many times?

MR. TYRE-KARP:  Objection to form.  Compound.

THE WITNESS:  Somewhere between three and five

Case 1:19-cv-00024-CEA-CHS   Document 106-2   Filed 01/22/24   Page 5 of 11
PageID #: 2020

back on the record.

Q   BY MS. SHEAR:  Have you ever been retained by a defendant as an expert in a securities class action?

A   In a securities class action, as an Attendee 5 or Section 11 case, as an expert, I don't believe so.  Or as I sit here today, I don't believe so.

Q   In what percentage of the cases where you have been retained as an expert in a securities class action did you issue a report opining whether the company stock traded in an efficient market?

A   Well, it -- it --

MR. TYRE-KARP:  Object to the form.

THE WITNESS:  So I -- I think we've just established, based on your previous question, that the majority, if not all, of my securities reports have been issued on behalf of plaintiffs.  So are you asking me whether I have ever reached a conclusion that a stock has not traded in an efficient market?  Because to the extent I have been retained by plaintiffs, when I reach that conclusion, they don't often ask me to submit a report.

Oh, well, let's see.

Yeah, I think that's the right answer to that question.

Q   BY MS. SHEAR:  Okay.  I don't think you answered my question.

Case 1:19-cv-00024-CEA-CHS    Document 106-2    Filed 01/22/24    Page 6 of 11
PageID #: 2021

MS. SHEAR:  Madam Court Reporter, can you read the question back.

(The requested portion of the record was read by the court reporter as follows:

"In what percentage of the cases where you have been retained as an expert in a securities class action did you issue a report opining whether the company stock traded in an efficient market?")

THE WITNESS:  So okay.  With -- again, with the specifics that I have been retained as an expert and issued a report, so ignoring all the cases where I have been retained as an expert and reached a conclusion that a stock didn't trade in an efficient market and did not issue a report, I believe possibly one, but I don't recall as I sit here today.

Q   BY MS. SHEAR:  When you say you believe possibly one, what is the one that you recall?

MR. TYRE-KARP:  Objection.

THE WITNESS:  Oh, sorry.

Here, I will get the -- hold on.  Let me pull up.

So looking at my Exhibit 1 to Exhibit 1 of this deposition, it's possible I did that in In re January 2021 Short Squeeze Trading Litigation.  So I -- I certainly found that the stocks traded in an efficient

Case 1:19-cv-00024-CEA-CHS   Document 106-2   Filed 01/22/24   Page 7 of 11
PageID #: 2022

A    I believe that's what I stated.

Q    The complaint includes allegations about multiple dates on which information about the allegations in the complaint was released.

Is that -- do you -- do you understand that?

A    You -- I'm -- I'm sorry.  No.  What -- what --

Q    Are there more than these five dates listed in the complaint as dates on which allegation-related information was released?

A    Okay.  So now you want me to look at that complaint?  I'd like to --

Q    If you need to look at the complaint, you can look at the complaint.  Yes, if you'd like to.

A    I mean, I'd like to try to answer the question as accurately as possible.  So I'm -- I'm going to look at the complaint.

All right.  I believe the -- I didn't look at the additional dates because they were not considered to be corrective in nature, which is why we used the subsequent event study analysis, the news/no news analysis, which it provides a more broad look at a event study or the impact of information on a stock's price.

Q    When you say you didn't look at the additional dates because they were not considered to be corrective in nature, does an allegation-related event study only

800.808.4958                                                        770.343.9696

consider events that are considered to be corrective in nature?

A   Sometimes, not always.  But again, that's why you rely on the news/no news analysis as a check against your initial event study.

Q   What makes --

A   It's generally also why courts tend to favor the news/no news analysis when looking at Factor 5.

Q   How did you determine which dates were corrective in nature?

A   Based on the complaint.

Q   So --

A   Based on my reading of the complaint.

Q   So you -- you used only dates selected by plaintiff to include in the complaint in your allegation-related event study.

MR. TYRE-KARP:  Objection.  Misstates the testimony.

Q   BY MS. SHEAR:  Am I correct?

A   I'm -- I'm sorry.  Could you reread the question.

Q   I can rephrase.

All of the dates that you considered as part of your allegation-related event study were selected by plaintiff to include in the complaint; is that correct?

Case 1.19-cv-00024-CEA-CHS    Document 106-2    Filed 01/22/24    Page 9 of 11
PageID #: 2024

at that number.

And as I've stated -- as I've stated previously, you know, courts have looked at a 90 percent confidence interval or below a 90 percent confidence interval and found that that is indicative of a statistically significant difference.

So as I sit here today, I don't know how scientists initially arrived at the decision to, for the most part, look at a 95 percent confidence interval when trying to determine whether or not two samples or two observations are statistically different from one another.

Q   BY MS. SHEAR:  The 90 -- do I understand correctly that you are saying the 95 percent confidence interval is traditionally used in scientific studies?

A   I don't know if I would say "traditionally."  I think it depends on the scientific study.

Q   And you --

A   I -- it's safe -- it's safe to say it's oftentimes used.

Q   Are you aware of any scientific paper or source, other than that St. Jude case, that supports the proposition that while the 50 percent filter for high information flow days did not exceed the threshold for statistical significance, this result is both

Case 1:19-cv-00024-CEA-CHS   Document 106-2   Filed 01/22/24   Page 10 of 11
PageID #: 2025

unsurprising and informative of market efficiency?

MR. TYRE-KARP:  Objection to form.

THE WITNESS:  Am I familiar?  I -- I am not sure that anyone has addressed this particular study.

I really -- I don't understand the question. I'm not quite sure how to answer it given that I don't understand it.

Q   BY MS. SHEAR:  Well, you -- you previously said the St. Jude case would support the proposition that you have here; that while the 50 percent filter for high information flow days did not exceed the threshold for statistical significance, this result is both unsurprising and informative of market efficiency.

I'm asking if you are aware of any other sources that would represent that proposition?

A   Common sense.  I mean, look, if I'm looking at a 10 percent filter, I'm looking at two extremes, right? Stuff where there's a lot of -- a lot of information -- a lot of news articles coming out on a day, and a day where there is almost no news articles coming out.

If I'm looking at a 50 percent filter, I could be looking at days where on one side you have three news articles that's in -- let's say that's a news day, and you have another sample where the threshold for a non-news day is two articles.