# Exhibit B

| | | |
|---|---|---|
| CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 1:19-cv-00024-PLR-CHS |
| Plaintiff, | ) ) | |
| vs. | ) ) | CLASS ACTION |
| ASTEC INDUSTRIES, INC. and BENJAMIN G. BROCK | ) ) ) | Judge Charles E. Atchley |
| Defendants. | ) ) ) | Mag. Judge Christopher H. Steger |

# EXPERT REPORT

# OF

# LUCY P. ALLEN

**January 22, 2024**

**TABLE OF CONTENTS**

I.     Scope of Assignment ........................................................................................................1

II.    Qualifications and Remuneration ...................................................................................1

     A. Qualifications...........................................................................................................1

     B. Remuneration..........................................................................................................2

III.   Materials Considered .....................................................................................................2

IV.   The Werner Declaration's Analysis of the Fifth *Cammer* Factor Is Non-Standard, Unscientific, Unreliable, and Biased ..............................................................................3

     A. Summary of the Werner Declaration's analysis of the Fifth *Cammer* Factor ...............3

     B. The Werner Declaration's main test of market efficiency is non-standard, unscientific, unreliable, and biased.................................................................................8

     C. The Werner Declaration's "check" test against his main test of market efficiency is unscientific, unreliable, and inconsistent with his prior reports...............................13

V.    The Werner Declaration's Proposed Common Damages Methodology Is Not Well-Specified and Fails to Explain How to Apply the PSLRA's 90-Day Lookback Provision to Members of the Proposed Class Who Sold Before the End of the Alleged Class Period, Which Results in Potential Conflicts Among Members of the Proposed Class ..............................................................................................................................18

i

# I. SCOPE OF ASSIGNMENT

1.      I have been asked by counsel for Defendants Astec Industries, Inc. ("Astec") and Benjamin G. Brock (former Astec CEO) to review and comment on the Declaration of Dr. Adam Werner, dated December 18, 2023 ("Werner Declaration") with regard to two issues. In particular, I have been asked to analyze the following two issues:

- Whether the Werner Declaration's market efficiency analysis of the fifth *Cammer* factor ("Fifth *Cammer* Factor") the factor the courts have found to be the "most important" in determining whether a market is efficient, is standard and reliable; and

- Whether the Werner Declaration's proposed common damages methodology is well-specified.


# II. QUALIFICATIONS AND REMUNERATION

## A. Qualifications

2.      I am a Senior Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

3.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues. In my over 25 years at NERA, I have been

1

engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies. My resume with recent publications and testifying experience is included as Appendix A.

## B. Remuneration

4. NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $1,200 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## III. MATERIALS CONSIDERED

5. In preparing this report, I considered the following materials:

a) Complaint, filed February 1, 2019 ("First Complaint");

b) Motion by Lynn Johnson for Appointment as Lead Plaintiff and Approval of Selection of Counsel, filed April 2, 2019, including Exhibit B;

c) Order on Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel, filed June 26, 2019;

d) Amended Complaint, filed August 26, 2019 ("Complaint");

e) Memorandum Opinion and Order on Defendants' Motion to Dismiss Amended Complaint, filed February 19, 2021;

f) Opinion on Appeal to Memorandum Opinion and Order on Defendants' Motion to Dismiss Amended Complaint, filed March 31, 2022;

g) Declaration of Phillip Kim in Support of Plaintiff's Motion for Class Certification, filed December 18, 2023;

h) Memorandum of Law in Support of Plaintiff's Motion for Class Certification, filed December 18, 2023;

2

i)  Werner Declaration, including exhibits, appendices, and materials considered and produced;

j)  Deposition of Dr. Adam Werner, dated January 9, 2024 ("Werner Deposition");

k)  Deposition of Lynn Johnson (Lead Plaintiff), dated January 12, 2024 ("Johnson Deposition");

l)  Dr. Werner's reports in other matters and complaints associated with those matters;

m) Price and trading volume data for Astec from Bloomberg, L.P.;

n)  Analyst reports on Astec from Refinitiv Eikon and the Company;

o)  Astec's filings with the Securities and Exchange Commission ("SEC") between 2016 and 2019;

p)  News stories on Astec from Factiva;

q)  Court decisions in securities class action cases; and

r)  Academic literature and textbooks on finance, securities, valuation, and statistics.

## IV.  THE WERNER DECLARATION'S ANALYSIS OF THE FIFTH *CAMMER* FACTOR IS NON-STANDARD, UNSCIENTIFIC, UNRELIABLE, AND BIASED

### A.  Summary of the Werner Declaration's analysis of the Fifth *Cammer* Factor

6.  Dr. Werner purports to determine whether Astec's stock traded in an efficient market during the period between July 26, 2016 and October 22, 2018 (the alleged "Class Period") by analyzing several factors considered in the *Cammer*, *Unger*, and *Krogman* decisions.[1]

---

[1]  Werner Declaration, ¶¶25, 105. See also, *Cammer v. Bloom*, 711 F.Supp. (D.N.J. 1989) at 1264, *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005), and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

7.    Dr. Werner considers the *Cammer* decision to be the "seminal decision on demonstrating market efficiency[.]"[2] The *Cammer* Court applied five factors in its analysis of market efficiency.[3] The *Cammer* Court found that the fifth factor, which analyzes a "cause and effect relationship" between news and the stock price, is the "essence of an efficient market" and the "foundation of the fraud on the market theory."[4] Other courts have stated that the Fifth *Cammer* Factor, the cause-and-effect relationship, is the "most important" factor in determining whether a market is efficient.[5]

***The Werner Declaration's Main Test of Market Efficiency***

8.    Dr. Werner's analysis of market efficiency for the Fifth *Cammer* Factor has a main test, based on an event study of the dates on which allegedly "corrective" information was disclosed, and a "check" of his main market efficiency test, where Dr. Werner purports to test whether or not Astec's stock price reacted differently on "news days" versus "non-news days" during the alleged Class Period.[6]

9.    For his main test, Dr. Werner performs his analysis of market efficiency for the Fifth *Cammer* Factor by conducting an event study of the price reactions on the dates after which allegedly "corrective" information was disclosed to the market.[7] Dr. Werner claims to have identified from Plaintiff's Complaint five dates that according to him were pled as alleged corrective disclosures on which "important, relevant[,] and material information was disclosed."[8] The five dates that Dr. Werner claims as alleged corrective disclosures are:

- July 25, 2017;

---

[2]    Werner Declaration, ¶22.

[3]    *Cammer*, 711 F.Supp. at 1264.

[4]    *Cammer*, 711 F.Supp. at 1264.

