# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NASHVILLE DIVISON

| | |
|---|---|
| **IN RE ASTEC INDUSTRIES, INC.**<br>**SECURITIES LITIGATION** | Civil Action No. 1:19-cv-00024-PLR-CHS |

REBUTTAL DECLARATION OF
DR. ADAM WERNER
February 12, 2024

# TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................................1

II.     PROFESSIONAL BACKGROUND AND EXPERIENCE.................................................1

III.     SUMMARY OF OPINIONS AND FINDINGS..........................................................3

IV.     AREAS OF AGREEMENT......................................................................................3

V.     CRITIQUE OF THE ALLEN REPORT......................................................................5

     A.     Ms. Allen's Critiques of My First Market Efficiency Study are Unfounded and Erroneous ......................................................................................7

         1.     My Selection of Alleged Corrective Disclosure Events is Replicable, Objective, and Appropriate for Assessing Market Efficiency........................................................................................8

         2.     Misrepresentations and Omissions are Not Appropriate Events for a Market Efficiency Study ...........................................................15

         3.     My Event Study Demonstrates Market Efficiency With Respect to the Allegation-Related Information ...............................................17

     B.     Ms. Allen's Critiques of My Second Set of Market Efficiency Tests Are Deeply Misguided and Ultimately Moot ................................................19

         1.     Ms. Allen Inappropriately Presents My 50% Filter Test as Two Separate Tests .................................................................................20

         2.     Ms. Allen's Concerns Regarding "Reverse Causality" Were Already Controlled for in the Werner Report...........................................22

         3.     Ms. Allen's Concerns That My Second Market Efficiency Study is Somehow Inconsistent with My Past Reports Demonstrates Her Lack of Credible Critique And Exposes Her Misinterpretation of Statistical Significance..................................................................23

     C.     Ms. Allen's Suggested Methodology for Applying the PSLRA 90-Day Lookback Provision Suffers from Severe Flaws ....................................28

VI.     LIMITING FACTORS AND OTHER ASSUMPTIONS.................................................30

I, Adam Werner, declare and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief. If called to testify, I could and would testify competently to the following facts.

## I.      INTRODUCTION

1.      I was asked by The Rosen Law Firm, P.A., counsel for the Lead Plaintiff, to consider and evaluate the arguments and conclusions in the Expert Report of Lucy P. Allen, dated January 22, 2014 ("Allen Report") submitted on behalf of Defendants in this matter. Ms. Allen was asked to "review and comment on the Declaration of Dr. Adam Werner … with regard to two issues", specifically, "Whether the Werner Declaration's market efficiency analysis of the fifth Cammer factor, the factor the courts have found to be the 'most important' in determining whether a market is efficient, is standard and reliable" and "Whether the Werner Declaration's proposed common damages methodology is well-specified."[1]

2.      To this end, I have reviewed the Allen Report as well as the Videotaped Deposition of Lucy P. Allen, dated January 31, 2024 ("Allen Deposition"). Additional documents I reviewed in forming my opinion in this matter are set forth in Exhibit-1 to this declaration.

3.      I understand that as an expert witness in this proceeding, my duty in providing my declaration is to the Court and that this duty overrides any obligation to the parties who have engaged me, from whom I have received instructions or compensation. I confirm that I have complied with this duty.

## II.     PROFESSIONAL BACKGROUND AND EXPERIENCE

4.      I am currently a managing director at SEDA Experts, LLC ("SEDA") having previously served as a Lecturer in economics at the Orfalea College of Business at California

---

[1] Allen Report, ¶1 (Internal citations and references omitted).

Polytechnic State University San Luis Obispo (Cal Poly). At Cal Poly, I taught managerial economics to graduate students, and international finance, macroeconomics, and intermediate microeconomics to undergraduates. Prior to working at SEDA, I spent over 25 years working for consulting firms including Cornerstone Research, CRA International, and NERA. I have been retained by both plaintiffs and defendants to consult on matters pertaining to market efficiency, materiality and loss causation, damages, investment banking, financial valuation, security issuance, bankruptcy, and options backdating. My expert opinions have been accepted in Federal, State, and Bankruptcy courts within the United States as well as courts in Australia and Canada. I have also testified in arbitrations both inside and outside of the United States. I have lectured frequently to attorneys on the topic of damage estimation and settlements in securities class actions. I have also spoken on the estimation of capital rates in emerging economies at a conference organized by the University of Texas School of Law.

5.    I hold a Ph.D. in Finance (1999) from Northwestern University's Kellogg Graduate School of Management. While at Kellogg, I taught M.B.A. classes in corporate finance, and futures and options. I was also awarded a University Scholarship during my time at Kellogg. Prior to graduate school, I served as a Research Assistant at the Federal Reserve Bank of Cleveland. My full Curriculum Vitae including prior testimony is attached as Exhibit-2 to this declaration.

6.    SEDA is currently being compensated at $750 per hour for my ongoing work on this matter. Additional SEDA consultants have assisted me with my work at rates ranging from $90 per hour to $550 per hour. This compensation is not contingent on the outcome of this matter.

## III. SUMMARY OF OPINIONS AND FINDINGS

**OPINION 1: Ms. Allen's critiques of my first market efficiency study are unfounded and erroneous. My event study was appropriately performed, did not suffer from selection bias, and does demonstrate that the market was efficient not only generally but specifically with respect to allegation-related information. Ms. Allen's opinion that I should have also tested misrepresentation and omission events relies on a deep misunderstanding of market efficiency event studies.**

**OPINION 2: Ms. Allen's critiques of my second market efficiency study rely on mischaracterizations of the tests I performed, a misunderstanding of statistical significance, and a red herring to distract from the fact that these studies demonstrate Astec traded in an efficient market throughout the Class Period.**

**OPINION 3: Ms. Allen's proposed methodology for the application of the 90-day PSLRA lookback provision is entirely novel and suffers from severe flaws.**

## IV. AREAS OF AGREEMENT

7.      In the Werner Report, I performed a series of computations and analyses to assess whether the publicly traded common stock of Astec traded in an efficient market during the Class Period. Among these computations and analyses is my study of *Cammer* factors 1-4 and the *Krogman* factors. Specifically, with regards to these factors, I found that:

a. ***Cammer* factor 1:** The average weekly trading volume of Astec stock as a percentage of shares outstanding was 3.18%, higher than the 2% required to meet the strong-presumption-of-efficiency benchmark set forth by the court in *Cammer v. Bloom*;[2]

b. ***Cammer* factor 2:** At least 21 securities analysts covered Astec and there were at least 331 news stories, press releases, and SEC filings published about the Company;

---

[2] *See Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

c. *Cammer* **factor 3:** Astec stock traded on the NASDAQ and had at least 131 firms making a market in its common stock during the Class Period. In addition, A high number of institutional investors owned Astec stock, as indicated by public filings;

d. *Cammer* **factor 4:** Astec was eligible to file an S-3 registration statement with the SEC throughout the Class Period;

e. *Krogman* **factor 1**: The market capitalization of Astec stock averaged $1.33 billion over the Class Period, which was larger than the total market capitalization of at least 70% of all other publicly traded companies in the U.S. during that period;

f. *Krogman* **factor 2**:Astec's float averaged $1.30 billion over the Class Period and was larger than the total market capitalization of at least 70% of all other publicly traded companies in the U.S. during that period; and

g. *Krogman* **factor 3**: Astec stock had an average bid-ask spread[3] of 0.05% compared to the average bid-ask spread of 0.53% for all other publicly traded companies in the U.S. during that period.[4]

8. While Ms. Allen takes issue with the relevance of these factors for assessing market efficiency, it is important to highlight that Ms. Allen does not contest my findings with respect to any of these factors. That is, Ms. Allen is silent on the fact that Astec stock readily satisfied all *Cammer* 1-4 and the *Krogman* factor metrics during the Class Period.

---

[3] A bid-ask spread is the price at which a market maker (intermediary) is willing to buy and sell a security. For example, if one is making a market in Company Y's security, one might be willing to buy (bid) security of Company Y at $10 per share and sell (ask) the same security at $10.15 per share. In this instance, the bid-ask spread would be $0.15, or approximately 1.5%.

[4] The Center for Research in Security Prices ("CRSP"). CRSP is a widely-used and generally accepted database for obtaining daily and monthly data on publicly-traded securities.