[5]    "The fifth factor (cause-and-effect relationship) is 'in many ways, the most important,' … and was recognized in *Cammer* itself as 'the essence of an efficient market and the foundation for fraud on the market theory[.]'" See *In re PolyMedica Corp. Litig.*, 453 F.Supp. 2d 260, 266 (D. Mass. 2006). See also, *Loritz v. Exide Techs.*, 2015 WL 6790247, at \*9-10 (C.D. Cal. July 21, 2015); *In re 2TheMart.Com, Inc. Sec. Litig.*, 114 F.Supp.2d 955, 964 (C.D. Cal. 2000); *Cammer*, 711 F.Supp. at 1287.

[6]    Werner Deposition, 88:23-89:5 and 95:12-16.

[7]    Werner Deposition, 83:11-15, 88:17-19, and 95:12-16.

[8]    Werner Declaration, ¶52.

4

- October 2, 2017;

- October 24, 2017;[9]

- July 24, 2018; and

- October 23, 2018.

10. Dr. Werner then performs an event study to test Astec's price reactions on each of those dates.[10] According to Dr. Werner, the result of this event study analysis "**best determines** whether the market for Astec stock was efficient for purposes of the fraud-on-the-market principle."[11] In other words, Dr. Werner's main test of market efficiency for the Fifth *Cammer* Factor is just to use an event study to test whether there is a significant price reaction on the dates that he claims the Complaint is alleging as corrective disclosures. Based on his event study, Dr. Werner finds that there was a statistically significant price decline in Astec's stock after each of the five alleged corrective disclosures he identifies from the Complaint.[12]

11. The chart below shows Astec's daily stock price and trading volume during the alleged Class Period, along with the five dates claimed by Dr. Werner as alleged corrective disclosures and the Complaint's alleged misrepresentations.

---

[9] As discussed in Section IV. B., the Complaint does not describe this date as an alleged corrective disclosure date. Instead, the Complaint describes this date as an alleged misrepresentation date. Dr. Werner adds this date as an alleged corrective disclosure date with no explanation.

[10] Werner Deposition, 114:24-115:7 and Werner Declaration, ¶¶65-79.

[11] Werner Declaration, ¶50, emphasis added.

[12] Werner Deposition, 115:18-23 and Werner Declaration, ¶¶65-79.



The chart titled "Astec Daily Stock Price and Trading Volume" shows:
- Legend: Yellow circle = Alleged Misrepresentations; Red circle = Alleged Corrective Disclosures
- Alleged Class Period: July 26, 2016 through October 22, 2018

**7/25/17 2Q17 earnings**
Astec reveals that margin for the Hazlehurst plant was "significantly less than we anticipated" and reveals that it "would not be recognizing any new pellet plant order in 2017"

**10/2/17**
Astec discloses that it is undertaking "substantial design upgrades" to correct "design flaws" at Highland and Hazlehurst

**10/24/17 3Q17 earnings**
Astec reports EPS "below analysts' consensus" and declining Infrastructure revenues.
Date Dr. Werner includes as an additional alleged corrective disclosure.

**7/24/18 2Q18 earnings**
Astec announces that it will "pay $68 million and forgive an additional $7 million" to exit Highland contract and that it is "removing [Hazlehurst] from its backlog"

**10/23/18 3Q18 earnings**
Astec announces lower than expected EPS and says that it "could end up owning" Hazlehurst

Sources:
Data from Bloomberg, L.P. Events from the Complaint and the Werner Declaration.

### *The Werner Declaration's News vs. No-News "Check" Test*

12. In addition, as a "check" of his main market efficiency test, Dr. Werner purports to test whether or not Astec's stock price reacts differently on "news days" versus "non-news days" during the alleged Class Period.[13]

13. Dr. Werner uses two ways of defining news for Astec using Factiva, the news aggregator. The first method classifies "news" as any article about Astec according to Factiva's indexing feature.[14] The second method classifies "news" as any Factiva article with Astec in "either the article's title or first paragraph."[15] As an additional, alternative definition of news, Dr. Werner uses Astec's nine earnings announcements during the alleged Class Period.[16]

---

[13] Werner Deposition, 88:23-89:5.

[14] Werner Declaration, ¶81.

[15] Werner Declaration, ¶86.

[16] Werner Declaration, ¶¶90, 92.

14. Dr. Werner then performs statistical tests to determine whether Astec's stock reacts differently on news versus non-news days ("News vs. No-News"). The statistical test essentially tests whether the number of statistically significant reactions on "news days" is more than would be expected by chance relative to "non-news days."

15. Before Dr. Werner performs his News vs. No-News tests, he applies three alternative "filters" to his first two methods of defining news. Dr. Werner's filters reduce the number of "news days" based on the number of news stories on each day: a) the top 50% of "news days" with the greatest frequency of news articles; b) the top 25%; and c) the top 10%.[17] Thus, in total, Dr. Werner performs seven News vs. No-News tests. The table below summarizes the results of Dr. Werner's News vs. No-News tests using Factiva articles on Astec.

| Werner's News vs. No-News "Check" Test Results | | | | |
|---|---|---|---|---|
| | No Filter (Not Shown by Werner) | 50% Filter | 25% Filter | 10% Filter |
| Factiva Articles on Astec | **Not Stat. Sig.** | **Not Stat. Sig.** | Stat. Sig. | Stat. Sig. |
| Factiva Articles with Astec in Title or First Paragraph | **Not Stat. Sig.** | **Not Stat. Sig.** | Stat. Sig. | Stat. Sig. |
| **Source:** Werner Declaration. | | | | |

16. Dr. Werner finds a statistically significant difference between Astec's stock price reactions on "news days" versus "non-news days" when applying the 25% or 10% filters.[18] Both of his tests using the "50% filter" result in *no* statistically significant difference.[19] Although he does not report the results, his tests without the filters also result in a finding of no statistically significant difference between "news days" and "non-news days."[20]

---

[17] Werner Declaration, ¶¶84, 88.

[18] Werner Declaration, Exhibit 11.

[19] There is no statistically significant difference at the 5% significance level, which is the standard Dr. Werner uses in his "Collective Tests Results" table in Exhibit 11 of the Werner Declaration and when testing price reactions (Werner Declaration, ¶63).