9. Furthermore, while Ms. Allen was tasked to assess whether "[w]hether the Werner Declaration's market efficiency analysis of the fifth *Cammer* factor … is standard and reliable",[5] she ultimately neglects to comment on my third market efficiency test that examined Astec earnings announcement days vs. all other days in the Class Period. Since Ms. Allen has offered no opinion on this test, despite her claim that she examined all of my analysis of the fifth *Cammer* factor, I assume for purposes of this report that Ms. Allen agrees with my test results and my conclusions. As I showed in the Werner Report, defining "high information flow" days as Astec earnings announcements during the Class Period finds a statistically significant difference between "high information flow" days versus "lesser information flow" days at the 99% confidence level. The result of this statistical test demonstrates that there was a cause-and-effect relationship between the release of new information and reactions in Astec's stock price. This result demonstrates that Astec stock traded in an efficient market during the Class Period.

## V. CRITIQUE OF THE ALLEN REPORT

10. Ms. Allen's assignment was to "review and comments on" the Werner Declaration with regard to two specific issues:

    a. Whether the Werner Declaration applied a "standard and reliable" analysis in assessing the fifth *Cammer* factor.

    b. Whether "the Werner Declaration's proposed common damages methodology is well-specified."

11. Under this directive, Ms. Allen begins by attempting to downplay the relevance and importance of *Cammer* factors 1-4 as well as all of the *Krogman* factors.[6] Instead, Ms. Allen

---

[5] Allen Report, ¶1.

[6] Allen Report, ¶7.

explains that "courts have stated that the Fifth Cammer Factor, the cause-and-effect relationship, is the 'most important' factor in determining whether a market is efficient."[7] Ms. Allen's understanding of what Courts require in assessing market efficiency is incomplete. While the fifth *Cammer* factor is indeed important, its importance does not relegate the other factors to irrelevance.

12.    That Ms. Allen does not even consider the other *Cammer* and *Krogman* factor renders her analysis insufficient to offer a reliable opinion on whether Astec stock traded in an efficient market during the Class Period. A scientific assessment of market efficiency should be holistic and consider all relevant factors, which is the work I performed in the Werner Declaration. As I showed in the Werner Declaration, following my assessment of all relevant market efficiency metrics, the available evidence strongly supports the fact that Astec stock traded in an efficient market throughout the Class Period. Ms. Allen's claims to the contrary are based on an incomplete reading of the facts and is therefore unreliable.

13.    While the entirety of Ms. Allen's opinions and conclusions are established on a foundation that omits relevant facts, her directed critiques towards the analyses and conclusions of the Werner Declaration suffer from flaws of their own. As explained in further detail in the sections below, none of Ms. Allen's critiques are valid and therefore nothing within the Allen Report offers a tangible reason for me to alter my opinions in the Werner Declaration.

---

[7] Allen Report, ¶7.

**A.** **Ms. Allen's Critiques of My First Market Efficiency Study are Unfounded and Erroneous**

14.     As an initial matter, it is puzzling that Ms. Allen labels my first market efficiency study as my "main test".[8] Nowhere in my report or deposition did I refer to my study examining corrective disclosure events as my "main test" nor have I ever referred to any individual market efficiency study as a "main" study. On the contrary, none of the tests I conducted should be considered a "main test" as my conclusions and opinions was holistically informed by all analyses I conducted, and I did not assign weights to any individual test as more or less informative of market efficiency. My market efficiency opinion relies on all of the evidence I provided, including all *Cammer* and *Krogman* factors, my empirical study of corrective disclosure events, my collective empirical study of Factiva news articles, and my collective empirical study of Astec earnings announcements.[9] Labelling the first market efficiency study I performed as my "main test" is Ms. Allen's own invention and reflects both a misrepresentation of my testimony and a mischaracterization of the evidence that informed my conclusions.

15.     Putting aside Ms. Allen's misrepresentation, Ms. Allen claims that my first test of market efficiency in the Werner Declaration is "is non-standard and unscientific in that it does not have any reliable and objective criteria for selecting the dates for which he tests price reactions."[10] More specifically, Ms. Allen takes issue with my methodology of testing alleged corrective disclosure events as, according to her, such a methodology is an example of "data snooping"[11] and

---

[8] Allen Report, ¶8.

[9] Indeed, in the hypothetical scenario where I could only submit a single test as empirical evidence of market efficiency, I would select my collective empirical study of Factiva news articles as such a test. Therefore, if anything, my "main test" is more appropriately my second market efficiency study.

[10] Allen Report, ¶18.

[11] Allen Report, ¶20.

selection bias. Ms. Allen also advances the position that my methodology should have also considered misrepresentations and omission events.

16. In addition to these arguments, Ms. Allen attacks the fact that my analysis provided evidence that news on allegation related days did impact the price of Astec stock on the basis that there could have been confounding information on the same dates as the alleged corrective disclosures.[12] In the same vein, Ms. Allen argues that because I only assessed the day of the information dissemination and did not consider any potential price bounce-back, my analysis cannot offer a complete picture of price impact. I address all of Ms. Allen's arguments in turn.

### 1. *My Selection of Alleged Corrective Disclosure Events is Replicable, Objective, and Appropriate for Assessing Market Efficiency*

17. The foundation of Ms. Allen's argument that my choice of testing alleged corrective disclosure events is unscientific relies on her assumption that it is a foregone conclusion that any alleged corrective disclosure event would be statistically significant such that the researcher conducting the analysis is effectively "data snooping" as the researcher already knows the results of the test before performing the analysis. Ms. Allen states:

> "It is not surprising to find statistically significant price drops on dates that Plaintiff has chosen to allege as corrective disclosures in the Complaint. Stock price drops often spur securities class action filings and the dates alleged as corrective disclosures are presumably selected by plaintiffs' counsel to 'increas[e] potential damages.'"[13]

---

[12] Note that in securities class actions, Defendants can choose to demonstrate that the alleged misrepresentation and omissions show no price impact but Plaintiffs are not required to demonstrate price impact to establish market efficiency, The fact that Ms. Allen presented no evidence that there was no price impact renders her points regarding price impact moot.

[13] Allen Report, ¶18 (internal citations omitted).

"Dr. Werner's selection of these five dates to test appears to be an example of 'data snooping,' which means using what is already known to design an empirical test. Dr. Werner's test, rather than analyzing if Astec's stock traded in an efficient market where 'publicly available information is incorporated in the security price,' instead analyzes dates that appear to have been chosen because there were large price drops."[14]

18. Ms. Allen's argument is riddled with flawed and unsubstantiated assumptions. First, Ms. Allen assumes that alleged corrective disclosures are selected only based on the size of the price decline rather than the nature of the information being disclosed. To my knowledge, Ms. Allen is not a legal expert and, as such, she does not have the expertise to identify or evaluate the basis on which disclosure events are selected. Nonetheless, nowhere in Ms. Allen's report does she claim that the alleged disclosure events I examined are unrelated or irrelevant to the alleged fraud in this case. The fact remains that every alleged disclosure disseminated information directly related to Astec's Infrastructure Group and its wood pellet plant business and this information changed the total mix of information for market participants when it was disclosed. The information disclosed on these alleged corrective events was also disseminated via official Astec press releases and, for the majority of the disclosures, disseminated during Astec's quarterly earnings announcements. Such a fact pattern suggests these events to be important and valuation-relevant news days that would be ideal candidates for a market efficiency event study, irrespective of the price movements on these days.

19. Second, Ms. Allen's assumption that a complaint discussing price movements must mean that those price movements are statistically significant is entirely false. Ms. Allen's position conflates raw price movements with residual, or excess, price movements. That a price movement may appear "large" on its face does not automatically mean that the price movement is statistically

---

[14] Allen Report, ¶20 (internal citations omitted).

significant. Consider the following example, a researcher examines that a stock price moved by 50% in a single day. Absent any additional analysis, the researcher may be tempted to conclude that this is largest price movement they've seen to date and therefore must be a statistically significant price movement. However, upon further examination, the researcher notices that the market return on that day was 20% and the sector return was 25%; assuming market and sector betas of 1, the researcher then realizes that the 50% return actually translates to a 5% residual return. The analysis does not stop here. Now, the researcher must also consider what is the typical stock price movement for the stock he is examining. If the typical stock price movement in this hypothetical is 10%, then the 5% residual return measured would not even come close to statistical significance. This example illustrates why raw price returns are deceptive on their face and why a researcher should not assume statistical significance on the basis of raw price returns alone.[15] Yet, Ms. Allen's critique of my methodology does exactly this. Ms. Allen claims that because the Complaint alleged stock price drops on the alleged disclosures, these drops must be statistically significant and therefore my event study must also be biased towards finding these dates to be statistically significant. The fact remains that I had no indication of whether any of the alleged disclosure dates would be statistically significant prior to performing my event study – Ms. Allen's claims to the contrary is nothing more than her own speculation based on deeply flawed logic.