[20] The Werner Declaration does not present any results for his News vs. No-News tests using the Factiva-based "news" definitions without the filters. However, Dr. Werner's methodology for his 50% filter does not end up filtering any "news days." See, for example, Werner Declaration, ¶¶83, 85, 87, 89, showing the same number of days for all "news days" and the "news days" as a result of the 50% filter. Thus, as shown by Dr. Werner's own

7

### B. The Werner Declaration's main test of market efficiency is non-standard, unscientific, unreliable, and biased

17. Dr. Werner's main test of market efficiency for the Fifth *Cammer* Factor, which involves conducting an event study of the price reactions on the dates after the alleged corrective disclosures, is non-standard, unscientific, unreliable, and biased. Dr. Werner provides no support for using this test, and I am not aware of any authority who claims that this is an appropriate test for analyzing market efficiency under the Fifth *Cammer* Factor.

18. Dr. Werner's test is non-standard and unscientific in that it does not have any reliable and objective criteria for selecting the dates for which he tests price reactions. It is not surprising to find statistically significant price drops on dates that Plaintiff has chosen to allege as corrective disclosures in the Complaint. Stock price drops often spur securities class action filings and the dates alleged as corrective disclosures are presumably selected by plaintiffs' counsel to "increas[e] potential damages."[21] In fact, the very literature Dr. Werner cites with regard to analyzing the Fifth *Cammer* Factor *explicitly* states that one should exclude "those days alleged to be corrective disclosure(s)," when testing the stock's price reactions to information, as "plaintiffs would normally choose a class period where corrective disclosures coincide with large negative price movements; including those days in the analysis would bias the results."[22]

19. Courts have similarly found that using dates picked by plaintiffs to test for market efficiency is unscientific and unreliable. For example, the Court in *Bell v. Ascendant Solutions, Inc.* found that plaintiffs' expert's testimony concerning market efficiency was unreliable and biased, noting that "[Plaintiffs' expert] Professor Pettit's identification of 'information days' includes dates that appear to be consciously chosen in order artificially to support his hypothesis of efficiency."[23] Moreover, the Court in *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, in excluding plaintiffs' expert's

---

results using the 50% filter, without any filter, Dr. Werner's tests would yield no statistically significant difference between Astec's stock price reactions on "news days" versus "non-news days."

[21] *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, No. 4:08CV0160, 5 (N.D. Ohio August 14, 2018).

[22] Ferrillo, Paul A., Frederick C. Dunbar, and David Tabak, "The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. Johns Law Review* (Vol. 78, 2004), p. 119 and footnote 155.

[23] *Bell v. Ascendant Solutions, Inc.*, No. 3:01CV0166N, 2004 WL 1490009, 3 (N.D. Tex. July 1, 2004).

testimony, cited the criticism that "using the last day of a class period [which was an alleged corrective disclosure] is not a scientifically valid way to test for market efficiency because, among other reasons, securities plaintiffs intentionally select such dates for purposes of increasing potential damages."[24]

20.     Moreover, Dr. Werner's selection of these five dates to test appears to be an example of "data snooping," which means using what is already known to design an empirical test.[25] Dr. Werner's test, rather than analyzing if Astec's stock traded in an efficient market where "publicly available information is incorporated in the security price," instead analyzes dates that appear to have been chosen because there were large price drops. A simple reading of the Complaint indicates that Plaintiff pled four alleged corrective disclosures – July 25, 2017, October 2, 2017, July 24, 2018, and October 23, 2018.[26] The Complaint refers to these four dates as "partial disclosures" or dates when "Defendants finally disclose the truth," and specifically attributes the stock price drops on those days to information that was supposedly corrective of the alleged fraud.[27] Thus, not only would Plaintiffs have selected these dates because they had large price drops, but by reviewing the Complaint, Dr. Werner would have already known that there were large price declines on these days before he performed his event study.

21.     To compound the unreliable, unscientific, and result-oriented nature of his analysis, without any explanation, Dr. Werner also chooses to include October 24, 2017, the date Astec announced 3Q2017 results, as an additional alleged corrective disclosure for his market efficiency test. The Complaint does not describe this date as a "partial disclosure" or attribute the stock price drop on that day to any new information that was supposedly corrective of the alleged fraud. Instead, the Complaint describes this date as an alleged misrepresentation where

---

[24]  *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, No. 4:08CV0160, 5 (N.D. Ohio August 14, 2018).

[25]  See, for example, Tabak, David, "*p*-Hacking and Event Studies in Securities Litigation," *NERA Economic Consulting*, 2023, p. 1 ("This latter procedure, using the results to determine the methodology, is known in the statistical literature by terms such as data mining, data snooping, researcher degrees of freedom, and p-hacking and may invalidate the resulting statistical conclusions."). See also, Green, Michael D., D. Michal Freedman, and Leon Gordis, "Reference Guide on Epidemiology," *Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial Center, 3rd ed., 2011), p. 622, on "data dredging," a term also synonymous to data snooping.

[26]  Complaint, ¶¶124-138, 152-156, 159-161.

[27]  Complaint, ¶¶124, 127, 129, 138, 152, 156, 159.

9

Defendants "failed to disclose adverse facts pertaining to the Company's business, operations and prospects."[28] According to Dr. Werner's event study, there is a statistically significant price decline on this date. When asked about how he determined "which dates were corrective in nature," Dr. Werner merely repeatedly testified that he did so "[b]ased on my reading of the [C]omplaint" without specifying any criteria.[29] Thus, it appears that his inclusion of October 24, 2017 as an alleged corrective disclosure for his test was driven by the large price drop on this date.

22. The unreliable and unscientific nature of Dr. Werner's choice of dates to test for market efficiency is further exemplified by the fact that he does not test any of the other fraud-related dates mentioned in the Complaint, including all the other alleged misrepresentations. Thus, Dr. Werner's selection of dates to test market efficiency appears to be merely an exercise of "data snooping." The Court in *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.* found that "data snooping," similar to what Dr. Werner does in this case, "violates the axiom that research should not be 'motivated by […] past investigations [of the data],'"[30] which in this case means prior knowledge of price drops on certain dates.

23. Dr. Werner's choice of dates to test for market efficiency highlights how his analysis lacks an objective method and is subject to selection bias. An analysis is said to suffer from sample selection bias when the data used in the analysis itself is chosen (directly or indirectly) on the basis of the outcome that the analysis intends to study.[31]

---

[28] Complaint, ¶¶140-141, 143.

[29] Werner Deposition, 89:9-13.

[30] Memorandum of Opinion and Order, *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, No. 4:08CV0160, 14 (N.D. Ohio August 14, 2018). In this case, the Court found that plaintiff's expert's selection of dates to test for market efficiency "was entirely improper because you are supposed to hypothesize and then see your results" and "[y]ou are not supposed to know your results in advance."