20. Surprisingly, during her deposition, Ms. Allen appears to accept the basic premise that a "large" stock price movement cannot automatically be assumed to also be statistically significant:

---

[15] None of my event studies assessed statistical significance on the basis of the raw price movements; instead, my studies examined the residual price movement, i.e. the amount of the Company-specific stock price movement after removing market and sector effects.

"Q. Is there any instance in which a residual return of an otherwise large stock price movement could be much lower due to market and sector effects?

A. It could be.

Q. Is it possible that what may appear to be large stock price movements are not such if the price movements are compared against other price movements that are similarly large?

A. So it's possible that one company's stock price drop could be not due to company-specific information but could be due to a drop in the, you know, the whole market could be dropping on that date."[16]

21. I understand that Ms. Allen also cites to two legal cases, *Bell v. Ascendant Solutions, Inc.*[17] and *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*,[18] where the experts were criticized for their event selection methodology because of bias. However, Ms. Allen's attempt to draw similarities between those cases and the study I performed is unpersuasive. Upon a closer reading of the type of event selection performed in these two cases, it is clear that the event study I performed do not share the same flaws. For example, in the *Bell v. Ascendant Solutions, Inc.* matter, the court pointed out the following flaws with the events selected by the expert:

"Many of the dates identified by Professor Pettit do not conform to any generally-accepted finance methodology used to establish efficiency. For example, Professor Pettit includes November 11, 1999, the date of Ascendant's initial public offering, as an information day. Because the closing price on November 10, 1999 was not set on an open, efficient market — indeed, the stock was not available on November

---

[16] Allen Deposition, at 113:24 to 114:15.

[17] *Bell v. Ascendant Solutions, Inc.*, No. 3:01CV0166N, 2004 WL 1490009, 3 (N.D. Tex. July 1, 2004).

[18] *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, No. 4:08CV0160, 5 (N.D. Ohio August 14, 2018).

10 — the 'news' of an initial public offering cannot reasonably be said to be reflected in the stock's price change on November 11, 1999.

Similarly, the inclusion of December 1, 1999, appears to skew Professor Pettit's analysis artificially. Plaintiffs contend that a Bloomberg News article concerning the resignation of Ascendant's corporate operating officer was responsible for a statistically significant price change, showing the efficiency of the market for Ascendant stock by quickly reflecting the new information through stock price movement. However, the Bloomberg article, released late in the trading day, simply reports the earlier price drop and attributes such price movement to incorrect rumors circulating on Internet message boards. The use of Internet rumors as 'information' to support a hypothesis that the market quickly reflects unexpected corporate events or financial releases appears to be unprecedented in finance methodology."

22. My event study does not suffer from these flaws - I did not assume any type of price return based on unavailable price information nor were the events I selected "internet rumors" that were just reporting on a price decline. Rather, as I mentioned above, the events I selected were important and valuation-relevant that, on the basis of financial and economic principles, would be expected to be impactful events in an efficient market.

23. My event study is also robust to any comparisons with the *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.* matter. In that case, the expert tested only a single event "over a 330-day Class Period" and that event was the final day of the Class Period:

"The opinions based on his single-date, last day of the putative Class Period event study to assess market efficiency over a 330-day Class Period are unreliable. According to Freddie Mac, Dr. Feinstein's use of a single date for his event study finds no support in the law or logic, and is even rejected by the very authorities cited by Dr. Feinstein. Economists, including economists upon whom Dr. Feinstein relies, agree that using the last day of a class period is not a scientifically valid way

to test for market efficiency because, among other reasons, securities plaintiffs intentionally select such dates for purposes of increasing potential damages."[19]

24.    My event study considered a total of five event dates that were distributed throughout the Class Period. The criticisms of a limited event study focusing only on a single event at the end of the Class Period is not applicable to the study I performed in the current matter.

25.    Finally, Ms. Allen's concern that I inappropriately selected October 24, 2017 as an alleged disclosure event because the "Complaint does not describe this date as a 'partial disclosure'"[20] demonstrates her lack of detailed reading of the Complaint. While Ms. Allen claims that the Complaint "describes this date as an alleged misrepresentation where Defendants 'failed to disclose adverse facts pertaining to the Company's business, operations and prospects'",[21] a more complete reading of the Complaint disproves this characterization. In fact, the discussion of October 24, 2017 occurs underneath the Complaint heading "The Truth Begins to Materialize and Emerge Through Partial Disclosures; Defendants Downplay the Problems and Falsely Reassure Investors."[22] In paragraph 140-141 of the Complaint, underneath this heading, the Complaint states:

> "On October 24, 2017, the Company issued a press release announcing its third quarter 2017 ('3Q2017') financial results for the period ended September 30, 2017. The release stated that Infrastructure Group revenues dropped by 9.7%, falling from $109 million to $98 million, and that profit in the group swung to a loss, dropping

---

[19] Memorandum of Opinion and Order, *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, No. 4:08CV0160, 14 (N.D. Ohio August 14, 2018).

[20] Allen Report, ¶21.

[21] Allen Report, ¶21.

[22] Complaint, p. 40.

227% from a 3Q2016 profit of $9.8 million to a 3Q2017 loss of $12.5 million. The release added:

***The net loss for the third quarter of 2017 was $2.7 million, or $0.12 per share, compared to earnings of $6.8 million, or $0.30 per diluted share, for the third quarter of 2016, a decrease of 140.0% per diluted share. As previously announced, the company initiated significant design upgrades to its customers' Georgia and Arkansas wood pellet plants to meet full production rates, which negatively impacted earnings per share by approximately $0.59 during the third quarter of 2017.***

The October 24, 2017 release quoted Brock as stating, in part:

'While we exited the third quarter with a strong backlog, product mix and contracted delivery schedules have tempered our expectations for the fourth quarter. We believe that we still have a good opportunity to drive slight year-over year sales growth for 2017; however, ***our originally anticipated uptick in sales and earnings growth during the fourth quarter will be pushed into 2018. Sequentially, we expect earnings in the fourth quarter of 2017 will be slightly below this quarter's earnings, adjusting for the wood pellet investment***. As we look to 2018, we are very optimistic on our outlook given our backlog, quote activity and conversations with our customers."

26.     The language of the Complaint is clear. On October 24, 2017, the Company disclosed to the market that their revenues and earnings for the Infrastructure group had fallen year-over-year, that the initiation of "significant design upgrades to its customers' Georgia and Arkansas wood pellet plants to meet full production rates" had negatively impacted the quarterly results by $0.59 per share, and that the Company's "anticipated uptick in sales and earnings growth during the fourth quarter will be pushed into 2018." All of these disclosures are negative information events that related directly to Astec's wood pellet plant business, which is the crux of the allegations. Thus, this event constitutes at least a partial corrective disclosure. Ms. Allen's characterizations to the contrary ignores this plain language from the Complaint.

27.     Importantly, Ms. Allen does not contest the event study I performed on any basis other than speculated bias. That is, despite Ms. Allen's contention that I was biased in doing so,

she does not argue that the events I examined should not be examined because of any financial and economic principles. Ms. Allen does not, nor could she, argue that each of the five events I tested were unimportant and non-valuation-relevant.

### 2. Misrepresentations and Omissions are Not Appropriate Events for a Market Efficiency Study

28. Ms. Allen also claims that my event selection for my first test of market efficiency was biased as I did not "test any of the other fraud-related dates mentioned in the Complaint, including all the other alleged misrepresentations."[23] This argument relies on a flawed assumption, namely that misrepresentation and omission events are appropriate and informative events to test for assessing market efficiency.

29. As I explained in the Werner Declaration:

"Not every piece of new information will result in a statistically significant abnormal security return. To the extent that the new information may have been expected, or the impact of the new information is appropriately modest, the appropriate abnormal price return should be statistically insignificant. As such, a finding of non-significance does not necessarily establish inefficiency as a modest non-significant security price reaction may be the appropriate and efficient security price reaction to a particular information event.

For example, if a company announces earnings that are in-line with analysts' and investors' expectations, even though the announcement contains important information, it may not change the total mix of information sufficiently enough to elicit a statistically significant security price reaction on that date. Appropriate candidate events for inclusion in a market efficiency event study, therefore, are events on which company-specific information was released that is new, unexpected, not confounded by major countervailing news, and is of such import as to reasonably be expected to elicit a security price reaction over the threshold for statistical significance."

---

[23] Allen Report, ¶21.