[31] See, for example, Stock, James H. and Mark W. Watson, *Introduction to Econometrics* (Pearson Education, Inc., Boston, MA, 2003), p. 250. Moreover, as Freedman, Pisani, and Purves explain in their textbook, *Statistics*, "Some samples are really bad. To find out whether a sample is any good, ask how it was chosen. Was there selection bias?" The authors state that, "A sampling procedure should be fair, selecting [data] for inclusion in the sample in an impartial way, so as to get a representative cross section[.]" Freedman, David, Robert Pisani, and Roger Purves, *Statistics* (W. W. Norton & Company, Inc.: New York, 4th ed., 2007), pp. 335-336.

10

24.     The unreliable, unscientific, and result-oriented nature of Dr. Werner's methodology is further demonstrated by examining the choices he made in other cases where he tested market efficiency. For example, in *In re Innocoll Holdings Public Limited Company Securities Litigation* ("*Innocoll*"), Dr. Werner's claim regarding his main test for market efficiency was the same as in this case – that he is testing the "the empirical behavior" of the stock "following the disclosure of allegation-related information."[32] However, while the Complaint in *Innocoll* pled 12 fraud-related dates, Dr. Werner only selected six of those dates to include in his test (five alleged misrepresentations and one alleged corrective disclosure).[33] The six dates Dr. Werner selected are the *only* dates among the 12 fraud-related dates with a statistically significant price movement according to his event study.[34] Dr. Werner provided no rationale as to why he selected and tested the six dates and ignored the other six fraud-related dates. Similarly, in this case, Dr. Werner appears to have cherry-picked the dates to include in his test, ignoring all of the alleged misrepresentation dates, except the one date that Dr. Werner claims is an alleged corrective disclosure date but was pled as an alleged misrepresentation date in the Complaint. Thus, Dr. Werner's selection of dates to test for market efficiency is unscientific, lacks any reliable, objective criteria, and appears merely result-driven.

25.     Dr. Werner claims that the results of his main test of market efficiency "ascertain that the market for Astec stock was efficient, not only generally, but also with respect to the particular information at issue in this case."[35] He is wrong. Not only is Dr. Werner's test non-standard, unscientific, and unreliable for testing market efficiency in general, but it is also unreliable for testing whether Astec's stock was efficient with respect to the "particular information at issue in this case" or whether that information even affected Astec's stock price.[36]

---

[32] Dr. Werner's Declaration in *Innocoll*, dated August 31, 2020, ¶59. As additional examples of this issue, see Dr. Werner's Declaration in *Voulgaris, et al. v. Array BioPharma, Inc. et al.* ("*Array*"), dated January 8, 2021, the Consolidated Class Action Complaint in *Array*, dated April 26, 2018, Dr. Werner's Declaration in *In re NIO, Inc. Securities Litigation* ("*NIO*"), dated June 21, 2022, and the Second Amended Class Action Complaint in *NIO*, dated September 18, 2020.

[33] Amended Class Action Complaint in *Innocoll*, dated May 25, 2017, ¶¶63-119 and Dr. Werner's Declaration in *Innocoll*, dated August 31, 2020, ¶61.

[34] Dr. Werner's Declaration in *Innocoll*, dated August 31, 2020, Exhibit 8.

[35] Werner Declaration, ¶50.

[36] Werner Declaration, ¶50.

26.     First, Dr. Werner's main test cannot reliably test whether the alleged corrective information affected the stock price, because it fails to account for any confounding information that might be driving the price reactions on his five chosen dates. In other words, Dr. Werner does nothing to analyze whether the price decline on his chosen alleged corrective disclosure dates is due to the allegedly corrective information disclosed on that date or other confounding information.

27.     Simple inspection of market commentary released around Dr. Werner's selected alleged corrective disclosure dates shows that the presence of confounding information is a problem. For example, on October 23, 2018, in addition to allegedly fraud-related news about its pellet plant business, Astec reported its Aggregate and Mining segment's revenue, which missed analysts' consensus expectation.[37] The new bad news about the Aggregate and Mining segment is not related to the pellet plant business, as the pellet plant business is in a different segment.[38]

28.     Second, Dr. Werner's main market efficiency test fails to analyze whether his event study's price reactions continue past one day. According to Dr. Werner's event study, there is a statistically significant stock price *increase* on October 3, 2017, the day after the statistically significant stock price *decline* on October 2, 2017, the second alleged corrective disclosure.[39] A review of analyst reports identified by Dr. Werner does not indicate there was any new information released about Astec on October 3, 2017.[40] According to Dr. Werner's event study, the stock rebounded such that the combined reaction to the alleged corrective disclosure over the

---

[37]  William Blair analyst report, dated October 23, 2018, p. 1. As another example, on July 24, 2018, in addition to allegedly fraud-related information about its pellet plant business, there was new negative news about the Infrastructure segment (beyond the pellet plant business). See, for example, William Blair analyst report, dated July 24, 2018, p. 1 ("[I]nfrastructure orders were quite weak, down 30%. […] Beyond the pellet plant announcement on Tuesday, the quarter was mixed overall.").

[38]  See, for example, Astec FY16 Form 10-K, filed March 1, 2017, p. 4.

Moreover, by this point in the alleged Class Period (and particularly after the first and second alleged corrective disclosures), analysts believed the pellet plant business was more of a "show-me" story and expectations about the pellet business had been reduced. See, for example, William Blair analyst report, dated July 25, 2017 and Dougherty analyst report, dated October 4, 2017.

[39]  Werner Declaration, Exhibit 8.

[40]  Based on Exhibit 2 of the Werner Declaration. Dr. Werner's list of analyst reports has one analyst report issued on October 3, which repeats the same information from another report on October 2. See, Seaport analyst reports issued on October 2 and 3, 2017.

two days is *not* statistically significant.[41] Thus, it is unclear how these results could be supportive of Dr. Werner's conclusion that the allegedly corrective information affected the stock price, much less of his conclusion of market efficiency.[42]

### C. The Werner Declaration's "check" test against his main test of market efficiency is unscientific, unreliable, and inconsistent with his prior reports

29. Not only is Dr. Werner's main test of market efficiency non-standard, unscientific, unreliable, and biased, but his "check" test against his main test also suffers from these issues as well as being inconsistent with the methodology in his prior reports. In addition to his main test of market efficiency (based on the five selected alleged corrective disclosure dates), Dr. Werner attempts to test whether Astec's stock price reacted differently on "news days" vs "non-news days," *i.e.*, his News vs. No-News tests.[43] Dr. Werner's methodology for performing these tests is neither scientific nor objective and is inconsistent with the methodology he used in prior reports, demonstrating the result-oriented nature of his methodology.