30.     Events containing only misrepresentations and omissions are often a perfect example of events that would not be expected to elicit statistically significant price reactions in an efficient market. In this case, Astec is alleged to have withheld important information from investors that would have informed them of the ultimate decline in the Company's wood pellet plant business. Because this information was withheld, investors were allegedly deceived into believing that Astec's wood pellet plant business was performing in-line with expectations. In such an information environment, it would be illogical to expect a misrepresentation that the Company's business is continuing to perform as anticipated to cause any observable price reaction as such a misrepresentation serves to maintain the price at an inflated level rather than raise the price.[24]  This effect is known as the maintenance principle, and it is generally accepted and described in the forensic finance literature:

> "Statements that allegedly inflated the share price often do not result in an observed price increase when they were made. For example, one might not expect large increases in share prices for a firm that inflated its stock price by falsely reporting high earnings, if it consistently met market expectations."[25]

31.     Looking to events that serve to maintain the price or withhold information as to not cause a negative impact as candidates for a market efficiency is a fruitless endeavor. Because the events themselves are not expected to cause a price reaction, a finding that these events indeed did

---

[24] During her deposition, Ms. Allen appears to acknowledge the maintenance principle at least in theory (*See*, Allen Deposition, at 124:2 to 126:4). Specifically, Ms. Allen conceded during her deposition that in a hypothetical example where a company represents that there was "no risk" of a negative outcome "and it turns out something bad has happened, and you don't tell anyone about it … you might not see any reaction" in the company's stock price (*See*, Allen Deposition, at 124:4 to 125:15). The Complaint alleges that, on the first day of the Class Period, Defendant Brock made the following misrepresentation regarding the Company's wood pellet plants: "I want to make sure everybody understands, we're not in a jam or at risk or anything, because there is no risk."

[25] "Federal Securities Acts and Areas of Expert Analysis," by Nicholas I. Crew, et al., in Chapter 18 of the *Litigation Services Handbook; The Role of the Financial Expert*, 4th ed., edited by Roman L. Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, John Wiley & Sons, Inc., 2007, pp. 18.14-15.

not cause a price reaction can only, at best, confirm the initial assumption but does not test the pertinent hypothesis of whether the stock price reacts to information. In order to test the appropriate hypothesis of information causing stock price reactions, it is paramount that the events selected are expected to cause price reactions so that the test can directly assess whether there is a relationship between information and stock price movements.

### 3. My Event Study Demonstrates Market Efficiency With Respect to the Allegation-Related Information

32. Ms. Allen takes issue with my opinion that the results of my first market efficiency event study assists in "ascertain[ing] that the market for Astec stock was efficient, not only generally, but also with respect to the particular information at issue in this case" because I did not control for confounding information in my analysis. This argument conflates loss causation analysis with market efficiency analysis.

33. As an initial mater, and as mentioned briefly above, Ms. Allen does not contest that negative, allegation-related information was released on each of the five corrective disclosures I tested. Ms. Allen does not contest that this allegation-related information was new, unexpected, changed the mix of information, and was discussed by both the Company itself and market participants. Ms. Allen also does not contest that Astec stock reacted in a statistically significant manner to all five corrective disclosure events. These facts alone establishes that the allegation-related information reached the market, the market traded on that information, and the price of Astec stock reacted to that information, which indeed demonstrates that the market was efficient with respect to the allegation-related information. That there may have been additional positive or negative information that the market and the price of Astec stock also reacted to on these event dates does not nullify the fact that Astec's stock price responded to new, value relevant information.

34. Furthermore, it is premature at this stage of this matter for Ms. Allen to be opining on what does and does not constitute confounding information. It is my understanding that no loss causation analysis has been done to date and that discovery is still ongoing. While Ms. Allen speculates that there may have been confounding information on October 23, 2018,[26] I hesitate to engage in a discussion of confounding information without first performing the appropriate analysis and without the full set of relevant data and document to rely on.[27] At this stage, I do not accept Ms. Allen's characterization of what is or is not confounding information. I reserve the right to address Ms. Allen's confounding information arguments if I am asked to perform a loss causation analysis.

35. In addition to her premature confounding information argument, Ms. Allen also argues that my event study cannot support my conclusion that the alleged corrective information impacted Astec's stock price because she observed a single instance of a price increase on the trading day following a disclosure.[28] Specifically, Ms. Allen contends that "there is a statistically significant stock price *increase* on October 3, 2017, the day after the statistically significant stock price *decline* on October 2, 2017, the second alleged corrective disclosure" and "A review of analyst reports identified by Dr. Werner does not indicate there was any new information released about Astec on October 3, 2017."[29] Ms. Allen then calculated the two-day residual return from

---

[26] What is particularly troubling is Ms. Allens' description of her methodology for identifying confounding information through a "Simple inspection of market commentary" (Allen Report, ¶21). A confounding information analysis, which is part of a loss causation analysis, should be done rigorously and comprehensively – "simple inspection(s)" should not be the tool of choice for performing such a complex and nuanced analysis.

[27] During her deposition, Ms. Allen admits that she has not performed any analysis to definitively opine on what constitutes confounding information (*See*, Allen Deposition, at 126:15 to 129:13).

[28] Allen Report, ¶28.

[29] Allen Report, ¶28.

October 2-3, 2017 using my event study results and concluded that this two-day reaction would not be statistically significant.[30] Thus, Ms. Allen implies, this disclosure could not have impacted the price of Astec stock.

36.    Ms. Allen's analysis is incomplete and, as a result, entirely unreliable. A major assumption Ms. Allen makes in her analysis of this two-day price reaction is that there was no new information released about Astec on October 3, 2017 such that the price movement on this day must have been due to a price rebound. She is wrong. On October 3, 2017, news outlets (*Dow Jones* and T*heflyonthewall.com*) reported that Baird analysts raised their rating of Astec stock from Neutral to Outperform.[31] These two news articles were included in the documents that I turned over to Defendants and it is likely that Ms. Allen also received them. In context of the existence of these articles, Ms. Allen's argument that the October 3, 2017 must have been a price rebound is untenable. Ms. Allen has no basis to assume that the stock price movement on October 3, 2017 is an extension of the price reaction on October 2, 2017 when there is intervening, positive news that is released between these two trading days. As such, I see no reason to deviate from my opinion that the stock price decline following the alleged disclosures on October 2, 2017 was statistically significant.

**B.    Ms. Allen's Critiques of My Second Set of Market Efficiency Tests Are Deeply Misguided and Ultimately Moot**

37.    Ms. Allen makes three distinct arguments criticizing my second set of market efficiency tests: a) that had I not applied any filters to news events and instead assessed all days with news articles vs. days without news articles, this would be an additional test providing

---

[30] Allen Report, ¶28.

[31] "Astec Industries Raised to Outperform From Neutral by Baird," *Dow Jones International News*, October 3, 2017, 7:19 AM; and "

evidence against market efficiency;[32] b) that my test "creates potential issues of reverse causality because large price movements themselves could cause the media to issue more news stories and conclude that information released on those days is more important to the stock price";[33] and c) that the tests I employed in the instant matter is not consistent with market efficiency studies I performed in other matters.[34]

38. Contrary to Ms. Allen's representations, my Report did include the results of a test assessing all days with news articles vs. all days without news articles as this is an exact replication of my 50% filter test. My second set of market efficiency tests both controlled for and are robust to "potential issues of reverse causality" and my market efficiency analyses as a whole (i.e. all analyses contained in the Werner Report) demonstrates that the direction of causality was appropriate. Finally, Ms. Allen's concerns that my current report is somehow inconsistent with my past report mischaracterizes my past work, my current opinions, and demonstrates a misunderstanding of statistical significance.

### 1. Ms. Allen Inappropriately Presents My 50% Filter Test as Two Separate Tests

39. Ms. Allen claims that my use of 10%, 25%, and 50% filters for identifying news days is somehow "unscientific and result-oriented" because "had Dr. Werner not applied his additional news-frequency-based filters, his tests would show that there was no statistically significant difference between Astec's stock price reactions on 'news days' versus 'non-news days.'"[35] While Ms. Allen presents her position under the guise that she performed a fourth test

---

[32] Allen Report, ¶30.

[33] Allen Report, ¶31.

[34] Allen Report, ¶¶32-36.

[35] Allen Report, ¶30.

assessing all days with at least one news article vs. all days with no news articles, this is not true. In fact, the test that Ms. Allen purports to have performed is the ***same exact test*** as my 50% filter test.[36] As shown in Exhibit-10 of the Werner Report, the sample of news day events using the 50% filter resulted in every day with even a single news article being categorized as a "news day". This exhibit as well the associated backup data were provided to Ms. Allen; it is both surprising and troubling that Ms. Allen would unscientifically label a test I have already performed as an entirely separate test.[37] This effort by Ms. Allen to portray my empirical studies as her own new analysis is deeply misleading.