30. Dr. Werner applies three different news-frequency based filters (50%, 25%, and 10%) to reduce his number of "news days" and reclassify some of his "news days" as "non-news days."[44] As a result, Dr. Werner's filters also increase the number of "non-news days." The unscientific and result-oriented nature of his methodology can be seen by the fact that had Dr. Werner not applied his additional news-frequency-based filters, his tests would show that there was *no* statistically significant difference between Astec's stock price reactions on "news days"

---

[41] Dr. Werner has previously analyzed a combined reaction over two days when both individual days had statistically significant price reactions. See, Dr. Werner's Declaration in *NIO*, dated June 21, 2022, ¶¶72-76.

[42] Dr. Werner claims that in an efficient market "new information that impacts the economic outlook of the firm gets quickly reflected in its security price." Werner Declaration, ¶16. Research has shown that stock prices in an efficient market react within minutes to new information. For example, according to a study frequently cited in finance textbooks, after company announcements of earnings or dividends, the *majority* of the stock market response is already completed within 5 to 10 minutes. See, for example, Brealey, Richard A. and Stewart C. Myers, *Principles of Corporate Finance* (McGraw-Hill: New York, 7th ed., 2003), pp. 351-353 and Patell, James M. and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (1984), pp. 223-252.

[43] Werner Declaration, ¶¶80-103.

[44] Werner Declaration, ¶¶84, 88.

versus "non-news days." Thus, without his filters, Dr. Werner would find that his News vs. No-News tests yield results that do *not* support a finding of market efficiency.[45]

31.     In addition, Dr. Werner's use of filters creates potential issues of reverse causality because large price movements *themselves* could cause the media to issue more news stories and conclude that information released on those days is more important to the stock price.[46] Dr. Werner's news search leads to the inclusion of news articles that "simply" talk about Astec's price movements, which contradicts the very literature Dr. Werner cites to support his News vs No-News tests. In particular, the literature Dr. Werner cites excludes "those stories that simply [report] on prior price movements," when performing a News vs. No-News test.[47] For example, on December 20, 2016, a "news day" with a statistically significant price increase according to Dr. Werner's event study, one of the three articles that Dr. Werner defines as news was about Astec's stock price increase on that day *itself*.[48] In particular, the article stated that Astec's stock had "gapped up and surged 8%."[49]

---

[45]  Note that Dr. Werner's 50% filter does not end up filtering out any "news days." See, for example, Werner Declaration, ¶¶83, 85, 87, 89, showing the same number of days for all "news days" and the "news days" as a result of the 50% filter. Thus, as shown by Dr. Werner's own results using the 50% filter, without any filter, Dr. Werner's tests would yield no statistically significant difference between Astec's stock price reactions on "news days" versus "non-news days." Werner Declaration, ¶100, Exhibits 10 and 11.

[46]  As explained by the *Reference Manual on Scientific Evidence*, reverse causality occurs when changes in the outcome variable (*e.g.*, Astec's price reactions) cause changes in the explanatory variable (*e.g.*, a day with the top 10% number of news articles).

      See, Freedman, David A. and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial Center, 3rd ed., 2011), p. 322 ("In the multiple regression framework, the expert often assumes that changes in explanatory variables affect the dependent variable, but changes in the dependent variable do not affect the explanatory variables—that is, there is no feedback. In making this assumption, the expert draws the conclusion that a correlation between a covariate and the dependent outcome variable results from the effect of the former on the latter and not vice versa. Were it the case that the causality was reversed so that the outcome variable affected the covariate, and not vice versa, spurious correlation is likely to cause the expert and the trier of fact to reach the wrong conclusion. Finally, it is possible in some cases that both the outcome variable and the covariate each affect the other; if the expert does not take this more complex relationship into account, the regression coefficient on the variable of interest could be either too high or too low.").

[47]  Ferrillo, Paul A., Frederick C. Dunbar, and David Tabak, "The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. Johns Law Review* (Vol. 78, 2004), p. 121.

[48]  Werner Declaration, Exhibit 8 and "Dow Flirts With 20,000 As Caterpillar, Goldman Sachs, Nike Score Gains," *Investor's Business Daily*, December 20, 2016.

[49]  "Dow Flirts With 20,000 As Caterpillar, Goldman Sachs, Nike Score Gains," *Investor's Business Daily*, December 20, 2016.

14

32.     The unreliable and unscientific nature of Dr. Werner's methodology for analyzing the Fifth *Cammer* Factor is further demonstrated by the inconsistency between his News vs. No-News tests in this case versus his methodology in his prior reports. I was able to obtain nine of his prior expert reports in which he performed market efficiency analysis of the Fifth *Cammer* Factor.[50] In only one of those cases did Dr. Werner perform the same News vs. No-News tests as in this case, and in that one case he interpreted the results from the same tests completely differently. The table below shows which News vs. No-News tests he performed in this case and in those nine prior reports.

| Summary of News vs. No-News Tests in Dr. Werner's Analyses of the Fifth *Cammer* Factor | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Market Efficiency Report in | | | | | | | | | |
| Test Performed | *Astec* | *Array* | *Co-Diagnostics* | *Concordia* | *Exela* | *Innocoll* | *Kandi* | *NIO* | *Short Squeeze* | *XL Fleet* |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| Factiva articles + 50% filter | X | | | | | | X | | | |
| Factiva articles + 25% filter | X | | | | | | X | | | |
| Factiva articles + 10% filter | X | | | | X | | X | | X | X |
| Title or first paragraph Factiva articles + 50% filter | X | | | | | | X | | | |
| Title or first paragraph Factiva articles + 25% filter | X | | | | | | X | | | |
| Title or first paragraph Factiva articles + 10% filter | X | | | | | | X | | | |
| Company's earnings announcements | X | | | | | | X | | | |
| Company's 8-K filings | | X | | X[1] | | | | | | |
| Earnings, additional capital raising, and clinical trial developments | | | | | | X | | | | |
| **Does not conduct News vs. No-News tests** | | | X | | | | | X | | |

Notes and Sources:
Based on the Werner Declaration and Dr. Werner's declarations in other cases.

[1] According to Dr. Werner, 6-K filings of a foreign company like Concordia are counterparts of 8-K filings of U.S. companies ("For foreign companies that trade on a U.S. exchange, the form 6-K is used to the same effect as the form 8-K," Dr. Werner's Declaration in *Concordia*, dated February 7, 2018, ¶118).