40. Furthermore, if Ms. Allen's position is that simply changing how a test is described qualitatively is akin to performing a separate test altogether, then there would be even more evidence in favor of market efficiency that can be found within the Werner Report. For example, all "news days" in my 25% filtered sample had at least 2 news articles release on those days. Using Ms. Allen's logic, if I simply state that I am now running a test looking at news days with at least 2 news articles this would be altogether a new test of market efficiency even though the results and inputs of the test are exactly the same. Thus, under Ms. Allen's reasoning, my 25% and 10% filter tests can represent far more than two tests if I simply choose to describe them differently. Clearly, such logic is flawed.

---

[36] During her deposition, Ms. Allen conceded that the inputs and results of the 50% filter is exactly the same as the "new" test she is proposing (*See*, Allen Deposition, at 141:8 to 141:18).

[37] That Ms. Allen considers her replication an entirely separate analysis is also evidenced by the labels used in the table beneath paragraph 15 of the Allen Report. In this table, Ms. Allen claims that her replication was "Not Shown by Werner".

### 2. Ms. Allen's Concerns Regarding "Reverse Causality" Were Already Controlled for in the Werner Report

41.     The Allen Report claims that "Dr. Werner's use of filters creates potential issues of reverse causality because large price movements themselves could cause the media to issue more news stories and conclude that information released on those days is more important to the stock price."[38] To purportedly demonstrate this point, Ms. Allen cites to a news article released on December 20, 2016 that, according to Ms. Allen, was an example of "news articles that 'simply' talk about Astec's price movements."[39] Had Ms. Allen more carefully examined my Report, she would have understood that the analyses I presented had already controlled for such articles and that my analyses are robust to the exclusion of the December 20, 2016 article and others similar news articles.[40]

42.     As I explained in the Werner Report:

"While the first definition of 'news days' used above is highly objective, the test could result in an overly broad definition of 'high information flow days.' For example, because all news articles during the Class Period are considered, it is possible that the initial sample of 'news' contains articles that are not specific to Astec. To address this potentially overly broad definition of news, I ran a second analysis focusing on news articles that mention Astec by name. Specifically, rather than beginning my analysis with *all* news articles produced by Factiva for Astec during the Class Period, I applied an additional filter at the initial step of identifying 'news days' to isolate news articles that contains the Company's name (or an iteration of the name, such as its ticker: ASTE) in either the article's title or first paragraph.

---

[38] Allen Report, ¶31.

[39] Allen Report, ¶31.

[40] During her deposition, Ms. Allen conceded that a set of my collective tests did control for and remove the December 20, 2016 article (*See*, Allen Deposition, at 156:25 to 161:13).

43.     As it turns out, this additional control parameter precisely identified the December 20, 2016 article Ms. Allen refers to as an article to be removed under this filter.[41] Further, as also shown in the Werner Report, the results of all my analyses are robust to exclusion of the December 20, 2016 article (and similar articles). Thus, Ms. Allen's speculation that my test results could somehow be impacted by "reverse causality" issues is without merit. That the methodology I applied in examining market efficiency even controlled for Ms. Allen's most far-fetched concerns demonstrates the objectivity and reliability of my methodology.

### 3. Ms. Allen's Concerns That My Second Market Efficiency Study is Somehow Inconsistent with My Past Reports Demonstrates Her Lack of Credible Critique And Exposes Her Misinterpretation of Statistical Significance

44.     Ms. Allen's final point with regards to my second market efficiency study is that the study I performed in this case is inconsistent with other News vs. No-News studies I had performed in other cases.[42] Despite her claim, Ms. Allen does submit that the analysis I performed in the instant case is exactly the same analysis as I had performed in my most recent previous case, *In re Kandi Technologies Group, Inc. Securities Litigation*. Nevertheless, Ms. Allen's arguments have no bearing on the results of my analyses nor their implications for market efficiency.

45.     While Ms. Allen is correct that the precise methodological steps I applied in this case is a relatively new part of my toolkit for assessing market efficiency, she overstates the level of "inconsistency" from my previous work. First, the actual test mechanism by which I assess the statistical difference between News vs. No-News days have always remained the same. In all the cases that Ms. Allen refers to as my previous cases, I applied the same Fisher's Exact Test I did in

---

[41] The removal of this article for the test of Astec-specific news articles can also be observed in Exhibit-10 of the Werner Report.

[42] Allen Report, ¶32.

this case to assess the statistical difference between News vs. No-News days. This aspect of the test, calculation of statistical significance, have always been consistently applied in my analysis of market efficiency.

46. Second, the only substantive difference in methodology between my recent cases and my older cases is how I define "news days". While Ms. Allen is correct that my definition of "news days" have evolved, she neglects to notice that the "news days" definition I apply in my recent cases is a far more rigorous methodology that is also applicable to a wide range of companies across any industry sector. In my previous cases where I had yet to apply this current definition of "news days", I had received critiques that my previous definitions of "news days" were either lacking in rigor, did not suit the company in question based on economic principles (i.e. using earnings announcement for a biotech company that was not expected to generate earnings), or was not comprehensive enough to capture all "news days" within a particular period. The evolution of my "news days" definition reflects the evolution of my own understanding of market efficiency analyses. I am not aware of any restrictions for expert witnesses that would preclude me from updating my methodological processes as my own understanding evolves.

47. Third, Ms. Allen's concerns that "my interpretation of the test results" for the 50% filter tests "is the complete opposite of his interpretation" of the same tests in the *In re Kandi Technologies Group, Inc. Securities Litigation* relies on a misunderstanding of statistical significance.[43] In the instant matter, I concluded that:

> "While the 50% filter for 'high information flow' days did not exceed the threshold for statistical significance, this result is both unsurprising and informative of market efficiency. As the definition of 'high information flow' is loosened to focus on news that is less likely to be important and valuation-relevant, the distinction between 'high information flow' days versus 'lesser information flow days' should, in

---

[43] Allen Report, ¶34.

theory, become more obscure and therefore less statistically significant. That this anticipated behavior did occur in this case is exactly what one would expect in an efficient market and under the broadest definition of news."[44]

48.    Notably, I did not conclude that the 50% filter is a demonstration of market efficiency by itself. Rather, my opinion is that the pattern of diminishing statistical significance exhibited by this broader filter in conjunction with the statistically significant results of the 10% and 25% filters, viewed holistically, is not inconsistent with what one would expect to observe in an efficient market. Ms. Allen's concern that this is a "complete opposite interpretation" from my findings in the *In re Kandi Technologies Group, Inc. Securities Litigation* where the 50% filter yielded a statistically significant result implicitly relies on the assumption that a non-statistically significant test result must mean that the test found the market to be inefficient. This is not a correct interpretation of statistical insignificance. Ms. Allen ignores the basic principle of statistics that failing to prove a proposition does not disprove the proposition or prove the opposite of the proposition to be true. Believing otherwise is an example of the "evidence of absence fallacy," which conflates absence of evidence with evidence of absence. Basic statistics textbooks explain the principle:

> "We should emphasize that if the null hypothesis [$H_0$] is not rejected, based on the sample data, we cannot say that the null hypothesis is true. To put it another way, failing to reject the null hypothesis does not prove that $H_0$ is true, it means we have *failed to disprove $H_0$*."[45]

49.    In the case of Astec, by broadening the definition of "news days" I increased the likelihood that what constitutes a "news days" is actually a lesser information flow day rather than

---

[44] Werner Report, ¶100.

[45] *Statistical Techniques in Business and Economics*, by Robert D. Mason, Douglas Lind, and William Marchal, 10th Edition, Irwin McGraw-Hill, 1999, p. 307 (emphasis in original).

a high information flow day – effectively weakening the power of the test. That a weaker test using the 50% filter is unable to detect a statistically significant relationship while more powerful tests (i.e. the 10% and 25% filters) did detect a statistically significant relationship is perfectly consistent with what one would expect to observe in an efficient market. That the 50% filter did not, by itself, demonstrate this relationship is largely beside the point.

50.　　Finally, Ms. Allen's interpretation of statistical significance, or the lack thereof, is far too shallow. Statistical significance is not a binary consideration. When researchers and experts refer to a test's results as being "statistically significant", the often-unsaid assumption is that the researcher is making the statement based on a pre-determined confidence level. Typically, the confidence level being discussed or assumed is 95%. However, it is important to keep in mind that the 95% confidence level is not a threshold borne from empirical analysis or statistical theory. The 95% confidence level is so prominent in statistical analysis only because it is typically used, i.e. it has become tradition. That the standard threshold for assessing statistical significance is not inherently a product of any scientific process is particularly relevant when interpreting the results of a test that does not produce a statistically significant result at the 95% confidence level. Consider three hypothetical test results, the first test result is statistically significant at the 95% confidence level, the second test result is statistically significant at the 94% confidence level, and third test result is statistically significant at the 50% confidence level. Using Ms. Allen's logic to interpret these test results, the first test would be considered a "pass" while the latter two tests are both "fails". However, in truth, the first two tests are much more similar in their results than the second and third tests. That Ms. Allen's logic would ultimately treat a 94% confidence level test result the same as a 50% confidence level test result exhibits the flaw in assessing statistical significance through the binary lens of only "pass" or "fail".