33.     As shown in the table above, only one of Dr. Werner's nine prior reports (*Kandi*) included the same News vs. No-News tests he performed in this case. Although Dr. Werner testified that he "[relies] on the news/no news analysis as a check against [his] initial event

---

50    Those reports are Dr. Werner's Declaration in *Array*, dated January 8, 2021, Dr. Werner's Declaration in *Gelt Trading v. Co-Diagnostics et al.*, dated October 17, 2022, ("*Co-Diagnostics*"), Dr. Werner's Declaration in *Meyer v. Concordia International Corp.*, dated February 7, 2018, ("*Concordia*"), Dr. Werner's Declaration in *Shen v. Exela Technologies, Inc. et al.*, dated April 14, 2023, ("*Exela*"), Dr. Werner's Declaration in *Innocoll*, dated August 31, 2020, Dr. Werner's Declaration in *In re Kandi Technologies Group, Inc. Securities Litigation*, dated November 8, 2023, ("*Kandi*"), Dr. Werner's Declaration in *NIO*, dated June 21, 2022, Dr. Werner's Declaration in *In Re: January 2021 Short Squeeze Trading Litigation*, dated February 16, 2023, ("*Short Squeeze*"), and Dr. Werner's Declaration in *In re XL Fleet Corp. Securities Litigation*, dated March 10, 2023, ("*XL Fleet*").

15

study" and that "courts tend to favor the news/no news analysis when looking at [*Cammer*] Factor 5," two out of his nine prior reports (*Co-Diagnostics* and *NIO*) did not even include a News vs. No-News test at all.[51] Further, three of his prior reports (*Short Squeeze*, *XL Fleet*, and *Exela*) used different sets of news-frequency-based filters.[52] In his other three prior reports (*Concordia*, *Innocoll*, and *Array*), he did not define any "news days" using Factiva but instead looked at SEC filings or press releases.[53]

34.     In the *Kandi* case, the only case where he performed the same News vs. No-News tests as in this case, Dr. Werner's interpretation of the test results is the complete opposite of his interpretation in this case.[54] In this case, when the tests using the 50% filter yield *no* statistically significant difference between Astec's stock price reactions on "news days" versus "non-news days," Dr. Werner calls this result "unsurprising" and "exactly what one would expect in an efficient market."[55] Dr. Werner's supposed rationale is that the 50% filter, relative to the 25% and 10% filters, "loosens" the scope of "news days" to "focus on news that is less likely to be important or valuation-relevant," which causes the "distinction between ['news days'] versus ['non-news days']" to become "more obscure and therefore less statistically significant."[56] Dr. Werner claims that compared to his "loose" 50% filter, his 10% filter is more likely to distinguish news "where the firm says that […] they have a billion dollars in revenue" versus "articles where the firm's CEO is talking about taking their dog for a walk."[57] Dr. Werner states that he would not expect any statistically significant price reactions to those "dog walking" news articles:

---

[51]  Werner Deposition, 89:3-8. See also, Dr. Werner's Declaration in *NIO*, dated June 21, 2022, ¶43 and Dr. Werner's Declaration in *Co-Diagnostics*, dated October 17, 2022, ¶41.

[52]  Dr. Werner's Declaration in *Short Squeeze*, dated April 28, 2023, ¶70, Dr. Werner's Declaration in *XL Fleet*, dated March 10, 2023, ¶77, and Dr. Werner's Declaration in *Exela*, dated April 14, 2023, ¶87.

[53]  Note if Dr. Werner had tested Astec's stock price reactions to Form 8-K filings (what he looked at in *Concordia* and *Array*), excluding his alleged corrective disclosures, he would find *no* statistically significant difference between Astec's stock price reactions on Form 8-K filing days and other days. See also, Dr. Werner's Declaration in *Concordia*, dated February 7, 2018, ¶117 and Dr. Werner's Declaration in *Array*, dated January 8, 2021, ¶80.

[54]  Dr. Werner's Declaration in *Kandi*, dated November 8, 2023, ¶¶77-86.

[55]  Werner Declaration, ¶100.

[56]  Werner Declaration, ¶100.

[57]  Werner Deposition, 108:12-15.

Q. Well, you -- you previously said the St. Jude case would support the proposition that you have here; that while the 50 percent filter for high information flow days did not exceed the threshold for statistical significance, this result is both unsurprising and informative of market efficiency. I'm asking if you are aware of any other sources that would represent that proposition?

A. Common sense. […] It would be like, oh, okay, in the 10 percent cut I've got news articles or days that are considered news where the firm says that, you know, they have a billion dollars in revenue, and that that was a surprise. The non-news days may be articles where the firm's CEO is talking about taking their dog for a walk, right? So would I expect the dog walking thing to elicit a statistically significant response? No, I would not. [Werner Deposition, 107:8-16 and 108:10-18]

35. Contrary to his testimony and claims in this case, Dr. Werner provides no such caveat about the 50% filter in his expert declaration in *Kandi*, where his 50% filter yielded a statistically significant difference between the company's stock price reactions on "news days" versus "non-news days." Instead, Dr. Werner's expert declaration in *Kandi* stated that "all filters for ['news days'] found that there was a statistically significant difference" and concluded that "[t]herefore, the results of these statistical tests demonstrate that there was a cause-and-effect relationship between the release of new information and reactions in Kandi's stock price."[58] Dr. Werner does not discuss at all that his 50% filter may have picked up "articles where the firm's CEO is talking about taking their dog for a walk."[59] Thus, it appears that regardless of whether his tests yield a statistically significant difference, Dr. Werner would interpret the results as supportive of his conclusion of market efficiency. Dr. Werner's conclusion of market efficiency regardless of his test results highlights how his analysis lacks an objective method and is subject to selection bias. An analysis is said to suffer from sample selection bias when the data used in the analysis itself is chosen (directly or indirectly) on the basis of the outcome that the analysis intends to study.[60]

---

[58] Dr. Werner's Declaration in *Kandi*, dated November 8, 2023, ¶96.

[59] Werner Deposition, 108:14-15.

[60] See, for example, Stock, James H. and Mark W. Watson, *Introduction to Econometrics* (Pearson Education, Inc., Boston, MA, 2003), p. 250. Moreover, as Freedman, Pisani, and Purves explain in their textbook, *Statistics*, "Some samples are really bad. To find out whether a sample is any good, ask how it was chosen. Was there selection bias?" The authors state that, "A sampling procedure should be fair, selecting [data] for inclusion in the sample in an impartial way, so as to get a representative cross section[.]" Freedman, David, Robert Pisani, and Roger Purves, *Statistics* (W. W. Norton & Company, Inc.: New York, 4th ed., 2007), pp. 335-336.

36.     In sum, Dr. Werner's market efficiency analysis of the Fifth *Cammer* Factor using either his main test or his "check" tests is not only non-standard, unscientific, unreliable, and biased, but also inconsistent with the approaches Dr. Werner has used in testing the Fifth *Cammer* Factor in his prior reports on market efficiency.