51.     It is becoming increasingly recognized in the literature that the 95% confidence level is not the only statistical finding dispositive of correlation and causation. While significance at the 95% confidence level provides strong proof that relationship being tested exists, it is also well-known and now generally accepted that significance at less than the 95% confidence level is informative as well.

> "Hypothesis tests are usually conducted using a type I error rate (probability of rejecting a true null) of 5%, but there is no good reason why 5% should be preferred to some other percentage. The father of statistics, R.A. Fisher, suggested it in an obscure 1923 paper, and it has been blindly followed ever since. Rosnow and Rosenthal (1989, p. 1277) recognize that 'surely, God loves the .06 as much as the .05.'"[46]

> "Statistical significance may be part of an expert's reasoning, but the expert should also consider all possible explanations for a scientific conclusion, including study design and the underlying scientific processes that affect the result. To the extent there are other studies or data that contradict the expert's conclusion, the expert should not dismiss that other data merely because it is not statistically significant."[47]

52.     In the Werner Report, my 50% filter tests found statistically significant results at the 93% confidence level for the test including all Factiva news articles and at the 90% confidence level for the test including only Astec-specific news articles which Ms. Allen seemingly ignores.[48] While these test results are not statistically significant under the traditional 95% confidence level, one can still conclude that these tests found statistical significance under a high level of confidence. That Ms. Allen would discard these test results as statistically insignificant without any further consideration reveals the lack of nuanced perspective applied in her critique of my analyses.

---

[46] *A Guide to Econometrics*, Peter Kennedy, 6th Edition, Blackwell Publishing, 2008, p. 60

[47] "New Views on Statistical Significance Affect Expert Testimony," by Josh Becker et al., *Law360.com*, May 23, 2019.

[48] Werner Report, Exhibit 11.

### C. Ms. Allen's Suggested Methodology for Applying the PSLRA 90-Day Lookback Provision Suffers from Severe Flaws

53. In the Werner Report, I proposed a common damages methodology to measure per share out-of-pocket damages for each Class member under Section 10(b) of the Exchange Act. Part of this methodology included a discussion of how to apply the PSLRA 90-day lookback provision:

> "Pursuant to the PSLRA, for any securities sold during the 90-day period after the end of the Class Period, per security damages would be calculated as the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss), or the decline in the security price (the investment loss), where the terminal security price is deemed to be the average price from the final corrective disclosure date to the sale date. Also pursuant to the PSLRA, for any securities held 90 days or more beyond the final corrective disclosure, damages would equal the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the security price (the investment loss), where the terminal security price is deemed to be the average price over the 90 days following the final corrective disclosure."[49]

54. Notably, this is the same application of the PSLRA 90-day lookback provision that I have provided in all my previous cases and in the work I have provided during mediation discussions. Ms. Allen takes issue with this proposed application and argues that, instead, the PSLRA 90-day lookback provision should be applied to every alleged disclosure during the Class Period as well.[50]

55. As an initial matter, Ms. Allen's interpretation of the PSLRA 90-day lookback provision is entirely novel. I have never applied nor seen other experts apply the PSLRA 90-day lookback provision in the manner suggested by Ms. Allen including when I was working at NERA.

---

[49] Werner Report, ¶119.iii.

[50] Allen Report, ¶¶38-50.

While Ms. Allen implies that her application is more "fair"[51], it my understanding that the application of the PSLRA 90-day lookback provision is ultimately a legal determination. Ms. Allen's proposed application of the PSLRA 90-day lookback provision would be a substantial deviation, in my experience, from the common application of the PSLRA 90-day lookback provision by legal authorities.

56. Furthermore, it is my understanding that under Ms. Allen's application of the PSLRA 90-day lookback provision, any price changes due to fraud-related information itself would be incorporated as part of the PSLRA 90-day lookback provision. For example, if a company makes a partial corrective disclosure, and the very next day the company makes another misrepresentation, Ms. Allen's application of the PSLRA 90-day lookback provision would limit class members' recovery based on the amount of price increase following the misrepresentation. The PSLRA 90-day lookback price for this hypothetical disclosure is therefore confounded by both fraud-related and non-fraud-related price movements.

57. Finally, even if Ms. Allen's novel and confused application of the PSLRA 90-day lookback provision is appropriate, such application would nonetheless be commonly applied to all Class members. Therefore, Ms. Allen has failed to disprove the fact that a common damages methodology can be applied to calculate damages for all Class members in the instant matter.

---

[51] Allen Report, ¶38.

## VI.     LIMITING FACTORS AND OTHER ASSUMPTIONS

58.     My analyses and opinions are based on the information available as of the date of this declaration. Should any additional data or information become available subsequent to the submission of this declaration, I reserve the right to supplement or amend this declaration based on this new information.


Dated:     February 12, 2024

Adam Werner, PhD
Managing Director, SEDA

**Exhibit-1**

**Documents and Other Information Considered
In Addition to the Werner Declaration**

**CASE DOCUMENTS**

- Expert Report of Lucy P. Allen, dated January 22, 2014.
- Videotaped Deposition of Lucy P. Allen, dated January 31, 2024.

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Becker Josh, et al., "New Views on Statistical Significance Affect Expert Testimony," *Law360.com*, May 23, 2019.
- Crew, Nicholas I., et al., "Federal Securities Acts and Areas of Expert Analysis," in Chapter 18 of the *Litigation Services Handbook; The Role of the Financial Expert*, 4th ed., edited by Roman L. Weil, Peter B. Frank, Christian W. Hughes, and Michael J. Wagner, John Wiley & Sons, Inc., 2007.
- Mason, Robert D., Douglas Lind, and William Marchal, *Statistical Techniques in Business and Economics*, 10th Edition, Irwin McGraw-Hill, 1999.
- Kennedy, Peter, *A Guide to Econometrics*, 6th Edition, Blackwell Publishing, 2008.

**LEGAL CASES**

- *Bell v. Ascendant Solutions, Inc.*, No. 3:01CV0166N, 2004 WL 1490009, 3 (N.D. Tex. July 1, 2004).
- *Ohio Public Employees Retirement System, etc. v. Federal Home Loan Mortgage Corporation, etc., et al.*, No. 4:08CV0160, 5 (N.D. Ohio August 14, 2018).

**OTHER**

- Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(e)).
- Other documents cited in my report.

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

## EDUCATION

1998        Northwestern University, Kellogg Graduate School of Management
            Ph.D. in Finance

1992        Oberlin College
            B.A. in Economics with Honors

## TEACHING EXPERIENCE

2014 – 2023        Cal Poly San Luis Obispo
                   Orfalea College of Business
                   San Luis Obispo, CA
                   Lecturer in Economics

## BUSINESS EXPERIENCE

2023 – Present        SEDA Experts

2015 – 2023        Crowninshield Financial Research

2018 – 2021        Pismo Beach Planning Commission

2009 – 2015        Gnarus Advisors/Berkeley Economic Consulting

2008 – 2009        LitiNomics

2004 – 2008        CRA International

2000 – 2003        National Economic Research Associates, Inc.

1998 – 2000        Cornerstone Research

1992 – 1993        Federal Reserve Bank of Cleveland

## PAPERS AND PUBLICATIONS

"The Impact of Underwriter Reputation on Equity Offering: An Empirical Study."
Thesis, 1999.

"The Long-Run Performance of Underwriters and its Impact on Seasoned Equity
Offerings." 1999.

"Dynamic Measures of Underwriter Reputation: A Study of IPO's." 1999.

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

"CAFE Economics: A Note on the Limits and Effectiveness of Fuel Economy Regulation." With Stephen Sheppard, 1992.

"Validation of Aggregate Damage Estimates in Securities Class Actions." with Narinder Walia, Law360, 2021.

"Trading Models Underestimate Securities Class Damages." with Narinder Walia, Law360, 2019.

"More 'Dark Pools' Deepen Litigation Issues." Law360, 2013.

"Recent Trends in Securities Class Action Litigation: Will Enron and Sarbanes-Oxley Change the Tides." with Elaine Buckberg, Todd Foster and Ronald Miller, 2003.

"The Effects of the PSLRA and Subsequent Events on Securities Litigation." With Fred Dunbar and Todd Foster, prepared for the New York City Bar Association, 2003.

"The Energy Tax: Who Pays?" joint with Mark Schweitzer, in Federal Reserve Bank of Cleveland's Economic Commentary, 1993.