## V.     THE WERNER DECLARATION'S PROPOSED COMMON DAMAGES METHODOLOGY IS NOT WELL-SPECIFIED AND FAILS TO EXPLAIN HOW TO APPLY THE PSLRA'S 90-DAY LOOKBACK PROVISION TO MEMBERS OF THE PROPOSED CLASS WHO SOLD BEFORE THE END OF THE ALLEGED CLASS PERIOD, WHICH RESULTS IN POTENTIAL CONFLICTS AMONG MEMBERS OF THE PROPOSED CLASS

37.     Dr. Werner's proposed common damages methodology is not well-specified and fails to explain how the 90-day lookback provision from the Private Securities Litigation Reform Act ("PSLRA") would be applied. In particular, given Astec's stock price pattern over the alleged Class Period, Dr. Werner fails to explain how to apply the PSLRA's 90-day lookback provision to proposed class members who sold their shares *before* the end of the alleged Class Period.

38.     The Werner Declaration states that "for any securities sold during the 90-day period after the end of the Class Period" or "held 90 days or more beyond the final corrective disclosure," damages should incorporate the PSLRA's "90-day lookback" provision.[61] However, Dr. Werner is silent about how to incorporate the PSLRA's 90-day lookback provision to proposed class members who sold their shares *before* the end of the alleged Class Period. This lack of specificity in Dr. Werner's proposed common damages methodology leads to potential conflicts among the proposed class members. When questioned about whether there was a "fair way" to calculate damages on a class-wide basis, Dr. Werner's response was unhelpful:

> Q. In looking at paragraph 2, you say you were asked to opine on whether damages in this matter were subject to a common methodology that can be calculated on a class-wide basis for all class members. As part of that analysis, did

---

[61]     Werner Declaration, ¶119.

you consider whether there was a fair way to calculate damages on a class-wide basis for all -- that was fair to all class members? […]

A. I don't -- when you say "fair way," what do you mean? Like a golf fairway? I don't -- I'm not -- or fair, slash, way; fair, space, way?

[…]

Q. Did you -- were -- did you consider whether there was a fair way to calculate damages on a class-wide basis for all class members when you did your analysis of whether damages in this matter are subject to a common methodology that could be calculated on -- on a class-wide basis? […]

A. Yeah, I don't understand the question. I -- I've – I've actually never been asked that before. I don't -- I'm not quite sure what you mean by "fair way." I mean, I've been doing this for 25 years. It's -- I don't know what -- what you mean by that. [Werner Deposition, 24:24-25:25]

39.    According to the PSLRA, the 90-day lookback provision caps damages as the "difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."[62] The language in the PSLRA does not indicate that the 90-day lookback provision should *only* be applied after the end of the alleged Class Period, or to the last alleged corrective disclosure. Instead, the PSLRA states the provision should be applied "beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."[63] A recent order in the U.S. District Court for the Northern District of California found that the PSLRA's 90-day lookback provision should be applied to the 90-day periods after any corrective disclosure date:

> "Nothing in the plain language of the Private Securities Litigation Reform Act (PSLRA) prohibits the use of multiple disclosure dates to determine a plaintiff's financial stake in the litigation" and that "[t]he single disclosure approach […] is neither rational nor consistent […]" [*In Re: Zoom Securities Litigation,* 2021 WL 1375854, at 2-3 (N.D. Cal. Apr. 12, 2021)]

40.    The Werner Declaration's proposed common damages methodology fails to explain how to apply the PSLRA's 90-day lookback provision to proposed class members who sold their shares after an alleged corrective disclosure but *before* the end of the alleged Class

---

[62]   Private Securities Litigation Reform Act of 1995.

[63]   Private Securities Litigation Reform Act of 1995.

Period. This lack of specificity creates issues that are particularly salient and problematic in this case given Astec's stock price patterns and bounce backs during the alleged Class Period. Making it more problematic is that Dr. Werner has chosen to introduce a new date as an alleged corrective disclosure. Deciding whether and how to apply the PSLRA's 90-day lookback provision after each of the alleged corrective disclosures (*i.e.*, a multiple disclosure application) or only after the last alleged corrective disclosure creates potential conflicts of economic interest among the proposed class.

41. For example, in the days following the October 2, 2017 alleged corrective disclosure, Astec's stock price was higher than it was for much of the period between July 25, 2017, the first alleged corrective disclosure, and October 2, 2017. A multiple-disclosure application of the PSLRA's 90-day lookback provision would yield *no* damages for many of the proposed class members who purchased Astec shares between July 25, 2017 and October 2, 2017 (like the defeated proposed Lead Plaintiff City of Taylor General Employees Retirement System)[64] and sold their shares right after October 2, 2017. Those proposed class members would receive no damages under a multiple-disclosure application and would thus have conflicting economic interests to other proposed class members like Lead Plaintiff (Lynn Johnson).

42. In this example, proposed class members, like Lead Plaintiff, who bought shares of Astec early in the alleged Class Period and held those shares through the end of the alleged Class Period, would receive damages *even* under a multiple-disclosure application of the PSLRA's 90-day lookback provision.[65] These proposed class members would not be similarly situated to members of the proposed Class who sold their Astec shares soon after the October 2, 2017 alleged corrective disclosure.

43. The vast majority of securities class actions settle, and there is often a question about how to divide up the available funds among class members.[66] In this example, a multiple-

---

[64] Based on City of Taylor General Employees Retirement System's schedule of trades from the First Complaint, that shows purchases between July 25, 2017 and October 2, 2017.

[65] Exhibit B to Motion by Lynn Johnson for Appointment as Lead Plaintiff and Approval of Selection of Counsel, filed April 2, 2019.

[66] McIntosh, Janeen, Svetlana Starykh, and Edward Flores, "Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review," *NERA Economic Consulting*, 2023, pp. 9-10.

disclosure lookback provision approach, which reduces or eliminates damages for portions of the class, could increase the funds available for proposed class members like the Lead Plaintiff who held their shares through the end of the alleged Class Period. Thus, proposed class members like Lead Plaintiff would have conflicting economic interests to other members of the proposed class.

44.     Dr. Werner's addition of an additional date as an alleged corrective disclosure, October 24, 2017, highlights the substantial conflicts created by the lack of specificity of Dr. Werner's proposed damages method. Specifically, given the stock price patterns in this case, the addition of this alleged corrective disclosure, while increasing damages for certain proposed class members like Lead Plaintiff, actually *decreases or eliminates* damages for many other proposed class members.