## PRESENTATIONS

"Cause or Effect: Are Settlement Statistics Driving Down Settlements?" Presentation to Robbins Geller Rudman & Dowd, LLP in San Diego, CA on October 10, 2013, Wolf Popper, LLP in New York, NY on September 18, 2013, Abraham, Fruchter & Twersky, LLP in New York, NY on September 17, 2013, Robbins Geller Rudman & Dowd, LLP in Melville, NY on September 11, 2013, Entwistle & Cappucci, LLP in New York, NY on September 10, 2013, and Faruqi & Faruqi, LLP in New York, NY on September 10, 2013.

"The Economics of Securities Litigation." Sidley & Austin in Los Angeles, CA on March 14, 2007.

"The Global Cost of Capital." Panel discussion on valuing assets in foreign countries at the University of Texas School of Law VALCON conference in Las Vegas on February 8, 2007.

"Economic Damages in Securities Fraud Matters." NERA Luncheon Seminars with Alan Cox given at the Fifth Avenue Suites Hotel in Portland, OR on November 19, 2002 and at the W Hotel in Seattle, WA on November 20, 2002.

"Shareholder Class Actions: Calculation of Damages." Presentation to Skadden, Arps, Slate, Meagher & Flom, LLP in San Francisco, CA on October 30, 2002, Marsh FINPRO in San Francisco, CA on September 18, 2002, Marsh Risk & Insurance Services in San

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

Diego, CA on September 17, 2002 and Marsh FINPRO in Los Angeles, CA on September 13, 2002.

"Capital Formation: Class Action Litigation and Prevention." Speech and panel discussion focusing on securities class action litigation, which sometimes arise from initial public offerings and/or market volatility in the aftermarket. Presented at the 2002 CALBIO Summit in San Diego, CA on April 23, 2002.

"Shareholder Class Actions after the NASDAQ Bubble." Speech given to the Securities Litigation Sub-Committee of the Colorado Bar Association at Holland & Hart, LLP in Denver, CO on April 17, 2002.

"Trends in Litigation: How Claims and Losses Are Valued." Speech at the American Bankers Association Insurance Risk Management Annual Conference in San Diego, CA on February 4, 2002.

"Recent Trends in Securities Litigation." "Basic Economic Analysis in Securities Class Action" and "Challenging the Efficient Market Assumption in Securities Class Action Matters." presented to Cooley Godward in San Diego, CA on November 28, 2001. "Recent Trends in Securities Litigation." presentation with Marcia Mayer given at Howard, Rice, Nemerovski, Canady, Falk & Rabkin in San Francisco, CA on November 27, 2001.

"Recent Trends in Securities Litigation." presentation given to Marsh USA in Denver, CO on November 8, 2001, and Thelen, Reid & Priest in Los Angeles, CA on November 6, 2001.

"Financial Economics in Litigation." speech presented to Simpson, Thacher & Bartlett in Palo Alto, CA on July 31, 2001, Baker & McKenzie in San Diego, CA on July 18, 2001, Brobeck, Phleger & Harrison in San Francisco, CA on June 25, 2001 and to Latham & Watkins in San Francisco, CA on June 26, 2001.

"Economic Analysis in Securities Fraud Cases." Speech with Alan Cox delivered to Morrison & Forester, San Francisco, CA on July 25, 2001.

"Recent Trends: Shareholder Class Actions Five Years After the PSLRA." speech presented to Shearman & Sterling in San Francisco, CA on May 23, 2001, O'Melveny & Myers in Los Angeles, CA on May 30, 2001, and Gray, Cary, Ware & Freidenrich in San Diego, CA on June 6, 2001.

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

## EXPERT REPORTS AND TESTIMONY

*Peter Trauernicht, et al. v. Genworth Financial Inc. Retirement Savings Plan.* Issued a report (2024), supplemental report (2024), and provided deposition testimony (2024) on damages in an ERISA case (U.S.D.C. Eastern District of Virginia)

*In re Kandi Technologies Group, Inc. Securities Litigation.* Issued a declaration (2023) and provided deposition testimony (2024) on market efficiency and damage methodology in a securities class action (U.S.D.C. Southern District of New York).

*Christopher Arbour, et al. v. Tingo Group Inc., et al.* Issued a declaration on loss causation in a securities class action (U.S.D.C. District of New Jersey, 2023).

*Bo Shen, et al. v. Exela Technologies, Inc., et al.* Issued a declaration (2023) and provided deposition testimony (2023) on market efficiency and damage methodology in a securities class action (U.S.D.C. Northern District of Texas).

*In re January 2021 Short Squeeze Trading Litigation.* Issued a declaration (2023), a reply declaration (2023) and provided deposition testimony (2023) on market efficiency and damage methodology in a securities class action (U.S.D.C. Southern District of Florida).

*In re XL Fleet Corp. Securities Litigation.* Issued a declaration on market efficiency and damage methodology in a securities class action (U.S.D.C. Southern District of New York, 2023).

*In re Nio, Inc. Securities Litigation.* Issued a declaration (2022), a reply declaration (2022) and provided deposition testimony (2022) on market efficiency and damage methodology in a securities class action (U.S.D.C. Eastern District of New York).

*Gelt Trading, LTD. v. Co-Diagnostics, Inc., et al.* Issued a declaration (2022) and a reply declaration (2022) on market efficiency and damage methodology in a securities class action (U.S.D.C. District of Utah, Central Division).

*6D Global Technologies, Inc. Securities Litigation.* Issued a declaration on loss causation and damages in a securities class action (U.S.D.C. Southern District of New York, 2022).

*In re Omega Healthcare Investors, Inc. Securities Litigation.* Issued a report (2022), a rebuttal report (2022) and provided deposition testimony (2022) on market efficiency and damage methodology in a securities class action (U.S.D.C. Southern District of New York).

*Securities and Exchange Commission v. Bradley C. Davis.* Issued a report (2021), a rebuttal report (2021), provided deposition testimony (2021) and trial testimony (2022) on materiality in a case brought by the SEC (U.S.D.C. Central District of California).

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Andrew Trampe, et. al. v. CD Projekt S.A.* Issued a declaration on aggregate damages in a securities class action (U.S.D.C. Central District of California, 2022).

*In re Global Brokerage, Inc. f/k/a/ FXCM Inc.* Issued a report (2020), a rebuttal report (2020), provided deposition testimony (2020) and testified (2020) on market efficiency and damage methodology in a securities class action. Issued a report (2021), a rebuttal report (2021) and provided deposition testimony (2021) on loss causation and damages (U.S.D.C. Southern District of New York).

*George Barney, et al. v. Nova Lifestyle, Inc., et al.* Issued a report on market efficiency and damage methodology in a securities class action (U.S.D.C. Central District of California, 2021).

*Peter Voulgaris, et al. v. Array Biopharma Inc., et al.* Issued a report (2021) and provided deposition testimony (2021) on market efficiency and damage methodology in a securities class action (U.S.D.C. District of Colorado).

*In re Innocoll Holdings Public Limited Company Securities Litigation.* Issued a report (2020), a rebuttal report (2020) and provided deposition testimony (2020) on market efficiency and damage methodology in a securities class action (U.S.D.C. Eastern District of Pennsylvania).

*Michael Tietz, et al. v. Crytobloc Technologies Corp., et al.* Issued a report on price impact in a securities class action (Supreme Court of British Columbia, 2020).

*In re Horsehead Holding Corp. Securities Litigation.* Issued a report (2020) and provided deposition testimony (2020) on market efficiency and damage methodology in a securities class action (U.S.D.C. District of Delaware).

*Bing Li, et al. v. Aeterna Zentaris, Inc., et al.* Issued a declaration (2016), a report (2017), and provided deposition testimony (2017) on market efficiency and damage methodology in a securities class action. Issued a declaration (2019) a reply report (2019), and provided deposition testimony (2020) on loss causation and damages (U.S.D.C. District of New Jersey).

*In re Patriot National Inc. Securities Litigation.* Issued a declaration (2019) and a supplemental declaration (2019) on damages in a securities class action (U.S.D.C. Southern District of New York).

*Hamza Ramzan, et al. v. GDS Holdings Limited, et al*. Issued a declaration on NASDAQ microstructure in a securities class action (U.S.D.C. Eastern District of Texas, Marshall Division, 2019).

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Ivan Nibur, et al. v. SandRidge Mississippian Trust I, et al.* Issued a declaration (2018), a reply declaration (2018), a supplemental reply declaration (2018), and provided deposition testimony (2018) on market efficiency and damage methodology in a securities class action. Issued a declaration (2019) a rebuttal declaration (2019), and provided deposition testimony (2019) on loss causation and damages (U.S.D.C. Western District of Oklahoma).