45.     To illustrate this issue and the potential conflicts in the proposed class, we can compare Lead Plaintiff to other proposed class members. Lead Plaintiff purchased his Astec shares on November 11, 2016 for $64.10 per share, and held those shares through the end of the alleged Class Period.[67] Following Dr. Werner's proposed methodology to "[control] for potentially confounding non-fraud-related information," assume for simplicity that half of the Dr. Werner's measured price reactions to the alleged corrective disclosures was caused by confounding information (which, as discussed above, Dr. Werner did not analyze) and the remainder was due to the alleged fraud.[68]

46.     Under these assumptions, the addition of the additional October 24, 2017 alleged corrective disclosure would *increase* Lead Plaintiff's damages as would typically be expected after adding an additional corrective disclosure and its corresponding price decline. But given the pattern of Astec's stock price, the addition of this alleged corrective disclosure would actually *decrease* the damages for other proposed class members.[69]

47.     Take the example of Investor X (see chart below). Investor X purchased Astec shares about a week before Lead Plaintiff on November 4, 2016 for $54.85 per share and sold

---

[67]   Exhibit B to Motion by Lynn Johnson for Appointment as Lead Plaintiff and Approval of Selection of Counsel, filed April 2, 2019, and Johnson Deposition, 121:12-15.

[68]   Werner Declaration, ¶119 and Section IV. B.

[69]   Based on Dr. Werner's event study there was a price reaction of $2.80, which in this hypothetical example would result in an increase in damages per share of $1.40, after controlling for "confounding non-fraud-related information." Werner Declaration, ¶119.

those shares on April 2, 2018. If Dr. Werner had not added the October 24, 2017 alleged corrective disclosure, both Investor X and Lead Plaintiff would have held through the first two alleged corrective disclosures, but they would *not* receive the same damages under a multiple-disclosure application of the PSLRA's 90-day lookback provision.



**Astec Stock Price and 90-Day Lookback Average Prices for Alleged Corrective Disclosures #2 and #3**

**Notes and Sources:**
Astec stock price data from Bloomberg, L.P. Events from the Complaint, Exhibit B to Motion by Lynn Johnson for Appointment as Lead Plaintiff and Approval Selection of Selection of Counsel, and the Werner Declaration. The vertical axis has been truncated to magnify the price movements.

48.     In particular, even though Investor X held through the first two alleged corrective disclosures and supposedly suffered $4.43 in damages per share,[70] Investor X is capped by a multiple-disclosure application of the PSLRA's 90-day lookback provision to $1.21 in damages per share.[71] Lead Plaintiff, who held his shares through the end of the alleged Class Period,

---

[70]   $4.43 is equal to the sum of the dollar price reactions after the first and second alleged corrective disclosures ($4.89 + $3.97) divided by 2. The dollar price reactions are based on Dr. Werner's event study.

[71]   As the average 90-day lookback price after the second alleged corrective disclosure is $53.64, Investor X's damages are limited to $1.21 per share (the difference between his $54.85 purchase price and the $53.64 average 90-day lookback price).

would not be subject to the same cap as Investor X. Lead Plaintiff would receive the full $4.43 in damages per share from the first two alleged corrective disclosures.[72]

49. However, *with* the addition of Dr. Werner's third alleged corrective disclosure, Investor X would receive *no* damages, even though he held through not only the first two alleged corrective disclosures but also the third alleged corrective disclosure added by Dr. Werner.[73] This is because the average 90-day lookback price after the third alleged corrective disclosure is higher than Investor X's purchase price (*i.e.*, the 90-day average lookback price of $55.87 is higher than his purchase price of $54.85). On the other hand, Lead Plaintiff would receive the full $5.83 in damages per share from the first three alleged corrective disclosures.[74]

50. Thus, the addition of Dr. Werner's alleged corrective disclosure, while increasing damages for proposed class members like Lead Plaintiff, actually *decreases or eliminates* the damages for certain proposed class members.

_____

Lucy P. Allen

---

[72] Since Lead Plaintiff held his shares through the end of the alleged Class Period, he would be capped by the 90-day lookback price after the last alleged corrective disclosure, not the price after the second alleged corrective disclosure.

[73] Note, this hypothetical would apply during multiple periods in the alleged Class Period. For example, take any investor that purchased at a price level between the average 90-day lookback price after the second alleged corrective disclosure ($53.64) and the average 90-day lookback price after the third alleged corrective disclosure ($55.87) and sold after the third alleged corrective disclosure (but before the fourth alleged corrective disclosure). This investor would receive no damages with the addition of the third alleged corrective disclosure. In addition, there are several other periods where the addition of the third alleged corrective disclosure reduces damages but does not eliminate them.

[74] Since Lead Plaintiff held his shares through the end of the alleged Class Period, he would be capped by the 90-day lookback price after the last alleged corrective disclosure, not the price after the third alleged corrective disclosure.

23



**Lucy P. Allen**
Senior Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Appendix A

## LUCY P. ALLEN
## SENIOR MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present     **National Economic Research Associates, Inc.**
Senior Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Managing Director (2016-2023).
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993     **Council of Economic Advisers, Executive Office of the President**
Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

1986-1988     **Ayers, Whitmore & Company (General Management Consultants)**
1983-1984     Senior Associate. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.

1

Diagnostic survey for auto parts manufacturer on growth obstacles.
Marketing plan to increase international market share for major accounting firm.

Summer 1985    **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983    **Arthur Andersen & Company**
<u>Consultant</u>.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

## Teaching
1989- 1992    <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications
"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Testimony (4 years)

Deposition Testimony before the United States District Court, Eastern District of Arkansas, in *Robert Murray v. EarthLink Holdings Corp., et al.,* 2023.

Deposition Testimony before the District Court of Harris County, Texas in *Houston Livestock Show and Rodeo, Inc. v. Hallmark Financial Services, Inc. D/B/A Hallmark Specialty Insurance Company, et al.,* 2023.

Testimony and Deposition before the United States District Court for the Southern District of Texas in *In re Apache Corp. Securities Litigation,* 2023.

Deposition Testimony before the United States District Court for the Central District of California in *In re Prime Healthcare ERISA Litigation,* 2023.

Deposition Testimony before the United States District Court for the Southern District of Texas in *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.,* 2023.

Testimony and Deposition before the United States District Court for the District of Oregon in *Oregon Firearms Federation, Inc. et al. v. Tina Kotek et al.*, 2023.

Testimony and Depositions before the United States District Court for the Southern District of Texas, Houston Division in *Miriam Edwards, et al. v. McDermott International, Inc., et al.,* 2023.

Deposition Testimony before the District Court of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al.*, 2022.

Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

4

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *Miller et al. v. Becerra et al.*, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

5

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.