*In Re Insys Theraputics, Inc. Securities Litigation.* Issued a report on market efficiency and damage methodology in a securities class action (U.S.D.C. Southern District of New York, 2019).

*In Re Spectrum Pharmaceuticals, Inc. Securities Litigation.* Issued a declaration (2019) and provided deposition testimony (2019) on market efficiency and damage methodology in a securities class action (U.S.D.C. District of Nevada).

*Amanda Beezley et al. v. Fenix Parts, Inc., et al.* Issued a declaration on market efficiency and damage methodology in a securities class action (U.S.D.C. Northern District of Illinois, Eastern Division, 2019).

*Wayne Mucha, et al. v. Volkswagen Aktiengesellschaft, et al.* Issued a declaration regarding benefits to firms that have ADRs listed in a securities class action (U.S.D.C. Eastern District of New York, 2018).

*Michael Desta, et al. v. Wins Finance Holdings Inc., et al.* Issued a declaration (2018) and provided deposition testimony (2018) on market efficiency and damage methodology in a securities class action (U.S.D.C. Central District of California).

*Andrew Meyer, et al. v. Concordia International Corp., et al.* Issued a declaration (2018), a reply declaration (2018), and provided deposition testimony (2018) on market efficiency and damage methodology in a securities class action. Issued a declaration (2018), a reply declaration (2018), and provided deposition testimony (2018) on loss causation and damages (U.S.D.C. Southern District of New York).

*In re: K12 Securities Litigation.* Issued a declaration (2018) and provided deposition testimony (2018) on market efficiency and damage methodology in a securities class action (U.S.D.C. Northern District of California).

*Robert Colman, et al. v. Theranos, Inc., et al.* Issued a declaration on damage methodology and price impact in a securities class action (U.S.D.C. Northern District of California, San Jose Division, 2018).

*In re: CytRx Corporation Securities Litigation.* Issued a declaration (2017) and provided deposition testimony (2018) regarding market efficiency and damage methodology in a securities class action (U.S.D.C. Central District of California).

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Lord Abbett Affiliated Fund, Inc., et al. v. American International Group, Inc.* Issued a report regarding market efficiency, loss causation, and damages in a securities case (U.S.D.C. Southern District of New York, 2017).

*Xiaolin Chi, et al. v. Qiao Xing Universal Resources, Inc., et al.* Issued a report on damages in a securities class action (District Court of the Virgin Islands, St. Croix Division, 2017).

*John Hosey v. Twitter, Inc., et al*. Issued a declaration (2017) and provided deposition testimony (2017) regarding rebuttal to Defendants' Motion for Summary Judgement in a securities class action (Superior Court of the State of California, County of San Mateo).

*Gwyn R. Hartman Revocable Living Trust v. Southern Michigan Bancorp, Inc. et al.* Issued a report on damages arising from alleged exclusions in a proxy solicitation (U.S.D.C. Western District of Michigan, 2017).

*Fred Kelsey, et al. v. Textura Corporation, et al.* Issued a declaration (2017) and provided deposition testimony (2017) on market efficiency and damage methodology in a securities class action (U.S.D.C. Northern District of Illinois).

*Dave Carlton, et al. v. Fred Cannon.* Issued a declaration on market efficiency and damage methodology in a securities class action (U.S.D.C. Southern District of Texas, Houston Division, 2016).

*James Middlemiss v. Penn West Petroleum LTD., et al*. Issued a report on damages in a securities class action (Superior Court of Justice Ontario, Canada, 2016).

*David Loritz, et al. v. Exide Technologies, et al.* Issued a report on damages and loss causation in a securities class action (U.S.D.C. Central District of California, 2015)

*Manishkumar Khunt, et al. v. Alibaba Group Holding Limited, et al.* Issued a declaration on potential investor damages in a securities class action (U.S.D.C. Southern District of New York, 2015).

*Biotechnology Value Fund, L.P. et al. v. Celera Corporation et al.* Issued a report (2014), a reply report (2014), a supplemental report (2014), and provided deposition testimony (2014) on damages arising from a merger (U.S.D.C. Northern District of California).

*In re: Hi-Crush Partners L.P. Securities Litigation.* Issued a declaration (2014), a supplemental declaration (2014), and provided deposition testimony (2014) regarding market efficiency and damage methodology in a securities class action (U.S.D.C. Southern District of New York).

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Ian Mausner v. MarketByte LLC, et al.* Issued a declaration about investment advisor incentives and liquidity needs in a securities class action (U.S.D.C. Southern District of California, 2014).

*Artes Medical, Inc. v. Lemperle et al.* Provided deposition testimony on behalf of defendants about alleged damages caused by a proxy contest (Superior Court of the State of California, County of San Diego, Central District, 2013).

*In re: Ebix Inc. Securities Litigation.* Issued a declaration (2012) and provided deposition testimony (2013) regarding market efficiency and damage methodology in a securities class action (U.S.D.C. Northern District of Georgia, Atlanta Division).

*Erik Poole and William Rhody v. Alange Energy Corp., et al.* Issued a report (2012) and a reply report (2013) on market efficiency and damages in a securities class action (Superior Court of Justice Ontario, Canada).

*In re: Hecla Mining Securities Litigation.* Issued a declaration on investor losses in a securities class action (U.S.D.C. District of Idaho, 2012).

*Mark Henning, et al. v. Orient Paper, Inc. et al.* Issued a declaration (2011), a supplemental declaration (2012) and provided deposition testimony (2012) regarding market efficiency and damage methodology in a securities class action (U.S.D.C. Central District of California).

*Carlos Munoz et al. v. China Expert Technology, Inc., et al.* Issued a declaration (2012), a supplemental declaration (2012) and provided deposition testimony (2012) in a securities class action regarding market efficiency and damage methodology (U.S.D.C. Southern District of New York).

*Theodore Dean, et al. v. China Agritech, Inc., et al.* Issued a declaration (2012), a supplemental declaration (2012) and provided deposition testimony (2012) in a case regarding market efficiency and damage methodology in a securities class action (U.S.D.C. Central District of California).

*Robert Michael Shenk, Derivatively on Behalf of Sirius XM Radio Inc. v. Melvin Alan Karmazin, et al.* Issued an expert report (2011), a supplemental expert report (2012) and provided deposition testimony (2012) in a case involving damages in a shareholder derivative matter (U.S.D.C. Southern District of New York).

*Pathway Investments Pty Ltd and Doystoy Pty Ltd v. National Australia Bank Ltd.* Submitted a report on survey techniques, the efficient market hypothesis and liquidity in a securities class action (Supreme Court of Victoria at Melbourne, Australia, Commercial and Equity Division, Commercial Court, 2012).

**Exhibit-2**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Bruce Simmonds, Robert Grant and Gordon Moore v. Armtec Infrastructure Inc. et al.* Issued a report on market efficiency and damages in a securities class action (Superior Court of Justice Ontario, Canada, 2011).

*In re: BP plc. Securities Litigation.* Issued a declaration regarding damages and materiality in a securities class action (U.S.D.C. Southern District of Texas, Houston Division, 2010).

*In re: Tripath Technology Inc., Debtor.* Issued a report (2009) and provided deposition testimony (2010) regarding damages arising from Directors' and Officers' breach of fiduciary duty in bankruptcy court (U.S.D.C. Northern District of California, San Jose Division).

*David Ainslie and Muriel Marentette v. CV Technologies et al.* Issued a report estimating damages in a securities class action (Superior Court of Justice, Ontario, Canada, 2010).

*Harry Stackhouse, on Behalf of Himself and All Others Similarly Situated v. Toyota Motor Corporation, et al.* Issued a declaration regarding the relationship between Toyota's U.S. stock price and Japanese stock price in a securities class action (U.S.D.C. Central District of California, 2010).

*Phillip Elliot and William Kormos v. NovaGold Resources Inc., et al.* Issued a declaration in a securities class action regarding trading volume in the U.S. versus Canada. (Superior Court of Justice, Ontario, Canada, 2010).

*International Arbitration between a private equity firm and Chinese biotech company.* Issued a report (2008) and testified (2009) before an International Arbitration Committee regarding the value of a private equity investment.

*Arbitration between Albert Richards and Old Republic Title Insurance.* Deposed regarding estimated damages incurred by plaintiff as a result of a forced sale of Russian securities due to Old Republic's breach of contract (2008).

*Californians United for a Responsible Budget, et al., v. California State Public Works Board, et al.* Issued a report on the cost of issuing revenue bonds to fund California prison expansion (The Superior Court for the State of California, County of Sacramento, 2008).

*Arbitration between Daniel Lyons and Morgan Lyons, and Chinese Hospital Association and Sam English.* Deposed regarding plaintiffs' calculated damages arising from asbestos exposure for plaintiff (2003).